**EXHIBIT A**

## BEFORE THE DEPARTMENT OF EDUCATION
## OF THE STATE OF ALABAMA

GADDIES HILL,                          )
                                       )
                                       )
    Petitioner,                )
                                       )
v.                                     )          SPECIAL EDUCATION NO: 02-109
                                       )
ELMORE COUNTY BOARD                    )
OF EDUCATION,                          )
                                       )
    Respondent.                )
_____)

### DUE PROCESS DECISION

### I.

### <u>Procedural History</u>

A due process hearing was held as a result of a request by the attorney for Petitioner.  The hearing request was dated November 27, 2002.  The request for due process hearing alleged that the school system had failed to develop an individualized education plan (IEP) for the Petitioner which conformed to the Individuals With Disabilities Education Act (IDEA).  The request further alleged that the local education agency had failed to identify and implement an appropriate curriculum for the Petitioner.

A pre-hearing teleconference was conducted on January 24, 2003.  At that time Petitioner's counsel maintained that the school system had failed to provide a free appropriate public education to the child because the education program implemented for the Petitioner was inadequate.  Specifically, the attorney for Petitioner submitted that the curriculum being used for Petitioner's education was inappropriate.  The lawyer for Petitioner also asserted that Petitioner's IEPs did not confer an educational benefit on her

client.

The school system insisted that it had provided a free appropriate public education to the Petitioner. It maintained that the education program and IEPs implemented for the child allowed him to progress satisfactorily in school.

The due process hearing was held on March 11, 2003. It was completed on March 12, 2003.

The Petitioner was represented at the due process hearing by his lawyer. Also present on his behalf was his mother. A representative of the Special Education Action Committee (SEAC) attended the hearing.

At the request of the parent, the hearing was open. However, all witnesses were sequestered in accordance with the demand of Petitioner's counsel.

Present on behalf of the Elmore County Board of Education was its Special Education Director. The Board was represented by its attorney.

II.

## Issues Presented

Counsel for the Petitioner alleged that the special education program designed for Petitioner by the Elmore County Board of Education did not meet the unique needs of the child. The lawyer criticized the content, methodology and delivery of the instruction provided by school officials to Petitioner. According to her, the content of Petitioner's course of study (his curriculum) had not been modified to meet the needs of the child.

Counsel also maintained that the IEPs developed for the child for the 2001-2002 school year and the 2002-2003 school year were inappropriate or improperly written.

2

The attorney for the school system submitted that the child's curriculum was designed to provide educational benefit. He maintained that the IEPs written for the child had allowed the child to progress both with respect to his academics and his behavior.

### III.

### Statement of Facts

The Petitioner is fifteen years old. He was born on December 4, 1987. He is the son of Juanita Corbett. Petitioner lives with his mother in Wetumpka, Alabama.

The Petitioner suffers from moderate to severe mental retardation. (Petitioner Exhibit 3)(hereinafter referred to as P. ___). His intelligence quotient (IQ) is 39. Petitioner is also speech and language impaired. He has received special education services since he has been enrolled in public schools.

Petitioner entered the Elmore County school system at the beginning of the 2000-2001 school year. He is presently assigned to Wetumpka Junior High School. He attends the eighth grade.

The psychologist for the school system testified that when Petitioner transferred to the Elmore County school system he was considered for eligibility for special education services. No curriculum recommendations were made at that time. Instead, school personnel reviewed the Petitioner's IQ, assessments and progress at the system that he previously attended in determining whether it would be necessary to modify the curriculum for him. Based on the information reviewed it was felt that Petitioner could progress to the second grade level in academic subjects.

At that time Petitioner was also referred for occupational therapy services. (Board

3

Exhibit 13)(hereinafter referred to as Bd. ___). The occupational therapist did not evaluate Petitioner with respect to activities that were directed to daily living skills. She determined that direct occupational therapy services provided by her to Petitioner were not necessary. She was available to consult on a program of occupational therapy for Petitioner as was needed. (P. 1 p.131). According to the occupational therapist, Petitioner's teachers and aides could provide occupational therapy to Petitioner. The occupational therapist recommended that Petitioner engage in fine motor coordination activities at school. School personnel have undertaken to have Petitioner engage in activities designed to improve his fine motor skills.

The school psychologist agreed that Petitioner needed a behavioral intervention plan because his behavior impeded his learning. Consequently, after Petitioner enrolled in the Elmore County school system a behavior management plan was developed to address Petitioner's non-compliant behavior. (P. 1 p.68, 131).

After an initial assessment of the child, it was determined that the goals for Petitioner should revolve around basic independent living skills. School personnel expected that Petitioner would live in an assisted living environment and would work in extremely structured workshop settings. Petitioner's IEP team recommended continued emphasis on Petitioner's functional academic skills in order for him to develop independence in his daily activities. Part of that goal was for Petitioner to be able to comply with the instructions of those who taught or supervised him.

The school psychologist said that with those goals in mind the child has engaged in pre-school activities. (P. 2, 4 and 5). Those activities include coloring pictures and tracing

4

and copying letters and numbers. The psychologist thought that Petitioner should continue with such activities.

The primary focus during much of the current school year has been to try to teach Petitioner his name, his telephone number, his street address and his mother's name. The school psychologist believed that those and other pre-school activities were appropriate for the child.

The special education teacher who served as Petitioner's case manager and who taught him math said that Petitioner's curriculum is essentially that which would be used for a pre-school student. She acknowledged that although that curriculum was the primary means of instructing Petitioner, the child does not know all of his body parts, he cannot unlock a door and he cannot tie his shoe. The math special education teacher explained that school personnel had tried to provide general education courses to the Petitioner similar to those that would be provided through the junior high school curriculum but brought to Petitioner's level. She commented that school system employees had adopted the course work to Petitioner's abilities as best they could.

School personnel are also working on Petitioner's toileting skills. Those skills are part of his behavior intervention plan. (P. 1 p.83). The toileting skills being taught Petitioner include acting appropriately when using the bathroom, not disturbing or glaring at those students who are using the bathroom at the same time as Petitioner and shutting the bathroom stall door when Petitioner uses the toilet.

According to the Petitioner's language arts special education teacher Petitioner's mother wanted her child to be able to read. Consequently, school officials have worked to

5

achieve that result.  The language arts teacher believed that the child eventually would be able to read a short phrase.  The teacher added that it was decided by the IEP team that the Petitioner should be taught to write his name because it was difficult to understand his speech.  His ability to write his name would enable the Petitioner to identify himself should it be necessary to do so.

Petitioner's math special education teacher testified that her activities with Petitioner are designed with the goal of allowing the Petitioner to work in a structured environment and to comply with the instructions of supervisors.  Included in those goals are Petitioner learning to write his name and address.  The math teacher, however, admitted that she had neither analyzed nor was she qualified to analyze how that goal would enhance Petitioner's potential job skills.

Petitioner's language arts teacher wanted Petitioner to  recognize his name in case an accident occurred which would require that he identify himself.  Other than writing his name the language arts special education teacher had not analyzed how the language art instruction that she provided Petitioner would relate to job skills that Petitioner might need if he were employed.  Petitioner's language arts teacher added that she did not believe that Petitioner could work independently in the community.

Although both the language arts teacher and the math teacher said that certain vocational skills were being taught to the child, the IEPs for Petitioner did not disclose what those skills were.

A professor of special education at the University of Alabama at Birmingham, Alabama testified as an expert for the Petitioner.  This witness stated that the use of a

6

traditional pre-school curriculum such as that being implemented by school personnel was totally improper for Petitioner. (P. 1 p.192-197). He expressed that the program being provided by the Elmore County Board of Education had conferred no educational benefit to the child. The professor of special education emphasized that school officials should examine what Petitioner's skills are and his areas of strength. They should then determine what are appropriate goals in regard to those areas of skill and strength and how those goals could best be achieved. He commented that Petitioner's teachers should examine what the Petitioner can do, not what he cannot do.

On cross-examination the professor of special education admitted that many persons in the special education field would not criticize the examination of a mentally retarded child's deficits - as opposed to his strengths - in implementing an education program for the child. The witness also acknowledged that there were views in the special education field that supported the use of a pre-school curriculum for mentally retarded youngsters such as Petitioner. He agreed that some of the specific techniques that school personnel had attempted with Petitioner had conferred educational benefit to the child.

The professor of special education believed that Petitioner could work independently in the community provided that he was exposed to community activities. This gentleman expressed that Petitioner needed to learn survival skills such as being able to lock a door, operate a microwave, use a telephone, call 911 and take care of himself if he sustains a cut or other minor injury.

The psychologist for the school system agreed that life skills should be taught to Petitioner. The psychologist recognized that as Petitioner grew older the necessity of

learning those skills would become more important than having Petitioner work in academic areas. The school psychologist expressed his opinion that although Petitioner could not yet write his name he was capable of learning by sight survival words such as exit, stop, men, etc.

According to the school psychologist the education program described in the individualized education plans (IEPs) for the 2001-2002 and 2002-2003 school years was adequate to permit academic progress on the part of Petitioner. The school psychologist did not feel that the changes suggested by the expert witness for Petitioner were warranted.

Petitioner's special education math instructor reported that as a consequence of her work with Petitioner during the 2002-2003 school year Petitioner had improved in a number of areas. Those areas included his manners, his interaction with other children, his eating habits, his personal hygiene, his toileting skills and his ability to call his mother by her correct name (as opposed to her nickname). The teacher added that Petitioner could say a partial address and telephone number. He can also go about the school campus without supervision. She remarked that Petitioner listens better and is more compliant with instruction. The teacher expressed that Petitioner's IEP was sufficient for him to make educational progress. According to her, some of the benchmarks contained in the IEP such as toileting skills had been achieved by the Petitioner.

Petitioner's language arts special education teacher also testified that Petitioner's IEP was sufficient to allow him to make educational progress. She said that Petitioner's mother had agreed to the IEP. The teacher admitted that school personnel were

8

attempting activities for Petitioner that were not specified in his IEP but felt that those activities were helpful to the child's education program. She remarked that Petitioner had progressed. She stated that Petitioner can say some letters. She added that his writing has improved. Although he cannot write, when Petitioner traces his letters and words he stays on the lines of the letters and words that he is tracing. (Bd. 1 and 4). Petitioner's toileting skills have improved as well. He washes his hands most of the time when he completes that function.

The special education teacher who works with Petitioner on his fine motor skills stated that she has seen improvement in the Petitioner's assignments. Petitioner now has the ability to color within the lines of a picture and his ability to trace letters has improved. (Bd. 5). The teacher also taught Petitioner science and social studies. According to her, Petitioner improved in those subjects.

Nonetheless, the school psychologist admitted that despite the years that Petitioner has attended school he has made only minimal progress in his pre-academic activities. He cannot write his entire name or his address. He cannot recognize numbers or letters. (P. 1 p.163). He can only count to three. (Id.)

The Petitioner was tested in April, 2002 and again in October, 2002 when he was reevaluated. Tests administered to Petitioner revealed an IQ of 39. The April, 2002 achievement test showed that Petitioner had made no gains in spelling, reading and arithmetic. (P. 1 p. 126-29). The achievement test conducted in October, 2002 showed only slight gains in one subject, arithmetic. (P. 1 p. 166). It was acknowledged by all of the school personnel who testified on the subject that as far as Petitioner's standard scores

9

were concerned there was no progress.

Moreover, an adaptive behavior evaluation scale showed serious levels of concern in all areas in which Petitioner received instruction. (P. 1 p.141). The school psychologist reported that although Petitioner had shown improvement in his social skills, the child had not experienced any significant progress in academic areas. Still, this individual believed that the child could benefit from a continuation of his present instruction.

An Alabama Alternate Assessment performed in 2002 revealed that Petitioner had made no progress in any area of instruction except in self-care/living skills. (P. 1 p.88). That was true despite the fact that Petitioner spends most of his school day in special education resource rooms served by a teacher and an aide.

Petitioner's language arts special education teacher said that the IEP committee for Petitioner's 2002-2003 school year reviewed his April, 2002 wide range achievement test results. The Petitioner had zeros in spelling and reading. For that reason his IEP did undergo a substantial revision in the area of language arts. (Compare P. 1 p.64 with P. 1 p.75).

Petitioner's special education math teacher admitted that the child had made little progress in reading or language arts between the 2000-2001 school year and the 2001-2002 school year. (Compare P. 1 p.45 with P.1 p.64). Much of the work in the those years was directed to Petitioner's ability to say the ABC's. Petitioner was retained in the seventh grade as a result of his inability to progress satisfactorily. This year, Petitioner entered the eighth grade. His special education math teacher stated that it was decided that the child would try to learn his name and address. At that time school personnel ceased to work on

his ABC's and focused on encouraging Petitioner to write his name. That effort has not been successful. On occasion Petitioner can write three letters of his first name. The writing, however, is virtually illegible. (Bd. 3 and 4).

According to the professor of special education who testified as an expert witness for Petitioner, the child is not progressing in his academics. As an example, he commented that the child entered the Elmore County school system with an IQ of 62. His IQ is currently measured at 39.[1] Other evidence in support of this witness' assessment of Petitioner's lack of progress included the fact that Petitioner is no longer capable of performing many of the activities that it was reported that he could do when he entered the Elmore County school system. (P. 1 p.92-114).

The testimony was also conflicting regarding improvements in Petitioner's behavior. Petitioner's language arts special education teacher testified that there were reduced incidents of his hitting other children or inappropriately touching them. There were, however, two incidents of cursing and aggression by the child during the 2002-2003 school year. The language arts teacher said that each of those episodes were addressed in an appropriate manner.

The math special education teacher admitted that on another occasion she struck Petitioner on the arm after he cursed.

Petitioner's school counselor stated that she provided counseling to Petitioner two to

---

[1] It appeared from the evidence that the IQ test provided to the Petitioner by his former school system was not the same as the IQ test which was used by Elmore County Board of Education officials to measure Petitioner's IQ. (Bd. 6 and 7). The Elmore County Board of Education used an IQ test designed to determine nonverbal intelligence. (Bd. 8).

three times a month. She discussed with him responding appropriately to other persons who may be in the bathroom, closing the door when he finishes in the bathroom and washing his hands afterward. She used role playing to accomplish those goals. According to her, Petitioner has improved to the point that he can perform satisfactorily in all of the areas that they worked on.

Similarly, Petitioner's special education math teacher expressed that Petitioner's behavior had improved. Petitioner does not hit other children as often as he did. He has engaged in appropriate conduct in group settings. Still, she acknowledged that his behavior remained a problem and that school personnel have had to contact Petitioner's mother about it. She added that most of the incidents of misbehavior occurred during the 2001-2002 school year rather than the present school year.

On the other hand, Ms. C. testified she was contacted by school officials three or four times a week concerning her son's misbehavior. She complained that she was told on a number of occasions to come and pick-up Petitioner from school. She acknowledged that many of those incidents occurred during the 2001-2002 school year.

The professor of special education who testified was also critical of the individualized education plans used with respect to the child. He explained that the student was in a self-contained special education classroom despite the fact that the IEPs disclosed that Petitioner received all of his special education services with his non-disabled peers. The witness also reported that transition services for the young man were entirely absent from the 2001-2002 IEP even though such services were appropriate for Petitioner. In the 2002-2003 IEP the transition services identified were inappropriate because they

12

did not encompass an effort to expose the Petitioner to the community and community activities.

The professor of special education continued by stating that although grades were used to mark the child's progress, information reflecting mastery of specific skills would have been more appropriate. He noted that an assessment of Petitioner's educational program appeared to be entirely subjective. The IEPs disclosed a lack of specificity and measurable standards. For example, in math Petitioner's grades were determined by whether Petitioner was compliant or completed his worksheets. In language arts the grades were assigned on the basis of task completion as opposed to mastery of a specific skill.

Because there was no relevant curriculum for the Petitioner, the special education professor expressed that the school system had failed to establish present levels of performance and meaningful annual goals for the Petitioner in the IEPs. This gentleman testified that the IEPs for the Petitioner failed to meet the standards required by IDEA.

The testimony of the special education math teacher reflected other discrepancies with the child's IEPs. On the 2001-2002 IEP Petitioner's math was stated to be oral. There was no mention of his ability to write numbers. The benchmarks in several areas of instruction were for the end of the year instead of a set period such as the first grading period. (P. 1 p.63). On the math portion of the IEP the present level of performance was incomplete. (Id.). In the language arts section the IEP did not indicate how many new words Petitioner would learn. (P. 1 p.64).

The IEPs for 2001-2002 and 2002-2003 did not contain any present level of

13

performance, goals or benchmarks for the subjects of social studies and science. Although the math special education teacher said that Petitioner was being instructed in vocational type skills, the IEPs did not reveal the nature of that instruction or what skills were taught. Indeed, the math teacher admitted that the IEPs did not contain that information and should have been changed.

In addition, the math teacher acknowledged that she had misstated that least restrictive environment portion of the IEPs by indicating that Petitioner received special education services with his non-disabled peers when in fact his only exposure to his non-disabled peers was during his physical education class and lunch time. (P. 1 p.69 and 84).

The math teacher also admitted that the IEPs did not address a number of skills identified by Petitioner's former school system as necessary for the child to master at the time that Petitioner enrolled in the Elmore County school system in August of 2000. (P. 1 p.93-116).

Although Petitioner receives counseling and apparently has for some time, the math teacher recognized that that information was not contained in Petitioner's 2002-2003 IEP until an addendum was added later in the year. (P. 1 p.85).

The 2002-2003 IEP specifies that the transition service for Petitioner will be that he take the LCCE (Life Centered Career Education) program at the end of the school year. (P. 1 p.71). However, that program requires a third grade reading level so that Petitioner is unable to access the LCCE curriculum.

Finally, the 2002-2003 IEP specifies that daily progress notes would be provided to Petitioner's mother. (P. 1 p.70). The testimony and written evidence disclosed that Ms. C.

14

had received those notes only on a sporadic basis.  (P. 7).

## IV.

## Discussion of Issues

Special education is defined as instruction designed to meet the unique needs of the child.  Those needs include an examination of content, methodology and delivery of instruction.  It was agreed by the parties that the content (or curriculum) used for an individual should be modified to meet the unique needs of the child.  A curriculum should bring a student to a desired outcome or goal which must be based on his/her strengths, areas of disability, progress and interests.  In this instance the curriculum used by Board employees did not meet the unique needs of the child.  Although the school system has provided a pre-school academic curriculum to the Petitioner it is apparent that he cannot be adequately educated by that means.

The decision in Board of Education Hendrick Hudson School District v. Rowley, 458 U.S. 176 (1982) makes it clear that a local education agency is only required to confer "some" educational benefit to a child who is entitled to special education services.  E.g. J.S.K. v. Hendry County School Board, 941 F. 2d 1563 (11th Cir. 1991)(a system can demonstrate that it is providing educational benefit when it can show that a student is making measurable and adequate gains in the classroom).  The benefit conferred need not be maximized to be adequate.  E.g. Devine v. Indian River County School Board, 2001 WL 460511 (11th Cir. 2001).  Thus, it is apparent from the decision in Rowley and cases decided since it that a school district is not required to provide an optimum program for a child, but only one from which a child can receive measurable and adequate educational

15

benefit. However, the educational benefit to a child must be more than "de minimus." Doe
v. Tullahoma City Schools, 9 F. 3d 455, 459 (6th Cir. 1993).

Based on the evidence presented it is apparent that the educational benefit provided
to this child by his program is de minimus. It does not meet the rather low threshold stated
by Rowley. The child is not achieving significant progress in his studies. Instead, it is
apparent that Petitioner needs services - whether they be called transition services or
otherwise - that will enable him to function when he completes his schooling with the
Elmore County Board of Education. His education program should be directed to activities
that promote movement from school to post-school activities, such as employment and
independent living. The services that he should be provided by his education program
should be coordinated and directed toward a specific outcome. The strengths and
interests of the Petitioner should be taken into account in the selection of the services to be
provided to him by the local education agency. Such steps have not been undertaken by
the school system at the present time.

A proper IEP is essential to the provision of a free appropriate public education. The
content of the IEP document is important. It should contain a statement of the child's
present level of educational performance. The statements in the IEP should cover
academic and non-academic areas. The IEP should be written in objective terms to the
extent possible, typically with the data from the child's evaluation. Deficiencies indicated
by the present levels of educational performance should be addressed both by the goals
and objectives and by the special education and related services listed on the IEP.

Annual goals and short-term instructional objectives are a second mandatory

16

component of an IEP. The goals and objectives are not as specific as those found in instruction plans but they must provide a mechanism for determining whether the placement and services are enabling the child to make educational progress. Annual goals or statements should describe what the child can reasonably be expected to accomplish during the year in the special education program. Short-term instructional objectives are measurable, intermediate steps between the child's current levels of educational performance and the annual goals. The goals and objectives must be written before placement and may be revised only at another IEP meeting.

A third required component of the IEP is a statement of the particular special education and related services to be provided to the child, with the dates for initiation and duration of the service and a statement of the extent to which the child would be able to participate in regular education programs. The IEP is a commitment by the school district to provide those services free of cost, either directly or by another public or private agency.

A fourth component of the IEP is transition services for students beginning at fourteen years of age (or younger if appropriate). Those services should be designed to allow a student to function in society once he or she completes their education.

Courts have held that IEPs which fail to state the specific educational services provided or which are inappropriate are invalid. See Cleveland Heights City School Dist. v. Boss, 1998 WL 219758 (6th Cir. 1998); Thornock v. Boise Indep. School Dist., 767 P. 2d 1241 (1988) cert. den'd, 490 U.S. 1068 (1989). Failure to have a proper IEP may result in a finding that the school district has not provided a free appropriate public education.

In this case the evidence disclosed a number of deficiencies in the Petitioner's IEP

for both the 2001-2002 school year and the 2002-2003 school year.  Consequently, the IEPs did not fulfill the mandatory standards required of an IEP by IDEA.

## V.

## Conclusions

The school system is relying on a pre-school curriculum to educate Petitioner.  The primary focus of the curriculum is to teach Petitioner to say and write his name, address and telephone number.    At present the Petitioner cannot write his name.  He cannot recognize numbers or letters. Thus, it is apparent that the school system's approach has not been successful.  It has conferred little - if any - educational benefit upon Petitioner. He is not making progress.  The educational program implemented by the local education agency is not working.  It is time to try something different.  The school system should implement a curriculum designed to enable Petitioner to earn a living and to engage in independent - albeit assisted - living.

The Board of Education argued that the choice of the curriculum to be implemented by a local education agency is a question of methodology which in the area of special education courts and hearing officers have generally avoided interjecting their views. Board of Education Hendrick Hudson School District v. Rowley, 458 U.S. at 207 (courts must be careful to avoid imposing their view of preferable educational methods).  For example, school personnel envision Petitioner working in a sheltered workshop so that they directed his activities to that goal.  Petitioner's expert disagreed with that goal, believing that Petitioner could work in the community.  Similarly, employees of the Board have Petitioner repeat information (name, address, etc.) over and over again so that Petitioner

18

will learn by repetition.  Petitioner's expert expressed that there were better uses of Petitioner's time.  However, in this case the selection of the curriculum for Petitioner is fundamental to the manner in which Petitioner is to be educated during his remaining years in the public school system.  Consequently, its choice transcends mere philosophical differences on how Petitioner should be educated.  Petitioner's need for a life skills curriculum is essential to his receipt of a free appropriate public education.  For that reason an IEP should be written and implemented that meets that approach.

In this case Petitioner's IEPs were improperly written.  It suffices to say that there were a number of deficiencies contained in them.  None of those deficiencies by themselves would indicate a denial of a free appropriate public education but taking them in their totality it must be concluded that the school system violated Petitioner's right to a free appropriate public education by not drafting and implementing appropriate IEPs.  That failure goes beyond the mere fact that school officials chose to implement a curriculum different than that demanded by Petitioner's counsel or that determined by the Hearing Officer in this decision.  For example, social studies and science were not addressed in the IEPs.  The least restrictive environment statement contained in the IEPs was false.  The math and language arts components of the 2002-2003 IEP contained the same isolated goals of saying and writing Petitioner's name and address and are virtually indistinguishable.  There are no other goals that relate to potential skills that would permit employment of the Petitioner or assist him in basic living.  That was true despite the fact that school officials maintained that they were assisting Petitioner in regard to those areas.  For that reason the inadequacies of the IEPs must be deemed a failure by the Elmore

19

County Board of Education to provide a free appropriate public education to the Petitioner.

## VI.

### Specific Findings

1.      The IEP for the 2001-2002 school year was improperly written and thus violated Petitioner's right to a free appropriate public education.

2.      The IEP for the 2002-2003 school year was improperly written and thus violated Petitioner's right to a free appropriate public education.

3.      The local education agency is providing an inappropriate curriculum to the Petitioner. That curriculum is not designed to provide educational benefit to the Petitioner. Accordingly, within fourteen (14) days of this decision an independent educational placement team shall convene to construct an IEP with measurable outcomes designed to prepare Petitioner for life after school. That IEP will include a transition component and a functional foundation incorporating community based education. The school system is urged to consult with appropriate outside individuals to develop such a program. The school system should also consult with its occupational therapist to determine activities which are necessary for Petitioner to live and work as independently as possible. Those activities shall be designated in Petitioner's IEP. To the extent that an occupational therapist is required to assist Petitioner in those activities the school system shall provide that assistance as a related service.

## VII.

### Notice of Appeal Rights

Any party dissatisfied with the decision may bring an appeal pursuant to 20 U.S.C.

§1415(e)(2).  The party dissatisfied with this decision must file a notice of intent to file a civil action with all other parties within thirty (30) calendar days of the receipt of this decision.  Thereafter, a civil action must be initiated within thirty (30) days of the filing of the notice of intent to file a civil action.

     DATED this the _____ day of April, 2003.


                      _____

                      Wesley Romine
                      Hearing Officer

cc:    Susan DePaola
       Houston Howard
       Emily Graham