# TRANSCRIPT

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 253

```
 1   go back and wash his hands and then come back
 2   He now knows his mother's correct name.
 3   Instead calling of her Cookie, he will now call
 4   her Juanita. Only he says, Fanita, which is very
 5   close. People will know what he's saying.
 6   Q   What work did you do with that regard?
 7   A   Say again.
 8   Q   What work did you do with Gaddies to get him to be
 9       able give his mother's correct name?
10   A   I would pull him out individually, take him into
11       the kitchen. Keep saying his mother's name over
12       and over and ask him his mother's name. I also
13       have put that all on a tape. He listens to that
14       tape, I would say, approximately maybe three or
15       four minutes, just about nothing but his name, his
16       mother's name, his dad's name, his address and
17       phone number and address.
18   Q   If you ask him his mom's name, what will he say?
19   A   Fanita Corbett.
20   Q   If you say, what is your address, what will he
21       say?
22   A   He does not know the number, but he knows it's on
23       Trace Road, Wetumpka, Alabama.
```

Page 254

```
 1   Q   If you ask him his telephone number, can he recite
 2       that?
 3   A   Yes, he can. In fact, I gave him a watch, because
 4       he could say it.
 5   Q   Over what period of time did you work with him on
 6       those skills, name, address, parents' name, phone
 7       number, before he could master them?
 8   A   It's taken him from August of this year until I
 9       think around the middle of January or possibly the
10       latter part of January.
11   Q   Now, in your view, are those skills that are
12       needed for him to have any sort of vocational
13       opportunity?
14   A   I view those as -- yes, that they are needed
15       skills
16   Q   All right. What other progress has he made?
17   A   Okay. He now knows how to get from my room to the
18       office of the school -- and that's quite a
19       distance -- by himself without supervision,
20       without, you know, making any detours. And he
21       also could go to the library and get a book, check
22       out a book by himself, and make it back.
23   Q   And over what period of time did you work with him
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 255

```
 1   on those skills?
 2   A   I and Mrs. Selmar and the counselor has been
 3       working on those skills since the beginning of the
 4       year.
 5   Q   All right. What other progress have you seen?
 6   A   Uhm, he actually knows how to count to six on the
 7       Touch Math chart.
 8   Q   Okay.
 9   A   And he can write the first three letters of his
10       name, G-A-D. And he also listens better now,
11       where before he didn't want to listen. But he
12       will pay enough attention to where he is
13       listening.
14   Q   And in regard to his name, what work have you done
15       with him on attempting to write his name?
16   A   Last year, it was tracing the letters. And me
17       putting my hand over his to go (indicating), you
18       know, to write the letters of his name. This
19       year, I am asking him to -- at the very beginning
20       of the year, I asked him to put just a G on there,
21       because I knew he could do that. And now, I am
22       requiring him to put a G-A-D.
23   Q   He is able to do that?
```

Page 256

```
 1   A   Yes.
 2   Q   And any other progress you have seen?
 3   A   Well, there probably is, but I -- I don't remember
 4       all of it.
 5   Q   Now, do you use a system of rewards in trying to
 6       help him progress?
 7   A   Yes, I do.
 8   Q   And you mentioned a watch earlier. What other
 9       types of reward systems have you used?
10   A   I have given him cocoa when he does things right.
11       Especially washing the dishes, I have given him
12       cookies and cocoa. I have given him cupcakes.
13       He's been able to buy -- using points that he
14       earns in class, he's been able to buy things from
15       my store, which is like pencils and papers and
16       erasers, crayons, and things like this.
17   Q   Now --
18   A   And I think I even had some cars, too, that he
19       liked.
20   Q   I think I asked you earlier about the number of
21       kids in your class last year. How many kids are
22       in your class this year during the period that
23       Gaddies is there?
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

**Page 257**

```
 1   A    There are 13.
 2   Q    And I asked you about the aide last year.  Is the
 3        aide in your class full-time this year, or how
 4        does that work?
 5   A    No, she is only with me my first period.  That's
 6        my largest class.
 7   Q    And when Gaddies leaves at the end of first
 8        period, does she leave with Gaddies?
 9   A    She leaves with Gaddies and goes to the next
10        period class, which is Ms. Selmar.
11   Q    Where Gaddies is?
12   A    Yes, language.  Wherever Gaddies and the other
13        four children go, she goes.
14   Q    What is that aide's name?
15   A    Pardon?
16   Q    What is the aide's name?
17   A    Mrs. Tate.
18   Q    Now, I want to talk about the behavior plan on
19        page 83, Petitioner's Exhibit 1 under the first
20        tab.  Did you prepare that?
21   A    Yes, I did.
22   Q    The type of problems, behavior problems, that you
23        were observing last year with Gaddies, are you
```

**Page 258**

```
 1        observing those this year?
 2   A    No.  No, I'm not.
 3   Q    And in your judgment, is the behavior plan working
 4        as you would expect it to work?
 5   A    Yes.
 6   Q    Okay.
 7   A    Now, sometimes, you know, there has been good
 8        days, and there has been not so good days.  But
 9        the majority of the time, nine times out of ten,
10        yes, sir, it is working.
11   Q    Now, the complaint has been made that the
12        activities for Gaddies that are in the IEP are
13        geared toward a preschooler.  Do you think those
14        are appropriate for Gaddies?
15   A    Yes, I do.
16   Q    And why is that?
17   A    Well, number one, he tested out -- he already had
18        about a 60 -- I don't have the scores in front of
19        me.  But, anyway, he had about a 69 or 63 or
20        something like that previously.
21   Q    Yes, ma'am.
22   A    And as I was working with him, I noticed that
23        that's the level that he was working with.  So,
```

**Page 259**

```
 1        that's why I'm working there, still.
 2   Q    Okay.  The level where he was functioning?
 3   A    The level where he was actually functioning is a
 4        preschool level, yes.
 5   Q    And in your judgment, is the IEP sufficient to let
 6        him make educational progress?
 7   A    Yes, it is.
 8   Q    And the benchmarks in Gaddies this year's IEP,
 9        have any of those been met?
10   A    Yes, they have.
11   Q    And call the page number and tell us the ones that
12        have been met.
13   A    Page 121, the first two have been met.
14   Q    And read those into the Record, please.
15   A    MS. DePAOLA:  Page 121?
16        THE WITNESS:  Yes.
17   Q    The Bates stamp, not the handwritten number.
18   A    Page 73 is the stamp number, and page 121 is the
19        handwritten number.
20   Q    Read in the Record the ones that he has met.
21   A    The ones he has met?  Gaddies will, by the end of
22        the first semester, be able to go in the restroom
23        and perform toileting needs by himself with
```

**Page 260**

```
 1        supervision.
 2   Q    Has that been met?
 3   A    That has been met.
 4   Q    What else?
 5   A    Gaddies will, by the end of the second semester,
 6        will go into the restroom and perform his
 7        toileting needs by himself without supervision.
 8   Q    And that is being met right now.
 9   Q    Any others you are aware of that have been met?
10   A    I know the counselor has been seeing him and
11        working with him with the toileting and the --
12        also in closing the doors.  And I've got that
13        listed here nine out of ten times.  I need to get
14        her records from her to, you know, more accurately
15        judge that.
16   Q    Okay.
17   A    I understand, too, from his mother, that he is
18        able to go to the restroom by himself with the
19        door not completely closed, but opened, but just a
20        crack.
21   Q    You've taught other students similar to Gaddies.
22        haven't you?
23   A    Yes, I have.
```

Page 261

```
 1  Q  Do you think Gaddies will be able to live
 2     independently as an adult?
 3  A  No.  No.  Gaddies will not.  Gaddies will need to
 4     have supervision.
 5     Now, then, that's my opinion as of right now.
 6     That's all I can tell you.  He may be able to
 7     mature and be a little wiser by the time he leaves
 8     high school.  I cannot judge that.
 9  Q  Did you meet with Dr. Gargiulo?
10  A  Yes, I did.
11  Q  How long did he meet with you?
12  A  Outside of class, about five minutes, I think.
13  Q  Was he in your class?
14  A  Yes, he was.
15  Q  How long was he in your class observing your
16     class?
17  A  Uhm, approximately ten to 15 minutes.
18  Q  Okay.
19  A  And part of that time, it was a tornado drill for
20     ten minutes.  He watched me get the kids where
21     they were supposed to be for safety, go through
22     what they were supposed to be doing, reminding
23     everybody where their head was supposed to be, and
```

Page 262

```
 1     waiting until the bell rang to dismiss us from
 2     there.
 3  Q  Now, did Dr. Gargiulo ask you questions?
 4  A  Yes, he did.
 5  Q  When?
 6  A  Right after the children left.
 7  Q  What questions did he ask you?
 8  A  He asked me questions about the tape that I was
 9     using with Gaddies, which he had just got there,
10     and Gaddies had just taken off his earphones.
11  Q  You mean, the one about his name and address and
12     parents' name?
13  A  Right.  And there is a little bit more on that
14     tape.  It goes over the days of the week.  It goes
15     over how many days of the months there are.  It
16     also goes over some -- just some songs and things
17     that we did that was a carryover from last year.
18     Like the Tooty Ta song, which is an exercise song.
19     And I do get them up, and we perform the Tooty Ta
20     song.
21  Q  What else did he ask you about?
22  A  He also wanted to know if he ever got to work on
23     any kind of technology-type things.  I said, yes,
```

Page 263

```
 1     we work on some Jump Starts on the computer.
 2  Q  Okay.  What --
 3  A  It was a kindergarten program.  And -- the Jump
 4     Start is.
 5  Q  What else did he ask you about?
 6  A  He -- let's see -- also wanted to know if we did
 7     any kind of pre-voc with Gaddies.  And I said,
 8     yes, we have been.  And I took him into the
 9     kitchen so that he could see the kitchen.  He was
10     amazed about how large it was.  But he thought it
11     was a nice kitchen.  I told him what Gaddies had
12     been doing.
13  Q  So, you all had not been doing prevocational work
14     with Gaddies while Dr. Gargiulo was there?
15  A  No.
16  Q  But he asked about if you did it?
17  A  Right.
18  Q  What else did he ask about?
19  A  He wanted to see some work, past work.  So, I
20     showed him the work that he did that day.
21  Q  What was the question he asked you?
22  A  He just was wanting to see some papers that
23     Gaddies had completed so that he could see what
```

Page 264

```
 1     kind of worksheets I was working with him on that
 2     particular day.
 3  Q  And you showed him that?
 4  A  Yes, I did.
 5  Q  Anything else he asked you about?
 6  A  I don't remember anything else.
 7  Q  Now, I'm looking at some things that are in his
 8     report, which probably is going to be admitted
 9     into evidence.  So, I'm going to ask you about
10     those.  Did he ask you whether Gaddies was making
11     progress?
12  A  Oh, yes, he did.
13  Q  What questions did he ask you in that regard?
14  A  He just wanted to know if Gaddies had been making
15     progress.  And I tried to list a few things that
16     he had right off the top of my head.
17  Q  Did you ever tell Dr. Gargiulo that you attributed
18     all of that progress to maturation?
19  A  I said some of it is maturation, yes, I did.  I
20     think that was the only word that he heard me say.
21  Q  What else did you tell him about the progress?
22  A  Did he ask anything else about it?
23  A  I don't remember anything.
```

---

Mary Moore-Wynn     Court Reporting Services     (334) 244-0203

Page 265

```
1  Q  How did it come up that you said some of it was
2     attributable to maturation?
3  A  Oh, he wanted to know, you know, what Gaddies
4     could do, could he achieve any of the things that
5     I was with working with Gaddies on?
6  Q  So, what was the question he asked you?
7  A  Verbatim?
8  Q  Best your memory, that led you to say that.
9  A  He just wanted to know what were some of the
10    things that I had been working on Gaddies and I
11    had seen as an improvement.
12 Q  Some of the things you were working on when he was
13    not there?
14 A  Yes, that's what I contribute it to.
15 Q  Did he ask about any particular time frame?
16 A  No.
17    MR. HOWARD: Those are all my questions.
18    FURTHER DIRECT EXAMINATION
19 BY MS. DePAOLA:
20 Q  Did Dr. Gargiulo ask you about toileting behavior,
21    and you responded in relation to maturity
22    affecting the toileting behavior?
23 A  Yes, I told him that that probably contributed to
```

Page 266

```
1     some -- to the reason why he's doing so well.
2  Q  So, he's met that goal at least in part because
3     he's older?
4  A  Right. Not only because he's older, but because
5     we have been working with him.
6  Q  And you said he had a 63 --
7  A  I didn't have an exact.
8  Q  I'm not pinning you down to a number. Don't get
9     defensive. In that ballpark -- talking about IQ
10    when you said 63?
11 A  Yes, I was.
12 Q  And that you were teaching him at that level,
13    because that's the IQ you were using or --
14 A  That's what I remember. But, no, I'm actually
15    going below 63 level to teach him, because that's
16    his functioning level. I'm teaching on him on
17    functioning level.
18 Q  Well, you somehow related to the prior 63 and I'm
19    teaching him on that level?
20 A  I'm sorry. I don't --
21 Q  Well, the Hearing Officer will be able to read it.
22    Now, all these prevocational things that
23    you're telling us about, these all -- assuming
```

Gaddies Hill     March 12, 2003     Elmore County Board of Education

133 (Pages 265 to 266)

---

Mary Moore-Wynn     Court Reporting Services     (334) 244-0203

Page 267

```
1     they occurred, I don't know quite what they are --
2     but this is all after I filed the request for due
3     process hearing on November 27; is that correct?
4  A  Some of them are, yes.
5  Q  Well, you said second semester. And that's after
6     November 27 --
7  A  Yes. Yes.
8  Q  -- and so --
9  A  Well, actually, it was after his birthday, because
10    he was showing -- when he came back to school.
11    So, yes, it would be second semester in January.
12 Q  It would be after I filed this request for a
13    hearing?
14 Q  Did you amend his IEP to identify any of these
15    pre-vocational skills?
16 A  No, because I was told not not to do anything until --
17    because this due process was going on.
18 Q  So, you just changed his program on your own
19    without the consent of any of the parties?
20 A  We were going to be going that way, anyway. Yes
21    ma'am, I guess I did.
22 Q  Okay. Okay. Let me ask you, you also said now
23    you've taught him to blow his nose, wipe the
```

Page 268

```
1     drool, button and zip?
2  A  I said he has improved in that area.
3  Q  Okay. I'd just like you to look at an exhibit for
4     me.
5     Because, if you look at the Brigance that they
6     finished when he was in Tallassee, for instance,
7     on page 104, it says he can wipe his nose without
8     verbal queues back in 1999?
9  A  Well, I'm sorry.
10 Q  Page 104. Is that right?
11 A  I see that it's there. That's what it says.
12 Q  And then --
13 A  But he could not do that.
14 Q  So, he forgot, or you don't know?
15 A  Probably he just forgot.
16 Q  You said you taught him to button and zip. It
17    looks to me like on page 103, he knew how to
18    button and zip.
19 A  Well, he was buttoning. But he would like take a
20    button, and it will be -- he would get one higher
21    or one lower is what he was doing.
22 Q  But he could button, and he could zip?
23 A  He could button and zip. But, now, he actually
```

Gaddies Hill     March 12, 2003     Elmore County Board of Education

134 (Pages 267 to 268)

1 buttons the correct way, instead of getting one
2 button up higher or lower than the other.
3 Q And it says on page 106 that in 1999 he knew his
4 first name, full name, age, sex, town, city,
5 birthday. Are you saying that you have just
6 taught him these things?
7 A I am just saying that he could not tell us that
8 last year. That's the difference between last
9 year and this year. Only thing he would say would
10 be, Gaddies, not the whole name.
11 Q Well, in here it says he knows it; isn't that
12 correct?
13 A In here it may say he knows it, but, ma'am, he did
14 not know his full name.
15 Q In 2000 when he left Tallassee, it states, knows
16 his full name.
17 Let me ask you this: Are you teaching him to
18 say Juanita Corbett?
19 A Yes, ma'am, he can say that.
20 Q Is there some problem with him calling his mom
21 Cookie?
22 A No. But if he was going to -- if he had to report
23 to a policeman, they would not know who Cookie

1 Corbett was. But they could look up Juanita
2 Corbett.
3 Q She is in the phone book? Is she in the phone
4 book?
5 A I don't know.
6 Q Okay. Now, this thing about going to the office
7 without supervision and going to the library and
8 checking out a book, that's not in his IEP, is it?
9 A No, it isn't.
10 Q He's actually never supposed to be unsupervised,
11 is he?
12 A He is supposed to be supervised up to a point.
13 Q I thought the IEP said he was supposed to be
14 supervised at all times?
15 A Only if there was one available.
16 Q If available?
17 A Yes, she was available. And she was staying way
18 behind him so that she could watch, otherwise, I
19 wouldn't know that he could do that.
20 Q Now, isn't it true that last year -- or was it
21 this year -- that you sent home the note saying, I
22 had to hit Gaddies today? Was that this year or
23 last year?

1 A I don't know. It may have been this year.
2 Q And why did you hit him?
3 A Because he was cussing, and he would not stop.
4 Q How did you hit him, on his face?
5 A No, I did not. It was on his arm. Right there
6 (indicating).
7 Q And it was serious enough that you wrote a note
8 home to Ms. Corbett --
9 A The reason why I told her that was because I knew
10 that he would probably blow it up by the time he
11 got home. It was not a very much of a hit. It
12 wouldn't leave a mark.
13 Q Is there anything in the IEP about corporal
14 punishment?
15 A No, ma'am, there is not.
16 Q It's not part of you're behavior plan, is it?
17 A No, it is not.
18 Q Would you say cussing is associated with his
19 mental retardation and lack of social judgment?
20 A I think it is not due to his mental retardation,
21 no, ma'am. I think it maybe might the social
22 judgment.
23 Q Don't you think that children that are mentally

1 retarded are also retarded in the area of social
2 judgment?
3 A It depends on how they were raised at home.
4 Q Just the home's fault?
5 A No.
6 Q It has nothing to do with the mental retardation?
7 Is that it?
8 A I don't know.
9 Q Now, isn't it true that last year you were calling
10 Ms. Corbett all the time to come get Gaddies?
11 A Yes, I was.
12 Q Every week there would be one or two days when
13 Gaddies was actually excluded from school?
14 A Yes. The year before, he was done that way,
15 also --
16 Q Okay. And these --
17 A -- from what I understand.
18 Q -- were exclusions for behaviors?
19 A Yes.
20 Q For behaviors associated with his disability?
21 A No. I think Gaddies knows right from wrong.
22 Q Tell me what behaviors he's being excluded for.
23 A Hitting other students.

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 275

1 she just come to your room and pick him up and go?
2 A It has been done both ways.
3 Q Did you provide the best work samples you could
4 find to Mr. Howard when he asked you to give him
5 some work samples?
6 MS. DePAOLA: I'm assuming that's where
7 you got them. Is that where you
8 got them?
9 MR. HOWARD: No.
10 MS. DePAOLA: Where did you get them?
11 MR. HOWARD: The exhibits that I gave
12 you here in the last few days right
13 before the deadline came from
14 Ms. Ross, okay. The other things I
15 gave you, I simply asked to be
16 provided the office file and the
17 teacher file. And that's what I
18 was given whenever those documents
19 were provided to me.
20 The color copies I gave you
21 last week or so came from Ms. Ross,
22 not from the -- are we
23 communicating, Susan?

Page 276

1 MS. DePAOLA: Yeah.
2 Are you going to mark --
3 MR. HOWARD: I've got exhibit numbers on
4 them.
5 MS. DePAOLA: Here are Board's
6 Exhibits 1, 2, 3, 4, 5. They are
7 already marked, and I'm putting
8 them in.
9 (Whereupon, Board's Exhibit 1, was
10 marked for identification and is
11 attached hereto.)
12 THE HEARING OFFICER: Call the date.
13 Q Board's Exhibit 1, have you ever seen Gaddies do
14 that kind of work, which is dated August 7, 2002?
15 A I have not seen this particular paper, but I have
16 seen Gaddies do this type of work.
17 Q Is that typical of his work?
18 A Yes, it is.
19 Q And Board's Exhibit 2, which is another tracing of
20 his name dated February 12th, '03; is that typical
21 of his work?
22 (Whereupon, Board's Exhibit 2 was marked
23 for identification and is attached

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 273

1 Q Now, you just said earlier that's in his behavior
2 intervention plan. That's an issue?
3 A That was last year, yes, ma'am.
4 Q So, you're sending him home for hitting other
5 students, which is in his behavior intervention
6 plan, right?
7 A I would have to check it out. I can't say for
8 last year.
9 Q Someplace in here you said he hit another student
10 Page 60, tends to become aggressive towards other
11 students when he's in the restroom?
12 A Yes.
13 Q So, is that like hitting?
14 A Yes, it is, because they are laughing at him.
15 Q So, hits them, and then he gets sent home?
16 A At that point in time, yes, ma'am, I thought it
17 was best to get him out of the room.
18 Q How much would you estimate that Gaddies was out
19 of school last year, being sent home?
20 A I don't know.
21 Q Twice a week?
22 A I don't know.
23 Q Once a week?

Page 274

1 A I honestly couldn't tell you. I did not keep any
2 records on that.
3 Q Who has the records on how much Gaddies was
4 excluded last year?
5 A As far as his absence?
6 Q No, as far as when you called Ms. Corbett and
7 said, come get him.
8 A That is not held against him at all.
9 Q Well, he loses education, doesn't he?
10 A Yes, he does.
11 Q So, I guess it is held against him. They don't
12 keep any record of it?
13 A If he is checked out by his mother, we do not take
14 that away from him as far as his absence.
15 Q You just don't keep a record? You send him home
16 whenever you want to if he's him somebody, and you
17 don't keep a record, is that it?
18 A That's right. I don't.
19 Q When you said, I don't, does anybody?
20 A They will -- if she goes through the office and
21 checks him out, yes, they do, they would have that
22 record in the office.
23 Q Is she required to do that when you call, or does

Page 277

1  hereto.)
2  A  As to what I get from Mr. Gaddies right now, the
3  first G-A-D looks pretty good, yes.
4  Q  Those are all traced, aren't they?
5  A  Yes, they are. I can definitely see an
6  improvement.
7  Q  How about Board's Exhibit 3, which is dated August
8  13th, '02, what is the purpose of that sheet, do
9  you know?
10  (Whereupon, Board's Exhibit 3 was marked
11  for identification and is attached
12  hereto.)
13  A  No, ma'am, I don't.
14  (Whereupon, Board's Exhibit 4 was marked
15  for identification and is attached
16  hereto.)
17  Q  Okay. How about Board's Exhibit 4, which is dated
18  October 15, '02, do you know what the purpose of
19  that is?
20  A  Learning to color red.
21  Q  Okay. Learning the color red?
22  A  And counting the apples.
23  Q  Let's just look at this Brigance. He already knew

Page 278

1  red, didn't he?
2  A  He knew red, yes.
3  Q  Did you look at the Brigance?
4  A  Yes.
5  Q  He knows most of his colors, didn't he?
6  A  Yes.
7  Q  So, I guess it's not to learn the color red? What
8  was the other thing you said?
9  A  Counting the apples or whatever they are.
10  Q  Okay. Can he count that many?
11  A  Yes, he can.
12  Q  And is that a sample of his handwriting, his
13  writing his name; G-A-D, do you see a G-A-D there?
14  A  I see a G. I see an A. I do not see a D.
15  (Whereupon, Board's Exhibit 5 was marked
16  for identification and is attached
17  hereto.)
18  Q  This is Board's Exhibit 5, dated January 27, '03.
19  Do you know what the purpose of that activity is?
20  A  No, ma'am, I don't.
21  Q  He knows his color brown, doesn't he?
22  A  Yes, he does. They may have been talking about
23  animals that day.

Page 279

1  Q  Now, are you saying that Gaddies can't do these
2  things because his mother isn't working with him?
3  You were saying, I send stuff home, and she
4  doesn't do it right?
5  A  No, she works with him.
6  Q  Okay. She works hard with him, doesn't she?
7  A  Yes, she does. I am assuming that she does, yes.
8  Q  His lack of educational progress, you're not
9  attributing that to something Ms. Corbett has
10  done; is that right?
11  A  No.
12  MS. DePAOLA: I don't have any other
13  questions.
14  A  She wants him to work. She tries to cooperate
15  with us, up to a point.
16  FURTHER CROSS-EXAMINATION
17  BY MR. HOWARD
18  Q  Ms. King, on a student like Gaddies, even with the
19  skills they have mastered, will they suffer
20  regression if they do not do any more work in
21  those areas?
22  A  Yes, they will.
23  Q  So, after a child like Gaddies learns, for

Page 280

1  instance, his name and address, can you just never
2  give him any further training in that area?
3  A  If I was not to repeat that, he would -- he would
4  eventually lose it if somebody somewhere did not
5  keep it up.
6  Q  Same thing about colors; is that the same --
7  A  That would be with the colors, also, yes.
8  MR. HOWARD: That's all.
9  THE HEARING OFFICER: All right. That's
10  all for you. You can go.
11  THE WITNESS: Thank you.
12  THE HEARING OFFICER: Who is the next
13  one?
14  MR. HOWARD: That's up to Susan.
15  THE HEARING OFFICER: Ms. Selmar.
16  MS. DePAOLA: Okay.
17  JOANN SELMAR
18  (Whereupon, the witness, after having first
19  been duly sworn to speak the truth, the whole truth,
20  and nothing but the truth, took the stand and
21  testified as follows:)
22
23

Page 281

```
 1          DIRECT EXAMINATION
 2   BY MS. DePAOLA
 3   Q   Ms. Selmar, my name is Susan DePaola. I represent
 4       Gaddies Hill and his mother, Juanita Corbett. I
 5       really don't have a lot of questions for you. I
 6       just had a few.
 7   A   Okay.
 8   Q   You are currently his language arts teacher?
 9   A   Correct.
10   Q   Were you his language arts teacher last year?
11   A   Last school year?
12   Q   Yes, ma'am.
13   A   No.
14   Q   And who was his language arts teacher last year;
15       do you know?
16   A   I can't really recall. I want to say he was
17       self-contained, but I'm not really sure.
18   Q   Okay. So, this year when you got Gaddies, how did
19       you go about assessing where to start with him?
20   A   With his reading, or with his language, basically,
21       I looked at the tests that he had taken, which was
22       the WRAT. And I looked at that information. I
23       knew that the students that were in Ms. King's
```

Page 282

```
 1       classroom were lower functioning, so, basically,
 2       we looked at his -- I looked at -- along with
 3       Ms. King -- at some of his other scores.
 4   Q   Okay. The WRAT you're referring to was the Wide
 5       Range Achievement Test given in April of 2002; is
 6       that right?
 7   A   That's correct.
 8   Q   And as I understood that score --
 9   A   Correct.
10   Q   Well, not 2002. She gives the test every year.
11   A   Well, okay, last spring would have been April of
12       2002, right?
13   Q   Oh, okay. I thought you said one. Okay.
14   A   No.
15   Q   And, if I can put my finger on it -- as I
16       understand it -- let me just approach you real
17       quickly and tell you how we are -- these are the
18       exhibit numbers we're looking at. And as I
19       understand it, this is Exhibit Number 126.
20   A   So, I have to turn?
21   Q   Yes, ma'am.
22   A   Okay.
23   Q   As I understand it, that's the test from
```

Page 283

```
 1       April 2002, given by Ms. King. He had a zero in
 2       letters. Name and letter writing was zero?
 3   A   Correct.
 4   Q   Okay. So, what did you decide to teach him in
 5       light of that score?
 6   A   Well, when -- when I saw the information,
 7       basically, I discussed with Ms. King, after
 8       looking at his IEP, some of the things that he
 9       needed to work on.
10   Q   When you said, looking at his IEP, are you talking
11       about last year's IEP, or the one for this year?
12   A   The IEP that's written -- written for this year.
13   Q   So, you didn't participate in preparing it?
14   A   No.
15   Q   Let me ask you this: You don't really believe
16       that Gaddies is going to learn to read, do you?
17   A   I believe that there is a chance that Gaddies will
18       be able to put some words together, yes. Not a --
19       you know, not all at one time, no. But in small
20       steps, Gaddies can -- you know, just like when --
21       at the beginning of the school year, we work on
22       different kinds of sentences. Well, of course,
23       Gaddies does not understand a telling sentence and
```

Page 284

```
 1   Q   His speech?
 2   A   His speech. Correct. And I looked at the test,
 3       and I told Ms. King that I had spoken to
 4       Ms. Corbett some time ago, and that she had
 5       expressed concern that Gaddies had, you know, made
 6       an A in a previous school, and she couldn't
 7       understand why he couldn't read. And so, knowing
 8       that, I wanted to be able to work with him in
 9       reading, but it was important for Gaddies to be
10       able to write his name and understand the letters
11       of the alphabet, according to this, because I knew
12       that in order for any of his test scores to prove
13       that he's capable after achieving success, that I
14       needed to work on some of those basic skills.
```

Page 285

1 an asking sentence, or anything of that nature.
2 But, at, you know, seventh and eighth grades, the
3 terms are different; they have changed. So, what
4 I did during that time, basically, I had, the cat
5 runs. And that's a sentence. So, basically,
6 Gaddies may not know how to manipulate those, but
7 through memory, Gaddies can put those three words
8 together to formulate a sentence. And I think the
9 more he sees that, he will be able to put it
10 together.
11 But to say he can read, you know, a big
12 book --
13 Q Well, now, if we bring Gaddies in here, and we put
14 out the words, the cat run, you're telling the
15 Hearing Officer that he can read them now?
16 A I'm not saying he can read them, now, no.
17 Q Haven't you, in fact, told Ms. Corbett that you
18 really don't think Gaddies is going to be able to
19 read?
20 A No, I did not.
21 Q Have you developed an opinion about whether he is
22 going to be able to learn phonics?
23 A Have I developed an opinion that he can learn

Page 286

1 phonics?
2 Q Uh-huh.
3 A I believe that Gaddies can listen to tapes and,
4 you know, learn some of the sounds, yes.
5 Q Okay. You're not teaching him any of them, are
6 you?
7 A I do teach some of the sounds. I have Hooked On
8 Phonics that I allow him to listen to.
9 Q Is this in his IEP anywhere?
10 A No, it's not in his IEP.
11 Q And so we have no present level of performance as
12 to his knowledge of phonics; is that right? We
13 have no measurable annual goal? We have no
14 benchmarks? We have no progress report?
15 Q For phonics?
16 A Sure.
17 Q No.
18 Q The only thing we have is a goal that relates to
19 writing his name?
20 A That's the goal that his mother wanted. But his
21 mother sent phonics tapes to me and wanted me to
22 allow Gaddies to listen to them. So, I do have --
23 Q Is she a professional educator?

Page 287

1 A She is not a professional, but that's what she
2 felt would help Gaddies, as well.
3 Q Okay. Now, are you teaching him to write his name
4 and address so he can fill out a job application
5 or what?
6 A I'm teaching Gaddies to write his name, because I
7 think it's important. And Gaddies wants to write
8 his name.
9 Q It's important for what? That's what we're
10 concerned about.
11 A Well, it's important for Gaddies. Gaddies feels
12 that if he is writing his name, he is doing the
13 same thing that the other children are doing in
14 the classroom. So, I don't want to isolate him.
15 Q So, it's just an emotional thing?
16 A Well, I wouldn't say it's an emotional thing.
17 Q Pardon?
18 A I don't think so.
19 Q You're just doing it so Gaddies will feel better
20 about himself?
21 A No, just to help Gaddies recognize his name. And
22 in case there is an accident or something to
23 occur -- and the reason I'm stating this is that I

Page 288

1 have been involved where there was an accident.
2 There was a mother; there was a child. And
3 because mother could not talk, child -- you know,
4 what is your mother's name? And the child is
5 saying mama. When I first met Gaddies, Gaddies is
6 saying, Cookie. I had no idea who Cookie was.
7 Q No, we're on writing his name.
8 A Right. So, what I am saying is, it's important in
9 case of an accident, or somebody saying, we can't
10 understand him, maybe he can write his name and
11 tell us. And then that's one way to identify who
12 this child is, who his parents are.
13 Q Have you ever seen an identification card for a
14 child?
15 A I have.
16 Q I guess that would pretty well solve that problem,
17 right?
18 A It could, yeah.
19 Q Have you considered any jobs that Gaddies might be
20 able to do in the future?
21 A I ask Gaddies all the time what he would like to
22 do when he grows up.
23 Q No, I'm saying --

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 289

```
1   A   And so, basically, I base my opinion on what --
2       you know, some of my opinion on what Gaddies would
3       like to do, because, they have to be happy with
4       what they are doing. And I will always try to
5       encourage Gaddies, well, Gaddies, think about
6       working in a store maybe. I don't know. But he
7       would always tell me, he wants to clean house. Or
8       he wants to be like dad. And I say, what is that?
9       And then he may say, a farmer. I say, oh, your
10      dad is a farmer?
11  Q   Okay. From that outcome, have you done any
12      curriculum analysis to determine what you need to
13      teach him so he can be a farmer, or so he can
14      clean houses?
15  A   We work on different skills. I have -- Gaddies
16      told me at one time he wants to be a cook. So,
17      during some of my classes on Friday, I may take
18      the class to the kitchen. And we may make a cake.
19      And I try to teach them that if you want to go
20      into the bakery field, or if you want to be a chef
21      or a cook, you need to learn some of these skills.
22  Q   Okay. Have you put any of this into his IEP
23      directed at Gaddies?
```

Gaddies Hill    March 12, 2003    Elmore County Board of Education

145 (Pages 289 to 290)

Page 290

```
1   A   No, I have not.
2   Q   So, there is nothing individualized about what you
3       just described, you took the class and did a
4       cooking exercise?
5   A   That's part of a hands-on activity. Just
6       something that we do.
7   Q   Okay. But as far as language arts, you have done
8       no analysis of what skills are needed for Gaddies
9       to do a job that he can actually perform?
10  A   No more than talking with Ms. Howard at the high
11      school, because I know that when Gaddies leaves
12      our school, she requires that we work with the
13      students on certain skills, because she said in
14      order for the children to have success once they
15      come over there, that we need to work -- you know,
16      they need to know their name. They need to know
17      how to spell their name. They need to know their
18      address and phone number.
19  Q   So, you're just relying on some other person as to
20      what --
21  A   But she is a professional and has been working
22      with that level of children --
23  Q   Has she ever met Gaddies?
```

Gaddies Hill    March 12, 2003    Elmore County Board of Education

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 291

```
1   A   I think she has met Gaddies
2   Q   Do you know --
3       THE HEARING OFFICER: Now, who is she at
4       the high school?
5       THE WITNESS: Ms. Howard.
6       THE HEARING OFFICER: What does she do?
7       What's her job?
8       THE WITNESS: She is a special ed
9       teacher over at the high school
10      MS. DePAOLA: I don't have any other
11      questions.
12      THE HEARING OFFICER: All right.
13      Houston, do you have some
14      questions?
15      CROSS-EXAMINATION
16  BY MR. HOWARD
17  Q   Ms. Selmar, what education do you have?
18  A   Master's.
19  Q   And how long have you been teaching special ed?
20  A   I have been teaching six years.
21  Q   And has all of that been here?
22  A   Here at Wetumpka Junior High.
23  Q   Now, when during the day do you have Gaddies?
```

Gaddies Hill    March 12, 2003    Elmore County Board of Education

146 (Pages 291 to 292)

Page 292

```
1   A   I have Gaddies during the second block.
2   Q   And that is from what time to what time?
3   A   Gaddies arrives at my room between 9:30, sometimes
4       he may get there at a quarter til
5   Q   And when does he leave?
6   A   He leaves at 11:15 sometimes 11:20 or 11:30.
7   Q   And how many children do you have during that time
8       period?
9   A   I have 12.
10  Q   Is there an aide that comes with Gaddies?
11  A   There is an aide.
12  Q   And what are the functioning levels of those other
13      students?
14  A   They vary. I have a nonverbal child. Another
15      child that may be at Gaddies' level, maybe, and
16      then I have -- the levels vary. I have students
17      on third grade reading level, fourth, and first
18  Q   Okay. Now, you've discussed some of the
19      activities that you have worked with Gaddies
20  Q   This is your first year with Gaddies, is that
21      right?
22  A   This is my first year with Gaddies.
23  Q   And what all activities have you done with him
```

Page 293

1  over the course of this year, or types of
2  activities?
3  A  We do a lot of hands on. Gaddies enjoys being
4  read to. Basically, I try to provide books that
5  according to the accelerated reading test that he
6  was given, which was like a point five -- like
7  preprimer. So, I tried to have books of that
8  nature for Gaddies.
9  Q  That you read to him or the aide?
10 A  That I will read or the aide will read.
11 Q  Okay.
12 A  We get occupational books. We do different
13    activities that pertain to the month, like
14    January. You know, made snowflakes and things of
15    that nature.
16 Q  Okay.
17 A  I have other books. I have a handwriting book
18    that Gaddies works in. He doesn't work in that
19    handwriting book daily. But he works in the book.
20    And I have other books that I have put together to
21    try to help with Gaddies' writing.
22 Q  Now, over the course of the time that you have had
23    Gaddies from the beginning of school up until now,

Page 294

1  have you noticed any progress?
2  A  Yes.
3  Q  In what areas?
4  A  In the writing, Gaddies can -- he still -- he does
5    not know the alphabet. He can say some of the
6    letters. I think he gets confused, or he may get
7    excited a lot of times. But with the writing, he
8    is not going all over the paper like he when I first
9    got him. I started off trying to teach Gaddies
10   how to write straight lines, slants, and that in
11   order to write the alphabet, so that we could work
12   with his name.
13 Q  Okay.
14 A  So, that has improved. I mean, he's staying
15   within the line.
16 Q  Okay.
17 A  When I personally worked with Gaddies, I would
18   place my hand by the letters so as to guide him.
19   So, at first, he used to push that away. But,
20   now, he allows, you know, me to guide him with
21   that.
22 Q  What other areas?
23 A  With the toileting, you know, that was a big thing
   that Ms. King wanted, and the committee wanted us

Page 295

1  to work on. And his mother felt that that was
2  something that we needed to work on. And so, I
3  suggested that with the drooling that he had -- he
4  had a problem with drooling. So, I told Ms. King
5  that we basically need to have him just to
6  constantly swallow it. And he know -- instead of
7  saying, Gaddies, wipe your face, wipe your mouth.
8  So, that's an improvement.
9  Q  I'm trying to get you to go through the areas.
10 Toileting, did you work with Gaddies on toileting?
11 A  Yes, I do every day.
12 Q  What work have you done with him on toileting?
13 A  With that, Gaddies -- I can stand at my door and
14   make sure that no other student has entered the
15   restroom. Gaddies will go down to the restroom by
16   himself. I will at that point go down, because he
17   has said I can do, Selmar. I said, okay. I said,
18   okay. After he goes, I will go down to watch him,
19   because it's only like from maybe here to there
20   (indicating). He goes in. He now closes the
21   door, whereas at first he used to leave the door
22   open. If guys were in the restroom, he used to
23   stand there and stare at them. And that used to

Page 296

1  cause a problem. So, now Gaddies can go in. If a
2  teacher allows her class to come to the restroom,
3  I may tell that group but you cannot go in, but
4  one student can go in. Gaddies does not stare.
5  He will go in, take care of his business, wash his
6  hands, and come out. And he will say, am I okay?
7  And I say, yes, Gaddies. So, then he will follow
8  me on back to the room.
9  Q  But will he come out fully clothed?
10 A  Yes, he's coming out fully clothed now. At one
11   point, he used to come out with maybe his pants
12   half zipped. Or one time he didn't have his shirt
13   all the way in, stuff like that. So, he's more
14   mature about how he's supposed to look when he
15   comes out of that stall.
16 Q  Any other areas where you have noticed
17   improvement?
18 A  He eats snack during my classroom. At one time,
19   he used to just take the stuff -- the snack, and
20   just constantly, you know, shove it in his mouth.
21   And he would be like the first one through. I
22   would say, Gaddies, take your time. You need to
23   enjoy that. So, he has slowed up.

Mary Moore-Wynn

1 Q Is that something you have worked with?
2 A Yes, I have worked with Gaddies on that.
3 Q How so?
4 A Because his mother sends him money. And so,
5 basically, the money -- we allow him to choose
6 whatever snack he wants and the drink. And so,
7 you know, basically, I'll say, Gaddies, do you
8 need a napkin? He'll say, yes, ma'am. He'll get
9 a napkin. And then I will give him chips and his
10 Coke.
11 Q Any other areas where you have noticed progress
12 this year?
13 A Gaddies gets -- I mean, he used to hit the
14 children. You know, and I think it was Gaddies
15 playing, but they were not taking it as a playful
16 touch or whatever. So, that's an improvement.
17 Q Now, have you worked with him in regard to his
18 behavior?
19 A Yes, I try to work with him with that.
20 Q Have you had any behavior problems with this
21 year?
22 A I've had the incidents -- the incident -- one
23 where he cursed -- well, actually, it was on two

1 occasions, but -- he cursed. I wrote him up. And
2 I called his mother. Sent a note home in the
3 planner, let her know that he had cursed. And,
4 you know, just tried to ask her, where is he
5 getting it from, this and that.
6 Q Any other -- other than that one incident?
7 A I -- let's see. I know he cursed. And then he
8 made the gesture as to jump at me one day when I
9 had allowed him to go to the restroom, and I was
10 there. And he went into the restroom without
11 permission. And I said, Gaddies, I told you not
12 to go into that restroom, because at that time
13 when he entered, there were a lot of guys in the
14 restroom. So, when he came out, and I was
15 explaining it to him, I said, just come on, follow
16 me. He walked to my room. When we got almost to
17 the door, he said, Selmar, and I said, yes,
18 Gaddies. He did like that (indicating). And I
19 said, don't you ever do that. And he looked at me
20 and he -- I said, because you really don't
21 understand what you have done. I said, you can do
22 that to the wrong person, and then I'm afraid you
23 may get hurt. And he said, mad at you, Selmar. I

Mary Moore-Wynn

1 said, that's okay, Gaddies.
2 I called his mother, and I informed her that,
3 you know, what Gaddies had done. And I told her
4 that she needs to talk with him. And that on that
5 particular incident, I would not write Gaddies up.
6 But I would write a note to the school's counselor
7 and let her know, you know, that she needs to work
8 with me in trying to help Gaddies realize that a
9 lot of things that he may be doing -- you know, he
10 really does not know the seriousness of it.
11 Because if he does that to one of the guys, you
12 know, that's passing, they could take that as, oh,
13 he's going to fight. You know, because their
14 tempers are so short.
15 Q Are those the only two behavior issues you have
16 had?
17 A Those are the only two. So, he has really
18 improved.
19 Q Was there a planner that you used with Gaddies at
20 the first of the year?
21 A There is a -- well, yeah, there was a planner.
22 Q And how was it used?
23 A Basically, the planner is used as a communication

1 device between the teachers and the parent to let
2 them know what the child is doing, you know. And
3 the parents are supposed to initial the planner,
4 or, you know, if they want to respond, they can
5 write a response. Or if I'm sending homework,
6 I'll send -- you know, I'll let you know. If the
7 child is sick, I'll say, Gaddies didn't feel good,
8 or you know, whatever.
9 Q Do you know where it is?
10 A We do not know where the planner is.
11 Q Where was it last time you saw it?
12 A Gaddies had it. It was in -- you know, placed in
13 his book bag.
14 Q Was it ever returned?
15 A That particular one was not. So, after --
16 Q Don't want to go into all of that.
17 A That one was not, the original planner.
18 Q All right. And he had it last?
19 A He had the planner last year.
20 Q Prior to that, he had been taking it home and
21 bringing it back every day?
22 A Yes, he had been taking it home. Ms. Corbett
23 would write notes or whatever that she wanted us

Mary Moore-Wynn        Court Reporting Services        (334) 244-0203

Page 301

1    to know.
2    Q    Did you have any discussion with Ms. Corbett about
3    it?
4    A    I asked her about the planner. She said that she
5    didn't know where the planner was. She said it
6    could have gotten lost on the bus; that Gaddies
7    has a habit of taking it out and looking at it on
8    the bus. But we never found the planner.
9    Q    Do you use a reward system in controlling Gaddies'
10    behavior?
11    A    Gaddies, in my classroom, is really not a behavior
12    problem. Like I said, he -- when he first came to
13    my class, Gaddies used to, you know, hit the
14    children. But, presently, Gaddies comes in, and
15    he's more of a helper. So, in my opinion, Gaddies
16    has progressed tremendously from being a child
17    that's constantly hitting and touching
18    inappropriately to someone who is very
19    compassionate.
20    Q    In your opinion, is his IEP sufficient to allow
21    him to make educational progress?
22    A    His IEP is, because what is stated in the IEP, and
23    what we as the educators wanted to do --

Page 302

1    Mrs. Corbett expressed to me -- I know the one
2    thing that she talked about was the Touch Math.
3    And she said that, you all think Gaddies has it,
4    but he's not ready for it. He's not ready for it.
5    And so her concern at that time in which I
6    became involved in the IEP was, you know, he
7    wasn't getting OT, and the Touch Math, the math
8    was too hard. And she basically wanted -- you
9    know, in the meeting, we were saying, well, are
10    you happy with this? And I basically was telling
11    her about the importance of Gaddies' name and him
12    being able to write as well as he be able to talk, so
13    that we could understand him more clearly. And so
14    when she agreed, I assume that she was in favor of
15    what was written.
16    Q    Did Dr. Gargiulo observe Gaddies in your class?
17    A    He did.
18    Q    About how long was he in your class?
19    A    He was in my classroom, I guess, approximately 90
20    minutes.
21    Q    And how was Gaddies' performance that day?
22    A    Excuse me?
23    Q    How did Gaddies perform that day insofar as --

Mary Moore-Wynn        Court Reporting Services        (334) 244-0203

Page 303

1    A    Gaddies was on task, but he knew that there was
2    someone different in the classroom, so, he -- you
3    know, kept looking away. But for the most part,
4    he stayed on task.
5    Q    Now, was there a story that you read to Gaddies
6    during that visit?
7    A    I did.
8    Q    And what was it about?
9    A    The story was about a pig wearing a cap. And,
10    basically, the stories that I read or that I have
11    Ms. Tate to read are just everyday stories,
12    stories to find out if a child can relate by
13    providing you with background information, and
14    being able to -- basically, being able to retell
15    it back to me in his own words.
16    Q    Now, the complaint has been made that this story
17    was, I guess --
18        THE HEARING OFFICER. Houston
19        (Brief interruption)
20        THE HEARING OFFICER. Now, what were you
21    saying? I totally lost your last
22    question

Page 304

1    BY MR. HOWARD
2    Q    The complaint has been made that the stories were
3    too juvenile or the subject was not age
4    appropriate for Gaddies. Do you think that that
5    complaint is justified?
6    A    I do not.
7    Q    Why is that?
8    A    Because, first of all, the story -- and according
9    to what Gaddies' mental level is, that story is
10    appropriate.
11    Q    Okay.
12    A    Gaddies, you know, can relate to that story. He
13    can tell you about a cow. He can tell you if that
14    makes since, that particular cow wearing a cap.
15    It's important. It's just like reading. You
16    know, we read different stories to children. The
17    Dr. Seuss series would not be considered an
18    appropriate story to read to Gaddies, but Gaddies
19    enjoyed reading the story.
20    Q    Why do you say it wouldn't be considered
21    appropriate?
22    A    Because Gaddies can understand that. You don't
23    want to read something that is so above his

Page 307

1  wrote his name on it?
2  A  That does not. But I don't know whose work that
3  is.
4  Q  That's not Gaddies -- you don't know if that's
5  Gaddies' --
6  A  No, what I am saying is -- are you asking me if
7  that is some of my work that I gave --
8  Q  Is that Gaddies' name?
9  A  Gaddies writes similar to that.
10  Q  That's what you think is writing his name?
11  A  No, I'm saying that that, you know, that looks
12  like some of what Gaddies can do.
13  Q  One thing you said that's interesting, you said
14  sometimes Gaddies does not realize the seriousness
15  of what he does.
16  A  Uh-huh.
17  Q  You were talking about cursing or hitting, not
18  sure which. Do you think that's associated with
19  his being mentally retarded?
20  A  I think that -- no, because I -- I mean, Gaddies
21  knows better.
22  Q  Okay. So, you don't think his mental retardation
23  in any way affects his social judgment?

Page 308

1  A  It could have an affect, because he's -- I mean,
2  children at -- I guess, you know, at that level,
3  and being that he's considered to be like at the
4  preprimer level, children do have a tendency when
5  they are that young to hit or whatever. But as
6  far as the cursing, no, I don't think so.
7  Q  Why? Why would that be any different; that he not
8  have good judgment about whether to curse or when
9  and where to do something like --
10  A  Well, because I know for a fact that Gaddies
11  understands cursing. Because if I say, Gaddies,
12  what did you say? Oh, nothing, Ms. Selmar,
13  nothing. So, he knows right from wrong.
14  Q  And several of the activities that you mentioned
15  today, being occupational books and listening
16  comprehension and months of the year, none of this
17  is in his IEP; is that correct?
18  A  That is not his IEP
19  MS. DePAOLA: That's all.
20  Q  But --
21  A  I'm sorry?
22  Q  I was just going to say, it's not in his IEP, but
23  when we write our lesson plans, we have to take

Page 305

1  understanding that, you know, if you were to
2  question him, he could not respond appropriately.
3  Q  Now, did Dr. Gargulo ask you questions?
4  A  Oh, I can't think.
5  Q  What questions did he ask you?
6  A  He asked me how did I assess Gaddies' grades. And
7  then he basically asked me about the story.
8  Q  He asked you about how you assess grades?
9  A  Uh-huh.
10  Q  Anything else you were asking him asking you about
11  that didn't occur while he was in class?
12  A  Huh -- had he asked me a -- it wasn't a whole lot.
13  But right now, I just don't quite remember
14  everything. I know he asked me about assessing
15  Gaddies' grades. He also asked about the story.
16  He asked me was that a typical -- was that how
17  Gaddies normally acted on a daily basis. And I
18  told him, no.
19  MS. DePAOLA: I can't hear you.
20  A  And I told him, no, normally, you know, because he
21  said, oh, I could tell that he was just constantly
22  off task as far as looking. I said, well, he
23  knows that there is a new face in the room. So,

Page 306

1  he kept constantly looking back at the rear table.
2  Q  Anything else that you remember him asking you
3  about?
4  A  Oh, I can't think.
5  MR. HOWARD: Those are all my questions.
6  THE HEARING OFFICER: Any follow up?
7  FURTHER DIRECT EXAMINATION
8  BY MS. DePAOLA
9  Q  When you say writing improved, what you're saying
10  is that he can trace better, aren't you?
11  A  He can trace a little bit better, plus the can
12  write the G, and he can write the A.
13  THE HEARING OFFICER: The G and A are
14  the two he can write?
15  THE WITNESS: Excuse me?
16  THE HEARING OFFICER: He can write a G
17  and an A?
18  THE WITNESS: The G is better than what
19  it has been, yes. And then with an
20  A, I will say, Gaddies, draw a
21  circle, kiss the back. So, if I
22  say that, he knows --
23  Q  Let me show you Exhibit 4. Has that got where he

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 309

1   into consideration the curriculum, the school's
2   curriculum. And I know that the IEP is for
3   Gaddies. But so that Gaddies will not just be
4   sitting there writing his name, writing his name,
5   all the time, we take time to try to incorporate
6   some of the other activities, so that he will not
7   feel left out.
8   Q   Well, you understand that all of this is supposed
9       to be in his IEP?
10  A   I understand that his IEP is written for him and
11      that we are supposed to make sure that we are
12      addressing that. So, you're telling me that
13      nothing else we're supposed to address?
14          MS. DePAOLA: I don't have any other
15      questions.
16          THE HEARING OFFICER: All right. Let me
17      ask you, I'm now missing --
18          MS. DePAOLA: I've got them.
19          THE HEARING OFFICER: Oh, okay.
20          MS. DePAOLA: I've got 6, 7, 8.
21          THE HEARING OFFICER: Okay. That will
22      conclude today. We will resume at
23      9:00 o'clock tomorrow.

Page 310

1   (Whereupon, at approximately 5:01 p.m. on
2   March, 11, 2003, the proceedings were
3   adjourned.)

Gaddies Hill                    March 12, 2003                    Elmore County Board of Education

155 (Pages 309 to 310)

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

**Page 311**

```
                                          9:00 A.M.
1    MARCH 12, 2003          DAY TWO
2           INDEX
3    RICHARD GARGIULO
4    Direct Examination By Ms. DePaola            313
     Voir Dire Examination By Mr. Howard          318
5    Direct Examination, Resumed By Ms. DePaola   326
     Cross-examination By Mr. Howard              362
6    Further Direct Examination By Ms. DePaola    401
     Further Cross-examination By Mr. Howard      407
7
8    JUANITA CORBETT
9    Direct Examination By Ms. DePaola            409
     Cross-examination By Mr. Howard              421
10
11   TAMMY HAWKINS
12   Direct Examination By Mr. Howard             431
     Cross Examination By Ms. DePaola             439
13
14   PAULETTE FREEMAN
15   Direct Examination By Mr. Howard             444
     Cross-examination By Ms. DePaola             446
16
17   SHEILA DEAN
18   Direct Examination By Mr. Howard             450
     Cross-examination By Ms. DePaola             455
19   Further Direct Examination By Mr. Howard     460
20
21   BESSIE ROBINSON
22   Direct Examination By Mr. Howard             463
     Cross-examination By Ms. DePaola             464
23
```

**Page 312**

```
1    LINDA ROSS
2    Direct Examination By Mr. Howard             465
     Cross-examination By Ms. DePaola             470
3
4           INDEX OF EXHIBITS
5    Exhibit Number    Description        Page Number
     Petitioner's Exhibit 8 Gargiulo Report       327
6    Petitioner's Exhibit 9 Occupational Therapy   340
7         Report
8    Petitioner's Exhibit 10 Summer School Contact 412
          Attempts, June 26, 2002
9    Petitioner's Exhibit 11 Sign-in Sheet         457
     Petitioner's Exhibit 12 11/2/002 Marshall Anderson  423
          letter
10   Board's Exhibit 13 September 11, 2001 OT Referral   433
     Board's Exhibit 14 OT Handout, List of Skills  435
11   Board's Exhibit 15 Hawkins to McQuiddy June 27,  436
          '02 Letter
12
13
14
15
16
17
18
19
20
21
22
23
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

**Page 313**

```
1    THE HEARING OFFICER: All right, sir.
2    If you would, we're back on the
3    Record in the hearing in Gaddies
4    Hill. We'll have the expert
5    witness.
6            RICHARD GARGIULO
7    (Whereupon, the witness, after having first
8    been duly sworn to speak the truth, the whole truth,
9    and nothing but the truth, took the stand and
10   testified as follows:)
11           DIRECT EXAMINATION
12   BY MS. DePAOLA
13   Q  Would you state your name?
14   A  Richard Gargiulo.
15   Q  Where are you employed?
16   A  University of Alabama in Birmingham.
17   Q  What is your position there?
18   A  Professor of special education.
19   Q  Could you briefly tell the Hearing Officer about
20      your educational background?
21   A  I have a Bachelor's degree in elementary education
22      in English from Hiram Scott College in Scottsboro,
23      Nebraska. Master's of Science degree in mental
```

**Page 314**

```
1    retardation, University of Wisconsin, Milwaukee.
2    PhD degree in the area of new learning, child
3    development and behavioral disorders, University
4    of Wisconsin, Madison.
5    Q  I'd like you to take a look at a document that
6    we've labeled document 175 and see if you can
7    identify that document for us.
8    A  This is my curriculum vitae.
9    Q  Does that summarize your relevant educational
10      experience?
11   A  Yes.
12   Q  And most professional experience?
13   A  Yes.
14      MS. DePAOLA: Houston, do you want me to
15      go through this, or are you willing
16      to stipulate to his credentials as
17      an expert in the field of mental
18      retardation?
19      MR. HOWARD: I have some questions I
20      want to ask him on voir dire before
21      he gives substantive opinions.
22      There is no need to go through his
23      resume'.
```

1  MS. DePAOLA: Do you stipulate to his
2  expertise, is my question, in the
3  field of mental retardation?
4  MR. HOWARD: In the field of mental
5  retardation, but not within all the
6  fields that are encompassed by his
7  report.
8  MS. DePAOLA: You mean occupational
9  therapy, is that what you're
10  concerned with?
11  MR. HOWARD: Well, an occupational
12  therapy analysis of psychological
13  tests.
14  MS. DePAOLA: Anything else that we need
15  to cover?
16  MR. HOWARD: It's a sphere in which I'm
17  not willing to stipulate as to his
18  expertise.
19  MS. DePAOLA: Anything other than
20  occupational therapy and, I guess,
21  mental measurements kind of thing?
22  MR. HOWARD: Well, I'm not sure exactly
23  what all you're tendering him as an

1  expert for. Do you follow?
2  MS. DePAOLA: I'm tendering him as an
3  expert in the field of the
4  education of children who are
5  mentally retarded.
6  MR. HOWARD: Stated that broadly, I
7  can't stipulate that he's qualified
8  to testify.
9  MS. DePAOLA: Okay. We will go through
10  the entire resume', then.
11  THE HEARING OFFICER: No, no, we're not
12  going to go through the resume'. I
13  can read it. It's an exhibit, and
14  it's admitted into evidence, and
15  we're not going to go through that
16  resume'
17  BY MS. DePAOLA
18  Q  Dr. Gargiulo, do you have experience as a teacher?
19  A  Yes.
20  Q  In the elementary school level?
21  A  Yes, I do.
22  Q  Including teaching of children who are mentally
23  retarded?

1  A  Correct.
2  Q  You are not currently the chairman of the special
3  ed department, are you?
4  A  No, ma'am.
5  Q  Were you formerly?
6  A  Yes, ma'am.
7  Q  For how long?
8  A  1982 to 1989, '90.
9  Q  Could you tell the Hearing Officer what you were
10  asked to do in this case?
11  A  When I was contacted by you, I was sent some
12  documents and asked to review some documents
13  pertaining to the educational program of a young
14  man with mental retardation and to render some
15  opinions as to the appropriateness of those
16  documents as far as conferring educational benefit
17  to that student.
18  Q  And were you later also asked to go and observe
19  the program and the student?
20  A  Yes, I was.
21  Q  And did you do so?
22  A  Yes, I did.
23  Q  And was that also to render an opinion as to the

1  appropriateness of the program being offered to
2  the student?
3  A  Yes, it was.
4  Q  And did you reach a conclusion with respect to
5  that issue?
6  A  Yes, I have.
7  MS. DePAOLA: I'm going to ask him for
8  his expert opinion, now.
9  MR. HOWARD: Okay. Can I ask him some
10  questions on voir dire?
11  THE HEARING OFFICER: Okay, yeah.
12  He's going to ask you some
13  questions, just, I think directed
14  to how you came to your opinions or
15  whatever he wants to ask you,
16  before you give your opinion.
17  VOIR DIRE EXAMINATION
18  BY MR. HOWARD
19  Q  Doctor, beginning on page 192 of the Petitioner's
20  Exhibit 1 is the report you rendered after your
21  observations in the classroom?
22  A  Correct.
23  Q  And you have a section there on page 1 where it

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 319

1   reflects the items and the things you considered,
2   is that correct?
3   A   Correct, sir
4   Q   And some of the items listed there are tests of
5   Gaddies' intellectual ability; is that correct?
6   A   It's a report of his intellectual abilities,
7   correct.
8   Q   In forming your opinions in this case, is that
9   based in part of your interpretation of the tests
10  of Gaddies' mental abilities and aptitudes?
11  A   It is.
12  Q   One of the things you have been asked to do in
13  this case is make an evaluation that would improve
14  Gaddies' ability to achieve independence in
15  living?
16  A   Repeat that question, please.
17  Q   Yes, sir. You made reference in your report to
18  Gaddies' ability to function independently as an
19  adult, don't you?
20  A   Yes, I do.
21  Q   And so the opinions you have reached are designed
22  to help him achieve that independence, aren't
23  they?

Page 320

1   A   Correct.
2   Q   And those opinions are made in light of his mental
3   retardation, aren't they?
4   A   Based partly on his mental retardation, correct.
5   Q   And how that mental retardation affects his
6   ability for independence in living; correct?
7   A   Correct.
8   Q   Do you hold any type of license in the state of
9   Alabama?
10  A   No, not in Alabama.
11  Q   The interpretation or analysis of tests of mental
12  abilities and aptitudes falls within the
13  discipline of psychology, doesn't it?
14  A   Correct.
15  Q   And it is something for which a person is required
16  to hold a license, isn't it?
17  A   Correct.
18  Q   And an evaluation of how something like mental
19  retardation would affect a person's ability to
20  achieve independent living is something that falls
21  within the field of occupational therapy, isn't
22  it?
23  A   You just moved, sir, from a psychological

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 321

1   evaluation to an occupational therapy evaluation,
2   if I am understanding you correctly.
3   Q   I'll repeat the question. An evaluation of how
4   mental retardation affects a person's functioning
5   and their ability to achieve independent living is
6   something that falls within the field of
7   occupational therapy, isn't it?
8   A   I'm still not understanding your question as to
9   what you're getting at. I apologize.
10  Q   You don't understand that question?
11  A   I'm not sure what you're actually asking me.
12  Q   Then I'll move to another question.
13      You interviewed the teachers in this case,
14  didn't you?
15  A   I had a brief conversation with both teachers in
16  question.
17  Q   And what questions did you ask Ms. King?
18  A   One of the questions I asked her was Gaddies'
19  performance in the classroom. I also asked her
20  what he was doing instructionally, how he was
21  doing instructionally. And I also asked her how
22  she formed her opinions of his performance in that
23  classroom.

Page 322

1   Q   You said you asked her how he was doing
2   performance-wise?
3   A   (Witness indicating.)
4   Q   I need to get you to say yes, sir
5       THE WITNESS: I'm sorry. I apologize.
6   A   Yes, sir
7   Q   Did you ask her what progress, if any, he was
8   making?
9   A   I asked her how she measured his progress.
10  Q   Now, that is a different question than how he is
11  doing performance-wise, isn't it?
12  A   Yes
13  Q   How he is doing performance-wise calls for
14  comparisons of performance at different times,
15  doesn't it?
16  A   Correct.
17  Q   And you would have been asking about performance
18  that had occurred on occasions other than when you
19  were there?
20  A   Prior to my observation.
21  Q   Any other questions you asked Ms. King?
22  A   I asked her about his instructional program which
23  she was teaching him

**Page 323**

```
1   Q   And did you ask her about instructional
2       programming that occurred when you were not there?
3   A   Correct.
4   Q   And over what period of time did you ask about
5       that instructional programming?
6   A   Over what period of time did my question cover?
7   Q   Yes. Yes.
8   A   I didn't stipulate. I asked her what was his
9       instructional program.
10  Q   Anything else?
11  A   Not that I can recall at this time.
12  Q   Sir?
13  A   Not that I can recall at this time.
14  Q   What about Ms. Selmar, what questions did you ask
15      her?
16  A   That was also a brief conversation at the end of
17      the time I was able to observe. And I asked her
18      about how she was measuring his performance in the
19      classroom.
20  Q   Anything else you recall?
21  A   No, sir.
22  Q   Now, the information you got in response to those
23      questions, did you consider it in formulating your
```

**Page 324**

```
1       opinions?
2   A   Yes, I did.
3           MR. HOWARD: At this time, we would move
4       to exclude his testimony on these
5       grounds. First of all, your
6       order -- the Hearing Officer's
7       order of January 24th specifically
8       delineated what he could do and
9       what he could not do. And it said,
10      quote, the evaluator may ask the
11      child's teachers any questions he
12      has about what he observes, but he
13      cannot ask them about past
14      educational programs and techniques
15      used for the child.
16          The testimony of this witness,
17      as well as those that testified
18      yesterday, clearly shows that he
19      did the things that he was
20      specifically prohibited from doing.
21          Secondly, the act of analyzing
22      and interpreting psychological
23      testing falls within the sphere of
```

**Page 325**

```
1       psychology, and this occurred in
2       the state of Alabama. And
3       regardless of whether he is
4       licensed as a psychologist in
5       another state, his act of rendering
6       opinions is engaging in the
7       practice of psychology, and he's
8       not licensed to do that in the
9       state of Alabama.
10          The practice of occupational
11      therapy is defined as the
12      application of purposeful
13      activities in which one engages for
14      evaluation, treatment, and
15      consultation related to problems
16      interfering with functional
17      performance in persons impaired or
18      threatened by physical illness or
19      injury, psychosocial dysfunction,
20      congenital dysfunction,
21      developmental and learning
22      dysfunction, the aging process
23      and environmental deprivation or
```

**Page 326**

```
1       anticipated dysfunction, in order
2       to maximize independence, prevent
3       disability, and maintain health.
4           The act of evaluating this
5       child's occupational potential
6       falls within the practice of
7       occupational therapy, and he's not
8       licensed to do that.
9           And for those reasons, we do
10      not believe he should be permitted
11      to testify.
12          THE HEARING OFFICER: I'll overrule that
13      objection. Go ahead.
14          DIRECT EXAMINATION, Resumed
15  BY MS. DePAOLA:
16  Q   I think a question before we moved on is: Did you
17      form an opinion as to whether or not the program
18      being rendered to Gaddies was appropriate?
19  A   Before I observed that day, are you saying?
20  Q   I realize we got way off on a tangent, but we
21      started out talking about what you were asked to
22      do. And as I understand your testimony, you were
23      asked to render an opinion as to whether Gaddies
```

1       was receiving an appropriate program --
2 A    Correct.
3 Q    -- correct?
4 A    Correct.
5 Q    And in order to do that, you reviewed records and
6       observed the class?
7 A    Yes.
8 Q    At the end of that process, did you reach a
9       conclusion -- I don't want you to tell me what
10       conclusion you reached -- but did you reach a
11       conclusion as to whether there was an appropriate
12       program for Gaddies?
13 A    Yes, I did.
14       MS. DePAOLA: Judge, I don't know what
15       exhibit I'm on, but I'd like to
16       have this report dated
17       December 9th, 2002, marked as my
18       next exhibit. I don't think it's
19       in the notebook.
20       MR. HOWARD: You're right.
21       (Whereupon, Petitioner's Exhibit 8 was
22       marked for identification and is
23       attached hereto.)

Page 328

1 Q    Could you look at the document which we're now
2       marking as Petitioner's Exhibit 8 and identify
3       that for the Record, please?
4 A    That is a letter that I wrote to you dated 9
5       December of last year based upon the initial set
6       of documents that you provided me.
7 Q    All right. So, could you just state your
8       conclusion with respect to the appropriateness of
9       the program after reviewing the documents?
10 A    At that time, in this letter of December 9, the
11       general conclusion was that Mr. Hill was being
12       provided an inappropriate education according to
13       the federal guidelines.
14 Q    All right. Did you believe that you needed to
15       undertake further activities before you could
16       render a conclusive opinion in that regard?
17 A    Yes, I felt it would be beneficial to have a
18       chance to observe the student in his classroom.
19 Q    All right. And --
20       MS. DePAOLA: First of all, we would
21       move for the admission of
22       Petitioner's Exhibit 8.
23       MR. HOWARD: Can I have a continuing

1       objection on the grounds that I
2       stated earlier?
3       THE HEARING OFFICER: Okay. That
4       objection is overruled, and
5       Petitioner's Exhibit 8 is admitted
6       BY MS. DePAOLA:
7 Q    Did you, in the process of reviewing these
8       records, review the scores that were provided on
9       the Test of Nonverbal Intelligence from the school
10       system?
11 A    Yes, I did.
12 Q    And did you also look at some prior scores from
13       the year 2000 on the Test of Nonverbal
14       Intelligence?
15 A    Yes, I did.
16 Q    Did you undertake to do any additional testing?
17 A    No, I did not.
18 Q    Just for the Record, you are trained and qualified
19       to administer the Wechsler Intelligence Scale for
20       Children?
21 A    No, I am not.
22 Q    How about the Stanford Binet?
23 A    No, I do not do testing.

Page 330

1 Q    Have you ever done testing?
2 A    No, ma'am.
3 Q    In the course of your activities, what you do is,
4       would you say, use a school psychologist to do
5       testing, and implement from their results a
6       program, or design and implement a program?
7 A    Correct.
8 Q    So, with respect to these scores, you have not
9       attempted to impeach or otherwise question whether
10       the scores were valid or not?
11 A    No, that was not a concern.
12       (Brief interruption.)
13 Q    Dr. Gargiulo, in reviewing your report, which is
14       Petitioner's Exhibit 8, December 9, 2002, did you
15       find that there were any corrections or changes
16       that you wanted to make on the report?
17 A    The December 9th report?
18 Q    Yes.
19 A    No, ma'am.
20 Q    After you went to the school, did you then
21       generate the report that is identified as
22       Petitioner's Exhibit 1, page 192?
23 A    Yes, I did.

---

**Page 331**

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

```
 1   Q   All right. Are there any corrections, changes,
 2       additions, anything to this report that you want
 3       to make?
 4   A   If I may, I would like to correct some of the
 5       language on page 194.
 6   Q   Could you tell us what the correction is?
 7   A   The second paragraph.
 8   Q   Okay.
 9   A   Where I have, Gaddies was also observed stringing
10       plastic beads, that paragraph right there, that
11       initial sentence, that was not an observation. I
12       am afraid to admit it, but that was my inability
13       to master word processing skills, and that was
14       retained in a previous draft.
15   Q   Other than that, the document is correct,
16       ma'am.
17   A   Yes, ma'am.
18   Q   Now, did you have any discussions with anyone
19       about stringing plastic beads and those items --
20   A   Right, that was from the teacher.
21   Q   Okay. Who told you about these activities?
22   A   I was shown those activities and demonstrated
23       those activities by Mrs. King.
24   Q   Other than that, are there any corrections,
```

---

**Page 332**

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

```
 1       changes, additions to your report?
 2   A   No, ma'am.
 3               MS DePAOLA: We would move for the
 4       admission of Dr. Gargiulo's report.
 5               MR. HOWARD: Our objection --
 6               THE HEARING OFFICER: Okay. It hasn't
 7       been admitted --
 8               MR. HOWARD: -- is the same.
 9               THE HEARING OFFICER: -- but it's
10       admitted.
11   BY MS DePAOLA
12   Q   I would like to review with you, Dr. Gargiulo.
13       your report. On the first page, have you listed
14       all of the documents that you reviewed in putting
15       together this report?
16   A   Yes, ma'am.
17   Q   And what was the amount of time that you actually
18       spent here in Elmore County?
19   A   On site?
20   Q   Yes, sir.
21   A   Just under three hours.
22   Q   Do you recall how much time you were allowed to be
23       here pursuant to the order that we got?
```

---

**Page 333**

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

```
 1   A   I believe it could not exceed three.
 2   Q   And during that time, what classes did you observe
 3       Gaddies in?
 4   A   I was able to observe the beginning of his math
 5       class -- I'm sorry -- the math class that was
 6       already under way, and the language arts.
 7   Q   And how long did you spend in the math class?
 8   A   Approximately 35 minutes.
 9   Q   All right. Could you tell me, describe for me,
10       any of the activities -- these are on the bottom
11       of page 193 in your report -- that you saw? I
12       don't want you to read it to us, but tell the
13       Hearing Officer in your own words what activities
14       you saw.
15   A   At that time, basically Gaddies was sitting off by
16       himself at a desk responding to an audio tape
17       where the teacher was asking him to repeat his
18       address and home telephone number. She made the
19       tape herself. It had the prompt, Gaddies, give me
20       your home phone number, your telephone number,
21       your address.
22   Q   Did you hear the tape?
23   A   No.
```

---

**Page 334**

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

```
 1   Q   So, she just tells you what was on the tape?
 2   A   She told me what was on it and that she made it to
 3       help him.
 4   Q   Do you know whether she was also telling him what
 5       the address was on the tape, or was he supposed to
 6       spontaneously remember it?
 7   A   He was just repeating it.
 8   Q   He was just repeating the address from the tape
 9       and repeating the phone number?
10   A   That is what I recall.
11   Q   And how long did this continue?
12   A   Approximately 20 minutes.
13   Q   Was it difficult to understand Gaddies?
14   A   At that time, I did not have a conversation with
15       him.
16   Q   I mean, could you hear him saying his address?
17   A   I was a good distance away, so, I would have
18       difficulty saying whether or not I could
19       understand him.  But he was responding.  He
20       required frequent prompts from the
21       paraprofessional.
22   Q   So, would you say there were attention problems,
23       too?
```

```
 1   A   Yes.
 2   Q   Could you describe this child -- I say child --
 3       could you describe this young man for the Hearing
 4       Officer, his size, his weight?
 5   A   Gee. Fairly large, I guess, by middle school
 6       standards, junior high standards. I would guess,
 7       five, four, five, six, possibly, if not larger.
 8       Weight, oh, I don't know.
 9   Q   Well, I mean, does he look like a teenager, or
10       look like a little --
11   A   No, he's definitely a fairly large-sized young
12       man.
13   Q   And were there any other children in the class
14       doing a similar activity?
15   A   The audio tape?
16   Q   Yes.
17   A   No, ma'am.
18   Q   What else did you observe in Ms. King's classroom?
19   A   After that activity was completed, she gave
20       Mr. Hill some worksheets.
21   Q   All right. Can you describe the content of those
22       worksheets?
23   A   They were -- he was asked to trace some lines and
```

```
 1       color apples, figures of apples.
 2   Q   Now, tracing lines like in the shapes of letters,
 3       or just tracing lines?
 4   A   Just tracing lines.
 5   Q   Let me show you what we have previously marked as
 6       Petitioner's Exhibit 5 and ask you if that top
 7       sheet is the kind of activity you're talking
 8       about.
 9   A   I cannot stipulate that.
10   Q   Oh, you couldn't get close enough?
11   A   I did not.
12   Q   But you know they were not letters?
13   A   They were not letters, because she was asking him
14       to trace lines, or having him to trace lines
15   Q   Did she tell you what the purpose of tracing the
16       lines was?
17   A   No, ma'am.
18   Q   The other activities you saw him do was coloring
19       apples, is that correct?
20   A   Correct.
21   Q   Can you describe the sheet?
22   A   If I remember right, it was three large apple
23       shapes, figures and representations of apples.
```

```
 1   Q   Were there any numbers on the sheet, or do you
 2       recall?
 3   A   Not that I recall.
 4   Q   What color was he coloring them?
 5   A   I'm sorry.
 6   Q   Did you all have any discussion about the
 7       educational purpose for that activity?
 8   A   No, ma'am.
 9   Q   Would you describe for the Hearing Officer the age
10       range of children that these kind of materials are
11       appropriate for?
12   A   That would be appropriate for a preschool child or
13       a much younger child.
14   Q   Can you explain to the Hearing Officer why these
15       preschool materials are not appropriate for
16       Gaddies?
17   A   Well, first of all, they are age inappropriate.
18       You don't have a 15 year old young man sitting
19       down coloring shapes of apples -- or apples,
20       coloring the apples. I would question the
21       functional relevance of it.
22   Q   Okay. In addition to the functional relevance,
23       you're saying it's age inappropriate?
```

```
 1   A   Age inappropriate.
 2   Q   If you wanted to teach him the colors, for
 3       instance -- we don't know what they were doing,
 4       but say that was it -- what kind of
 5       age-appropriate materials -- what would they look
 6       like?
 7   A   Excuse me?
 8   Q   We don't know the purpose of the activity.  Say it
 9       was to teach him the color red.  Can you describe
10       what an age-appropriate activity would be to teach
11       him colors?
12   A   A 15 year old with Gaddies' abilities? You could
13       have him outline the color of the word red for
14       word recognition.  Or I would probably switch to
15       functional vocabulary, to have him trace the
16       letters, like exit is typically in red.
17   Q   So, in other words, relate the color skill to some
18       survival skill like reading an exit sign is what
19       you're saying?
20   A   Yes.
21   Q   Relate to the Hearing Officer the conversation
22       about the beads, plastic nuts, and bolts.
23   A   Mrs. King, after Gaddies had moved on to his next
```

---

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 341

1     admission of Exhibit 9.
2     THE HEARING OFFICER. All right. It's
3 admitted.
4 Q Going back to your report on page 194, what
5 discussions did you have with Ms. King about
6 grading for Gaddies?
7 A I asked her how were his grades determined.
8 Q And what was her response?
9 A She said that her grades were determined based
10 upon task compliance.
11 Q In other words, if he was compliant and completed
12 a task?
13 A Right. Correct.
14 Q Then he got what?
15 A I'm not sure if he got a piece of candy that day.
16 She described it as a reinforcer but did not
17 describe the reinforcer. I believe that
18 particular day it was a piece of candy. And then
19 she awarded him a grade of 70.
20 Q So, there is no indication that the grading was on
21 any kind of qualitative basis, like, yes, he can
22 write his name, or no, he can't write his name?
23 A No.

---

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 342

1 Q Did you have some discussions with Ms. King about
2 Gaddies' behavior?
3 A She volunteered that he had significantly improved
4 in certain areas of his behavior. One of them
5 that she mentioned was his better manners. And
6 that he was eating a lot slower.
7 Q And did she attribute this to any particular
8 reason?
9 A He was just older.
10 Q Does that pretty much summarize your observation
11 of that class, as far as what you saw in
12 Ms. King's class?
13 A Other than after the students left the classroom,
14 she took me into an adjacent classroom where there
15 was a kitchen sink set up and some dishes. And
16 she volunteered to me and told me that Mr. Hill
17 enjoys washing dishes, he is quite good at it,
18 he's successful with that task but has
19 difficulties sweeping floors. And she noticed in
20 the corner, I gotta get on him, because he missed
21 that spot. He doesn't do well sweeping the
22 floors, but he does do good washing dishes and the
23 associated tasks.

---

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 339

1 class, was showing me some of the activities that
2 she had as part of his program. She volunteered
3 this. She showed me some of the beads, regular
4 preschool beads, and a long almost like shoelace
5 that he would do this activity. She then had some
6 therapeutic putty. I would call it like Silly
7 Putty. It was actually putty that the
8 occupational therapist brought. She would bury
9 items in it, like little trinkets. I believe she
10 said she put a penny in there. Mr. Hill was
11 supposed to go in and get the item out of the
12 putty.
13     The other thing was a large bag filled with
14 plastic nuts and bolts, yellow bolts, blue bolts,
15 red bolts. He was to use that to do work with
16 fine motor skills. That was the purpose of that
17 activity.
18 Q Did you review the occupational therapist's report
19 dated August 13th, 2002, which is Exhibit 131 in
20 the notebook?
21 A Yes.
22 Q Has anything in this report indicated to you that
23 Gaddies already knew how to do bead stringing?

---

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 340

1 A Yes.
2 Q Okay. Did you read anything that indicated he
3 already knew how to screw and unscrew nuts and
4 bolts?
5 A I don't -- I did not see -- if I may read this for
6 a moment.
7 Q There is another report, too, and I need to get
8 that one out.
9     Let me show you the other report, which I
10 don't think is in the notebook.
11     MS. DePAOLA: I would like to mark this
12 as Petitioner's Exhibit 9.
13     (Whereupon, Petitioner's Exhibit 9 was
14     marked for identification and is
15     attached hereto.)
16 Q Did you also review that document which we have
17 labeled as Petitioner's Exhibit 9?
18 A Yes.
19 Q Did you determine from reading that that the
20 occupational therapist already concluded he could
21 do nuts and bolts?
22 A Yes, ma'am.
23     MS. DePAOLA: We would move for the

1 Q Did you see anything in his IEP about dish washing
2   as an educational activity?
3 A Not that I recall, ma'am.
4 Q Can you go on and tell us about your visits for
5   language arts class? Who was the teacher in
6   there?
7 A That was Ms. Selmar.
8 Q Can you tell us what the activity was in there?
9 A The initial activity was basically a repeat of
10  what I observed just a few minutes earlier, where
11  Mr. Hill was working on verbalizing his name and
12  telephone number.
13 Q Was he doing any tracing in this class of his name
14  and telephone number?
15 A Not at that time, no.
16 Q Did he do that at all during the time that you
17  were in there?
18 A Yes, he was doing some tracing.
19 Q So, first, he went in and got another tape?
20 A There was no audio tape.
21 Q What was he doing at this time?
22 A As far as I remember, she was asking him, Gaddies,
23  what is your telephone number?

Page 344

1 Q And then was she saying it, and he would repeat
2   it?
3 A They would prompt. This was working with the
4   aide, I believe.
5 Q Did you ever at any time spontaneously observe him
6   respond without a prompt, my phone number is
7   514-4962?
8 A No, ma'am.
9 Q So, every time you observed it, he was simply
10  responding to prompts?
11 A Correct.
12 Q Let me ask you this. When you say prompts, are
13  you saying, Gaddies, it's five, and he would
14  repeat five, one, and he --
15 A What comes next.
16 Q So, in any event, it was never, Gaddies, say your
17  number, 514-4962?
18 A No.
19 Q All right. What else did you observe in that
20  classroom?
21 A One of the next activities that they gave him was
22  a worksheet -- for lack of a better word -- that
23  had a stop sign on it. And he was asked to trace

1   the letters for the word stop sign while making
2   sure that he stayed within the design of the stop
3   sign.
4 Q Okay. Is there anything in his IEP that you saw
5   that relates to coloring or tracing a stop sign?
6 A No, ma'am.
7 Q Did he also do some tracing of his name while you
8   were in there, or any tracing relating to his
9   name?
10 A Possibly.
11 Q You just don't recall?
12 A No, I don't recall right off.
13 Q Okay. What other activities did you see in there?
14 A Ms. Selmar was working with him in the area of
15  reading.
16 Q And did she read a story to him?
17 A She read him a story.
18 Q And what was the content of that story?
19 A As I recall, it was about a pig wearing a hat.
20 Q Is there any problem in terms of age
21  appropriateness in this kind of story for Gaddies?
22 A My professional opinion, reading a story about a
23  pig wearing a hat to a 15 year old young man is

Page 346

1   most inappropriate.
2 Q Even a 15 year old young man who has significant
3   mental retardation?
4 A Correct.
5 Q Okay. On page 195 of your report, you appear to
6   have reached a conclusion about using a
7   traditional preschool program with this child.
8 Q Can you tell the Hearing Officer whether you feel
9   that the traditional preschool program is
10  appropriate or inappropriate for him?
11 A Whether the program that he is being exposed to
12  now is appropriate?
13 Q Whether the traditional preschool curriculum being
14  used with this 15 year old student is appropriate
15  or inappropriate.
16 A It's inappropriate, I believe.
17 Q Did you reach a conclusion about whether it
18  conferred meaningful educational benefit to the
19  student?
20 A Yes, I did.
21 Q What is that opinion?
22 A That there was no educational benefit at all.
23 Q Let me ask you if you would agree that it's very

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 347

1  important for someone along the way, for a student
2  like Gaddies, to determine what the appropriate
3  content of a program is going to be?
4  A  That should be the beginning point.
5  Q  Okay. And so, what you're looking for is what
6  kind of an outcome you want; is that accurate?
7  A  Correct.
8  Q  I mean, where are you going with him?
9  A  Right.
10  Q  Would you agree that in making that determination,
11  you need to consider the child's strengths?
12  A  Definitely.
13  Q  Okay. Explain that to the Hearing Officer.
14  A  It is quite easy to go in and do deficit-based
15  analysis; go in and say, okay, this student has
16  this, this ability, this IQ, well, therefore, he
17  or she cannot do this or that. There is a school
18  of authority rather recent in the last couple of
19  years in the literature that says you do
20  strength-based assessments. You look at what the
21  student can do, not what it is they cannot do. We
22  all have skills. It's a matter of finding out
23  what those strengths are and basing a program

Page 348

1  around those strengths.
2  Stated another way, instead of asking how
3  smart is the student, ask how is the student
4  smart? And a whole different picture gets painted
5  now.
6  Q  Dr. Gargiulo, in addition to looking at his
7  strengths, do you also need to consider how far
8  he's progressed over the last 11 years with what
9  you're trying to do with him?
10  A  You also -- yeah, correct.
11  Q  Okay. Could you explain that, please?
12  A  Well, it's nice to know where he's been. But he
13  is 15 years of age. He is going to go in a school
14  system of Elmore County another five to six years.
15  You need to have a vision, where is this student
16  going to go? What are his goals for independent
17  living in the community as a young adult?
18  Curriculum that should be exposed to should be
19  equipping him to be as successful as possible in
20  those independent life skills.
21  Q  Do those include some sort of employment outcome
22  plus a living outcome?
23  A  Correct.

Gaddies Hill    March 12, 2003    Elmore County Board of Education

19 (Pages 347 to 348)

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 349

1  Q  Have you seen any evidence that anyone, in any of
2  the documents or conversations here in Elmore
3  County, has determined an outcome for him from
4  which they have based a curriculum?
5  A  No, I have seen no evidence of that whatsoever.
6  Q  Let me ask you about some of the items on page 196
7  on your report. In order to comply with IDEA, the
8  school system has to write present levels of
9  performance. Is it a prerequisite to do that in a
10  meaningful way that you have a curriculum or an
11  outcome in mind?
12  A  Rephrase that please.
13  Q  In your report you said, without a relevant
14  curriculum, it is impossible to establish present
15  levels of performance and meaningful annual goals.
16  Can you explain that to us?
17  A  Right now, what I believe he is getting is a bunch
18  of haphazard, isolated text. There is no
19  relevancy. There is no congruency. There is not
20  interrelationship. There is a little bit of this,
21  a little bit of that, but there is no big picture
22  as to where the young man needs to be going.
23  Q  Is there any kind of overall outcome that you see

Page 350

1  that they are working towards?
2  A  No.
3  Q  Did you review the IEP with respect to a least
4  restrictive environment issue?
5  A  Yes.
6  Q  What does it say with respect to Gaddies' least
7  restrictive environment?
8  A  May I refer back?
9  Q  Yeah. You want the IEP?
10  A  Yes.
11  Q  It's on page 70.
12  A  All right. On page -- it should be the same
13  document.
14  Q  Eighty-four.
15  A  Page eighty-four.
16  Q  What struck you about least restrictive
17  environment on this page with respect to what you
18  observed?
19  A  The -- in the middle column, or the middle
20  heading, says, least restrictive environment. The
21  second statement was, this student received all
22  special education services with nondisabled peers,
23  which means the general ed student. That is

Gaddies Hill    March 12, 2003    Elmore County Board of Education

20 (Pages 349 to 350)

Page 351

1  indicated, yes.
2  Q  Did you observe him receiving his services with
3     nondisabled peers?
4  A  Not to the best of my knowledge, I did not. I
5     also point out that it is in complete
6     disregard to item number four that's checked off
7     where they have him over 21 hours a week outside
8     the regular classroom.
9  Q  These things are in conflict?
10 A  They are in conflict.
11 Q  Staying on that document that you're looking at
12    now, the IEP, I would like to ask you to comment
13    on the statement regarding transition needs.
14    That's on page -- on page 71. Do you have an
15    opinion whether it would be appropriate for them
16    to begin to consider transition goals for Gaddies?
17 A  Transition goals?
18 Q  Well, outcomes.
19 A  Because they do address the transition goals at
20    the very top of page 71.
21 Q  The transition goal being a, quote, sheltered
22    workshop?
23 A  Right.

Page 352

1  Q  Can you tell the Hearing Officer what kind of
2     activities he might be able to do at a job in a
3     sheltered workshop?
4  A  Low-skilled, highly repetitive tasks, minimal
5     variation in the types of activities. These
6     activities tend to be redundant. For example,
7     some of the sheltered workshops that I'm familiar
8     with will package the, for lack of a better word,
9     the plastic silverware and salt and pepper that
10    you get on -- when you fly in an airline when they
11    give you your meal, the little plastic where they
12    heat shrink it. That is usually done in sheltered
13    workshops.
14    Putting in the mailings where you get a bunch
15    of coupons from stores. It's assembly line
16    production. Typically, that was in vogue 30 years
17    ago. It is not contemporary thinking as to how to
18    best meet the needs of students with mental
19    retardation.
20 Q  In your experience and expertise, what kind of
21    jobs could you see as potential outcomes for
22    Gaddies?
23 A  Based upon my experience, I believe Gaddies could

Page 353

1  work independently in the community.
2  Q  At Wal-Mart or where, doing what?
3  A  Places like Wal-Mart, Target, grocery stores,
4     stocking shelves, working in a -- for a
5     veterinarian, helping clean out cages, grooming
6     the animals. There are a wide variety of
7     opportunities, but the student needs to have
8     exposure to those community-based opportunities.
9  Q  Did you reach a conclusion as to whether this
10    sheltered workshop was appropriate or
11    inappropriate for Gaddies?
12 A  I don't think it's appropriate for him.
13 Q  Did you see any evidence that they analyzed the
14    skills he would need to do these jobs in a
15    sheltered workshop and incorporate them into his
16    IEP in any way?
17 A  No.
18 Q  Let me ask you about the next thing, statement of
19    transition service needs that focus on the
20    student's course of study. Are you familiar with
21    the LCCE?
22 A  Yes, I am.
23 Q  Is that the Life Centered Career Education?

Page 354

1  A  Yes.
2  Q  Can you tell the Hearing Officer what kind of
3     reading level is required to benefit from the
4     LCCE?
5  A  Third grade reading level.
6  Q  Do you think it's appropriate for them to say that
7     it's not applicable to have him have any
8     transition service needs at this point?
9  A  If you read the rules and regulations that
10    accompany the IDEA, particularly on page 71, you
11    will notice the phrase, beginning at age 16, or
12    younger if appropriate, which means you do not
13    have to wait until the child reaches the
14    chronological age of 16.
15 Q  Do you feel that it would have been appropriate to
16    consider these things for Gaddies?
17 A  Yes, I do.
18 Q  On the front of that IEP, on page 70, it indicates
19    that the child is going to receive daily progress
20    reports, which will show whether he's meeting his
21    annual goals. Did you see any evidence that that
22    was happening?
23 A  I did not see nor receive any documentation that

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

Page 355

```
 1   would suggest that his parents were receiving
 2   daily correspondence.
 3  Q  I mean, the only indication you had was that they
 4   were grading him? Did you receive a grade sheet?
 5   Did I send you a grade sheet? Did I send you one
 6   of those (indicating)?
 7  A  I don't believe so, no.
 8  Q  The only indication you had was the discussion
 9   with Ms. King and Ms. Selmar about compliance and
10   completing work, is that right?
11  A  I do not recall receiving that sheet. But in the
12   documents that I reviewed, I recall Gaddies
13   receiving C's for his grades. Where that
14   information came from, it was one of the
15   documents, but it was not in his IEP. There was
16   not that grade sheet. But they did give him C's
17   for his junior high school work.
18  Q  Okay. On page 197 of your report, did you reach
19   some conclusions about -- that you basically have
20   already given to the Hearing Officer today --
21   about the failing to confer meaningful educational
22   benefit? Is there anything in this summary and
23   recommendations that conflict with anything you
```

Page 356

```
 1   have said today?
 2  A  I don't believe it conflicts, no.
 3  Q  As part of your duties, do you ever participate in
 4   training people about how to do functional
 5   behavioral assessments, or behavior intervention
 6   plans?
 7  A  Yes.
 8  Q  Have you done some publications in that regard?
 9  A  Oh...
10  Q  Well, let me just point you to what I'm -- I mean,
11   I was looking on page 184 of your resume', and it
12   says, conducting functional assessments and
13   writing positive proactive IEP's for students who
14   are exhibiting violent and aggressive behavior.
15   This is an area you have done presentations?
16  A  Done presentations, correct.
17  Q  All right. Let me ask you to take a look on
18   page 83 of this exhibit. Could you tell the
19   Hearing Officer, have you ever previously reviewed
20   either behavior management plan for Gaddies?
21  A  I did not see this one, to the best of my
22   knowledge.
23  Q  These are his IEP on page 68, which was the
```

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

Page 357

```
 1   behavior management plan and his IEP for last
 2   year.
 3          MR. HOWARD: What pages number did you
 4   just call?
 5          MS. DePAOLA: Sixty-eight.
 6  A  I did not see this before, ma'am.
 7  Q  Okay. Have you ever seen any behavior plans for
 8   Gaddies?
 9  A  One of the earlier placements that he was in.
10  Q  Okay.
11  A  But I do not recall having this as part of the
12   documents that I was furnished.
13  Q  Okay. So, you have not attempted to formulate an
14   opinion either as to the behavior management plan
15   on page 68 or the one on page 84?
16   You don't have with you today the documents
17   that were sent to you?
18  A  I do.
19  Q  Okay. Could you please look at the IEP that was
20   sent to you for 2001-2002? I mean, the ones in
21   your stack.
22  A  The one for 2001-2002?
23  Q  Yes.
```

Page 358

```
 1  A  It is not part of the documentation.
 2  Q  How about the next one, 2002-2003?
 3  A  That is not part of the documentation.
 4  Q  Well, I didn't do right. I should have gotten
 5   those to you.
 6   Let's move on to another issue. Do you make
 7   referrals to occupational therapists from time to
 8   time to evaluate students?
 9  A  No, ma'am.
10  Q  Have you ever done that?
11  A  Not that I recall in the recent past in Alabama,
12   no.
13  Q  Yesterday one of the witnesses testified that the
14   hyperactivity in Gaddies -- did you observe some
15   level of distractibility and hyperactivity?
16  A  Problems with focusing and attention to task.
17  Q  One of the witnesses testified yesterday that that
18   just comes with the territory of mental
19   retardation, is that accurate?
20  A  You mean, it comes --
21  Q  Well, that if you are mentally retarded, you will
22   be hyperactive?
23  A  No.
```

Page 359

```
1   Q   So, there are children who are mentally retarded
2       at a level of 39 IQ who are not hyperactive?
3   A   Correct.
4   Q   And there are children who are hyperactive?
5   A   Correct.
6   Q   And is it important that that issue be addressed
7       with respect to a child who is hyperactive?
8   A   I would think so.
9   Q   You have done some writing in the area of mental
10      retardation and moral judgments?
11  A   Oh, boy --
12  Q   Does that relate at all?
13  A   -- twenty years ago.
14  Q   Well, here's what I am trying to find out: Does
15      mental retardation have an impact on a child's
16      social judgment?
17  A   It can.
18  Q   And can you explain that to the Hearing Officer?
19  A   When you have a young person who has a decrease in
20      intellectual ability, there is the potential for
21      impaired social judgment as an artifact of their
22      IQ.
23  Q   So, such things as relating to someone by
```

Page 360

```
1       hitting -- although we would think that would not
2       be socially appropriate -- would that be something
3       that a child with a low IQ may not be able to
4       perceive as inappropriate?
5   A   That may be their only way to express frustration.
6   Q   So, it may be associated with their disability?
7   A   It could be, yes. That would come out when you
8       did a manifestation determination.
9   Q   So, if this child was hitting someone, would you
10      have expected a manifestation determination to
11      have been made?
12  A   If they are going to do any sort of punishment to
13      penalize that student, it's required by law.
14  Q   Would you consider hitting him, for instance, for
15      cursing, to be something that would require a
16      manifestation determination?
17  A   Who hit whom?
18  Q   Well, take that as a hypothetical as the evidence
19      yesterday indicated.
20          THE HEARING OFFICER: The teacher hit
21      the child after he cursed.
22  A   I'm not sure what the question is. Who are you
23      asking me to evaluate, the teacher's behavior or
```

Page 361

```
1       the student?
2   Q   No, I'm asking you to tell me whether that
3       behavior might be reflective of his poor social
4       judgment associated with mental retardation.
5   A   Yes, ma'am. I'm sorry.
6   Q   So, that is a yes?
7   A   Yes, that is a yes.
8   Q   So, you would then believe that they need to
9       consider a manifestation determination, an FBA,
10      and behavioral plan?
11  A   Correct.
12  Q   Do you see anything to indicate they did a
13      manifestation determination?
14  A   Not in the documentation that I reviewed, no,
15      ma'am.
16  Q   Let me ask you another thing about, could you tell
17      the Hearing Officer whether or not it's important
18      to counsel parents about the impact of their
19      child's disability?
20  A   Whether it's important? You mean, long range
21      outcomes?
22  Q   Well, for instance, Ms. Corbett, when they say to
23      her, Ms. Corbett, your child has a 39 IQ, do you,
```

Page 362

```
1       in your professional judgment, believe that
2       requires some explanation or counseling about what
3       that means in the long run?
4   A   Yes.
5   Q   Can you explain that to the Hearing Officer?
6   A   I think it would be incumbent upon school
7       authorities to explain to the parents what the
8       long-term prognosis is, what the occupational
9       independent living skills for that person might
10      be, in terms of preparing that child for useful
11      functional adulthood in their community.
12  Q   Do parents sometimes have an unrealistic
13      expectation for their children?
14  A   That is not uncommon.
15          MS. DePAOLA: I don't have anything
16      further.
17          THE HEARING OFFICER: All right.
18      Mr. Howard will have some more
19      questions for you.
20                  CROSS-EXAMINATION
21  BY MR. HOWARD
22  Q   Have you ever taught a class of special education
23      students?
```

## Page 365

Mary Moore-Wynn    Court Reporting Services    Page 365

```
1   A   That would be an unfair assumption on your part.
2   Q   Well, if you consider yourself as an advocate for
3       one side or another, doesn't that give you a bias?
4   A   I think that you need to look at what the facts
5       are and render a clear and reasonable opinion.
6   Q   Regardless of how you feel the facts -- of how you
7       might personally feel about a situation.
8   Q   But, I mean, in disputes between parents and
9       children on one end, and school boards on the
10      other, you're just naturally more sympathetic to
11      the parents and the children, aren't you?
12  A   Again, I object to that analysis of being
13      naturally sympathetic to the parents.
14  Q   Do you have a child that is disabled?
15  A   I question the relevance of that question, sir.
16          THE HEARING OFFICER:  Well, you can
17             answer it.
18  A   Yes, I do.
19  Q   And does that fact affect your analysis of
20      situations such as this?
21  A   In no way, shape, or form.
22  Q   You have viewed problems such as the ones the
23      Hearing Officer is going to resolve through the
```

## Page 366

(334) 244-0203    Page 366

```
1       eyes of a parent, haven't you?
2   A   Excuse me?
3   Q   Well, as a parent of a disabled child, you have
4       had situations where you looked at those
5       situations not through the eyes of an educator,
6       but through the eyes of a parent, haven't you?
7   A   That's not what I was asked to do was to look at
8       this through the eyes of a parent.  I was asked to
9       look at this through the eyes of a person that has
10      over 30 years of experience in the field of
11      special education.
12  Q   Do you think you're able to set aside your
13      personal experiences in that regard?
14  A   Sir, my daughter's disability has nothing to do
15      with this hearing this morning, nor does it affect
16      my judgment.
17  Q   Have your writings been criticized in the
18      professional literature on the grounds that you're
19      out of touch with the realities that the teachers
20      have to deal with?
21  A   I'm sure.  If you do as much writing as I do, I'm
22      sure people that take exceptions to articles and
23      books.
```

## Page 363

Mary Moore-Wynn    Court Reporting Services    Page 363    (334) 244-0203

```
1   A   Yes, sir.
2   Q   When was that?
3   A   1968 through 1972.
4   Q   Now, your resume', page 175, indicates your
5       certification is in the field of grades K through
6       eight; is that right?
7   A   Correct.
8   Q   Did you ever hold a certification in special
9       education?
10  A   Yes, I did.
11  Q   And when was that?
12  A   When I was living in Wisconsin, late 1960's, early
13      1970's.
14  Q   But it's not listed on the resume'?
15  A   No. No, it isn't.
16  Q   Why is that?
17  A   It's out of date.
18  Q   At the time, then, you were teaching, IDEA had not
19      even been passed, had it?
20  A   Correct.
21  Q   Have you ever written an IEP?
22  A   I've facilitated the writing of IEP's. And I
23      train teachers how to write IEP's.
```

## Page 364

Court Reporting Services    Page 364    (334) 244-0203

```
1   Q   But you've never written one?
2   A   No.
3   Q   Have you ever applied to be licensed as a
4       psychologist here in Alabama?
5   A   No, sir.
6   Q   And never in your career have you administered
7       intelligence tests at all?
8   A   No, sir.
9   Q   Or made referrals for occupational therapy?
10  A   Correct.
11      Let me rephrase that.  Not here.
12  Q   Not here in Alabama?
13  A   Not here in Alabama.
14  Q   And you have been here in Alabama since the late
15      '80's?
16  A   Eighty-two.
17  Q   Eighty-two.  Do you consider yourself as an
18      advocate for the disabled or the handicapped?
19  A   Yes.
20  Q   So, in a dispute like this between a parent and a
21      child on one side and a school board on the other,
22      you come into this situation with a preexisting
23      bias, don't you?
```

Mary Moore-Wynn      Court Reporting Services

Page 367

1   Q   There are articles -- reviews of your books that
2    have been written where the criticism is that you
3    are out of touch with the realities that the
4    teachers face, aren't they?
5   A   Not that I am aware of. It wouldn't surprise me,
6    though.
7   Q   Are you familiar with the review of your book,
8    Working with Parents of Exceptional Children,
9    written by Harry N. Chandler in the Journal of
10   Learning Disabilities?
11   A   No, sir.
12   Q   Where he concluded, quote, it's too bad that
13    Dr. Gargiulo is so unaware of the practical
14    limitations teachers face when working with
15    parents of handicapped children?
16      MS. DePAOLA: What's the question?
17      MR. HOWARD: Is he aware of that
18    criticism?
19   A   No.
20   Q   A good part of your writings are devoted to
21    criticizing classroom teachers, aren't they?
22   A   No, sir.
23   Q   And one of your articles here on your resume is

     (334) 244-0203

Page 368

1    labeled, Burned Out Teachers Have No Class. Is
2    that right?
3   A   Yes, it is.
4   Q   And a good portion of your writings are directed
5    toward teachers who suffer from what is
6    characterized as burnout, isn't it?
7   A   I would question your use of the term, a majority,
8    or whatever you said. That was a few articles
9    about the particular (inaudible) of teachers
10   stressing.
11   Q   And you took those teachers to task, didn't you?
12   A   I wouldn't say I took them to task.
13   Q   Well, about five years after you -- when did you
14    get your PhD?
15   A   1974
16   Q   About five years after that, you published an
17    article where you concluded that the entire
18    educational system was negligent in the way it was
19    training teachers, didn't you?
20   Q   Could you cite the article, please?
21   A   Yes, sir  Perceived Competences of Elementary and
22    Special Education Teachers
23   A   I believe that was an article that I did with Fred

---

Mary Moore-Wynn      Court Reporting Services

Page 369

1   Q   Finch. Do you have the senior author?
2   A   Yeah, Fred Finch. That was an article where
3    we analyzed the difference between the
4    competencies of elementary and special education
5    teachers in the state of Ohio.
6   Q   And you concluded that the educational system had
7    been negligent in the training of the teachers,
8    didn't you?
9   A   If that's what I said, if you have it in front of
10   you, yes.
11    I don't remember something I wrote 23 years
12    ago. I take you at your word, if that's what it
13    says, then, yeah.
14   Q   Well, was that your opinion?
15   A   Yes, sir, if that's what was in there.
16   Q   And has that been your opinion throughout your
17    academic career that for the most part the
18    educational system has been negligent in the way
19    it trained teachers?
20   A   Again, that would be an unfair extension of the
21    writings.
22   Q   So, that has not been your opinion throughout your
23    academic career?

     (334) 244-0203

Page 370

1   A   Correct.
2   Q   When did your opinion change?
3   A   I've always had a positive outlook towards the
4    training of teachers. That's been my life's work.
5    Just because you criticize doesn't mean the entire
6    system is at fault. It was a matter of how we
7    were training some 20 odd years ago. It was how
8    the teachers were being trained. All I did was
9    analyze the data.
10   Q   Well, the data didn't show that the teachers were
11    incorrectly trained, did it, sir?
12   A   I don't -- sir, I'm sorry, I cannot recall the
13    parameters or the database of an article I wrote
14    that was published in 1979.
15   Q   Now, a child such as Gaddies, it's not realistic
16    to expect him to live independently as an adult,
17    is it?
18   A   I see no reason why he could not, sir.
19   Q   The studies that have been done of people with
20    similar conditions have shown that they are not
21    normally successful in living independently as
22    adults, don't they?
23   A   I would disagree with that analysis, sir, because

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

Page 371

1  that is the whole premise of having group homes
2  and community-based living. But with appropriate
3  supports, these individuals with mental
4  retardation can be successful.
5  Q  Can be, but probably won't?
6  A  I disagree.
7  Q  What is the name of your last book that came out
8  here the first of this year?
9  A  Contemporary -- Special Education -- Special
10  Education in Contemporary Society.
11  Q  All right. And in that book, don't you write,
12  besides employment difficulties, researchers have
13  found that for many citizens with mental
14  retardation, independent living is an objective
15  not yet obtained?
16  A  Uh-huh.
17  Q  That was your opinion?
18  A  For many. It doesn't say all. So, there are
19  success stories.
20  Q  And you further wrote, adolescence is a time of
21  transition and for individuals with mental
22  retardation, one that is often difficult and
23  stressful?

Page 372

1  A  Uh-huh.
2  Q  Edgar characterizes his period of movement from
3  student to independent adulthood as one of
4  floundering. For many young adults with mental
5  retardation, this journey is not a successful one.
6  Status as a productive independent adult
7  frequently remains an elusive goal.
8  A  And that is what Edgar wrote.
9  Q  And you cite studies to back up all of that?
10  A  That is correct; I do.
11  What's pointed out is the need for effective
12  transitional planning, because without effective
13  transition planning, many young people are doomed
14  to failure.
15  Q  And what you do then, after quoting that, is blame
16  all that on the educators, don't you?
17  A  I did not blame anyone, sir.
18  Q  Quote, the preceding evidence suggests that
19  professionals must do a better job of planning
20  transitioning experiences for adolescents
21  with mental retardation if they are going to reach
22  their full potential as adults.
23  A  I fully embrace that statement. Exactly what I

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

Page 373

1  said; that it requires effective and meaningful
2  transition planning if our young people are going
3  to leave the public schools, sir, and be
4  successful in their community.
5  Q  In the absence of doing any work in testing, does
6  your experience qualify you to determine the
7  characteristics of a child with a 39 IQ?
8  A  Having worked for four years in a state facility
9  for the mentally retarded, I believe so.
10  Q  Would such a person be severely mentally retarded
11  in your judgment?
12  A  If you look at the IQ of 39, standard error of
13  measurement, that could be as high as 42 or as low
14  as 36. So, the range could be moderately mentally
15  retarded, possibly severely mentally retarded.
16  Q  I want to show you Petitioner's Exhibit 3, the
17  excerpt from the DSM-IV.
18  A  Right. Yes, sir.
19  Q  You're very familiar with that, aren't you?
20  A  Yes, I am.
21  Q  Do you agree with the summary that that provides
22  for the category 318.1, severe mental retardation?
23  A  Correct.

Page 374

1  Q  So, that summary says those persons' likely
2  outcome is life in a group home or with families;
3  is that correct?
4  A  Yes, sir.
5  Q  And even in the category above it, moderate mental
6  retardation, that description does not hold out
7  the hope that those folks would achieve
8  independence in living, does it?
9  A  I'm not sure what you're referring to there.
10  Q  They may learn to travel independently in familiar
11  places. They adapt well to life in the community,
12  usually in supervised settings?
13  A  Yeah. And that would be a group home in the
14  community, sir.
15  Q  Now, you criticized earlier the Board's
16  determination that Gaddies' potential was to work
17  in a sheltered workshop, didn't you?
18  A  Correct.
19  Q  But a sheltered workshop is a recognized, accepted
20  form of employment for folks with Gaddies' level
21  of retardation, isn't it?
22  A  It is one area of opportunity that would present
23  itself for them.

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 375

1  Q  And when you say that you disagree with that, I
2     mean, that's a matter about which professionals
3     can differ, isn't it?
4  A  Oh, yes.
5  Q  When you say you disagree with that, that is not
6     to say that the Board's judgment that that is
7     appropriate is an incorrect judgment, is it?
8  A  Not sure if it would be characterized as an
9     incorrect judgment. I don't think they've
10    explored all options for Gaddies.
11 Q  Now, to work in a place like Wal-Mart stocking
12    shelves and things of that nature would require a
13    whole host of skills that he doesn't have now,
14    wouldn't it?
15 A  And that is the purpose for having transition
16    planning in community-based education.
17 Q  And some of those skills would include some sort
18    of limited recognition of words, wouldn't it?
19 A  Correct.
20 Q  And some sort of limited recognition of his name?
21 A  Correct.
22 Q  And ability to identify himself and where he
23    lives?

Page 376

1  A  Correct.
2  Q  And the ability to identify his parent or whoever
3     he is living with?
4  A  Yes, sir.
5  Q  And his phone number, wherever he lives?
6  A  Yes.
7  Q  So, those types of skills would be skills that
8     would be necessary to prepare Gaddies for
9     independent living if that were a possibility,
10    wouldn't it?
11 A  If it would be a possibility. But what I would
12    question, sir, is how many years are you going to
13    try to teach him that before you realize that that
14    may not be successful, and why don't you put his
15    name and his phone number and address and legal
16    guardian on a card and laminate it so he can carry
17    it with him should he get lost or need to contact
18    someone?
19 Q  Well, a child of that level of functioning could
20    lose a card like that, couldn't he?
21 A  Yeah. And we all could lose our wallets.
22 Q  So I'm clear, is it your position that the idea of
23    Gaddies working in a sheltered workshop should be

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 377

1     abandoned in favor of the idea of his working in a
2     place like Wal-Mart?
3  A  I would try that first.
4  Q  Which one would you try first?
5  A  I would try the community-based job.
6  Q  Like Wal-Mart?
7  A  Like Wal-Mart, like working in the veterinarian
8     store, like working in McDonald's.
9  Q  And so that I am clear, is it your opinion that
10    the Board should abandon the idea of trying to
11    teach Gaddies to recognize some limited skills, to
12    know his name, address, and phone number, or
13    should they continue with that?
14 A  They can continue with that. But I don't think
15    it's the best use of his time in classes that I
16    had the chance to observe.
17 Q  Well, if he needs those skills to work in a place
18    like Wal-Mart, how can he be progress toward that
19    goal if he's not being taught those skills?
20 A  I question, sir, the redundancy of doing the
21    activity over and over again, where, if I recall
22    his records right, at one time he knew his name
23    and knew his address.

Page 378

1  Q  Isn't memory deficit a characteristic of a child
2     with mental retardation?
3  A  Short-term memory is; long-term memory is not.
4  Q  Isn't memory impaired in a child like Gaddies?
5  A  Possibly.
6  Q  Isn't it necessary that things be repeated over
7     and over so he doesn't lose the skill?
8  A  So he doesn't lose the skill?
9  Q  Whether it's recognizing a color, being able to
10    recite his name, address, things of that nature.
11 A  Repetition is a tactic that one could use.
12 Q  Well, it's an accepted tactic, isn't it?
13 A  Correct.
14 Q  So, if the Board is repeating things over and
15    over -- I mean, they are within the field of what
16    is accepted, aren't they?
17 A  Accepted does not equate with best practice.
18 Q  Okay. But it's an accepted practice, isn't it?
19 A  It's an accepted practice.
20 Q  And many of the ideas that you have expressed to
21    us today are on what you would characterize as the
22    cutting edge, aren't they?
23 A  I don't think they are cutting edge. It's fairly

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 379

1  standard in the field of mental retardation.
2  Q  Well, let me see if I can find some of the things
3     you talked about. I mean, for example, you just
4     spoke earlier of what I wrote down, strength-based
5     analysis. You said that was a recent trend of
6     thought in the literature, didn't you?
7  A  In the last ten years, yes.
8  Q  But the other trends of thought are not
9     discredited to the point that they are abandoned,
10    are they?
11 A  No, I didn't say that they should be.
12 Q  And so that if a school system is doing an
13    analysis, a deficit-based analysis, that's not
14    outside of the realm of accepted analysis, is it?
15 A  No, it is not.
16 Q  Now, going back to the stories you talked about,
17    did you have a judgment as to what sort of age
18    level Gaddies is functioning at, where he's
19    functioning if we have compared him to a normal
20    child.
21 A  Probably, the preschool level, if I remember his
22    assessment data.
23 Q  And is your criticism of the story that he was

Court Reporting Services                    (334) 244-0203

Page 380

1  read that it was appropriate for a preschooler?
2  A  Correct.
3  Q  And when presenting materials such as that to
4     Gaddies, should it be presented based upon his
5     chronological age, or his mental age?
6  A  It should be based upon his academic ability.
7  Q  And that is as a preschooler?
8  A  That is as a preschooler.
9     The issue comes up, sir, as to the curriculum
10    materials that you use to teach the concept.
11 Q  Well, if he's functioning --
12    MS. DePAOLA: Your Honor, I would like
13    to ask him to let Dr. Gargiulo
14    finish his answer.
15    MR. HOWARD: Sorry. I thought he had
16    finished.
17    THE HEARING OFFICER: I thought he had,
18    too.
19 A  No, the objection is not to what they were doing;
20    it was to the actual curriculum material.
21 Q  Okay. Then, I misunderstood. I thought the
22    objection was to the content of that particular
23    story.

Mary Moore-Wynn                    Court Reporting Services                    Page 381

1  A  Having a 15 year old child listen to a story about
2     a pig wearing a hat, which is what I believe I
3     heard in that classroom with Ms. Selmar; that's
4     what I object to. Not the skills that they are
5     teaching him, sir, but the material that was used.
6     That is where the age inappropriateness comes in.
7  Q  And this is the question I'm asking you about?
8     It's your testimony that it was inappropriate to
9     have a story about a pig in a hat, because Gaddies
10    is 15 years old?
11 A  What they were teaching him was fine. It was the
12    medium through which they were using to provide
13    that instruction.
14 Q  Okay. You don't have an objection, then, to the
15    particular content of that story?
16 A  I didn't hear the content of the story. I just
17    had a chance to overlook her shoulder and saw the
18    picture of the cat -- cat -- the pig with the hat
19    on.
20 Q  What I am distinguishing that is material that a
21    normal 15 or 16 year old may be interested in such
22    as some sporting event?
23 A  Uh-huh.

Court Reporting Services                    (334) 244-0203

Page 382

1  Q  But, I mean, that's not the problem you're finding
2     that this was about some juvenile-type behavior,
3     pig in the hat?
4  A  It was the material that I objected to.
5  Q  The curriculum, not the story, itself?
6  A  The curriculum -- let me try to make myself clear.
7     I'm sorry I'm being so confusing. The skills that
8     that teacher was assessing, auditory recall, and
9     discrimination skills; those were fine. Those
10    were fine. It was teaching the student through a
11    story that would be appropriate for a three or
12    four year old child. There is the age
13    inappropriateness.
14 Q  If Gaddies were read a story that would have been
15    appropriate for a 15 year old child, would Gaddies
16    have had the mental capability to understand it?
17 A  No, I didn't say use a story for a 15 year old
18    child.
19 Q  What the teacher was doing -- even with that
20    story -- insofar as Gaddies' auditory recall
21    perceptual skills -- isn't that what you referred
22    to just then?
23 A  His auditory discrimination and comprehension.

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

Page 385

1  Q  The issue of whether what was being done there was
2  appropriate is a thing about which educators could
3  disagree, isn't it?
4  A  Yes, we can.
5  Q  And what you observed in the tracing or trying --
6  repeating back on the tape to him his name and
7  telephone number, that is something that will
8  provide benefit to him, isn't it?
9  A  Yes, sir.
10  Q  And that's not entirely irrelevant to even what
11  you would hope he would achieve, is it?
12  A  I see it as an isolated skill.
13  Q  That would be useful for him?
14  A  Yes. That would be necessary.
15  Q  Now, I want to go over your report of
16  December 9th, which has been marked. That would
17  be Petitioner's Exhibit 8. Do you have that
18  before you?
19  A  Yes, I do, sir.
20  Q  I want to get in the middle of the first paragraph
21  where you lay out your criticisms of what you
22  observed. The first one is that it fails to
23  confer meaningful benefit. That really is just a

Page 386

1  conclusion based on everything else, isn't it?
2  A  Correct.
3  Q  The second one is, poorly written. The complaint
4  is that the IEP is poorly written?
5  A  Correct.
6  Q  Is there any requirement in the law that it be
7  well written?
8  A  In order to have an effective IEP, it needs to
9  meet certain standards. I believe that this IEP
10  failed to meet the standards.
11  Q  So, I guess what I am trying to figure out, are
12  you complaining about the literary quality of it,
13  or what?
14  A  No, as I recall, the goals and objectives were
15  poorly constructed.
16  Q  So, the complaint really is not that it is written
17  poorly; the complaint is that it is poorly
18  conceived?
19  A  The quality of services.
20  Q  The next complaint is the lack of a behavior
21  intervention plan. We found out a while ago there
22  is one; you just didn't see it; correct?
23  A  Yeah. Correct. I'm sorry.

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

Page 383

1  Q  Okay. Is that an appropriate activity, teaching
2  activity?
3  A  It depends on what the goal was. I was not aware.
4  I came in, just got a snapshot. So, I don't know
5  what the goal or intent of the activity was.
6  Q  But for a child such as Gaddies, that activity
7  could provide educational benefit, couldn't it?
8  A  In terms of looking at auditory discrimination?
9  Q  Sir?
10  A  For auditory discrimination comprehension?
11  Q  Yeah.
12  A  Yes.
13  Q  And those are things that are useful for a child
14  such as Gaddies to have, aren't they?
15  A  Yes.
16  Q  Okay. So, you can't rule that out as being
17  something that was meaningful for Gaddies, can
18  you?
19  A  Cannot rule it out?
20  Q  Yes, sir.
21  A  I can rule it out, because I don't think -- I
22  don't think it's semantics. It's the delivery
23  system that was used.

Page 384

1  THE HEARING OFFICER: Give an example of
2  what you would substitute in place
3  of the pig in that.
4  THE WITNESS: I would do something that
5  would be more age appropriate for a
6  child that you're trying to get
7  ready to move out into the
8  community. I may have him do -- if
9  you're going to do auditory
10  discrimination, Man Versus Ran
11  Versus Pan. Get some survival
12  skills there.
13  Have him -- let's -- you know,
14  bank sounds like, and give him some
15  other distracters and have him pick
16  out the appropriate sound.
17  THE HEARING OFFICER: Okay.
18  BY MR. HOWARD
19  Q  That's just a preference of yours, though, isn't
20  it?
21  A  Well, I think it's the preference of a lot of
22  professionals that work with individuals with
23  mental retardation, sir.

Mary Moore-Wynn

```
1    Q   And then the complaint that incorporating positive
2        behavioral supports, there are positive behavioral
3        supports in the behavior intervention plan that
4        exist, aren't they?
5    A   I can't testify to that, because I have not seen
6        it.
7    Q   Let's flip over to it.
8    A   See, I don't have that.
9    Q   Look at page 83, I believe it is.  This is the
10       plan that Ms. DePaola called to your attention on
11       your direct, isn't it?
12   A   This is the page that was missing in my packet of
13       materials.
14   Q   But this would be a behavioral intervention plan,
15       wouldn't it?
16       MS. DePAOLA:  Do you want to take some
17       time to read it?
18       THE WITNESS:  Yeah, I'd like to read it,
19       first.
20       MS. DePAOLA:  Can we take a break, so he
21       can read it?
22       THE HEARING OFFICER:  All right.  Take a
23       five-minute break.
```

Court Reporting Services

```
1        (Brief recess.)
2        THE HEARING OFFICER:  All right.  We're
3        back on the Record after a brief
4        break and continuing with the
5        cross-examination.
6        And we were looking at the
7        behavior management plan.
8        BY MR. HOWARD
9    Q   Okay.  Doctor, page 83 of Petitioner's Exhibit 1
10       is a behavior intervention plan, isn't it?
11   A   Yes, sir.
12   Q   And it does contain positive behavioral supports,
13       doesn't it?
14   A   The term, positive behavioral supports, is a
15       concept that says you take a proactive stance so
16       that the inappropriate behavior does not present
17       itself, rather than a reactive stance where you
18       deal with the consequences of that behavior.
19       So, it does contain suggestions for dealing
20       with the behavior.  But I guess I would not
21       qualify that as positive behavioral supports.
22       What you have here is a list of strategies,
23       behavioral strategies.
```

Mary Moore-Wynn

```
1    Q   In paragraph three where it lists verbal praise,
2        have snack or extra snack time, you do not view
3        that as a positive behavioral support?
4    A   No, that's the reinforcer for the appropriate
5        behavior.
6    Q   Then the next complaint in your letter of December
7        9th is there was nothing to address his toileting
8        needs.  But this behavior management plan does
9        address his toileting needs, doesn't it?
10   A   Yes, sir.
11   Q   So, going back to -- you were asked the question
12       by Ms. DePaola earlier whether there is anything
13       in this letter of December 9th that should be
14       changed, is there anything that you feel now that
15       should be taken out of there as a complaint?
16   A   Not based upon the documentation I have in my
17       earlier letter, no, sir.
18   Q   But, I mean, based upon the documentation now, you
19       would take out the line that it lacks a behavior
20       intervention plan, wouldn't you, or the phrase?
21       MS. DePAOLA:  Well, you need to read the
22       entire phrase, incorporating
23       positive behavioral supports, is
```

```
1        what he said.
2    A   I'm sorry?
3    Q   Are there any changes in this first paragraph that
4        you would make to this letter?
5    A   No, sir.  No, sir.
6    Q   You would leave it as written?
7    A   With the stipulation -- with the question
8        surrounding the behavior invention plan and
9        positive behavior supports.
10   Q   All right.  Now, going on to the next sentence, we
11       have already talked about the possibility of
12       Gaddies' potential for independent adulthood,
13       haven't we?
14   A   Yes.
15   Q   And there are many professionals in the field that
16       would disagree with your assessment that that is a
17       realistic possibility, aren't there?
18   A   I would object to the use of the word, many
19       professionals.  I go along with some
20       professionals.
21   Q   But whether independent adulthood is a likely or
22       probable outcome is certainly a debatable issue,
23       isn't it?
```

**Page 391**

1  A  I don't think for me it would be.
2  Q  I know for you it wouldn't be. But, I mean, in
3     the field, it's debatable?
4  A  It could be subject to debate.
5  Q  Now, there is a transition goal stated on page 71
6     of the IEP, isn't there?
7  A  Yes, sir.
8  Q  But as we went over, you just disagree as to
9     whether that is the most appropriate goal?
10 A  Correct.
11 Q  And how would you word that goal?
12 A  My objection is the location that they are placing
13    Gaddies. I don't think they have done any sort of
14    career exploration. And I would probably start
15    with that for Gaddies looking at career
16    opportunities, but also explore the
17    community-living outcome.
18 Q  In other words, to complete the IEP, what would
19    you have written there where it says, employment
20    outcome?
21 A  I would probably put a statement in there to the
22    effect of, explore community-based employment
23    opportunities in the Wetumpka area, or in the

**Page 392**

1     community.
2  Q  And you would have left out entirely the sheltered
3     workshop?
4  A  That would not be a priority for me, no, sir.
5     That is contrary to current thinking in the field
6     which is supported community employment.
7  Q  Are there some folks that can work in sheltered
8     workshops but that can't work in a place like
9     Wal-Mart?
10 A  Yes, sir.
11 Q  And one of the things that they would do -- I
12    mean, you've observed sheltered workshops, haven't
13    you?
14 A  Yes, sir.
15 Q  Do they assemble things such as put nuts and bolts
16    together?
17 A  Sorting tasks, yes, they do the sorting.
18 Q  And the task that Ms. King related to you that
19    Gaddies performed such as with the nuts and bolts
20    and stringing beads are very similar to activities
21    that are performed in sheltered workshops, aren't
22    they?
23 A  Not the stringing of the beads.

**Page 393**

1  Q  The nuts and bolts?
2  A  The nuts and bolts or sorting requirements, yes.
3  Q  Is that an activity that a child such as Gaddies,
4     or a skill, that they would lose if they didn't do
5     it for extended periods of time?
6  A  I'm not sure if I can testify to whether or not he
7     would lose it if he didn't have the exposure to
8     it.
9  Q  But, in other words, things done in school, the
10    screwing, unscrewing, nuts and bolts, that is a
11    skill that would be directly transferable to work
12    in a sheltered workshop.
13 A  Yes, assuming the fact that Gaddies already had
14    that in his repertoire of skills to begin with.
15 Q  And that would provide educational benefit to him,
16    wouldn't it?
17 A  It would provide an avenue that he could use for
18    employment purposes.
19 Q  And that would be educational benefit, wouldn't
20    it?
21 A  I think you're extrapolating educational benefit
22    from nuts and bolts, and I would disagree with you
23    on that. It gives him an employability skill.

**Page 394**

1  Q  And employability, as I understand it, is one of
2     the main things you're concerned about, isn't it?
3  A  Yes
4  Q  Which you label as transition, correct?
5  A  Yes. Transitional from school to independent
6     adulthood.
7  Q  Is that right?
8  A  Yes.
9  Q  Now, let's go down to the paragraph in your letter
10    of December 9th about the testing. Are you
11    familiar with the TONI?
12 A  Uh-huh. Test of Nonverbal Intelligence.
13 Q  Are you familiar with the C-TONI?
14 A  The new one, no.
15 Q  Okay. So, the test that was administered by the
16    Board in this case, Elmore County Board, you're
17    just not familiar with that test?
18 A  No.
19 Q  Do you have enough experience in the field of
20    testing to know whether the TONI and the C-TONI
21    are comparable tests?
22 A  I cannot speak to that issue, sir.
23 Q  Do you have enough knowledge to have an opinion as

Mary Moore-Wynn
Court Reporting Services

## Page 397

1 Q No. Your assumption is that an identical test was
2 administered to Gaddies in March of 2000 --
3 A October.
4 Q Let me start over. Is it your assumption that
5 Gaddies was administered the same test on both of
6 these occasions?
7 A Yes.
8 Q And if it turned out that the tests were
9 different, would that affect your opinion?
10 A Possibly.
11 Q And you're not familiar with the C-TONI --
12 A No, sir.
13 Q -- or what it measures? Okay.
14 Now, going down to the next paragraph on
15 Attention Deficit Hyperactivity Disorder; are
16 attention deficits a characteristic of mentally
17 retarded children?
18 A In some cases, yes.
19 Q For a child such as Gaddies, would an attention
20 deficit be a characteristic of his mental
21 retardation?
22 A Possibly.
23 Q Okay. All right. I want to ask you about the

(334) 244-0203

## Page 398

1 second report. For a child such as Gaddies, is
2 compliance with instructions a problem?
3 A Is it a problem?
4 Q Let me rephrase that question. In a child
5 retarded to the degree that Gaddies is, is
6 noncompliance with instructions something that
7 frequently occurs?
8 A In some youngsters, it would.
9 Q And is it something that has to be handled or
10 dealt with before you can address other areas?
11 A You can't get the child to learn if they are
12 continually off task.
13 Q And motivation for children like that; is that a
14 problem?
15 A In some cases, it would be.
16 Q And I think you mentioned attention or staying
17 focused is a problem?
18 A Uh-huh.
19 Q So that when a teacher sets as a goal for Gaddies
20 that he complete a task, that is something that is
21 addressing the child's attention deficit, his
22 motivation, and his compliance, isn't it?
23 A Okay.

---

Mary Moore-Wynn
Court Reporting Services

(334) 244-0203

## Page 395

1 to whether there were problems with the TONI in
2 regard to its validity?
3 A I'm aware of what the literature says that that
4 was at issue. But I would not feel comfortable
5 speaking to the psychometric properties of the
6 test.
7 Q So, insofar as to whether Gaddies' IQ has actually
8 decreased or not, you really don't have an opinion
9 on that, do you?
10 A Oh, I have an opinion about it, but not from a
11 psychometric point of view.
12 I did not question the administration or the
13 appropriateness of the test. What I am
14 questioning in that paragraph is that they had a
15 decrease of 23 IQ points, and they made no change
16 in his IEP whatsoever by a standard deviation and
17 a half drop in his IQ.
18 Q And at question here is whether Gaddies' IQ
19 actually dropped, or whether the tests measure
20 different things, or whether one test is
21 incorrect; isn't that right?
22 A I would question -- no, because I believe on both
23 of these, they used the TONI. I did not see the

## Page 396

1 C-TONI being used, unless I am mistaken.
2 Q But the statement you made is, quote, the most
3 recent administration of this test shows a
4 decrease of 23 IQ points?
5 A Correct.
6 Q And that can be attributable to the invalidity of
7 one test score, couldn't it?
8 A To the invalidity of the test or test score?
9 Q Well, the result the test produced, the score.
10 The invalidity of the test or the test score could
11 account for that?
12 A So, then, you're saying that the test itself is
13 suspect?
14 Q I'm asking you.
15 A All I am doing, sir, is pointing out the fact that
16 there is a 23-point drop in IQ on the
17 administration of the exact same test.
18 Q So, your assumption is that the exact same test
19 was administered in March of 2000 and -- you have
20 October 2003, but I think you mean October 2002?
21 A Correct. Sorry.
22 Q But that is your assumption, isn't it?
23 A That the IQ changed because of the test.

---

Mary Moore-Wynn                                    Court Reporting Services

Page 399

```
1   Q   isn't that true?
2   A   Yes.
3   Q   And does that provide educational benefit to a
4       child such as Gaddies?
5   A   To keep having him refocus on the task?
6   Q   No, sir, to get him to complete a given task, no
7       matter what it is.
8   A   Yeah, task completion is a requirement for
9       success.
10  Q   And compliance with instructions from a teacher,
11      such as a classroom teacher, that is teaching
12      Gaddies to comply with instructions; does that
13      provide educational benefit?
14  A   That's important.
15  Q   And provides benefit?
16  A   That provides benefit so the student can do the
17      work.
18  Q   Because both of those things, task completion and
19      compliance with instructions, are necessary before
20      he could go to a sheltered workshop or to
21      Wal-Mart, aren't they?
22  A   Yes, sir.
23  Q   Now, in making your analysis in this case, did you
```

Page 400

```
1       give any consideration to what Gaddies was being
2       provided in the way of speech services?
3   A   No, sir.
4   Q   And that was part of his IEP, wasn't it?
5   A   I would have to go back and take a look. I
6       believe he did receive speech and language
7       services.
8   Q   And are you qualified to form an opinion about
9       things that --
10          (Brief interruption.)
11  A   I'm sorry. I did not hear the last part of the
12      question.
13  Q   Are you qualified to form an opinion about speech
14      services?
15  A   No, sir.
16  Q   Or occupational therapy services?
17  A   No, sir.
18  Q   So, you don't have an opinion one way or the other
19      as to whether Gaddies should receive occupational
20      therapy services?
21  A   No, sir.
22          MR. HOWARD: I believe that's all.
23          THE HEARING OFFICER: Any follow up?
```

---

Mary Moore-Wynn                                    Court Reporting Services

Page 401

```
1           MS. DePAOLA: Yes, sir.
2                   FURTHER DIRECT EXAMINATION
3   BY MS. DePAOLA
4   Q   Dr. Gargiulo, I would like to talk about your
5       experience testifying or serving as an expert
6       witness. Have you only served as an expert
7       witness for parent advocates?
8   A   No.
9   Q   Tell the Hearing Officer what school systems you
10      have served as an expert for, or in what occasions
11      you have done that for school systems?
12  A   Most recent was a couple of years ago for the
13      Birmingham Board of Education in an LRE issue.
14      Not on a due process hearing, but as result as
15      federal trial. I served as an expert witness in
16      this case.
17  Q   And in your entire career in Alabama, could you
18      estimate the number of cases that you have
19      actually testified in?
20  A   Probably three or four besides the Birmingham City
21      case.
22  Q   Okay. So, this isn't something you do as a
23      routine matter?
```

Page 402

```
1   A   Oh, no, ma'am.
2   Q   Okay. Would it be fair to say that your life's
3       work is teacher training?
4   A   Yes, ma'am.
5   Q   Okay. So, whatever criticism you have of teacher
6       training, I assume that's associated with your
7       designing and implementing the program at UAB that
8       you think is a better program; is that true?
9   A   Well, if you're going back to the criticism about
10      the article about perceived teacher competencies,
11      that's when I taught at Bowling Green University
12      in Ohio.
13  Q   And the purpose of that was what, to improve
14      teacher training?
15  A   Improve teacher training.
16  Q   I guess it was a sort of a self-criticism?
17  A   Oh, it was for our teacher ed program, because it
18      was our graduates that we were talking about.
19  Q   When you said you have never written an IEP, do I
20      understand that you have just never signed one?
21  A   Oh, I've signed them.
22  Q   Explain to me when you say you've never written an
23      IEP, I don't understand if you've --
```

(334) 244-0203
Court Reporting Services
Mary Moore-Wynn
Page 403

1   A   As a classroom teacher.
2   Q   Okay. But since that time, you've consulted
3       regularly?
4   A   Well, I've dealt with my three daughters that have
5       had IEPs.
6   Q   So, you have participated in the process?
7   A   Oh, fully in the process.
8   Q   How about your perspective of expertise as an
9       educator? Have you ever been called on by anyone
10      to attend an IEP to assist in the development --
11  A   I have.
12  Q   And what courses do you teach in that? You said
13      you train teachers on writing IEP's. Can you
14      explain that?
15  A   That would be part of the courses I used to teach
16      on positive behavioral supports (inaudible) with
17      the IEP class.
18  Q   And isn't it also correct that school systems in
19      the Birmingham area have you come in to consult
20      and train their teachers?
21  A   I have done that in the past, yes, ma'am.
22  Q   Can you tell us some of the systems that you have
23      consulted with?

Page 404

1   A   Birmingham City, Shelby County, just for two of
2       them.
3   Q   Okay. Now, you said earlier that it would be very
4       important for Gaddies to write his name, or
5       something in that vein. Can you tell me why?
6   A   Something as simple as signing an application for
7       employment, signing a paycheck.
8   Q   And can he sign it, does he have to write Gaddies
9       Hill? Is there any other way for him to sign?
10  A   As long as he be made a mark that was recognizable to
11      him.
12  Q   And have you seen some of Gaddies' signatures?
13  A   No, ma'am, I have not.
14  Q   Well, let me just show you Board's Exhibits 4.
15      So, what you're saying is there next to name where
16      there appears to be a G, and Gaddies appears to
17      have written that, that that is sufficient for
18      your purpose of signing a check?
19  A   If the bank will accept it.
20  Q   And so, spending more time on this writing his
21      name; is that an appropriate educational activity?
22  A   I believe not.
23  Q   Just sort of a cost benefit analysis at this point

(334) 244-0203
Court Reporting Services
Mary Moore-Wynn
Page 405

1       in his life?
2   A   Yeah. How much more time are you going to spend
3       doing the same task over and over again when you
4       have a finite amount of time left to prepare him
5       to leave school?
6   Q   Now, if he works at Wal-Mart, and he needs to find
7       his time card, is this absolutely necessary that
8       he be able to recognize his name in order to do
9       that, or are there other ways to do that?
10  A   Oh, no.
11  Q   What else could be done?
12  A   Put his picture on the name card, or put his
13      picture by the name card, or some sort of color
14      coding system.
15  Q   And the concept of an ID card, name, address,
16      phone number; I mean, is that just something new,
17      cutting edge, or is that something that's done all
18      the time?
19  A   I was doing that when I taught 35 years ago.
20  Q   Okay. So, those kind of approaches would meet the
21      requirements, in your opinion, of identifying him?
22  A   (Witness indicating.)
23  Q   (Indicating).

Page 406

1   A   Yes, ma'am.
2   Q   And Mr. Howard asked you if stringing and sorting
3       beads would confer an educational benefit. If
4       Gaddies already knows how to string and sort
5       beads, do you believe that continuing to string
6       and sort beads for two years confers additional
7       educational benefit of any sort?
8   A   No, ma'am.
9   Q   If Gaddies were to live in a group home, is that
10      considered independent living, a group home?
11  A   That is a form of independent living.
12  Q   And so we're not talking about him having his own
13      apartment? We're talking about him living in a
14      supervised situation?
15  A   Supported environment.
16  Q   Or if Gaddies had to live with his mother for the
17      rest of his life, are there still skills that he
18      needs to be taught?
19  A   Oh, yes.
20  Q   Does he need to be taught like clothes washing?
21      What you're talking about, ma'am, are survival
22      skills, how to operate a microwave, how to take
23      care of yourself, say, if you cut your finger.

Page 407

1    How to do an emergency, dial 911, how to use a
2    telephone, how to access the community, how to go
3    to the bank, how to use an ATM machine if that
4    might be appropriate.
5    Q    How about making his bed?
6    A    Making his bed, making his lunch, locking the
7    door. Those are very functional, very pragmatic,
8    useful skills
9    Q    Whether he lives with his mother or lives in a
10   group home?
11   A    Still things that he's going to have to do.
12   Q    And you have not seen any analysis, any documents,
13   of any outcomes that are now related to what's in
14   his IEP?
15   A    No, ma'am.
16        MS. DePAOLA: That's all I have.
17        FURTHER CROSS-EXAMINATION
18   BY MR. HOWARD
19   Q    The activity of working with nuts and bolts is
20   related to the outcome of living or working in a
21   sheltered workshop, isn't it?
22   A    If that would be the outcome for Gaddies, that
23   might be a task that he would be expected to do.

Page 408

1    Q    That would be related to that?
2    A    Yes.
3    Q    And the activity of being able to recite his name,
4    his mother's name, and phone numbers, those are
5    related to that same outcome, aren't they?
6    A    Yes, sir.
7        MR. HOWARD: That's all
8        THE HEARING OFFICER: Okay. Thank you
9        You can go
10       All right. Who is your next
11       witness?
12       MS. DePAOLA: I would like to take a
13       break and talk to the mother just
14       for a minute
15       THE HEARING OFFICER: Take a five-minute
16       break.
17       (Brief recess.)
18       THE HEARING OFFICER: Who is your next
19       witness?
20       MS. DePAOLA: Juanita Corbett.
21            JUANITA CORBETT
22   (Whereupon, the witness, after having first
23   been duly sworn to speak the truth, the whole truth,

Page 409

1    and nothing but the truth, took the stand and
2    testified as follows:)
3        DIRECT EXAMINATION
4    BY MS. DePAOLA
5    Q    State your name for the Hearing Officer.
6    A    Juanita Corbett.
7    Q    Are you the mother of Gaddies Hill?
8    A    Yes, I am.
9    Q    I just have a few questions for you about Gaddies.
10   I don't think it's come out in the Record how many
11   times Gaddies has been held back in school.
12   A    That's correct.
13   Q    Would you tell the Hearing Officer?
14   A    He was held back in the first grade, and he was
15   held back in the seventh grade.
16   Q    Did he go to kindergarten in Ohio?
17   A    No, he went to preschool. He went to preschool,
18   and from preschool to elementary.
19   Q    Okay. What age did he start school?
20   A    Two.
21   Q    So, Gaddies has been in school from age two
22   through age 15 at some point?
23   A    That's right.

Page 410

1    Q    Flunking two grades?
2    A    That's right
3    Q    Have they informed you he's going to flunk again
4    this year, or he can't go on to the high school?
5    A    No, they haven't, but I hope that be the case.
6    Q    Have they told you that he can't go on unless he
7    can write his name?
8    A    Yeah, they have told me that, write his name, know
9    his address and telephone number.
10   Q    So, let me ask you this about extended school
11   year. You were promised services last year
12   pursuant to this profile sheet on the IEP for
13   summer school, right?
14   A    That's right.
15   Q    Or during summer school, let's put it that way
16   Now, can you tell the Hearing Officer how much
17   services were actually provided?
18   A    I think he got a chance to go for two weeks. And
19   then I brought him the first day, they didn't know
20   what to do --
21       THE HEARING OFFICER: He was supposed to
22       go for two weeks?
23       THE WITNESS: No, he was supposed to go

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 411

```
 1   to summer school.
 2        THE HEARING OFFICER: For the whole
 3   quarter or term?
 4        THE WITNESS: Yes, sir.
 5        THE HEARING OFFICER: He went for two
 6   weeks?
 7        THE WITNESS: And that's why they got in
 8   touch with me, because they say
 9   they couldn't get in touch with me.
10        MS. DePAOLA: Your Honor, I would
11   just -- these are not part -- these
12   are part of Houston's exhibits, but
13   I would like to get into the Record
14   Petitioner's Exhibit 11, I guess it
15   would be.
16        THE HEARING OFFICER: No, 10.
17        MS. DePAOLA: Ten, which apparently the
18   notes where someone's trying to
19   contact Ms. Hill relating to summer
20   school.
21        Do you have one where the top's
22   not cut off?
23        MR. HOWARD: No.
```

Page 412

```
 1        What was Petitioner's
 2   Exhibit 10?
 3        THE HEARING OFFICER: No, this is 10.
 4        MS. DePAOLA: This document appears to
 5   be dated June 26, 2002.
 6        MR. HOWARD: What is my number at the
 7   bottom?
 8        MS. DePAOLA: 0-152.
 9        (Whereupon, Petitioner's Exhibit 10 was
10   marked for identification and is
11   attached hereto.)
12        MS. DePAOLA: Just for the Record, Your
13   Honor, the date on that is June 26,
14   2002. And that appears to be
15   contact attempts with Ms. Corbett
16   for summer school.
17        THE HEARING OFFICER: All right.
18   BY MS. DePAOLA
19   Q   Ms. Corbett, did you receive any contact from
20   anyone prior to the 26th related to summer school?
21   A   No, I didn't. It was so late into summer, and I
22   knew school would be starting back. I started
23   calling the board of education or whatever you
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 413

```
 1   call it. And I asked them about was Gaddies going
 2   to summer school. They couldn't tell me when I
 3   called. They told me they would get back with me.
 4   Q   And so, I see actually a sticky note here saying
 5   you called on July 1st. Do you think you called
 6   before that time?
 7   A   Oh, I called before then and talked to the
 8   secretary --
 9   Q   So, basically, when you were trying to get the
10   services --
11   A   -- but she couldn't tell me.
12   Q   Listen to my question. You were trying to get
13   services for him before they contacted you?
14   A   That's right.
15        THE HEARING OFFICER: Did he ever get
16   any? Did he ever go at all?
17        THE WITNESS: He went for two weeks.
18   Q   And did they appear to have an IEP or any kind of
19   program for him when he arrived?
20   A   No, she didn't know what to do with him. She told
21   me she would have to find out what she is supposed
22   to be doing with Gaddies, and she would try to let
23   me know something.
```

Page 414

```
 1   I get there the next day, she told me she went
 2   over there. She had somebody in the car. She
 3   couldn't get out and go upstairs. She didn't get
 4   no information that day.
 5   Q   The first two days he went, they had no
 6   information --
 7   A   She just kept him 15 minutes.
 8   Q   Kept him 15 minutes?
 9   A   Uh-huh.
10   Q   And then the third day, did she seem to have any
11   information?
12   A   Huh-huh.
13   Q   How long did this go on?
14   A   It was a week. It was the second week before she
15   could tell me what she supposed to do. And she
16   told me that she only supposed to be with him for
17   15 minutes and that I didn't have to bring him no
18   more at 8:30.
19   Q   Who is she?
20   A   Whoever the teacher was then. I can't remember
21   her name.
22   Q   And so, they were making you drive him to school?
23   A   Uh-huh.
```

**Page 415**

1 Q Doesn't he take the special ed bus, usually?
2 A Yes, ma'am.
3 Q He has to actually be strapped into the seat,
4 doesn't he?
5 A Yes, ma'am, supposed to be.
6 Q How far did you drive him every day?
7 A About 14 miles.
8 Q Each way?
9 A Uh-huh.
10 Q And you just did it for another week, and then it
11 was over or what?
12 A I did it for two weeks.
13 Q And then school started back up?
14 A And then she said that was his last day. And he
15 maybe had two weeks before school started back up
16 or a week.
17 Q Now, yesterday, we talked a little bit about
18 Gaddies being excluded from school last year.
19 A Uh-huh.
20 Q Can you tell the Hearing Officer how often an
21 average week were you told to come and get
22 Gaddies?
23 A Maybe three, four, times out of a week. And I got

**Page 416**

1 so tired of it until I went to the office to talk
2 to Mr. Teal about it. And he said he would talk
3 to them, because it was something wrong that they
4 needed to call me that often to come get him.
5 Q And I take it that when they would have you pick
6 him up, you wouldn't necessarily check him out
7 through the office every time?
8 A Oh, I checked him out every time through the
9 office. And they would call and let him know that
10 I was there.
11 Q So, they should have a record of all the times --
12 A They should.
13 Q Okay. When did this finally stop, the exclusion?
14 I mean, did it stop last year at some point?
15 A Well, I tried -- I went to Mr. Teal and telling
16 him what was happening. And telling him that they
17 had took his OT out and speech therapy out of his
18 file.
19 Q Now, I'm talking about the exclusion.
20 A Well, that went on -- it went on until I got with
21 SEAC, and then they started telling me what to do.
22 MR. HOWARD: Until what? I didn't
23 understand her response.

**Page 417**

1 MS. DePAOLA: Until she got with SEAC,
2 and they started telling her what
3 to do.
4 Q Tell me what you mean by that. What did they tell
5 you to do?
6 A They told me to start documenting everything
7 that -- every time I went to get Gaddies and what
8 Ms. King would say to me or whoever called me.
9 Q Did they ever inform the school that they needed
10 to stop sending him home?
11 A No, they just told me to stop going and getting
12 him.
13 Q Okay. Now, yesterday, someone testified that
14 Gaddies could say his phone number. If you say,
15 Gaddies, what's your phone number, can he tell you
16 that?
17 A No.
18 Q Did you try that last night?
19 A Yes, I did.
20 Q Okay. If you say, Gaddies -- tell me what you did
21 with him.
22 A I said, Gaddies, what is your telephone number? I
23 said, Gaddies, you can't tell me your telephone

**Page 418**

1 number? He just kept on looking at me. I would
2 say, five; he would say, five. I would say, one;
3 he would say one -- whatever I said, he would say.
4 Q So, he could repeat it if you would do it digit by
5 digit?
6 A That's right.
7 Q Did you ask him, Gaddies, say your address?
8 A Yes, I did.
9 Q He couldn't say that, either?
10 A Huh-huh. He would say what I say.
11 Q Now, I would like you to identify for the Record
12 one document that really hasn't been identified.
13 And that is document number one. Can you just
14 tell the Hearing Officer what that is?
15 A It's a Individualized Educational Program, IEP --
16 Q From where?
17 A Columbus, Ohio.
18 Q And did you deliver that IEP to any of the Alabama
19 schools when he came down here?
20 A I delivered it to Tallassee, and I delivered it to
21 Wetumpka.
22 Q Okay. So, we've got that in the Record.
23 Now, there were some questions yesterday about

Page 419

1 a notebook prior to this notebook, which has been
2 marked as Petitioner's Exhibit 7. Was there any
3 kind of notebook coming home this year?
4 A   That one (indicating).
5 Q   Okay. But prior to this one?
6 A   If there were, I don't remember it.
7 Q   You never saw another one?
8 A   I don't remember one, no.
9      And I tried to keep up with everything that I
10     get of Gaddies'
11 Q   Now, when you had a meeting in November of 2002 --
12     that was just a few months ago -- to go over his
13     new testing, did you, after they went through all
14     of that, say, well, I think we need to revise the
15     IEP? Did you request a revision to the IEP?
16 A   Yes, I did.
17 Q   What was their response?
18 A   They would do it. They would get with me and set
19     a date. But at the time, Ms. King's mother died,
20     or she got sick or something. So, they like
21     forgot about contacting me and letting me know
22     when they was going to do it. So, I got tired of
23     waiting. I called the school system back and

---

Page 420

1 asked them why hadn't they set a date for me to
2 come in for an IEP meeting. And then maybe the
3 next week or so, they made a date, and I went into
4 the school.
5 Q   Are you saying there was an IEP after November of
6     2002? We haven't seen that document. Is there
7     some other IEP?
8 A   Yes, there should be, because we did another one.
9 Q   Okay. Did they ever tell you that you needed to
10    wait until the end of the year to revise the IEP?
11        MR. HOWARD: We object to her leading
12    her own client.
13        THE HEARING OFFICER: Well, I think she
14    has exhausted her memory, so I'll
15    let her lead on that. Overruled.
16 BY MS. DePAOLA
17 Q   Did they tell you this year that you needed to
18    wait until the end of the year?
19 A   Yes, they did.
20        MS. DePAOLA: Do you have any other
21    IEPs, Houston, that you haven't
22    produced?
23        MR. HOWARD: I don't. I've given you

---

1 what I've got.
2        MS. DePAOLA: I just want to make sure
3    that we're --
4 Q   Let me show you at page 165, is that what you're
5     talking about that you all got together?
6 A   Yes, it is.
7 Q   And you haven't done anything since then?
8 A   No.
9        MS. DePAOLA: Your Honor, for the
10    Record, that's the new eligibility
11    decision that was done in December.
12        THE HEARING OFFICER: That's what you
13    all were doing at that meeting?
14        MS. DePAOLA: Yes.
15        THE WITNESS: Uh-huh.
16        MS. DePAOLA: I don't have any other
17    questions, Your Honor.
18        CROSS-EXAMINATION
19 BY MR. HOWARD
20 Q   If I'm understanding you correctly, you called in
21    and asked someone about whether they were going to
22    do up a new IEP; is that correct?
23 A   That's correct.

---

Page 422

1 Q   Who did you talk --
2 A   I didn't call in at that time. I talked to
3     Mr. Teal. I came to the school and talked to him
4     personally.
5 Q   Mr. Teal, the principal?
6 A   Uh-huh. That's right.
7 Q   And they told you they were going to do a new IEP?
8 A   He told me he would contact me after he talked to
9     Ms. King. Because at that time, he didn't know
10    that all of this was going on. Because he said
11    after he talked to her that they would contact me
12    back, but they didn't. So, I called back to the
13    school.
14 Q   Who was it that told you there were going to do a
15    new IEP?
16 A   Mr. Teal, after he had talked to Ms. King.
17 Q   And, in fact, you had the meeting where you signed
18    a document you went over with Ms. DePaola; is that
19    right?
20 A   That's right.
21 Q   And was Ms. King at that meeting?
22 A   Yes, she was.
23 Q   Her name doesn't appear on it, does it?

Mary Moore-Wynn                                  Court Reporting Services                                  (334) 244-0203

Page 423

```
 1   A   She was there. I thought she was.
 2   Q   Let's look at it.
 3            THE HEARING OFFICER: 168.
 4            MR. HOWARD: What did you say, 168?
 5            THE WITNESS: Was she there?
 6            MS. DePAOLA: She might have been. I
 7       don't know. She did not sign.
 8            THE WITNESS: Well, I don't guess she
 9       was. She is not on there.
10   Q   Okay. Her name does not appear --
11   A   No, it doesn't.
12   Q   -- on page 168, does it?
13   A   No.
14   Q   Was there any discussion at that meeting about
15       whether the IEP would be revised?
16   A   Yes, it was.
17   Q   And were you told that the IEP would be revised?
18   A   Yes.
19   Q   And were you told that they would contact you to
20       set up a date to do that?
21   A   That's fine.
22   Q   And that happened at this meeting?
23   A   That's right.
```

Page 424

```
 1            (Whereupon, Board's Exhibit 12 was
 2       marked for identification and is
 3       attached hereto.)
 4   Q   I'm going to show you Board's Exhibit 12, which is
 5       a letter signed by Marshall Anderson dated
 6       November 20th, 2002. Did you receive a copy of
 7       that?
 8   A   Yes, I did.
 9            MR. HOWARD: Offer Board's Exhibit 12
10       into evidence.
11            THE HEARING OFFICER: All right. It's
12       admitted.
13   Q   And then this request for a due process hearing
14       was filed within a week or so after getting that
15       letter from Mr. Anderson stating that a meeting
16       would be held to redo the IEP, wasn't it?
17   A   That's what I said.
18   Q   Okay. Now, is it your testimony that Gaddies
19       averaged attending school a full day just one day
20       a week last year?
21   A   Maybe two days, yes, sir.
22   Q   And the rest of that time --
23   A   I would have to go get him and take him home.
```

Mary Moore-Wynn                                  Court Reporting Services                                  (334) 244-0203

Page 425

```
 1   Q   You were picking him up?
 2   A   They would call me like 10:00 or 11:00, something
 3       like that, and I would pick him up.
 4   Q   So, if we averaged up all the days that he was
 5       there a full day, it would have been no more than
 6       two days a week on average?
 7   A   On average of what?
 8   Q   For the whole school year last year.
 9   A   No, because I did not say the whole school year.
10   Q   Ma'am?
11   A   No, because I did not say the whole school year.
12   Q   That's what I was understanding you to say. Is
13       that incorrect?
14   A   No, you didn't understand me to say that. Yes,
15       it's incorrect.
16   Q   What period of time was it when he stayed in
17       school all day for two days a week?
18   A   I said it was for about maybe three weeks.
19   Q   At the first of the year?
20   A   It might have been up in the middle of the year.
21   Q   The beginning of the year?
22   A   Maybe a month over into the year.
23   Q   Well, I'm trying to figure out what part of the
```

Page 426

```
 1       year this was --
 2   A   And I'm trying to help you figure out, because I
 3       don't remember myself hardly, but I know that it
 4       was over into the middle of the year. Maybe a
 5       month in there.
 6            It was right when they got started. Ms. King
 7       and them had never dealt with Gaddies, so, they
 8       just didn't really know how to deal with him.
 9   Q   And you're not sure how many times a week you
10       would have to go pick him up, are you?
11   A   No, I'm not really sure. Definite of how many
12       days I had to go pick him up?
13   Q   Yes, ma'am.
14   A   But I'm sure it was two to three days a week.
15   Q   You can't even remember what month it was in, can
16       you?
17   A   That's fine.
18   Q   When school started this year, was there a
19       notebook that was sent home with Gaddies every
20       day?
21   A   Just as I told her, I don't know if I got a
22       notebook or not, because I called --
23            MS. DePAOLA: Wait and let --
```

1  THE WITNESS: I'm fixing to answer him
2  about this notebook.
3  Because I called the school and asked Ms. Selmar
4  and Ms. King where was the book that I was
5  supposed to be getting for him. And that's what
6  they sent me.
7  Q I'm going to show you Petitioner's Exhibit 7. You
8  brought this notebook to the hearing; is that
9  right?
10 A No, I did not.
11 Q Did you give it to your attorney?
12 A Yes, I did.
13 Q And were you supposed to send it back to school?
14 A I sent it to the school with him every day.
15 Q You didn't send it back the last time?
16 A I didn't send it back this week, because my lawyer
17 had it.
18 Q The first day in here is November 12, isn't it?
19 A Uh-huh.
20 Q Is that right?
21 A Yes.
22 Q Was there a notebook before that?
23 A I just told you I don't know nothing about no

1  other notebook.
2  Q Well, you don't remember whether there was one, or
3  there wasn't one or --
4  A I don't recall. I don't remember, however you
5  want to classify it.
6  Q Do you have another notebook at home?
7  A No, I do not. If I had it, I would have gave it
8  to her just like I did everything else
9  Q Did you throw another notebook away?
10 A No, I have no need to throw away nothing that I
11 need.
12 Q Now, did you do some of Gaddies homework that was
13 sent home?
14 A No. I help some with his homework.
15 Q Did you draw some of the lines yourself?
16 A No, I do hand on hand with him.
17 Q Ma'am?
18 A Hand on hand. My hand on top of his hand.
19 Q Back at the IEP committee last -- into the last
20 school year, did you complain to the IEP committee
21 that Gaddies couldn't read or write?
22 A Well -- I complained? I don't say I complained.
23 They asked me what I would I like to see for him

1  to do. I told them what I would like to see. I
2  would like to see him read. I would like to see
3  him write. I would like to see -- I don't know.
4  I can't tell you everything. But I can get my pad
5  and tell you what I told them.
6  Q Get what?
7  A My pad over there and tell you everything
8  specifically what I told them I would want Gaddies
9  to have. I choose not to lie.
10 Q Did you tell the committee you wanted them to work
11 on Gaddies' reading and writing?
12 A If there was a spiritual way, yes.
13 Q Ma'am?
14 A If there was a spiritual way, yes, I did.
15 Q A spiritual way?
16 A That's right. In God, I say he will write one
17 day.
18 Q What do you mean by that?
19 A Because God say all you have to do is ask, and I
20 have asked him. That's what I mean.
21 Q Did you ask the school people to help?
22 A No, I didn't ask them to help. They asked me what
23 I wanted. I told them.

1  MR. HOWARD: That's all.
2  THE HEARING OFFICER: All right. Any
3  follow up?
4  MS. DePAOLA: No, sir. We rest.
5  THE HEARING OFFICER: The Petitioners
6  rest.
7  MS. DePAOLA: You can come back down.
8  THE HEARING OFFICER: Who is going to be
9  your first witness?
10 MR. HOWARD: I don't know. What I would
11 like to do, if we could, is break
12 for lunch and let me see if I can
13 get people lined up.
14 THE HEARING OFFICER: Okay. What time
15 do you want to resume?
16 MR. HOWARD: Let's see. 1:00 o'clock,
17 is that too long?
18 THE HEARING OFFICER: No, if that's what
19 you think. 1:00 o'clock, we'll
20 resume.
21 (Lunch recess.)

Page 431

```
 1        TAMMY HAWKINS
 2        (Whereupon, the witness, after having first
 3   been duly sworn to speak the truth, the whole truth,
 4   and nothing but the truth, took the stand and
 5   testified as follows:)
 6        DIRECT EXAMINATION
 7        MR. HOWARD:  Before I get started,
 8   Susan, can we stipulate that the
 9   child has been provided the speech
10   services required by the IEP?
11        MS. DePAOLA:  I really haven't even
12   looked at that.  I'll let you know
13   in about an hour.
14        I think so.
15        MR. HOWARD:  Speech hasn't been
16   mentioned.
17   BY MR. HOWARD:
18   Q   State your name, please, ma'am.
19   A   Tammy Hawkins.
20   Q   And Ms. Hawkins, what is your occupation or
21   profession?
22   A   I'm an occupational therapist.
23   Q   And are you licensed by the State in that regard?
```

Page 432

```
 1   A   Yes, sir.
 2   Q   And how long have you been practicing occupational
 3   therapy?
 4   A   Since 1996.
 5   Q   And what education do you have?
 6   A   I have a Bachelor's degree in occupational therapy
 7   and a Master's in rehab counseling and vocational
 8   evaluation.
 9   Q   Are you employed full time by the board of
10   education?
11   A   I'm employed on an hourly basis, but it relates
12   about to full-time employment.
13   Q   Do you have a private practice, also?
14   A   Yes, sir.
15   Q   Do you do work similar to that you do for the
16   Elmore County Board of Education for any other
17   school systems?
18   A   I work one day a week in Montgomery County.  So,
19   work in the Montgomery school system.
20   Q   What does an occupational therapist do?
21   A   In the school system, I help children to become
22   more independent in fine motor and self-help
23   skills.
```

Page 433

```
 1   Q   Was Gaddies referred to you for you to make an
 2   occupational therapy evaluation?
 3   A   Yes, sir, he was.
 4   Q   The document I have marked as Board's Exhibit 13,
 5   what is that?
 6   A   That's a referral for related services.  It can be
 7   used for occupational or physical therapy.  But
 8   that's the referral form where he was referred to
 9   me.
10   Q   And it has the date of what on it?
11   A   September 11th, 2000.
12   Q   Is that the first date you had any knowledge of
13   Gaddies Hill?
14   A   Yes, sir, that's usually the first thing that
15   comes across to me.
16        (Whereupon, Board's Exhibit 13 was
17   marked for identification and is
18   attached hereto.)
19        MR. HOWARD:  We offer Board's Exhibit
20   13.
21        THE HEARING OFFICER:  All right.  It's
22   admitted.
23   Q   And did you make an occupational therapy
```

Page 434

```
 1   evaluation of Gaddies on September 22nd, 2000?
 2   And I show you Petitioner's Exhibit (inaudible).
 3   A   Yes, sir.
 4   Q   Is that that evaluation?
 5   A   Yes, sir.
 6   Q   And at that time, did you make a determination as
 7   to whether Gaddies would benefit from occupational
 8   therapy provided by you?
 9   A   Yes, sir.
10   Q   What was that determination?
11   A   I felt like I didn't need to see him on a weekly
12   or regular basis, but that I would be available
13   for a consultation-type service as needed.
14        MS. DePAOLA:  Excuse me, Houston, what
15   is the number on the document?  Is
16   that 095?
17        MR. HOWARD:  0187.
18        MS. DePAOLA:  I thought you put in the
19   second one.
20        MR. HOWARD:  The August one is in your
21   book.
22        MS. DePAOLA:  No, I was confused.
23   Q   What was the reason you determined that Gaddies
```

Page 435

```
 1    didn't need occupational therapy?
 2  A  Well, I had to look at the skills he was working
 3     on. And I talked with his aides and his teachers,
 4     and I got a feel for what they were doing with him
 5     already. And after I asked him to do a few little
 6     tests and things that I have a child do when I'm
 7     doing an evaluation, I felt like the teachers and
 8     aides that were working with him in the classroom
 9     at that time were doing the same type of things
10     that I would do if I came on a weekly basis.
11  Q  What is Board's Exhibit 14?
12  A  Yes, sir.
13  Q  This is just a general handout that I made out
14     years ago that I give out to aides and teachers to
15     help them come up with ideas of things that they
16     can do to help with students that need help or
17     need to improve their fine motor skills.
18  Q  Did you provide that to Gaddies' teacher at that
19     time?
20  A  I believe this was the one in 2000, I gave to
21     Ms. Gill at that time.
22        MR. HOWARD: This is document 238.
23        (Whereupon, Board's Exhibit 14 was
           marked for identification and is
```

Page 436

```
 1        attached hereto.)
 2        MR. HOWARD: We offer Board's Exhibit 14
 3        into evidence.
 4        THE HEARING OFFICER: All right. It's
 5        admitted.
 6  Q  Now, look in the book of exhibits before you,
 7     please, ma'am. Flip over to page 131.
 8  A  Okay.
 9  Q  All right. Now, before we go to that, did you
10     provide a letter to Ms. Doris McQuiddy in the
11     summer of 2000 --
12  A  Yes, sir.
13  Q  -- about your experience with Gaddies'
14     occupational therapy?
15  A  Yes, sir.
16  Q  Is that letter marked as Board's Exhibit 15?
17  A  Yes, sir, yes, it is.
18        (Whereupon, Board's Exhibit 15 was
19        marked for identification and is
20        attached hereto.)
21        MR. HOWARD: C158. June 27, '02.
22        We offer Board's Exhibit 15
23        into evidence.
```

Page 437

```
 1        THE HEARING OFFICER: All right. It's
 2        admitted.
 3     BY MR. HOWARD
 4  Q  And then looking beginning on page 131 of
 5     Petitioner's Exhibit 1, the book there, is that
 6     the occupational therapy evaluation you made of
 7     Gaddies this school year?
 8  A  Yes, sir.
 9  Q  And tell the Hearing Officer, if you would,
10     please, ma'am, what you did with Gaddies in making
11     that evaluation?
12  A  Well, I met with Gaddies and his aide, and I did
13     basically a reevaluation. I looked at the same
14     skills that I would look at when I'm asked to do a
15     reevaluation. And I asked him to do many of the
16     same things I asked him to do two years ago
17  Q  And could you make a determination whether he had
18     made any progress from your first evaluation?
19  A  There were some small improvements that I noted
20     between the 2000, 2002 evaluation.
21  Q  In what areas were those?
22  A  Basically, they were real specific things. They
23     were scissors skills, letter recognition, and then
```

Page 438

```
 1     tracing.
 2  Q  Now, I forgot to go over one document with you,
 3     Board's Exhibit 11. It's dated 8/9/01. What was
 4     that?
 5  A  I believe this is what I gave to his aide at the
 6     beginning of the second school year, if we're
 7     counting 2000 as the first. Because I believe 1
 8     called, and they questioned, are you going to see
 9     him on a regular basis? I said, no, I did the
10     evaluation last year, but this is things the can
11     work on.
12  Q  So, it's kind of like a consultation as
13     needed.
14  A  Now, as a result of your most recent evaluation,
15     do you think Gaddies needs occupational therapy
16     provided by you, a certified therapist?
17  Q  I provide therapy services on a weekly, monthly,
18     consultative basis. I don't feel like he needs
19     direct. And direct, by that I mean weekly
20     services. But I'm available for a consultation.
21  Q  Why is it you don't believe he needs the services?
22  A  I feel that his full-time aide and teachers that
23     are working with him are capable of providing the
```

## Page 442

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

1   Q   And the other question I had for you is: As far
2       as activities of daily living --
3   A   Uh-huh.
4   Q   -- you reported in there some things about the can
5       dress himself, et cetera. Where did you get that
6       information?
7   A   Well, that's one thing, sometimes when I'm working
8       with a student, I will actually do the skills. I
9       think in this particular evaluation, I got this
10      per report, which would be from an aide. It would
11      be from me asking, can he use the bathroom? If I
12      wrote that in my report, then it was answered to
13      me, yes, he can go to the bathroom.
14  Q   So, activities of daily living that I'm talking
15      about are buttoning, zipping, folding clothes,
16      front and back, you didn't do any independent
17      evaluation?
18  A   No, I did not. I might have had him button a
19      button on the table top, but I did not do a
20      full --
21  Q   You just accepted a report from someone else?
22  A   It was a verbal report from his aide.
23  Q   Is one of the functions of occupational therapists

## Page 441

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

1   Q   And you're not in the business of reevaluating
2       whether that's an appropriate goal for Gaddies?
3   Q   You're not an educator, so you're not trying to
4       decide, well, he's smart enough to write, or not
5       smart enough to write? You're just saying, well,
6       if that's what they want to do, these are the
7       things that he has to do?
8   A   Right.
9   Q   So, if the Hearing Officer determines that
10      whatever the goal was appropriate, it's
11      possible some of these activities are not
12      necessary; is that right?
13  A   Well, when I'm asked to do an evaluation, I give
14      my opinion about what I think would benefit the
15      student.
16  Q   If he's going to learn to write --
17  A   Right.
18  Q   -- he needs to trace?
19  A   Correct.
20  Q   If someone determines that this is an
21      inappropriate goal, you don't address that?
22  A   I would have no idea that they felt it was
23      inappropriate unless they let me know.

## Page 439

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

1       assistance of things he needs, like trace his name
2       and help with counting and just the things that I
3       would try to work on. I feel like they would
4       adequately meet his needs.
5   Q   Now, you're paid on a per hourly basis?
6   A   Yes, sir.
7   Q   And if you provided the services, you would make
8       more money?
9   A   Yes, sir.
10  Q   And whose judgment was it that he didn't need the
11      services?
12  A   Just my own.
13          MR. HOWARD: That's all of the
14      questions.
15          CROSS EXAMINATION
16      BY MS. DePAOLA:
17  Q   Ms. Hawkins, this referral form that's been marked
18      as Board's Exhibit 13, who put the checks on
19      there?
20  A   I believe it was the classroom teacher at that
21      time. And I think her name was Mrs. Cox.
22  Q   So, this comes to you with them defining what the
23      area of concern is?

## Page 440

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

1   A   Correct.
2   Q   And them telling you whether he can button, zip,
3       dress, undress, et cetera?
4   A   They are giving me their opinion.
5   Q   So, your evaluation is limited in scope to what
6       they call attention to?
7   A   Well, I'm not sure if I understand your question.
8       What I do is I take that as a referral form that
9       there is an evaluation to be done. And then I do
10      an evaluation, full, complete evaluation. It's
11      the same form used for every child.
12  Q   They were expressing to you a problem with fine
13      motor coordination?
14  A   Correct.
15  Q   Do you know why they wanted his fine motor
16      coordination improved?
17  A   Because that would be a positive step to be more
18      independent.
19  Q   Is that for his writing ability?
20  A   Exactly. That's what I assumed was the biggest
21      area.
22  Q   So, they are trying to teach him to write?
23  A   Uh-huh.

Page 443

1    to evaluate activities of daily living for a
2    child?
3    A  How it affects their school performance, yes.
4    Q  Were you ever asked to do that for Gaddies?
5    A  I was asked what are his self-help skills. That's
6    why I wrote that in my report. And she said, yes,
7    he could use the bathroom.
8    Q  Is that the end of it?
9    A  Well, I'm not going to go into the bathroom and
10   make sure.
11   Q  No, but aren't there other activities of daily
12   living?
13   A  Well, yes, feeding, buttoning, washing hands.
14   Q  Are there any evaluations you have done of his
15   activities of daily living, personal evaluations?
16   A  Like watching him eat lunch? Is that what you
17   mean?
18   Q  Well, your report in here that he can use his fork
19   and knife real well.
20   A  Real well?
21   Q  Well, you said he could use --
22   A  That was per report. I generally ask, like we'll
23   have a minute or two conversation. If I find

Page 444

1    there is a problem, I'll ask more about it. But
2    since I was given, no, he can do that, he can do
3    that, then I move on to other areas.
4            MS DePAOLA:  That's all.
5            THE HEARING OFFICER:  Okay. Thank you
6    You can go.
7                PAULETTE FREEMAN
8            (Whereupon, the witness, after having first
9    been duly sworn to speak the truth, the whole truth,
10   and nothing but the truth, took the stand and
11   testified as follows:)
12               DIRECT EXAMINATION
13   BY MR. HOWARD
14   Q  What is your occupation, please, ma'am?
15   A  I'm a school counselor.
16   Q  For what school?
17   A  For Wetumpka Junior High School.
18   Q  How long have you served in that capacity?
19   A  Five years.
20   Q  And what education do you have, please, ma'am?
21   A  I have a Bachelor's in elementary and a
22   Master's in counseling and psychology.
23   Q  And how long have you been employed in the field

Page 445

1    of education?
2    A  Thirteen years.
3    Q  Okay. Have you provided counseling to Gaddies
4    Hill?
5    A  Yes, I have.
6    Q  Over what period of time?
7    A  From August of this past year through this month.
8    Q  And by August of this past year, you mean
9    August 2002?
10   A  Yes, August 2002.
11   Q  And on what frequency?
12   A  Two to three times a month.
13   Q  Some in every month?
14   A  Yes, some in every month. Sometimes two,
15   sometimes three.
16   Q  What issues have you addressed in your counseling
17   with Gaddies?
18   A  We worked on how he goes into the bathroom, what
19   he does when he's in there, how he comes out of
20   the bathroom, how he responds to young people in
21   the bathroom.
22   And then we also worked on, like stranger
23   danger, like if he was out and not at home, if the

Page 446

1    was away from his house, what he would do if
2    someone came up to him, and that kind of thing.
3    Q  And have you noticed any improvement in Gaddies'
4    behavior?
5    A  I have. I sure have.
6    Q  What have you noticed?
7    A  Well, at first, I was working with him about three
8    times a month. And he would know what to do. We
9    role played. And I would take him into the
10   teachers lounge, you know, so other kids wouldn't
11   see me working with him like that. And we would
12   talk about it. And he would tell me what he was
13   supposed to do. And I would say, I'm going to sit
14   here, and you pretend that you're coming in. And
15   we would just role play. And then he will tell me
16   what he was going to do. And I would say, turn
17   the light on. He would turn it on and shut the
18   door. He could do that. After a little while, I
19   would say, okay, come out, tell me what you do
20   before you come out and when you come out. And we
21   would talk about that. And he seemed to -- he
22   does it now all the time. He knows exactly what
23   to do at school.

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 447

1  MR. HOWARD: Those are all my questions.
2
3  CROSS-EXAMINATION
4  BY MS. DePAOLA
5  Q  Ms. Freeman, did you ever review Gaddies' IEP?
6  A  Yes, I have.
7  Q  Is there anything in there that commits the system
8     to any amount of counseling?
9  A  No, there isn't an amount of counseling. In the
10    area that deals with me, it says as she has time,
11    I believe. I can't think of it right now. I
12    don't know it word for word.
13 Q  Let's take a look on page 70 in that document in
14    front of you. And we're looking at these numbers
15    here if you can read them.
16 A  Okay.
17 Q  So, you say you are providing counseling services
18    this year?
19 A  Right.
20 Q  I'm asking you to show us in the IEP where those
21    services are described.
22 A  Okay, I will. Here it is on page 121.
23 Q  121?
    A  Well, 0-121. I'm sorry. Seventy-three.

Page 448

1  Q  Tell me what you're referring to.
2  A  The fourth benchmark. Do you want me to read it
3     as I see it?
4  Q  Yes, ma'am. That will be great.
5  A  Gaddies will need to see the counselor as
6     frequently as time will allow for her to work on
7     the toileting and behavior of closing the door at
8     nine out of ten times.
9  Q  What does that as frequently as time will allow
10    mean? Is that just as frequently as you have time
11    to do it?
12 A  As frequently as time will allow.
13 Q  Is that once a week, five times a week? I'm a
14    little unclear about that.
15 A  I took it to mean that I would work with Gaddies
16    at my discretion when he would close the door nine
17    out of ten times and close his pants and close the
18    door.
19 Q  So, you just got to decide how many times that was
20    a week; is that what you're saying?
21 A  Right.
22 Q  IDEA requires parent counseling and training to
23    assist the parents, quote, in understanding the

Page 449

1  special needs of their child. Have you or any
2  other counselor in Wetumpka provided that training
3  for Ms. Corbett?
4  A  No, I have not spoken with Ms. Corbett, except the
5     one time, I guess that was in September. And she
6     told me at that time what she expected me to do.
7  Q  About the toileting?
8  A  Yes, and also -- she said at that time that she
9     would like me to work with him also with like
10    stranger danger, you know, that kind of thing so
11    he would know. And that isn't in the IEP, of
12    course, she just told me she wanted me to do that.
13 Q  Okay.
14       MS. DePAOLA: Referring here Hearing
15    Officer Romine 34CFR 324 (b)7.
16 Q  So, what you have not undertaken to counsel
17    Ms. Corbett to assist her in understanding her
18    child's disability?
19 A  That's what I am saying. I have not.
20       MS. DePAOLA: Thank you. That's all.
21       THE HEARING OFFICER: That's all for
22    her?
23       MR. HOWARD: Okay. You're done.

Page 450

1        SHEILA DEAN
2  (Whereupon, the witness, after having first
3  been duly sworn to speak the truth, the whole truth,
4  and nothing but the truth, took the stand and
5  testified as follows.)
6          DIRECT EXAMINATION
7  BY MR. HOWARD
8  Q  Ms. Dean, what is your occupation or profession?
9  A  Special ed teacher for 24 years.
10 Q  Okay. And are you employed with the Elmore County
11    Board of Education?
12 A  Yes, I am.
13 Q  And what school are you assigned to?
14 A  Wetumpka Intermediate School
15 Q  And what education do you have?
16 A  A BS degree from Troy State.
17 Q  And your certification is in what?
18 A  Special ed, K through twelve.
19 Q  Did you teach in summer school this past
20    year?
21 A  I did.
22 Q  And was Gaddies Hill in your class?
23 A  He was.

Page 451

```
 1  Q   And when did summer school start?
 2  A   On June the 3rd.
 3  Q   Okay.  And when did it wrap up?
 4  A   On July 25th.
 5  Q   Okay.  And was there a delay in you learning that
 6      he was assigned to your class?
 7  A   Yes, there was.
 8  Q   And when did you learn that he was assigned to
 9      your class?
10  A   Uhm, approximately around June 26th.
11  Q   And then did you attempt to make contact with
12      Ms. Corbett?
13  A   I did.
14  Q   How did that go?
15  A   I didn't have real good luck.  I called, and an
16      older lady answered the phone and said Ms. Corbett
17      wasn't at home.  That was at 9:00 o'clock.  At
18      9:30, I called, and another person answered the
19      phone and she wasn't at home.  Said she was at
20      the store, but she would be back.  So, I called
21      again, gave the person my cell phone number and
22      everything so Ms. Corbett could get back with me.
23      That day, I called one last time, and she still
```

Page 452

```
 1      wasn't at home.  That was at 11:30.
 2  Q   You mean at night or in the morning?
 3  A   In the morning.
 4  Q   On June 27th, I started calling again.  And on
 5      July 2nd, I still had not heard from Ms. Corbett.
 6      Will try again Monday.
 7  Q   Now, you're referring to a document.  What is the
 8      Petitioner's Exhibit number on it?
 9  A   I'm sorry.  Ten.
10  Q   Petitioner's Exhibit 10.  Is this in your
11      handwriting?
12  A   Yes, it is.
13  Q   And these are your notes?
14  A   Yes, they are.
15  Q   Okay.  When did Gaddies first attend your class?
16  A   His first day was on July 8th.
17  Q   Do you know when you finally was able to make contact
18      with Ms. Corbett?
19  A   I think I finally talked with her at some point
20      during that time and scheduled a time with her.  I
21      think maybe between the time on this paper and the
22      time he came like the first week, somewhere in
23      there I had talked to Ms. Doris McQuiddy from the
```

Page 453

```
 1      State Department.  And she had let me know that
 2      the IEP was in place and that I could get ahold of
 3      it.  And I did.  And was 30 minutes a day four
 4      days a week.
 5  Q   And did he come thereafter?
 6  A   He did.
 7          THE HEARING OFFICER  How much did he
 8      come?
 9          THE WITNESS:  I've got the only day that
10      I do not have marked is the 10th of
11      July.  Every other day, I have
12      marked.  He was there the 8th, the
13      9th, the 11th -- summer school was
14      only four days a week; no Fridays.
15      So, he was there all except the
16      10th.  And I have that not marked
17      as him being present.
18  BY MR. HOWARD
19  Q   Now, did you have available to you his IEP?
20  A   I did but not the first day that she came.
21  Q   Okay.
22  A   It was given to me shortly thereafter.  Maybe
23      within the next day or so.  And the skills that we
```

Page 454

```
 1      worked on were readiness skills, number
 2      recognition, ABC's, the sound of the first five
 3      letters of the alphabet.  He was given homework to
 4      take home and do so that I could see that -- if
 5      there was anything that we needed to work harder
 6      on.
 7  Q   The first day that Ms. Corbett came down and met
 8      with you, did she express any preference to you as
 9      to what she wanted you to work with or work on?
10  A   No, sir.
11  Q   Did you have any discussion with her as to what
12      you would work with Gaddies on?
13  A   I absolutely did.  I told her at that time, I did
14      not have an IEP.  But that as soon as I did get
15      one and knew what was to be done -- I have been
16      doing this for 24 years; I could pretty much --
17      after he sat down for a few minutes, I knew some
18      of the skills that he could do.  So, we just
19      started out with dot to dots and tracing and
20      worked on bathroom skills, those kind of things,
21      just readiness skills.
22  Q   Did you ever discuss that with his mother at all?
23  A   I did.
```

---

Mary Moore-Wynn

Court Reporting Services                                (334) 244-4203

Page 455

```
1   Q   What did she say?
2   A   Most days when she came, she had her younger child
3       with her, and she would come in and pick Gaddies
4       up.  And we'd talk about what we did during the
5       day.  And I would let her know.  And I would give
6       Gaddies homework to take home.  It would get taken
7       home.  Some days, it got brought back, some days,
8       it didn't.
9   Q   Did you feel like you got good cooperation?
10  A   Yeah.  It's -- (indicating.)  You know, as well as
11      any other parent during the summer, I guess.
12  Q   Did you send work home every day?
13  A   Pretty -- pretty much every day.  And it wasn't
14      much.  It was just like dot-to-dot tracing, that
15      kind of stuff.
16  Q   What percentage of the time would it not come
17      back?
18  A   Well, a lot of days -- well, some days, it got
19      left at home, and it would come back the next day.
20      Or Gaddies would tear it up or write on it or
21      something.  Anyway, it would get back eventually,
22      but not like the next day.
23          MR. HOWARD:  Okay.  Those are all my
```

Gaddies Hill                March 12, 2003                Elmore County Board of Education

73 (Pages 455 to 456)

---

Court Reporting Services                                (334) 244-4203

Page 456

```
1       questions.
2           CROSS-EXAMINATION
3   BY MS. DePAOLA:
4   Q   You're Sheila Dean?
5   A   That's okay.  Yes.
6   Q   You didn't undertake any independent evaluation
7       about what they were telling you to teach him, did
8       you?  I mean, like, you didn't say, well, I better
9       consider whether this is appropriate or not, this
10      ABC's or tracing, all that stuff?
11  A   If that's what was in his IEP, I assumed that's
12      what he needed to have done.
13  Q   So, you didn't undertake any independent
14      evaluation to see if this was appropriate to have
15      done?
16  A   No, I did not.
17  Q   You realize you're supposed to sign when you get
18      an IEP, aren't you?  Isn't that something you all
19      do at Elmore County; when somebody has access to
20      the IEP, they are supposed to sign that sheet; is
21      that right?
22  A   If I go in the folder, yes, I am.
23  Q   And is your name anywhere on that sheet?
```

Gaddies Hill                March 12, 2003                Elmore County Board of Education

---

Mary Moore-Wynn

Court Reporting Services

Page 457

```
1   A   No, it's not.
2           MS. DePAOLA:  I thought this had been
3       offered.  If it's not, we would
4       like to offer that as Petitioner's
5       Exhibit
6           (Whereupon, Petitioner's Exhibit 11 was
7       marked for identification and is
8       attached hereto.)
9   Q   So, you're saying somebody handed you some whole
10      page or the IEP?
11  A   I was given a copy of the IEP.
12  Q   So, let's see which one you got.
13  A   I'm sorry, I don't have that
14  Q   Here's one, Petitioner's Exhibit 1, page 70; there
15      is an IEP for 2002-2003, which was prepared in the
16      spring of 2002.  Is that the IEP you're talking
17      about?
18  A   Uh-huh.
19  Q   Did you receive a copy of that?
20  A   Uh-huh, I did.
21  Q   Now, this IEP just says they are going to work on
22      his address, his name and address.  And I take it
23      you were working on ABC's, is that right?
```

Gaddies Hill                March 12, 2003                Elmore County Board of Education

74 (Pages 457 to 458)

---

Court Reporting Services

Page 458

```
1   A   We worked on ABC's.  We worked on numbers.  We
2       worked on bathroom skills.  We worked on mother,
3       little brother, names, those kind of things.
4   Q   What I am saying is, you weren't working on what's
5       identified here in the IEP for language arts and
6       math, are you?
7   A   Okay  It's his present level of performance was
8       in writing.  It's extremely limited  So,
9       therefore, you know, before we work on some of
10      these skills, we have to start back earlier.
11  Q   So, you're just going to start over again on the
12      preprimer --
13  A   Readiness.
14  Q   Readiness skills.  Okay.
15          THE HEARING OFFICER:  While she is
16      looking, how many actual days of
17      summer school did you give him?
18          THE WITNESS:  Eleven.
19          THE HEARING OFFICER:  Eleven.  And he
20      missed how many, due to what you
21      were saying there was confusion
22      about whether he was to be in your
23      class?
```

```
 1      THE WITNESS: I don't think I said there
 2   was confusion about him being in
 3   the class. I didn't get word that
 4   he was to be in the class until the
 5   week of the 24th.
 6      THE HEARING OFFICER: Okay. How many
 7   days did he miss?
 8      THE WITNESS: Sixteen, 18 days.
 9   BY MS. DePAOLA
10   Q  Who was the person who was responsible for
11   notifying you that there was going to be a student
12   in your class?
13   A  The end of the school year, all teachers that are
14   going to have children in the summer school
15   program have to turn in a list to Mr. Anderson's
16   office with who is going to be getting summer
17   services and what skills they are going to be
18   getting summer services in.
19   Q  Was that turned in on Gaddies?
20   A  I didn't see that. That's not -- I don't usually
21   see those.
22   Q  Okay. Now, one other thing here. June 26th and
23   June 27th appears to be when you tried to contact
```

```
 1   her by phone and then July 2nd, is that right? Is
 2   that your handwriting on July 2nd?
 3   A  Yes, it is.
 4   Q  And then this copy I have has it looks like a
 5   sticky note on it of Ms. Corbett trying to return
 6   your calls. Whose handwriting is that?
 7   A  I have no idea.
 8   Q  What does that say right there?
 9   A  I'm sorry. I don't know. It's not my
10   handwriting.
11   Q  Okay. If you don't know, that's okay?
12   A  I'm sorry. I don't know whose that is.
13      MS. DePAOLA: That's all. Thank you.
14      FURTHER DIRECT EXAMINATION
15   BY MR. HOWARD
16   Q  Ms. Dean, look on page 85 of the book, please.
17   A  Okay.
18   Q  Do you see an entry there that says summer school
19   will be for 30 minutes with reinforcing numbers
20   one to ten in math, recognition of ABC's and
21   sounds for the first five letters?
22   A  I do.
23   Q  Did you work on those things this summer?
```

```
 1   A  I did.
 2   Q  Now, I want to go back to these days, again. You
 3   said he actually attended summer school for 11
 4   days?
 5   A  Uh-huh.
 6   Q  And then you said there were 16 days that he did
 7   not attend?
 8   A  Okay. Those -- that was prior to me knowing.
 9   That is what I had already worked before I knew
10   that he was to be there.
11   Q  Well, I'm trying to break down the days. How many
12   days are there of school between the day school
13   started and the day you made that call that's
14   documented? Is that 16 or some lesser number?
15   A  About 14 days.
16   Q  And how many days elapsed -- days of school --
17   between the day you made that first call and the
18   day he first attended?
19   A  Eighteen.
20   Q  I'm not sure we're making sense. Your first call
21   was in June 26 or 27th?
22   A  Yes, sir.
23   Q  And his first day of attending was July 8th?
```

```
 1   A  Yes, sir.
 2   Q  So, how many school days are in that interim?
 3   A  Let me explain. The week of July 4th --
 4   Q  Uh-huh.
 5   A  -- I make up my days in June, the two days we're
 6   going to be out for July 4th. So, the week of
 7   July 4th, we only went to school two days. The
 8   week of June 24th of that week, we went to school
 9   five days to make up our days of being off. The
10   week before I went five days. But summer school
11   is four days, four half days.
12   Q  But how many school days were there between
13   June 27th, or 28th -- wasn't that when you first
14   called?
15   A  Uh-huh.
16   Q  -- and July 8th? How many school days were there
17   in that interim?
18   Q  Actual days that we were in that class?
19   A  That he would have been there if he had been
20   there?
21   A  Four.
22   Q  Okay.
23   A  Four.
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 463

```
1    MR. HOWARD:  Okay.  Thank you.
2         THE HEARING OFFICER:  Okay.  Thank you
3                    BESSIE ROBINSON
4         (Whereupon, the witness, after having first
5    been duly sworn to speak the truth, the whole truth,
6    and nothing but the truth, took the stand and
7    testified as follows:)
8                  DIRECT EXAMINATION
9    BY MR. HOWARD
10   Q   Ms. Robinson, what is your position, please,
11       ma'am?
12   A   I'm currently assistant principal of Wetumpka
13       Junior High School.
14   Q   And what education do you have?
15   A   I have a Master's degree in special education,
16       guidance and counseling, and school
17       administration
18   Q   How long have you been employed in the field of
19       education?
20   A   Twenty-seven years.
21   Q   As assistant principal, do you have access to the
22       sign-out sheet for Wetumpka Junior High School?
23   A   Yes, sir.
```

Gaddies Hill                         March 12, 2003                    Elmore County Board of Education

---

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 464

```
1    Q   And have you reviewed that to see how many
2        occasions Gaddies Hill signed out in the last
3        school year, 2001-2002?
4    A   Yes, sir.
5    Q   And how many occasions was that?
6    A   Seven.
7    Q   For the total school year?
8    A   Yes, sir
9         MR. HOWARD:  Thank you.  That's all
10                  CROSS-EXAMINATION
11   BY MS. DePAOLA
12   Q   Yesterday, Ms. King testified that sometimes the
13       child left the class with the mother directly
14       without signing out?  Are you aware of that?
15   A   No.  It's never been reported to me.
16   Q   So, that wouldn't be reflected in your records,
17       would it?
18   A   No, sir.  And she should have told the office if a
19       child left without signing out.
20   Q   I agree.
21        MS. DePAOLA:  Thank you.
22        THE HEARING OFFICER:  Okay.  Thank you
23
```

77 (Pages 463 to 464)

Gaddies Hill                         March 12, 2003                    Elmore County Board of Education

---

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 465

```
1                      LINDA ROSS
2         (Whereupon, the witness, after having first
3    been duly sworn to speak the truth, the whole truth,
4    and nothing but the truth, took the stand and
5    testified as follows:)
6                  DIRECT EXAMINATION
7    BY MR. HOWARD
8    Q   What is your occupation or profession?
9    A   I'm a special education teacher at Wetumpka Junior
10       High School.
11   Q   What education do you have?
12   A   I have a Master's degree.
13   Q   In what field?
14   A   Special education.
15   Q   And what is your certification?
16   A   SLD, specific learning disabilities.
17   Q   And have you taught Gaddies Hill school?
18   A   Yes, sir.  This school year, I have
19   Q   Okay.  And during what time of the day do you have
20       him?
21   A   Gaddies comes to me at 11:15, and then he stays
22       with me until 12:50 -- no, 1:00 o'clock.  We go to
23       lunch during that time.
```

Gaddies Hill                         March 12, 2003

---

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 466

```
1    Q   Okay.  And have you had any behavior problems with
2        Gaddies this year?
3    A   No.  I really haven't.
4    Q   What type of activities do you work with Gaddies
5        on?
6    A   Usually -- I teach his science -- well, the
7        beginning of the year, it was social studies,
8        first semester.  Last half of the semester, we're
9        working on our science.  The first half of the
10       class, which is from 11:15 until about ten til
11       12:00, we usually work on fine motor skills.  I
12       usually have something prepared for us to use
13       cutting.  We work with our scissors.  We cut and
14       paste.  We work on tracing.  We have -- use water
15       colors.  Anything I can do to help with his fine
16       motor skills.
17   Q   Have you noticed any improvement?
18   A   I have.  I have noticed some improvement.  I'm not
19       going to say gargantuan improvement, but, yes,
20       there has been some improvement.  His ability to
21       color within the lines has greatly -- I feel
22       like -- has been greatly enhanced.  And his
23       tracing -- at first when he would trace, it would
```

78 (Pages 465 to 466)

Gaddies Hill                         March 12, 2003                    Elmore County Board of Education

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

**Page 467**

1 kind of be a squiggle mark. It's a little more --
2 it's straighter now. His lines are straighter.
3 And those are the things during that time that we
4 have worked on.
5 Q Board's Exhibit 1, which is tracing of his name,
6 what time period is that from?
7 A This is at the beginning of the school year.
8 Q It's dated up there. Does that accurately reflect
9 when it was done?
10 A Yes, sir.
11 Q And then Board's Exhibit 2, when was that done?
12 A This month -- no, last month. February.
13 Q And is Board's Exhibit 2 representative of his
14 work now?
15 A Yes, sir, it is.
16 Now, he has good days, and he has bad days.
17 That's a pretty good day.
18 Q Was Board's Exhibit 1 representative of his work
19 at the beginning of the year?
20 A Yes, it was. At the beginning of the year, his
21 fine motor skills were very poor. This is
22 something that we have worked on daily. I have
23 used my science time or my social studies time to

**Page 468**

1 trace a science word or a social studies word,
2 just to use that fine motor skill and also
3 incorporate the academics.
4 Q Board's Exhibit 3 --
5 A That's the beginning of the year.
6 Q August 13th?
7 A Uh-huh.
8 Q And Board's Exhibit 4?
9 A Right. More towards -- a few months later, right?
10 What we have tried to work on here also, is he
11 would take one color, and he would make everything
12 that one color. And so we've also tried to help
13 his discrimination out a little bit. Now,
14 Gaddies, honey, if that's a tree, would that tree
15 be blue? No. And we would say, if you were a
16 tree, what color would you be? And we would try
17 to work on that, too. Instead of coloring in the
18 lines, we've also tried to apply things.
19 Q How so?
20 A This orange, if I told Gaddies to color this, he
21 would pick up any color. I would say, Gaddies,
22 honey, that is an apple. If you were an apple,
23 what color would you probably want to be? And we

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

**Page 469**

1 would go from there. And I would say maybe a red
2 and or green apple. I would put out the crayons.
3 And I would say, now, you pick Ms. Ross the red
4 apple or red crayon or green crayon. So, we work
5 on our colors, also.
6 Q And Board's Exhibit 5.
7 A Right. This is more recent. In science, we've
8 been studying animal families, plants and animals.
9 This is a baby bear and mama bear. We worked on
10 just coloring the bear brown. And we tried to
11 make him color -- the fish -- he actually wanted a
12 yellow fish. I said, some fish could be yellow.
13 Q And that was related to the study of animals?
14 A Right.
15 Q Okay. Now, any other areas that you have noticed
16 progress or improvement in Gaddies other than
17 this, the drawing or the tracing?
18 A Firsthand that I have noticed?
19 Q Yes, ma'am.
20 A I really can't say that. I know he has excellent
21 manners. And that's just a praise on his part.
22 The child just, he always holds the door, says
23 thank you, yes, ma'am. Probably better manners

**Page 470**

1 than any child I teach. Been like that just about
2 all year.
3 Q You take him to lunch?
4 A I do.
5 Q How is he in lunch?
6 A Wonderful. He fixes his tray. I usually stand
7 right by him. He fixes his tray. We take it to
8 the table. He eats. We'll say, Gaddies -- if he
9 needs to, he'll wipe his mouth. He has excellent
10 manners, excellent table manners.
11 MR. HOWARD: Thank you. That's all.
12 CROSS-EXAMINATION
13 BY MS. DePAOLA:
14 Q Ms. Ross, what you're telling the Hearing Officer
15 is that based on those exhibits Gaddies is a
16 better tracer now than he was before?
17 A His fine motor skills have improved.
18 Q His tracing has improved?
19 A Yes, ma'am.
20 Q A fine motor --
21 A Yes, ma'am. And scissor cutting. I believe I
22 mentioned that, also.
23 Q And I understood from the occupational therapist

Mary Moore-Wynn  Court Reporting Services  (334) 244-0203

**Page 471**

```
 1        that he could already use scissors. Is that
 2        right?
 3    A   I didn't say he couldn't. I'm just saying cut
 4        straight lines. You know, anybody can pick up a
 5        pair of scissors. But the ability to cut on a
 6        line is a little different.
 7    Q   All right. So, have you undertaken to determine
 8        what jobs that it's important to trace in?
 9    A   I believe in order to have a job one would need to
10        be able to write one's name in most cases. And in
11        order to write your name, you would need to be
12        able to hold a pencil correct and write with it --
13        I'm talking tracing. Let's assume those letters
14        don't really mean anything to him. Because
15        everybody's testified he doesn't know --
16    Q   Right. Well, in order to know letters --
17    A   preschool, before they learn letters, they learn
18        tracing and writing.
19    Q   So, what you're trying to do is teach him how to
20        read?
21    A   We are trying to work on our skills, our fine
22        motor skills.
23    Q   Reading? Regular kindergarten skills, going into
```

**Page 472**

```
 1        first grade?
 2    A   I don't recall I said anything about reading.
 3    Q   You don't expect him to read?
 4    A   I didn't say that.
 5    Q   Tell us what --
 6    A   We were tracing.
 7    Q   For what purpose?
 8    A   Fine motor skills.
 9    Q   So that he could write his name?
10    A   I believe the front page of the IEP says something
11        about fine motor skills are poor.
12    Q   I'm just asking you why you're teaching him to
13        trace.
14    A   I'm teaching him fine motor skills.
15    Q   And what jobs are you required to color within the
16        line?
17    A   Another fine motor skill. Following directions.
18    Q   You really haven't analyzed any jobs, have you, to
19        determine what skills you need?
20    A   I'm not a job analyst. I'm a teacher.
21    Q   And I don't see anything in the current IEP, which
22        is document 70, really, that relates to you at
23        all?
```

Mary Moore-Wynn  Court Reporting Services  (334) 244-0203

**Page 473**

```
 1    A   No, ma'am. Science and social studies is not
 2        covered.
 3    Q   Why not?
 4    A   It's not a major academic area.
 5    Q   So Elmore County has some kind of rule that if
 6        it's not a major academic area it does not have to
 7        be addressed in the IEP?
 8    A   Science and social studies has never been in an
 9        IEP that I have seen.
10        MS DePAOLA:  That's all.
11        MR. HOWARD:  That concludes this
12        witness.
13        THE HEARING OFFICER:  Okay. Thank you
14        THE WITNESS:  Thank you.
15        MR. HOWARD:  On this speech thing, there
16        is not any issue about speech, is
17        it?
18        MS DePAOLA:  Let's look at it. I have
19        been sort of listening to the
20        witnesses
21        MR. HOWARD:  Yeah.
22        MS DePAOLA:  Oh, is that your next
23        witness?
```

**Page 474**

```
 1        MR. HOWARD:  Well, if we're going to go
 2        into it.
 3        I'm sort of at a loss as to
 4        understand all of what we are we
 5        going into it, Wes, if it's not
 6        raised in the request.
 7        Let me step out here and talk
 8        to Marshall.
 9        THE HEARING OFFICER:  All right.
10        (Brief recess.)
11        THE HEARING OFFICER:  All right. Who is
12        next?
13        MR. HOWARD:  Susan says they don't raise
14        any issue with regard to speech, so
15        in regard to that, we rest.
16        THE HEARING OFFICER:  Okay. He does
17        receive speech services?
18        MR. HOWARD:  Yes.
19        THE HEARING OFFICER:  Okay. Have you
20        got anything further, Susan?
21        MS DePAOLA:  No, sir.
22        THE HEARING OFFICER:  All right. That
23        will conclude it. Let me make sure
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 475

1    I've got all the exhibits.
2    MS. DePAOLA: Can we make remarks?
3    THE HEARING OFFICER: Yeah.
4    MR. HOWARD: I would like the
5    opportunity to submit written
6    remarks.
7    THE HEARING OFFICER: Well, whichever
8    you all want to do.
9    Let's just do written, then,
10    and do them within five days.
11    MR. HOWARD: Five calendar days?
12    THE HEARING OFFICER: No, five business.
13    They would be due next --
14    MR. HOWARD: Wednesday?
15    THE HEARING OFFICER: Wednesday.
16    MS. DePAOLA: Thank you.
17
18    (Whereupon, at approximately 1:51 p.m on
19    March, 12, 2003, the proceedings were
20    adjourned.)
21    * * * * * * * * * *
22    END OF PROCEEDINGS
23    * * * * * * * * * *

Page 476

1                    REPORTER'S CERTIFICATE
2
3    STATE OF ALABAMA
4    MONTGOMERY COUNTY
5
6    I do hereby certify that the above and
7    foregoing transcript of proceedings in the matter of
8    GADDIES HILL v. ELMORE COUNTY BOARD OF EDUCATION,
9    Case Number 02-109 was taken down by me in machine
10    shorthand on the 12th of March, 2003, and the
11    questions and answers thereto reduced to writing
12    under my personal supervision, and that the
13    foregoing represents a true and correct transcript
14    of the proceedings given by said witness upon said
15    hearing.
16    I further certify that I am neither of counsel
17    nor related to the parties to the action, nor am I
18    any wise interested in the results of said cause.
19    Dated this 7th day of April, 2003.
20
21
22                    Mary Moore-Wynn
23                    Certified Shorthand Reporter

Mary Moore-Wynn — Court Reporting Services — (334) 244-0203

**Page 1**

```
1    IN RE THE MATTER OF
2    GADDIES HILL,
3         VERSUS
4    ELMORE COUNTY BOARD OF EDUCATION
5    DUE PROCESS HEARING
6    CASE NUMBER: 02-109
7    HEARD IN THE ABOVE-STYLED CAUSE
8    ON THE 11th and 12th DAY OF MARCH, 2003
9    HEARD BEFORE HONORABLE WESLEY ROMINE
10   HELD AT ELMORE COUNTY BOARD OF EDUCATION
11   WETUMPKA, ALABAMA
12   APPEARANCES
13   FOR THE PETITIONER:
14   Hon. Susan DePaola
15   Attorney at Law
16   Montgomery, Alabama
17   FOR THE RESPONDENT:
18   Hon. Houston Howard
19   Attorney at Law
20   Wetumpka, Alabama
21
22
23
```

Gaddies Hill        March 12, 2003        Elmore County Board of Education        1 (Pages 1 to 2)

---

**Page 2**    (334) 244-0203

INDEX

| | | Page |
|---|---|---|
| 1 | INDEX | |
| 2 | Opening Statements by Ms. DePaola | 6 |
| 3 | Opening Statements by Mr. Howard | 12 |
| 4 | JACK MAYER | |
| 5 | Direct Examination By Ms. DePaola | 15 |
| 6 | Cross-examination By Mr. Howard | 104 |
| 6 | Further Direct Examination By Ms. DePaola | 134 |
| 7 | MELBA KING | |
| 8 | Direct Examination By Ms. DePaola | 140 |
| 9 | Cross-examination By Mr. Howard | 233 |
| 9 | Further Direct Examination By Ms. DePaola | 265 |
| | Further Cross-examination By Mr. Howard | 279 |
| 10 | | |
| 11 | JOANN SELMAR | |
| 12 | Direct Examination By Ms. DePaola | 280 |
| 13 | Cross-examination By Mr. Howard | 291 |
| | Further Direct Examination By Ms. DePaola | 305 |
| 14 | INDEX OF EXHIBITS | |
| 15 | Exhibit Number    Description    Page Number | |
| 16 | Board's Exhibit 1, August 7, 2002 Work Sample | 276 |
| | Board's Exhibit 2 February 12, '03 Work Sample | 276 |
| 17 | Board's Exhibit 3 August 13, '02 Work Sample | 277 |
| | Board's Exhibit 4 October 15, '02 Work Sample | 277 |
| 18 | Board's Exhibit 5 January 27, '03 Work Sample | 278 |
| | Board's Exhibit 6 Buros Mental Measurement | 114 |
| 19 | Yearbook Critique | |
| 20 | Board's Exhibit 7 C-TONI Critique | 118 |
| | Board's Exhibit 8 Examiner's Manual Excerpt | 108 |
| | Board's Exhibit 11 Tammy Hawkins list | 246 |
| 21 | | |
| 22 | Petitioner's Exhibit 1 Composite Exhibit | |
| | Notebook, pages 1-197 | 14 |
| 23 | Petitioner's Exhibit 2 Work Samples | 69 |
| | Petitioner's Exhibit 3 DSM-IV Excerpt | 73 |

---

Mary Moore-Wynn — Court Reporting Services — (334) 244-0203

**Page 3**

| | | 76 |
|---|---|---|
| 1 | Petitioner's Exhibit 4 Math Work Samples | 76 |
| | Petitioner's Exhibit 5 Miscellaneous Activities | 79 |
| 2 | Petitioner's Exhibit 6 Name Tracing | 80 |
| | Petitioner's Exhibit 7 Daily Planner | 221 |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |

---

**Page 4**

```
1    THE HEARING OFFICER:  All right.  We're
2         now on the Record in a hearing on
3         behalf of Gaddies Hill represented
4         by his attorney, Susan DePaola.
5         The Board is represented here by
6         its attorney, Houston Howard
7         I'm proposing some stipulations
8         just for background of the child
9         Gaddies is how old?
10   MS. DePAOLA:  He's 15
11   THE HEARING OFFICER:  What's his date of
12        birth?
13   MS. DePAOLA:  Date of birth is 12/4/87.
14   THE HEARING OFFICER:  What is his
15        disability?
16   MS. DePAOLA:  He's classified as
17        mentally retarded and I believe
18        speech and language impaired.
19   MR. HOWARD:  What was the second one,
20        Susan?
21   MS. DePAOLA:  Speech and language
22        impaired.
23   THE HEARING OFFICER:  Where does he go
```

Gaddies Hill        March 12, 2003        Elmore County Board of Education        2 (Pages 3 to 4)

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 5

```
1   to school?
2       MS. DePAOLA: Wetumpka Junior High
3   School.
4       THE HEARING OFFICER: And does he live
5   here with his mother in Wetumpka?
6       MS. DePAOLA: Yes, sir.
7       THE HEARING OFFICER: Has this child
8   been in the Wetumpka system very
9   long?
10      MS. DePAOLA: He's been here for three
11  years.
12      MR. HOWARD: Actually, I think he came
13  here in mid-year; isn't that right?
14      MS. DePAOLA: He came at the beginning
15  of the year 2000.
16      THE HEARING OFFICER: 2000-2001 school
17  year?
18      MS. DePAOLA: Yes.
19      THE HEARING OFFICER: All right. Those
20  facts will be stipulated, then, as
21  part of the Record.
22      If you would, Susan, just tell
23  us a little bit about what you
```

Page 6

```
1   contend, what issues will have to
2   be determined.
3       MS. DePAOLA: I have some visuals. It
4   comes from my teaching background.
5       This is a case brought under
6   IDEA, which is the statute that
7   provides for a free, appropriate
8   public education. Special
9   Education, or Section 1401(25),
10  provides for specially designed
11  instruction. And specially
12  designed instruction under
13  34CFR300.28(a), talks about
14  adapting the content and
15  methodology or delivery of
16  instruction. And that is just
17  language directly out of the
18  statute.
19      Judge, obviously, you can take
20  Judicial notice of this, but it
21  says that the school system is
22  required to adapt content,
23  methodology, or delivery of
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 7

```
1   instruction. That is what is
2   specially designed instruction.
3   The content must change, the
4   method, or the manner of delivery
5   of instruction.
6       Also, looking into that
7   section, it says special education
8   is specially designed instruction
9   to meet the unique needs of the
10  child. And it is my contention at
11  this hearing that one of the
12  problems with Gaddies Hill's
13  program is that the content has not
14  been modified to meet the unique
15  needs of this child. So, to a
16  large extent, this hearing will
17  focus on content. It is my
18  contention that an education cannot
19  be appropriate if the content is
20  not appropriate, and I think the
21  witnesses will testify to that.
22      So, in other words, regardless
23  of whether you're able to write
```

Page 8

```
1   current levels of performance, or
2   measurable annual goals, or all
3   those things that are under
4   1414(d), if the content is
5   inappropriate, then all of these
6   things are meaningless.
7       In examining the witnesses, I
8   believe the testimony will show --
9   first of all, I want to find out
10  and make sure that all of us
11  understand the content to include
12  or be synonymous with the
13  curriculum or course of study. I
14  hope with Mr. Mayer we'll be able
15  to establish whether we're all
16  talking about the same thing when
17  we say content. If not, I'll
18  figure out what their position is
19  on that.
20      It's my position and my
21  expert's position that the content
22  must be designed to bring us to a
23  particular outcome. He's going to
```

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203
Page 9

1  be a doctor. He's going to scrub
2  floors. The content needs to be
3  related to an outcome that the
4  school system has defined for this
5  particular student. That's why I
6  think curriculum and maybe course
7  of study are synonymous terms here.
8      The testimony will be. I
9  believe, that that outcome, that
10 goal that you're looking for for
11 the child, has to be based on the
12 child's strengths -- maybe he's a
13 really good athlete -- his areas of
14 disability, maybe he is severely
15 mentally retarded. Maybe he has
16 physical disabilities. Maybe he's
17 blind -- that's going to limit the
18 outcome you can expect or change
19 the outcome.
20     I think that the testimony will
21 be that we also have to look at his
22 progress. Some kids will surprise
23 you. You thought they were only

Court Reporting Services                (334) 244-0203
Page 10

1  going to be able to do this much
2  based on their disability, but
3  looking at what they have
4  accomplished, they have
5  accomplished a lot more.
6      And the outcome has to be based
7  on their interest.
8      The testimony, I believe, in
9  this case will demonstrate that the
10 system has not designed an
11 appropriate outcome or content for
12 Gaddies Hill, hasn't considered
13 these factors. And I think they
14 are required to do so in order to
15 provide FAPE.
16     All of us are familiar with the
17 general ed curriculum when a kid is
18 going to get a high school diploma,
19 regular high school diploma. All
20 of us are familiar with the Alabama
21 Occupational Diploma curriculum.
22 Those are pretty well established
23 by the State of Alabama by courses

Mary Moore-Wynn                Court Reporting Services
Page 11

1  of study.
2      But, there are other kids --
3  you may be able to spread the K-8
4  curriculum out over the years,
5  maybe they will hit somewhere in
6  there. Then there are other kids
7  who just cannot even access the
8  regular K through eighth grade
9  curriculum, period. It's my
10 opinion that's where Gaddies is.
11 The school system has been trying
12 to force him into that kindergarten
13 curriculum for the last three
14 years. He can't make it. He's
15 other (indicating). This is the
16 most difficult group to educate.
17 And he's not being educated, I
18 believe the evidence will
19 demonstrate.
20     If for some reason you
21 determine the content of what he is
22 doing is appropriate -- which I
23 cannot believe that -- but we are

(334) 244-0203
Page 12

1  going to review the content that
2  they have in these IEP's, these
3  factors from 1414(d), whether they
4  have established present levels of
5  performance, appropriate goals, et
6  cetera. But I really think that
7  those are largely irrelevant in
8  light of the fact that the content
9  they are working on is
10 inappropriate.
11     Thank you.
12     THE HEARING OFFICER:  All right.
13 Houston?
14     MR. HOWARD:  This child has had an
15 intellectual assessment done by
16 Mr. Mayer, who Susan says will be
17 her first witness. Back last
18 October, his IQ was 39. We think
19 the evidence will show that the
20 alternatives available to him at
21 that range are not exceedingly
22 great.
23     The child's IEP does have

Mary Moore-Wynn                    Court Reporting Services

Page 13

1   goals. It does have benchmarks.
2   It does make reference to outcomes that
3   And the teachers will testify that
4   he has made some progress, not
5   tremendous progress. But we think
6   the evidence will show that
7   tremendous progress is not what
8   should be expected from a child
9   functioning at this level.
10  I don't know whether there is
11  going to be talk of transition
12  services or transition goals, if
13  that's what Susan is speaking of.
14  But transition services are not
15  required until the child is 16.
16  The child is not yet 16.
17  The final test of a case like
18  this is whether the IEP that the
19  school Board has developed and
20  implemented is sufficient to allow
21  the child to make educational
22  progress. And we believe that he
23  is making educational progress.

Court Reporting Services                    (334) 244-0203

Page 14

1   THE HEARING OFFICER: Who will be the
2   first witness?
3   MS. DePAOLA: Jack Mayer.
4   MR. HOWARD: Susan, do we need to put on
5   Record our stipulation about the
6   exhibits?
7   (Whereupon, Petitioner's Exhibit 1 was
8   marked for identification and is
9   attached hereto.)
10  MS. DePAOLA: As I understand it, we
11  have stipulated to the
12  admissibility of Petitioner's
13  Exhibit 1, with the exception of
14  the section labeled, Dr. Gargiulo,
15  which we're reserving the
16  admissibility of that until you
17  have a chance to rule on that
18  tomorrow.
19  THE HEARING OFFICER: All right.
20  Petitioner's Exhibit 1, pages 1
21  through 174, is admitted. 175
22  through the end, 197, is the CV of
23  Dr. Gargiulo and his report. The

Mary Moore-Wynn                    Court Reporting Services

Page 15

1   Board may have an objection to
2   those, so we'll hear that at a
3   later time. But other than that,
4   the Petitioner's exhibit is
5   admitted.
6                    JACK MAYER
7   (Whereupon, the witness, after having first
8   been duly sworn to speak the truth, the whole truth,
9   and nothing but the truth, took the stand and
10  testified as follows:)
11                    DIRECT EXAMINATION
12  BY MS. DePAOLA
13  Q   I'm Susan DePaola. I have met you previously?
14      You are Jack Mayer; is that correct?
15  A   That's correct.
16  Q   Where are you employed?
17  A   Elmore County Board of Education.
18  Q   And how long have you been employed there?
19  A   This is my 28th year.
20  Q   Okay. And what is your position?
21  A   I'm school psychologist.
22  MS. DePAOLA: Just for the Record, what
23  we had intended with respect to

Court Reporting Services                    (334) 244-0203

Page 16

1   witnesses was to leave the hearing
2   open to the public, but to invoke
3   the Rule with respect to witnesses.
4   THE HEARING OFFICER: Okay. So, the
5   hearing is open, and the Rule of
6   Sequestration is in force. Okay.
7   BY MS. DePAOLA
8   Q   Okay. Could you tell me briefly as school
9   psychologist what credentials you have to obtain
10      that designation?
11  A   I have an educational specialist degree from the
12      University of Auburn 1991 in school psychology
13      I've got a Master's degree in psychology and a
14      Master's degree in secondary education.
15  Q   So, do you have a doctorate?
16  A   No.
17  Q   Okay. And so, you've got some teaching
18      experience?
19  A   Yes, I do.
20  Q   Do you have teaching experience with special
21      education students?
22  A   Yes.
23  Q   I'm going to come over here to ask you some

Page 17

1  questions. Before we get started, I wanted to
2  make sure we all are talking the same language. I
3  know you probably are familiar with IDEA's
4  requirement of a free, appropriate public
5  education including specially designed instruction
6  to meet the unique needs of the children. Are you
7  familiar with those concepts?
8  A  Yes.
9  Q  Are you familiar with the federal regulations that
10  says --
11      THE HEARING OFFICER: If you need to,
12      Susan, you can move it backwards,
13      because I can see it pretty good.
14      But you can see it okay?
15      THE WITNESS: That's fine. Yes.
16  Q  Specially designed instruction includes
17  instruction which adapts the content of the
18  program. You do understand that to be the federal
19  regulations?
20  A  Yes.
21  Q  And do we agree that the content must be designed
22  to meet the unique needs of the child?
23  A  Yes.

Page 18

1  Q  Okay. So, we do agree about that.
2      Now, when we use the term content, I just want
3  to make sure we all understand it the same. If
4  I'm wrong, I want to know now. We're talking
5  about content, I guess I think of that as we're
6  talking about what curriculum, what course of
7  study, what's going to be in this package we're
8  trying to give this child. Is this a fair
9  description of content?
10  A  That's correct.
11  Q  So, like for some children, the content can be
12  regular ed curriculum all the way through a high
13  school diploma, right?
14  A  Yes.
15  Q  Even if they are special ed, is that right?
16  A  Yes.
17  Q  And for some kids, the content is going to be
18  Alabama Occupational Diploma curriculum?
19  A  Yes.
20  Q  Particularly for special education kids?
21  A  Yes.
22  Q  You agree with that?
23  A  Yes.

Page 19

1  Q  If we start using these terms interchangeably,
2  would you understand them to mean the same thing?
3  A  Yes.
4  Q  Okay. Because they label this outcome
5  occupational diploma curriculum that I understand
6  to be a content that is appropriate for a
7  particular group of kids?
8  A  Right.
9  Q  Then other special ed kids who I guess are going
10  to progress somewhere through the K through eight
11  curriculum, we don't know how far they are going
12  to get?
13  A  Right.
14  Q  They may end up reading at the third grade level
15  or fourth grade level?
16  A  Right.
17  Q  And would you also agree that there are going to
18  be some kids who are not going to be able to
19  access any curriculum at all?
20  A  Yes.
21  Q  So, no matter how long you push them into pre-
22  readiness K activities, they are not going to be
23  able to get into that?

Page 20

1  A  Yes.
2  Q  Those kids are pretty severely disabled?
3  A  Yes.
4  Q  So, am I correct, the state of Alabama has no
5  published curriculum or course of study for this
6  other group?
7  A  Yes. I would say that.
8  Q  So, the teachers and Mr. Anderson and principals,
9  whoever, pretty much have to design a curriculum
10  for the kids in the other batch?
11  A  Yes, ma'am.
12  Q  Let me ask you this: When do they need to start
13  doing this? Do they wait until ninth grade? You
14  know, from an educational perspective -- I'm not
15  asking you a legal opinion -- but from an
16  educational perspective, when can you start
17  looking at where we're going here?
18  A  Well, I think as soon as the student is tested,
19  and weaknesses have been determined, then you
20  design a program around that.
21  Q  I mean, you don't wait until they are 14 or 12 or
22  16, do you? I mean, if you can see at age eight,
23  for instance, that a child has a 30 IQ, you start

1 looking at these options, don't you?
2 A That's correct.
3 Q Have you ever reviewed the Preparing for Life
4 Publication from the Alabama Department of
5 Education? It's called an Individualized
6 Education Program Team Planning Guide for
7 Determining Exit Options for Students with
8 Disabilities.
9 A No.
10 Q Let me ask you if you agree with this statement
11 that I have found in there: Transition planning
12 should begin as early as elementary school as
13 parents and teachers discuss the educational
14 progress of students with disabilities?
15 A I would agree that you can start thinking about
16 it.
17 Q Well, I mean, that's what the outcome -- you know,
18 you're looking at outcomes, and you have to figure
19 out if they are in the other category, wouldn't
20 that be a type of transition plan?
21 A Yes.
22 Q Would you agree with this statement: Part of that
23 process to begin discussion concerning future

1 goals for the student and the skills that are
2 needed to support those goals?
3 A Yes.
4 Q Tell me what planning the school system has done
5 for Gaddies Hill.
6 Would you agree Gaddies is in the other
7 category?
8 A Yes, I would.
9 Q Okay. Tell me what planning the school system has
10 done with respect to goals for Gaddies Hill and
11 when that started, if it started?
12 A Well, he came from Tallassee. And he had an IEP
13 at that time. And I assumed that his program was
14 carried out according to that IEP until such time
15 that we developed our own IEP. And then when he
16 was just tested a few months ago, more recently.
17 So, I'm assuming the school has based his IEP on
18 previous testing, because that's what you're
19 supposed to do is base it on the assessment
20 process and the input from his IEP when he
21 came to Elmore County as to what his program
22 should be.
23 Q The question was: What outcome or goal have you

1 identified for Gaddies Hill?
2 A At this point in time?
3 Q Yes.
4 A Okay. Well, I noticed he had four goals, I
5 believe, on his IEP, ranging from independent
6 living skills, reading, math, and behavior. He
7 had four goals, as I recall.
8 Q Well, then we don't understand it the same. What
9 do you expect Gaddies to do or be at the end of
10 his educational program?
11 A Well, based on his IQ, and looking at the DSM-IV
12 content, he would not likely learn many academic
13 skills. It would be more preschool sorts of
14 activities. He would likely need assisted living.
15 I didn't understand the first thing. But I do
16 understand assisted living. He's going to need
17 some help taking care of himself?
18 A That's correct.
19 Q What about employment?
20 A Employment would only be under an extremely
21 supervised situation. I think like a structured
22 workshop sort of thing.
23 Q To do what? What kind activities in structured

1 workshop would he be able to do?
2 A Maybe some sort of assembly line sort of thing,
3 where he's assembling one little part of a larger
4 object, possibly.
5 Q Is that what you all have discussed? I'm asking
6 you what you have already done. What have you
7 identified as an outcome or goal for him in the
8 end?
9 A Okay. Transition goals is, I believe, a
10 structured workshop sort of situation that I have
11 just described. And then I believe living with
12 parent with assistance.
13 Q But that doesn't tell you what you're going to
14 teach him. In this sheltered workshop, what do
15 you see as being the outcome? Is he going to be
16 able to sweep floors? Is he going to be able to
17 wash dishes? Is he going to be able to assemble
18 motors? What have you determined already as team
19 that his outcome is going to be?
20 A I don't know that we've zeroed in on the specifics
21 of dishwashing or assembling things. But I think
22 more just that concept of being with a group or
23 doing certain activities related to cleaning or

Mary Moore-Wynn

Court Reporting Services

(334) 244-0203

Page 25

1    that sort of thing.
2  Q  So, you have discussed the skills that are needed
3    to assemble, and designed an IEP around that?
4  A  No.
5  Q  Have you discussed the skills necessary to do
6    cleaning and done an IEP around that?
7  A  No.
8  Q  Okay. Now, I think you have previously testified
9    that the student transferred into the system in
10   the fall of 2000, is that correct?
11  A  I believe so.
12  Q  And you participated in an eligibility
13   determination relating to him at that time?
14  A  No, not at that time, not back in 2000.
15  Q  Well, I would ask you to look in that notebook you
16   have in front of you at page 119. And I may have
17   misunderstood what this document is. But, the
18   bottom right-hand corner, there is stamped
19   numbers.
20  A  Okay.
21  Q  Now, I understood that to be an eligibility
22   determination done when she came in, the document
23   system?

Page 26

1  A  On page 119?
2  Q  Yes, sir.
3  A  Right.
4  Q  Isn't that what that is?
5  A  Yes, it is. I was --
6  Q  And isn't your name on there?
7  A  I was there. Right.
8  Q  You did participate in the eligibility
9   determination?
10  A  I did. Right.
11  Q  Why did you do an eligibility determination?
12  A  If they are a transfer student from another
13   system, we do an MEDC or eligibility determination
14   to make sure that they qualify according to our
15   guidelines.
16  Q  Are your eligibility guidelines different from the
17   State?
18  A  Sometimes, we get students that have not qualified
19   under the State guidelines. We don't want to make
20   the error of continuing to qualify them.
21  Q  Didn't you receive, when he came in, the document
22   that is labeled page number 115?
23  A  Yes.

Mary Moore-Wynn

Court Reporting Services

(334) 244-0203

Page 27

1  Q  And, in fact, what you did when you did the
2   eligibility determination, as best I can tell, is
3   just copied the information from Tallasee's
4   eligibility onto yours?
5  A  That's correct.
6  Q  And the purpose of that was what?
7  A  Well, we use existing information to see whether
8   they qualified according to our State guidelines.
9   And he did. So, we just simply recopied the
10   information on our Elmore County form, and then
11   just continued his services. He continued to meet
12   the guidelines.
13  Q  Let's just look at some of what you used. As I
14   understand it -- if you will look back at page 92
15   in that exhibit book -- you received from
16   Tallasee, or from Mrs. Corbett, the documents
17   numbered 92, is that correct?
18  A  Yes.
19  Q  So, from Tallasee, you received a Brigance
20   Developmental Inventory identifying skills he
21   could and could not do?
22  A  Right.
23  Q  Is that what you understand this to be indicating?

Page 28

1  A  Yes.
2  Q  Could you explain to the Hearing Officer how you
3   understand they can indicate whether they have
4   mastered it or whether it's just developing?
5  A  Well, as you look through that, they'll circle
6   certain items. For instance, page T7, there,
7   understanding position has number 16 circled. The
8   sitting position has number 11. So, you circle
9   the highest functioning levels on each one, or you
10   circle the items that he can do.
11  Q  Okay. You circle the things that are mastered.
12   And then I notice in the front it says that you
13   underline objectives that he's still working on.
14   Is that your understanding?
15  A  Well, I wasn't involved with this in the IEP part
16   at that time. So, I really can't speak to that.
17   I just know the typical way of deciding what their
18   skill level is circling the items that they have
19   mastered.
20  Q  Just reading the front, it says, underline
21   objectives set for the next evaluation with the
22   next color. Is that something different than you
23   use as an approach here with the underlining?

Mary Moore-Wynn                Court Reporting Services                (334) 244-4203

Page 29

1   A   What page?
2   Q   Page 93, it says, very front, second page. Circle
3       responses for skills mastered. You can understand
4       that. And underline objectives set for the next
5       evaluation.
6   A   Okay.
7   Q   Is there something unusual about the way they are
8       doing this? You've seen this before, haven't you?
9   A   I have not seen this particular document. I'm
10      familiar with the test.
11  Q   You're familiar with the Brigance?
12  A   Right.
13  Q   There is nothing unusual about the approach of
14      underlining the ones that he hasn't mastered yet?
15  A   No.
16  Q   So, you relied upon the information in document
17      number 92 in making your eligibility
18      determination; is that correct?
19  A   I would have to look -- you know, that was back in
20      2000 -- to see.
21      Yes, that was on the document that we
22      considered that information.
23  Q   Let's just look at your eligibility determination.

Page 30

1       I can't say that you did any testing. Did you?
2   A   No, we didn't. I don't believe we did.
3   Q   Okay.
4   A   Because we felt like his testing was adequate at
5       that time to make our decision.
6   Q   So, for instance, on the basic reading skills, you
7       got 2/1/00 Brigance, cannot recognize the letters.
8       That's on page 119?
9   A   Right.
10  Q   Where did you get that from? Did you actually
11      read the Brigance, or did you just copy off
12      page 115?
13  A   Probably copied off the existing document.
14  Q   Okay. And then for math it says something about
15      counting. On page 115, under Brigance, he can
16      count one to ten. Did you incorporate that in any
17      way in your report that you are aware of?
18  A   No, I think what I used was an actual math
19      instrument there that talked about standard
20      scores, expressed standard scores.
21  Q   Okay. That's the Key Math. Is that what you're
22      talking about?
23  A   Yes.

Mary Moore-Wynn                Court Reporting Services                (334) 244-4203

Page 31

1   Q   Look at page 125, the exhibit page 125. Is that
2       the Key Math that you relied on?
3   A   Yes.
4   Q   Now, as I understand it, on this test, you have
5       since given this again, haven't you?
6   A   No.
7   Q   Or was that the Wide Range Achievement?
8   A   Wide Range Achievement.
9   Q   And his score on this was below the first
10      percentile?
11  A   That's correct.
12  Q   Now, you also relied upon the Test of Nonverbal
13      Intelligence; is that correct?
14  A   That's correct.
15  Q   Did you believe that that was an appropriate
16      instrument?
17  A   At that time, I assumed it was.
18  Q   So, if you had any doubts about, the test, you
19      could have checked it at that time?
20  A   Right. I did not have doubts about the test at
21      that time. But I was not familiar with it,
22      either. We didn't give that particular test.
23  Q   Well, I did some research with the TONI, and I
        found out that it had some technical problems with

Page 32

1       instruction norms, test instruction.
2   Q   When did you do this research?
3   A   Within the last week or so.
4   Q   Okay. So, you didn't do this when you were
5       evaluating him or trying to change the
6       intelligence instrument?
7   A   That's right.
8   Q   You did this research for this hearing?
9   A   That's right.
10  Q   Okay. And the information you have about problems
11      with the norms, or test development, or
12      instructions, or racial bias, or whatever the
13      problems are, all of that information was
14      available in 2000, was it not?
15  A   That's right.
16  Q   Came from Buros Mental Measurement Yearbook?
17  A   Right.
18  Q   So, if you had any doubts about, the test, you
19      could have checked it at that time?
20  A   Right. I did not have doubts about the test at
21      that time. But I was not familiar with it,
22      either. We didn't give that particular test.
23  Q   So, you relied on it without knowing about

Page 33

```
 1   it?
 2   A   We assumed that they knew what they were doing in
 3       Tallasee and had given an appropriate test.
 4   Q   Now, I don't have the original test protocol from
 5       the TONI, nor do I have it from your current test.
 6       I think we should have been provided that.  But,
 7       anyway, I notice in looking on page 115 that when
 8       it was given in Tallassee, his raw score, his
 9       total raw score, on the test was one.  Does that
10       tell you anything about the reliability of that
11       test?
12   A   Well, it would suggest the test is not a good
13       test, the test instruction.
14   Q   And did you see that in the year 2000 when you
15       received these scores?
16   A   No, I didn't -- I don't remember seeing that.
17   Q   Do you remember seeing this document?
18   A   Actually, it was pointed out recently within the
19       last week or so about the raw score of one.
20   Q   By whom?
21   A   One of my colleagues.
22   Q   So, you would agree with me that reliance on the
23       test where the student could only get a total raw
```

Page 34

```
 1   score of one is not appropriate?
 2   A   That's correct.
 3   Q   Did you also receive and review the report that is
 4       labeled as number 123, page 123 in the notebook?
 5       Let me just say as I understand it, this is
 6       the report by the examiner who actually did the
 7       TONI in Tallassee, an Alex Coker.  And I believe
 8       it's in the school system's documents, also.  Did
 9       you review that document?
10   A   Yes, ma'am, I did.
11   Q   Okay.  Now, I notice in there that Mr. Coker
12       suggests that curriculum suggestions for improving
13       this student's academic deficiencies -- this is
14       the very last line of his recommendations --
15       curriculum suggestions for improving academic
16       deficiencies are provided upon request.  Did you
17       do anything to either find out what those
18       recommendations might have been or to make your
19       own recommendation?
20   A   No, I didn't.
21   Q   I guess with respect to our chart over here, what
22       we're talking about is deciding a curriculum with
23       a reliable measure of what his areas of disability
```

Page 35

```
 1   are, how badly retarded the is, is that right?
 2   A   That's correct.
 3   Q   So, you relied upon an instrument that you have
 4       now decided was inappropriate, that had a raw
 5       score of one, is that your testimony?
 6   A   Right.
 7   Q   And did you make any curriculum recommendations?
 8   A   No, not at that time.  That was just an
 9       eligibility meeting to see whether he continued to
10       qualify.  That was my --
11   A   Well, I would assume that you -- just like
12       Mr. Coker, who I also understand is a school
13       psychologist -- you would be qualified to make
14       curriculum recommendations; would you not?
15   A   Now, I'm sorry.  I thought you were asking with
16       this particular document, page 120, I didn't.  But
17       with my current testing, I didn't I did make
18       recommendations.
19   Q   No, I'm worried about the last three years.  In
20       the year 2000, someone identified him as having a
21       62 IQ --
22   A   Right.
23   Q   -- with an inappropriate instrument with a raw
```

Page 36

```
 1   score of one.
 2   Q   The question is:  You do have qualifications
 3       to make curriculum recommendations, do you not?
 4   A   Yes.
 5   Q   Did you review to see what his curriculum was,
 6       whether any recommendations were necessary?
 7   A   No.  Again, that wasn't the point of my
 8       involvement.
 9   Q   Well, who would have been responsible for doing
10       that?
11   A   Well, see, the IEP team from Tallassee before he
12       came here would have based their recommendations
13       on the testing.
14   Q   Mr. Mayer, you're not willing to rely upon their
15       eligibility determination, why would you be
16       willing to rely upon their IEP?
17   A   Like I said, at the time, we thought the TONI was
18       appropriate.  We were not familiar with that
19       instrument and assumed it was a reliable, valid
20       instrument that they had used in another school
21       system.
22   Q   You undertook a review of his eligibility, why
23       didn't you undertake a review of his IEP?
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 37

1    A    I don't know that our IEP team did not do that. I
2         just did not do that.
3    Q    Do you think it would have been appropriate to do
4         so?
5    A    I think it's standard practice to look at the IEP
6         if he's a transfer student from another system to
7         see if it's an appropriate document. I wasn't
8         involved in that process.
9    Q    Would it also be important in deciding on content
10        to look at the student's progress thus far?
11   A    I think in terms of noting his strengths and
12        weaknesses, certainly.
13        No, I said progress this far. He's been in school
14        by the time he comes to you for seven years?
15   A    Right.
16   Q    Would it be appropriate to look at how he's done
17        over those seven years?
18   A    Yes.
19   Q    Would it be important to look at the Brigance to
20        see what skills he's mastered and what skills he
21        hadn't?
22   A    Yes, that's one means.
23   Q    What other means do you have?

Page 38

1    A    Well, observation, teacher observation, work
2         samples, teacher data.
3    Q    Was any of that done?
4    A    Again, this is an IEP that I did not participate
5         in.
6    Q    But you would agree you have to modify the content
7         as you look at his IQ and his progress to date?
8    A    Yes, based on your assessments.
9    Q    We've already talked about the Key Math. You
10        incorporated that into your report.
11        Again, if you look on page 117, the original
12        report on the Key Math. I'm kind of interested in
13        this, because it says, achievement, Diagnostic Key
14        Math. On the original report on 115, it said,
15        below 1.0 grade level. Is that what you interpret
16        that to say on the right-hand column there?
17   A    Right.
18   Q    In your report, you've got, that's on page 120,
19        Key Math, grade equivalent, less than one. Is
20        that what that means?
21   A    Yes.
22   Q    Was the Key Math an appropriate instrument to test
23        a child of Gaddies' ability level?

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 39

1    A    Yes, I think it was.
2    Q    So, he could respond to enough of the items to
3         make it a valid score?
4    A    He did get some items correct, yes.
5    Q    Did you use the Key Math when you retested him?
6    A    No, I didn't.
7    Q    Why not?
8    A    Because I thought the WRAT -- I was familiar with
9         that, and it has some activities that I felt would
10        be appropriate for him, some very simple counting
11        activities, a lot of preschool sorts of
12        activities, that I think is a better measurement
13        of his functioning level.
14   Q    I may have asked you this already. With respect
15        to his math, did you say you did or did not
16        actually review the Brigance?
17   A    No, I did not actually review it.
18   Q    Let me ask you to do that now. You just copied on
19        your sheet what they had on their sheet, one
20        through ten?
21   A    That's right.
22   Q    Take a look on page 92 of those exhibits, which is
23        the actual -- I'm sorry. That's not right. Let

Page 40

1         me find it. There is something in here that tells
2         what numbers he got, and I didn't write down the
3         page.
4         Here it is. I'm sorry. Page 113. Do you
5         understand that he actually could count to 19 by
6         the time he finished in Tallassee in the year
7         2000?
8    A    Well, like I said, I haven't looked at this prior
9         to today, but if that's what it says.
10   Q    Is that what it says?
11   A    Right, it does.
12   Q    So, that was relying -- that was done in February
13        of 2000, the one through ten. And then by the end
14        of the year, he apparently could count to 19. Is
15        that your understanding?
16   A    Yes.
17   Q    Now, from looking at what he came into the system
18        with, would you agree that he had made little or
19        no progress in regular kindergarten activities
20        before he came here?
21   A    Little or no progress in pre-kindergarten?
22   Q    In kindergarten activities.
23   A    Yes, I guess that would be a fair statement.

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 41

1    Q    And that was in seven years?
2    A    Right.
3    Q    Is that what you understand? He had been in
4    school for seven years?
5    A    Yes.
6    Q    So, if we're considering his weaknesses, like he's
7    got a 62 IQ, which you think is questionable, and
8    his progress, minimal or no progress in the last
9    seven years, though factors would both indicate
10    that perhaps kindergarten activities are not
11    appropriate, isn't that true?
12    A    No, I wouldn't agree with that.
13    Q    Okay. Why not?
14    A    Well, kindergarten are pre-academic sort of
15    activities that are necessary before he's going to
16    advance any further, if he advances further.
17    Q    Necessary before he learns to read?
18    A    That's correct.
19    Q    You don't think Gaddies is going to learn to read,
20    do you?
21    A    It's highly questionable.
22    Q    It's highly questionable, isn't it, Mr. Mayer?
23    We've now been at this for ten years? Do you have

Page 42

1    an opinion that Gaddies is going to learn to read?
2    A    I think it's possible that he could learn some
3    sight words, that is, some survival words.
4    Q    Learning sight words; that's not like sounding out
5    words, is it?
6    A    That's correct.
7    Q    That's just, I can recognize exit?
8    A    Right.
9    Q    That's just like I can recognize a picture of a
10    toaster?
11    A    (Witness indicating.)
12    Q    I mean, it's just a visual impression of it, and
13    you go, oh, that's exit or stop, right?
14    A    That's correct.
15    Q    But as far as learning the names of the letters,
16    writing letters, sounding out words, I mean, I
17    assume you have reached a conclusion based on his
18    disability and progress to date, he's not going to
19    be able to do those things?
20    A    Well, I wouldn't necessarily agree with all of
21    those. I think sounding out a number of words
22    might be questionable. I think he can learn
23    possibly letters and sounds of some letters with

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 43

1    enough drilling. I wouldn't want to give up on
2    that.
3    Q    As we sit here today, Gaddies still hasn't learned
4    any of the names of his letters?
5    A    Yes.
6    Q    He knows how to say A-B-C-D, sing the song. Are
7    you telling me that he can say, this is a D, this
8    is a G?
9    A    I thought I heard he could name a few letters. I
10    don't know which ones they are. Maybe at various
11    times.
12    Q    Do you have any personal knowledge that Gaddies
13    knows the names of the letters when he has them
14    written down?
15    A    No, he could not on my instrument that I gave him.
16    Q    Okay. You had mentioned that you used the Wide
17    Range Achievement Test with Gaddies. And I just
18    call your attention to page 126 in the notebook.
19    And I don't know if this is you—it seemed to be
20    Ms. King did this. And I didn't see one that you
21    had done.
22    A    Right. That's not mine.
23    Q    Okay. Is yours from back in 2000?

Page 44

1    A    No.
2    Q    Where is yours?
3    A    Where is it?
4    MS DePAOLA: Do I have it? Houston,
5    where is it?
6    MR. HOWARD: I gave you everything I was
7    given.
8    BY MS DePAOLA:
9    Q    Do you have it? Can you tell us something about
10    it?
11    A    Well, it was given at the same point in time as
12    the intelligence test was given.
13    THE HEARING OFFICER: Do you remember
14    what year, or where he was? He
15    came in 2000.
16    THE WITNESS: 10/24/02, I believe. Yes.
17    10/24/02 was when I gave it.
18    A    It's on page 165.
19    THE HEARING OFFICER: The Wide Range
20    Achievement Test, or the
21    intelligence test?
22    THE WITNESS: Both were given on this
23    date.

Page 45

1  THE HEARING OFFICER: These are results?
2  THE WITNESS: Yes.
3  Q  Okay. Page 165 is another eligibility
4  determination you did in November of 2002; is that
5  correct?
6  A  Yes.
7  Q  And it references in there a Wide Range
8  Achievement Test. How many items could he do? I
9  mean, I've never seen it.
10  A  Right. From what I could recall, he could count
11  to three correctly, and then he would get off
12  track. I don't remember whether he could name
13  some letters or not. But it wasn't a lot that he
14  could do
15  Q  Where is that document now? Where is the
16  original?
17  A  Well, it would be in the teacher's folder.
18  MS. DePAOLA: Can we see that?
19  A  The original would be in our annex office.
20  THE HEARING OFFICER: What document are
21  we talking about?
22  MS. DePAOLA: The Wide Range Achievement
23  Test that he gave in November of

Page 46

1  2002.
2  Maybe Mr. Anderson could look
3  for that while we go on, so we can
4  keep moving along.
5  THE HEARING OFFICER: What was this, a
6  reevaluation that was given in
7  November of 2002?
8  THE WITNESS: Yes.
9  Q  This reevaluation was done, because the mother was
10  dissatisfied with the prior evaluations; is that
11  correct?
12  A  That was my understanding.
13  Q  Okay. And as part of that, you gave the Wide
14  Range Achievement Test. Hadn't that just been
15  given in April 2002, by Ms. King --
16  MS. DePAOLA: I'm sorry, Houston. I
17  found it.
18  Q  Let's look at your results. Page 161.
19  MR. HOWARD: Glad that you know it
20  wasn't missing.
21  MS. DePAOLA: Sorry.
22  Q  Pages 161. Now, that shows no items that he
23  responded to; is that accurate?

Page 47

1  A  Well, that's only one page. The test really has
2  three different subtests to it. And that's just
3  one.
4  THE HEARING OFFICER: But he actually
5  writes on this one, right?
6  BY MS. DePAOLA
7  Q  This is where you write your answer; is that
8  right?
9  A  For spelling, I guess.
10  MS. DePAOLA: Well, I guess, Houston,
11  you do need to look. This is all
12  we have is just the cover sheet.
13  MR. HOWARD: I can get someone to bring
14  the original. If I gave you this
15  one page, Susan, that's the only
16  page I have.
17  (Off the Record discussion.)
18  MR. HOWARD: Do you want Marshall to ask
19  Ms. King to go back over and pick
20  it up?
21  Q  Let me just ask, Mr. Mayer, looking at the upper
22  right-hand corner, it says, reading, spelling,
23  arithmetic. It's extremely hard to read. Do you

Page 48

1  have the original?
2  A  (Witness indicating.)
3  Q  Because it says, reading, zero; is that right?
4  A  Right.
5  Q  Spelling, zero; is that right?
6  A  It looks like it.
7  Q  And arithmetic, I am not sure if it says one or
8  not?
9  A  It looks like one.
10  Q  One item. Do you feel this was an appropriate
11  evaluation of this achievement?
12  A  Well, it's part of the evaluation process. We
13  want to get standard scores to show how he
14  compares to the national norms. You have to give
15  standardized tests. True, he could not do much on
16  this, but we needed to do the standardized
17  instrument. He didn't do much on the Key Math,
18  either.
19  Q  Sure. Isn't it true that when a child is scoring
20  so far at the bottom that the test is not a
21  reliable instrument for them?
22  A  No.
23  Q  Statistically speaking?

Mary Moore-Wynn                    Court Reporting Services

1   A   No. I wouldn't agree with that.
2   Q   I mean, don't they have to have some sort of basal
3       achievement to get into a test like this?
4   A   No.
5   Q   Okay. Now, when he was given this same test in
6       April of 2002 by Ms. King -- on page 126, do you
7       see that?
8   A   Yes.
9   Q   -- do you have any indication that he scored
10      anything, was able to do any items?
11  A   No.
12  Q   And page 127 shows the kind of items we're talking
13      about, doesn't it? Like up at the top of 127, you
14      asked the child to count those three ducks, one,
15      two, three, right?
16  A   That's correct.
17  Q   And he couldn't do that, one, two, three, he
18      couldn't count the three ducks?
19  A   At what time?
20  Q   On this administration --
21  A   -- he could not.
22  Q   All right. So, I mean, would you say that as of
23      April 2002, there was no evidence of progress in

1       academics?
2   A   No, I can't say that, because if you want to talk
3       about was is there any improvement on standardized
4       tests with what they measure, you might possibly
5       say no. But teachers do a lot of activities that
6       measure academic progress that wouldn't be
7       reflected here.
8   Q   No, I'm talking about. You said you wanted
9       standard scores. As far as standard scores and
10      comparing to the population as a whole, this
11      demonstrates no gains?
12  A   That's correct.
13  Q   And at that time, he had been in the system almost
14      two years; is that correct?
15  A   Yes.
16  Q   Did you at that time undertake a reevaluation of
17      the curriculum?
18  A   At what time?
19  Q   When you saw in April of 2002 that Gaddies had
20      made no progress academically, as measured on the
21      standardized test, did you undertake a review of
22      the content, the curriculum, what you're trying to
23      do with him?

Mary Moore-Wynn                    Court Reporting Services

1   A   I did not personally, no.
2   Q   Who did?
3   A   Well, again, that's up to his IEP team. And I did
4       not participate in that.
5   Q   You don't know if anybody did; is that correct?
6   A   I don't know. That's correct.
7   Q   Okay. Now, at the parent's request, you undertook
8       a reevaluation in October of 2002. And I
9       understand you wrote a report that's in this
10      notebook at page 162. That's not your report.
11  A   That's the intellectual assessment. And there is
12      a report here, too, somewhere.
13          First of all, let me ask you to look at 162
14      and tell me if that's your intellectual
15      assessment.
16  A   It is.
17  Q   All right. Let's go over that, first of all.
18      Now, this time, it says you gave the TONI, again.
19      That's not right, is it?
20  A   That was a typo.
21  Q   Okay. Why didn't you give the TONI?
22  A   Because the TONI -- at that time I knew was -- the
23      TONI that was originally given was given back

1       in -- or started back in 1982. And this is ten
2       years later -- or several many more years than
3       that later. But it had been revised several
4       times. We wanted to give a more updated test.
5   Q   What did you select for a more updated test?
6   A   The C-TONI.
7   Q   And that's the Comprehensive Test of Nonverbal
8       Intelligence; is that right?
9   A   Yes.
10  Q   Okay. And at that time, did you make a
11      determination of what his intelligence quotient
12      was?
13  A   Yes, I did.
14  Q   And what did you estimate it to be?
15  A   Thirty-nine.
16  Q   Is this in sort of the severe range?
17  A   Yes, it is.
18  Q   All right. And so, I guess that would have an
19      impact on this area, his area of disability, is
20      even more severe than you thought; is that
21      accurate?
22  A   That's correct.
23  Q   Did you revise the curriculum at that time?

Mary Moore-Wynn        Court Reporting Services        (334) 244-0203

**Page 53**

1  A  I don't know.
2  Q  Did you recommend they revise the curriculum?
3  A  No, I didn't. I wrote recommendations based on my
4     testing.
5  Q  Did you review the curriculum?
6  A  No.
7  Q  Well, who was responsible at that point for
8     reviewing and revising the curriculum if they
9     determined it was appropriate?
10 A  The IEP team, his IEP team.
11 Q  Did you ask that it be convened?
12 A  No, I didn't.
13 Q  So, what was going to happen was Gaddies was just
14    going to keep on through the rest of the year on
15    his old IEP?
16 A  If the IEP team thought that was appropriate.
17 Q  Well, did you ask them to convene to consider this
18    score?
19 A  No.
20 Q  Did you present this score to them at that time?
21 A  At eligibility, we did, yes -- I did.
22 Q  And at eligibility, was there not a request made
23    by the mother that you reconvene the IEP team to

**Page 54**

1     look at what you're doing with him?
2  A  No, not that I recall.
3  Q  You all mention in this report -- and this is
4     under background information -- that Gaddies has a
5     medical diagnosis of hyperactivity. What
6     specifically has the system been doing to address
7     the hyperactivity?
8  A  I really can't answer that. I don't think it was
9     addressed in his IEP, per se.
10 Q  Okay. You said in there that when you were with
11    him, he was somewhat active, wanted to handle all
12    the objects in the room. You had to constantly
13    remind him to stay on task, and that his attention
14    you described as fair; is that a good description?
15 A  Yes.
16 Q  You concluded that this was a valid test?
17 A  Right.
18 Q  Do you think that the behavior you observed could
19    have an impact on his education in the classroom?
20 A  Yes.
21 Q  So, you think it should be addressed in the IEP?
22 A  Let me back off, it was not severe enough that I
23    felt like he would not benefit from his

Mary Moore-Wynn        Court Reporting Services        (334) 244-0203

**Page 55**

1     educational experiences. The little bit -- I
2     thought it was natural for him to see some
3     objectives there that he had never seen before and
4     want to perhaps reach for them. It was a new,
5     novel environment that he was in. He commented on
6     some pictures that I had hanging on the wall. I
7     thought that was all pretty natural.
8  Q  Well, you saw fit to include these descriptions in
9     your report --
10 A  Right.
11 Q  -- so, I assume you thought it was somewhat out of
12    the norm.
13 A  No, I was just describing. A little bit out of
14    the norm for what I would normally work with, yes.
15 Q  Okay. Now, on the middle of page 2 of your
16    report, after you talk about the intelligence
17    quotient at the top in the fourth paragraph, you
18    say -- about the third sentence -- Gaddies could
19    not recognize any numbers or letters. Is that
20    your testimony now? Because earlier, you said you
21    thought he could recognize letters. Which way is
22    it?
23 A  I thought I had talked with some teachers, and

**Page 56**

1     they said he could occasionally recognize some
2     letters.
3  Q  But from your observation, he could not recognize
4     any numbers or letters?
5  A  From my assessment, yes.
6  Q  You also said he could count to three?
7  A  Yes.
8  Q  Is that those three bunnies that we saw?
9  A  Yes.
10 Q  You go on and say, classroom teachers say, he has,
11    quote, no number or letter recognition. Is that
12    what you recall them telling you?
13 A  That -- if I made that comment in the report,
14    that's accurate.
15 Q  And you also say that the teacher -- this is the
16    end of that paragraph -- the teachers state his
17    academics have not progressed a great deal since
18    he came from Tallassee. Do you agree with that?
19 A  Well, I don't know exactly what they were at
20    Tallassee. I'm agreeing with that statement. If
21    that statement is true, I would agree with it.
22 Q  Well, I mean, you see what the Brigance said about
23    numbers one to ten and doesn't know any of the

Page 57

1 letters. Do you have any reason to believe he has
2 progressed a great deal since he came from
3 Tallassee?
4 A In number and letter recognition, possibly not.
5 Q And the teachers state in looking at previous
6 records, Gaddies' skills have not improved to any
7 great extent?
8 A Right.
9 Q And I assume that you agreed with that as a result
10 of your evaluation?
11 A Right, yes, ma'am.
12 Q As a result of that information coming to your
13 attention, did you suggest that they reconsider
14 the curriculum?
15 A No, I did not.
16 Q You think it would have been appropriate to
17 reconsider the curriculum?
18 A Not necessarily, because I felt like what they
19 were doing with him was the results of what I got
20 with him. He's working at a preschool level.
21 They were doing preschool goals and
22 benchmarks. They were doing the sort of
23 activities that I would have recommended, anyway.

Page 58

1 Q So, you still thought they should try and be
2 teaching him the ABC's after 12 years? Now, we're
3 up to 15 years. He's 15 years old?
4 A Right.
5 Q You still thought they should be teaching him the
6 names of the letters of the alphabet?
7 A Along with other goals.
8 Q I just want to stay with that one. For a reading
9 goal, they should be teaching him the names of the
10 letters of the alphabet?
11 A In my opinion, yes.
12 Q Why?
13 A Because I wouldn't like to think that we're just
14 going to give up on Gaddies in terms of ever being
15 able to read or do some math. That would be
16 questionable. I would like to think we continue
17 to have him strive toward doing that.
18 Q Aren't there a lot of other more important goals
19 for some children?
20 A I guess I would agree with that.
21 Q And, for instance, if Gaddies doesn't know the
22 front and back of his clothes, that's more
23 important than him learning the ABC's, isn't it?

Page 59

1 A I think there are certain life skills that would
2 be important.
3 Q Can you say whether that would be something they
4 should be teaching him?
5 A Are you talking about that one specific example?
6 Q Yes, sir. The front and back of his clothes, so
7 he could dress himself.
8 A I think, among other things, that would be useful.
9 Q How about which shoe goes on which foot?
10 A I would think so.
11 Q How about how to brush his teeth?
12 A Yes.
13 Q How about how to pour milk in a glass so he can
14 get a drink?
15 A Yes.
16 Q Wouldn't you agree with me at some point, it
17 becomes a whole lot more important for a child
18 like Gaddies to learn those skills than to be
19 worrying about his ABC's?
20 A Yes, I think I could agree with that.
21 Q Were they teaching him any of those skills that I
22 just mentioned?
23 A I can't answer that, because I don't know.

Page 60

1 Q In your professional opinion, how long would you
2 have had to work with Gaddies before you realized
3 there were other more important things he needed
4 to be taught other than ABC's?
5 A I would think within several weeks it would be
6 fairly obvious to determine.
7 Q So, we're talking back in the year 2000 when he
8 came in, within a few weeks, someone could have
9 determined whether the curriculum was what was
10 critical for him?
11 A Yes.
12 Q And you would agree with me that for some children
13 an education is life skill rather than ABC's and
14 numbers?
15 A I think I would agree with you that might be
16 a priority.
17 Q Okay. Do you think it would be a priority with
18 Gaddies?
19 A You know, I'm just trying to learn to read.
20 And I would hate to think we would abandon numbers
21 and letters and just totally pick up self-help
22 skills. So, I would like to see a balance there.
23 Q When you say, read, I'm assuming you might mean

---

## Page 61

1 like, exit, danger, stop? Sight words, right?
2 A I would say in general, yes.
3 Q Okay. And you don't mean phonics?
4 A Well, I think it's conceivable that he could learn
5 a few very minimal phonics skills.
6 Q Like what?
7 A I think if you can learn to sound out any letters,
8 you have the potential to sound out a few words
9 based on that. It may not be the perfect phonics.
10 But any would be better than nothing, I would
11 think.
12 Q How many years does Gaddies get to stay in Elmore
13 County schools?
14 A Through age, what, 21?
15 Q The way I see it is, you've got 12 years -- you
16 know, like regular -- for the regular kids. And
17 then maybe another five years. Maybe just four
18 more years. So, you've got like 16 years to work
19 with this kid, is that about right?
20 A Yes.
21 Q And doesn't it, at some point, reach a critical
22 mass, when you, you know, I've only got four
23 or five more years left, and he doesn't know the

---

## Page 62

1 front and back of his clothes, and I better look
2 at the content?
3 A Yes.
4 Q All right. In your report on page 163, you made
5 some recommendations. Let me ask you, first: Had
6 you reviewed what the curriculum was that they
7 were using with him when you wrote this report?
8 A No.
9 Q So, in your recommendations where you say,
10 continued emphasis on those functional academic
11 skills that will develop independence, you had no
12 idea what they were doing with him?
13 A That's correct.
14 Q Okay. So, whatever functional academic skills
15 were being reported to you, I guess, the teachers
16 were telling you, we're doing functional math, or
17 functional reading?
18 A Right.
19 Q How did that get in there, that's my question.
20 Did a teacher tell you that?
21 A Tell me what?
22 Q That they are doing functional academic skills.
23 A Right. I knew he was tracing letters. Working on

---

## Page 63

1 recognition. Touch Point math was being used.
2 These are all pre-first grade kind of skills.
3 Q Tell me what is functional math for a child of
4 Gaddies' IQ level.
5 A I think the ability to possibly write down his
6 street address, which involves numbers. Is a
7 life -- it's a survival skill, in my opinion.
8 Maybe being able to recognize a few numbers would
9 come in handy.
10 Q For why?
11 A Ma'am?
12 Q Recognize a few numbers for what?
13 A Well, I think anytime he was reading something and
14 saw the number ten there, if he had some concept
15 of what that ten meant, certainly that would be
16 valuable to him. I don't know if the necessarily
17 needs to be able to multiply and divide, but some
18 basic number recognition.
19 Q Let me go back to the outcome. We agreed earlier
20 that Gaddies could probably sweep floors, wash
21 dishes. Any math in there?
22 A Not on what you just said, no.
23 Q Okay. I mean, just saying that it's functional

---

## Page 64

1 doesn't make it so. If I say Algebra, II, is
2 functional math, that's not what we mean by
3 functional math, is it?
4 A No.
5 Q Tell us what functional math is.
6 A Well, I think the example that you used, if he is
7 sweeping floors, and he's going to make $2.00 an
8 hour, I think he needs to know if somebody gave
9 him $2.00 instead of $1.00.
10 Q He needs to know money?
11 A Right.
12 Q Have you ever seen that in his IEP?
13 A I don't believe so
14 Q Okay. He's sweeping floors. What other math does
15 he need to know?
16 A I don't know. It was -- with the sweeping floors
17 analogy, I don't know.
18 Washing dishes -- you gave me an employment that
19 you think Gaddies Hill can do.
20 Q An employment?
21 A Yeah, an outcome. Where was he going? What's the
22 end here? Where is this child going to live, and
23 what's he going to be doing?

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

**Page 65**

1 A  Well, again I think what they determined at this
2 point is supervised workshop sort of setting where
3 he's with working with other people, doing chores
4 of some sort.
5 Q  Doing a chore. Sweeping -- you don't have any
6 other ideas for what Gaddies might do for
7 employment; is that basically it?
8 A  Not really.
9 Q  Not really, you don't have any other ideas?
10 A  No, not on the spur of the moment, I don't.
11 Q  Okay. Now, in functional reading, as I understood
12 what you're saying is, you wanted him to know some
13 emergency signs, like sight reading; is that
14 right?
15 A  I would say some functional phonics might be
16 useful. If he could pick up anything
17 phonics-wise, it might be useful.
18 Q  What does functional mean to you?
19 A  Very basic.
20 Q  You mean that to say very basic?
21 A  Yes.
22 Q  Because, to me, functional reading means what
23 you're going to have to be able to do to work or

**Page 66**

1 to move around in the community. Is that not what
2 you understand that to mean?
3 A  Yes, which might involve some reading at some
4 point. If he can read at all, he's better off
5 than no reading.
6 Q  And in the jobs that we have identified or agreed
7 upon that he might be able to do, the phonics that
8 he would need would be what?
9 A  Well, again, I think just any letter sounding out
10 any combination of letters could possibly lead to
11 sounding out words, which might be useful at some
12 point.
13 Q  In the jobs that we've identified so far, what
14 phonics would be necessary?
15 A  I guess in terms of function, maybe, he could
16 sound out exit from an exit sign, so he would know
17 where to exit a building, things of that nature.
18 Q  Oh, I thought that you thought that he should be
19 taught that as a sight word?
20 A  Sight word is memory. If he forgets it, he can
21 sound it out.
22 Q  And your testimony to the Hearing Officer is that
23 Gaddies Hill is going to be able to sound out

Gaddies Hill        March 12, 2003        Elmore County Board of Education

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

**Page 67**

1 exit?
2 A  It would be questionable. It would.
3 Q  And we do sort of agree Gaddies is running out of
4 time in the educational process, don't we?
5 A  Well, he's got five, six years left.
6 Q  And based upon his rate of progress in these
7 academics that you're identifying, he's running
8 out of time, isn't he?
9 Q  Running out of time in academics?
10 Q  To learn how to sound out exit.
11 A  Yes, if you consider six years running out of
12 time.
13 Q  Well, do you, considering his rate of progress to
14 date?
15 A  If you're asking me would it be unlikely that he's
16 going to learn a great deal of academic skills, I
17 would say that is true.
18 I would hate to abandon him altogether,
19 though.
20 Q  Have you seen any of the work samples that they
21 have been using with Gaddies?
22 A  Yes, I have.
23 MS. DePAOLA: I wasn't going to admit

**Page 68**

1 all of these. I was just going to
2 use them as -- do you want to admit
3 all of these?
4 MR. HOWARD: I don't know. If you're
5 just going to question him about
6 them, I don't object to you
7 questioning him about them without
8 admitting them as exhibits.
9 MS. DePAOLA: Well, these are all --
10 MR. HOWARD: Is this some of the stuff
11 you sent the other day, or what is
12 this?
13 MS. DePAOLA: There is your numbers on
14 it. I just sort of grouped it
15 according to what they seem to be
16 trying to do.
17 MR. HOWARD: Whatever you would like to
18 do.
19 MS. DePAOLA: If you would like to look
20 at those before I examine him on
21 them. Do you want me to mark it as
22 an exhibit?
23 THE HEARING OFFICER: Yeah, we'll just

Gaddies Hill        March 12, 2003        Elmore County Board of Education