1   call them Petitioner's Exhibit 2.
2   And these are work samples of
3   Gaddis?
4   MS. DePAOLA:  Yeah.
5   (Whereupon, Petitioner's Exhibit 2 was
6   marked for identification and is
7   attached hereto.)
8   BY MS. DePAOLA
9   Q   I'm going to show you Petitioner's Exhibit 2.
10  Have you ever seen any of those work samples?
11  A   Yes, I have.
12  Q   Could you tell me what is functional in terms of a
13  job for Gaddis that's related to any of those
14  pages there?  Because they look to me like they
15  are just tracing letters.
16  A   That's right.
17  Q   What's the purpose of that?
18  A   What's the purpose of tracing letters?  Well, it's
19  a prerequisite skill to reading.
20  Q   Tracing letters is a prerequisite skill to
21  reading?
22  A   Well, or spelling, or just any academic task.
23  Q   Does he even know the names of these letters?

1   A   Not in general, no, he doesn't.
2   Q   Would it be accurate to say Gaddis could be
3   tracing anything here?  He has no idea what he's
4   drawing?
5   A   If you're asking me is it more advantageous to
6   trace letters than just any old thing, I would
7   probably say yes.
8   MS. DePAOLA:  Could you read my question
9   back?
10  (Whereupon, the requested material was
11  read back.)
12  MR. HOWARD:  Object to form of the
13  question.  There is no evidence so
14  far as to whether he has any idea
15  to what he's drawing.
16  THE HEARING OFFICER:  Well, overruled.
17  If you can answer or have an
18  opinion.
19  A   You are asking me would he know what he's tracing?
20  Is that what you're asking?
21  Q   Uh-huh.
22  A   I think occasionally, he may know.  But probably
23  in general, no.

1   Q   But this is from this year, 9/2/02?
2   A   Yes, ma'am.
3   Q   9/3/02?
4   A   Well, it's 4/3/02.
5   Q   It's 4/3?  It looks like 9/3 to me.
6   THE HEARING OFFICER:  And if I didn't
7   admit them, Petitioner's Exhibit 2
8   is admitted
9   Q   Aren't those basically what you do with
10  kindergarten kids?
11  A   Yes.
12  Q   I mean, Gaddis is not even accessing these
13  kindergarten skills, is he, after 12 years?
14  A   In the academic areas, yes.
15  Q   Do you know what his schedule is?  Do you know how
16  much time his schedule is in reading, language
17  arts, math?
18  A   No, I don't know the specifics.
19  Q   Would you be surprised to know that it's about
20  half the day?
21  A   (Witness indicating.)
22  Q   I'm sorry?
23  A   Yes, I didn't know that.

1   Q   He's doing math from 7:30 to 9:30?
2   MS. DePAOLA:  Can we stipulate to his
3   schedule, Houston?
4   MR. HOWARD:  What?
5   MS. DePAOLA:  Can we stipulate to his
6   schedule?
7   MR. HOWARD:  Where is it?
8   MS. DePAOLA:  You sent it to me when
9   Dr. Gargiulo was coming down.  You
10  said he was in math from 7:30 to
11  9:30, language arts from 9:30 to
12  11:15, social studies from 11:15 to
13  1:15, including lunch during this
14  time, and science 11:15 to 1:15,
15  including lunch during that time,
16  and PE from 1:15 to 2:45.  Can we
17  stipulate to that schedule?
18  MR. HOWARD:  Yes.
19  BY MS. DePAOLA
20  Q   So, apparently, in language arts, we have got
21  about an hour 45 minutes in these kinds of
22  activities.  Is that appropriate?
23  A   I think the IEP team made the decision to stress

**Page 73**

1 some pre-academic skills. And in that sense, it
2 would be appropriate. That was the emphasis at
3 that time.
4 Q I'm asking for your professional opinion. You
5 weren't on this team, were you?
6 A No, I wasn't.
7 Q If you're asking me, is academics just
8 straight through the day without any self-help
9 sort of skills appropriate, I would say possibly
10 no. I don't know that they don't do some
11 self-help skills within that time period.
12 Q Are there any in the IEP?
13 A Yes.
14 Q We'll look at that in just a second.
15 You know, in preparation for this hearing --
16 and I didn't make this an exhibit -- I'm just
17 wondering if you --
18 MS. DePAOLA: I'll show it to Mr. --
19 Howard, I'm sorry.
20 MR. HOWARD: Maybe I need to make more
21 objections.
22 (Whereupon, Petitioner's Exhibit 3 was
23 marked for identification and is

**Page 74**

1 attached hereto.)
2 MS. DePAOLA: This is Plaintiff's
3 Exhibit 3.
4 THE HEARING OFFICER: What is it?
5 MS. DePAOLA: This is a segment from the
6 Diagnostic and Statistic Manual,
7 IV.
8 THE HEARING OFFICER: All right.
9 Plaintiff's Exhibit 3 is admitted.
10 Now, he's in a self-contained
11 classroom?
12 THE WITNESS: He is, yes -- well, no,
13 no, I'm sorry. He goes to
14 different resource rooms.
15 THE HEARING OFFICER: So, he goes to the
16 resource room, but he's in a
17 special ed room all through the
18 day?
19 THE WITNESS: That's correct.
20 BY MS. DePAOLA
21 Q Would you describe these as pre-academic skills,
22 Plaintiff's Exhibit 2, tracing letters?
23 A Yes.

**Page 75**

1 Q Doesn't the DSM-IV indicate that a child with his
2 retardation level will profit only to a limited
3 extent from instruction in pre-academic
4 instruction?
5 A Yes.
6 Q Such as familiarity with the alphabet and simple
7 counting?
8 A Yes.
9 Q It says in the manual that you provided Mr. Howard
10 that they will profit only to a limited extent
11 from what is being taught?
12 A Yes.
13 Q And what what should be taught is, for example, sight
14 reading?
15 A That's what's stated.
16 Q And you agree with that?
17 A Yes, to a limited extent, yes.
18 THE HEARING OFFICER: Now, he would be
19 characterized moderate mental
20 retardation or severe?
21 THE WITNESS: Well, actually, the way
22 they have got the numbers there, it
23 looks like moderate to severe. His

**Page 76**

1 score falls within both those
2 categories.
3 Q Do you have an opinion that he's moderate or
4 severe, from your experience?
5 A Severe.
6 Q Okay.
7 MS. DePAOLA: Can we mark this as
8 Plaintiff's Exhibit 4, please?
9 MR. HOWARD: Is this more work samples?
10 MS. DePAOLA: These are math.
11 THE HEARING OFFICER: Number 2 was work
12 samples in language arts?
13 MS. DePAOLA: Yes, sir.
14 THE HEARING OFFICER: Plaintiff's
15 Exhibit 4 is math work samples.
16 (Whereupon, Petitioner's Exhibit 4 was
17 marked for identification and is
18 attached hereto.)
19 MR. HOWARD: No objection.
20 Q I think the term that they use in DSM is
21 pre-academic subjects. Would you say that this
22 work here that we've labeled as Petitioner's
23 Exhibit 4 is what we would call pre-academic

```
 1        subjects?
 2    A   Yes.
 3    Q   Do you agree he can profit only to a limited
 4        extent from that?
 5    A   That's the prediction.
 6    Q   And, actually, tell the Hearing Officer what is he
 7        doing here.  I mean, isn't he just tracing
 8        numbers?
 9    A   Yes.
10    Q   Tracing?
11    A   Yes.
12    Q   This is all tracing?
13    A   Yes.
14    Q   This is tracing, the one, two, three, four, all
15        the way up to 26, that's tracing?
16        it?
17    Q   Page T84.  What's he supposed to do there, trace
18        the numbers, too?
19    A   Right.
20    Q   And, now, the last page in here, that's Houston's
21        page T60.  It's the fourth to the last page in
22        here.
23    A   Okay.
```

```
 1    Q   I'm sorry I don't have extra copies of that.
 2        That's some addition and subtraction, right?
 3    A   Yes.
 4    Q   Gaddies can't do that, can he?
 5    A   No.
 6    Q   He just traced the answer?
 7    A   Yeah.
 8    Q   Why?
 9    A   Why did he trace the answer?
10    Q   What is the possible relevance for this?
11    A   Well, I see some logic in that they've got five
12        minus two is three.  He's going to trace the three
13        and maybe hopefully make the connection between
14        the five and the two.
15    Q   You think he's going to memorize them?  Is that
16        it?
17    A   No, I think -- well, I don't know what their
18        intent was as far as his tracing.
19    Q   But that's the kind of pre-academic skills they
20        are talking about -- actually, that's beyond
21        pre-academic?  That's first grade?
22    A   Well, I think the point of the exercise was to
23        trace, which would be pre-academic.
```

```
 1    Q   Tracing to what end?  I'm having a hard time
 2        understanding that.
 3    A   To be able to form those numbers.
 4    Q   Even though he doesn't know what they mean?
 5    A   Well, they are working on that, too.
 6        MS. DePAOLA:  Did I offer that?
 7        THE HEARING OFFICER:  P4 is admitted.
 8        MS. DePAOLA:  Offer this as Plaintiff's
 9        Exhibit 5.
10        THE HEARING OFFICER:  What are these?
11        Work samples.
12        MS. DePAOLA:  Miscellaneous activities.
13        (Whereupon, Petitioner's Exhibit 5 was
14        marked for identification and is
15        attached hereto.)
16    Q   Would you look through Petitioner's Exhibit 5 and
17        tell me are those the kind of pre-academic
18        activities that the DSM is referring to?
19    A   Yes.
20    Q   These are from this year, aren't they,
21        September 27th, '02?
22    A   Yes.
23    Q   Can you see where his name is written on that
```

```
 1        document?
 2    A   I assume that's his name.  You really can't --
 3    Q   You can't read it?
 4    A   No.  It's pretty illegible.
 5    Q   That's on the fish page --
 6    A   Yes.
 7    Q   -- that you're referring to?  You can't read it
 8        where it says, name?
 9    A   No.
10        MS. DePAOLA:  And the last group I'm
11        going to label as Petitioner's
12        Exhibit 6.
13        (Whereupon, Petitioner's Exhibit 6 was
14        marked for identification and is
15        attached hereto.)
16        MR. HOWARD:  What exhibit number is
17        this?
18        THE HEARING OFFICER:  Petitioner's
19        Exhibit 6.
20        MR. HOWARD:  What does that say?
21        MS. DePAOLA:  Tracing name.
22        THE HEARING OFFICER:  But this whole
23        exhibit is work at trying to trace
```

Page 81

1  his name?
2  MS. DePAOLA: Yes, sir.
3  THE HEARING OFFICER: All right. It's
4  admitted.
5  Q  Have you reviewed any of the work they have done
6  trying to trace his name?
7  A  Not specifically trace his name, no.
8  Q  Gaddies doesn't know the names of any letters,
9  right?
10  A  Yes.
11  Q  Am I correct?
12  A  As far as my assessment.
13  Q  So, he has no idea what any of these letters are
14  that he's tracing as far as you can tell?
15  A  Probably not.
16  Q  Now --
17  A  Excuse me, I would like to back up. I think he
18  knows he's trying to do his name.
19  Q  You think he knows that?
20  A  Yes.
21  Q  Why do you think that?
22  A  He's traced it. And they have reviewed that, and
23  they have done it now where he can recognize his

Page 82

1  name, I believe.
2  MS. DePAOLA: Okay. We would offer
3  Petitioner's Exhibit 6.
4  THE HEARING OFFICER: All right. It's
5  in.
6  Q  Now, do you really think Gaddies is going to be
7  able to fill out an employment application?
8  A  No, I don't.
9  Q  No. So, he doesn't need to write his name for
10  that purpose? What I am assuming is you think he
11  needs to write his name if he gets lost or
12  something, or what? Why are you trying to teach
13  him to write his name?
14  A  I think that's basic survival skill. If he does
15  get lost, he can't communicate -- they can't
16  understand him, he may have to write his name.
17  Q  Can Gaddies say his name?
18  A  He can say his name.
19  Q  So, he doesn't need to write it to communicate his
20  name; he can say his name?
21  A  Well, he doesn't speak always with real good
22  articulation.
23  Q  What grade is he in? He's sort of in the

Page 83

1  ninth grade. He's flunked once. So, he's really
2  been in school nine, ten years, right?
3  A  I wasn't aware he had failed.
4  Q  Yeah, he failed seventh grade. He did that twice.
5  THE HEARING OFFICER: But he's in the
6  eighth grade?
7  MS. DePAOLA: He's in the eighth grade.
8  Q  So, that would be -- he's been in school about ten
9  years, right?
10  A  Well, he didn't --
11  Q  You didn't know that he failed it?
12  A  I was not aware he failed twice.
13  Q  No, I said he failed seventh grade. He came into
14  your school in the seventh grade, and you kept him
15  in the seventh grade two years?
16  A  Right.
17  Q  I'm not trying to badger. I'm trying to figure
18  out how long he's been in school. My calculation
19  is he's been in school ten years. Does that sound
20  about right?
21  A  (Witness indicating.)
22  Q  If you're concerned about him being able to
23  identify himself in the case of an emergency, are

Page 84

1  there any other strategies besides writing your
2  name?
3  A  Well, he could have some documents in his pocket
4  he could pull out.
5  Q  Exactly. Exactly. So, they could say, Gaddies,
6  show me your identification. Gaddies show me your
7  name, right?
8  A  Right.
9  Q  And he could pull out a card like a driver's
10  license, here's my name?
11  A  Yes.
12  Q  And after ten years in school, would you think
13  that would be a really good approach to take?
14  A  As opposed to teaching him to write his name? Is
15  that what you're asking?
16  Q  We will try -- yes.
17  A  I think in addition to teaching him to write his
18  name, that would be excellent.
19  Q  Has that been done?
20  A  I don't know.
21  Q  What else could you have on an identification card
22  that would be helpful if he got lost?
23  A  His address.

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203

Page 85

```
 1   Q   His phone number?  He doesn't know any of that,
 2       does he?
 3   A   I can't answer that.  They are drilling him on
 4       that.
 5   Q   Would it be very, very helpful if the got lost to
 6       be able to look at a card, see a phone number, and
 7       not necessarily understand that, what those
 8       numbers meant, but be able to look at a telephone
 9       and go, five, six, seven -- (indicating) and call
10       home?  Would that be really a critical thing to
11       know?
12   A   I'm sorry.  Would you say it again?
13   Q   Would it be a really critical safety thing for him
14       to be able to call home?
15   A   Yes.
16   Q   And Gaddies can do one thing, I think, for sure;
17       and that's match letters and numbers, can't he?
18       In other words, if you show him a seven, and you
19       show him a seven, he knows that's the same number,
20       doesn't he?
21   A   I don't know.
22   Q   Look at the Brigance; look at what that said in
23       the Brigance.  It said he can match numbers, every
```

Page 86

```
 1       single one of them?
 2   A   Okay.
 3   Q   Do you think they could teach him to dial a phone
 4       if he had the numbers and could see the phone?
 5   A   I think they have attempted that, and it was not
 6       successful.  Could they probably teach him with
 7       enough drill, yes, possibly.
 8   Q   Wouldn't it be a real important thing to know?
 9   A   I would think so.
10   Q   You don't have any firsthand knowledge that they
11       have attempted to teach him to dial the phone?
12   A   Well, actually, I did.  I talked with the teacher
13       this morning.
14   Q   Did you observe him?
15   A   No.
16   Q   So, when he left Tallassee, we have decided he
17       could count to 19 based on the Brigance, and right
18       now, he can count to three; is that a fair summary
19       of what the documents say?
20   A   That would be what my assessment suggested.
21   Q   And as when he left Tallassee, he did not recognize
22       and name any letters, and he still can't?
23   A   As far as I know, that's correct.
```

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203

Page 87

```
 1   Q   Did you ever review or see the IEP from the
 2       Columbus, Georgia public schools?
 3   A   Could you tell me where that is?
 4   Q   It's document number one in this notebook.
 5       You know that Gaddies was enrolled in a school
 6       before Tallassee; he was enrolled in Columbus,
 7       Georgia?
 8       (Brief off the Record discussion.)
 9   A   Oh, I'm sorry.  Columbus, Ohio.
10   A   No, I don't think I've seen this, no.
11   Q   Okay.  You also administered -- and this is on
12       page 141 -- the Adaptive Behavior Evaluation
13       Scales.  I don't know if the word, administered --
14       do you give them out, or how does that come to be
15       done?
16   A   Right.  I just score it.  I give it out and score
17       it.
18   Q   You gave that out.  It's on page 141, I guess the
19       scoring, for the Adaptive Behavior Scales?
20   A   That's correct.
21   Q   And as I understand this from the stuff at the
22       bottom there, every single area in there indicated
23       a serious level of concern; is that correct?
```

Page 88

```
 1   A   That's correct.
 2   Q   And this was done in October of 2002?
 3   A   Yes.
 4   Q   Did the IEP team revise the IEP in response to
 5       this Adaptive Behavior Evaluation Scale?
 6   A   I don't know.
 7   Q   Pardon?
 8   A   I don't know.
 9   Q   Did you suggest that they do so?
10   A   No.
11   Q   What did you suggest they do with respect to these
12       items that are a serious level of concern?
13   A   Well, typically what happens is, I report the
14       scores and what they mean, and then the IEP team
15       decides what they are going to do with the scores,
16       if anything.
17   Q   Would you think it would be appropriate to do
18       something with relation to this result here from
19       the teacher?
20   A   Yes, I think that should be incorporated into this
21       curriculum.
22   Q   And as I understand Ms. King's responses here --
23       did you review these at all to see what she was
```

1 concerned about?
2 A   To see --
3 Q   What Ms. King was concerned about.
4 A   -- what she was concerned about?
5 Q   Yeah, what areas she was reporting serious levels
6   of concern. Did you review them, or did you just
7   score it?
8 A   No, I looked at them.
9 Q   Did you suggest they start teaching any of the
10   things that are serious areas of concern, like
11   appropriate hygiene or meal times or any of the
12   things that are identified in here?
13 A   I did not suggest anything, no.
14 Q   There are some things he will never be able to do
15   like comprehending written communication. They
16   said some areas of concern about that. As I
17   understand your testimony, you said you don't
18   expect him to be able to do that, anyway; is that
19   right?
20 A   Probably not to any meaningful extent.
21 Q   Like for instance, communicating name, address,
22   and telephone number is an area on page 142 that
23   Ms. King has a concern about; is that right?

1 A   Yes.
2 Q   I guess he could do that either writing, verbally,
3   on a card, whatever; is that right?
4 A   That's right.
5 Q   Would you agree that you need to select an
6   appropriate mode of communication? I mean, if a
7   child is blind, you don't ask them to write their
8   name. Is that a fair statement?
9 A   Yes.
10 Q   Like, if a child is blind, you want them to tell
11   them their name, address, telephone number?
12 A   Right.
13 Q   If a child has a severe mental retardation, would
14   you also want to consider how they are going to do
15   this?
16 A   Yes.
17      MS. DePAOLA: Do you want me to keep
18   going, Wes?
19      THE HEARING OFFICER: Yeah.
20 Q   Similarly, you asked the mother to fill this out.
21   That's on page 148. Is that right?
22 A   I did ask her to do one.
23 Q   And did she indicate a serious level of concern in

1 every single area on the Adaptive Behavior
2 Evaluation Scale?
3 A   Yes.
4 Q   And was it your recommendation that the IEP team
5   take this into account, or review these on the IEP
6   team?
7 A   No, that's not my suggestion.
8 Q   What did you suggest they do?
9 A   My job is to report the assessment results. The
10   IEP team decides what they are going to do with
11   the results, as appropriate.
12 Q   So, when you see a child with severe Adaptive
13   Behavior Evaluation Scales, aren't you a member of
14   that IEP team?
15 A   No.
16 Q   As the school psychologist, you don't make any
17   recommendations? You just say, here it is?
18 A   I make recommendations on the assessment that I
19   did. And it's up to the IEP team to incorporate
20   those, if they see a need to.
21 Q   The last thing I wanted to ask you about was the
22   Behavior Assessment System for Children on
23   page 135. As I understand it, this is a measure

1 of emotional and behavioral disorders for
2 children; is that correct?
3 A   Yes, it is.
4 Q   And could you tell the Hearing Officer whether
5   there were some serious areas of concern here?
6 A   Well, on page 140, if you have that document --
7 Q   Okay.
8 A   -- looking under T-scores where it says, raw
9   scores, total omits, and so forth, going across the
10   page under T-score. On that particular
11   instrument, if the scores are above 70, they are
12   considered clinically significant, and you would
13   have serious concern. So, the areas of
14   hyperactivity, attention problems, and learning
15   problems, and atypicality were the only ones of
16   significant concern.
17 Q   In your report, on page 163, you specifically
18   mention clinical deficits in those areas; is that
19   correct?
20 A   Yes, I did.
21 Q   Did you make any recommendations to the IEP team
22   about what they should do with a child with
23   clinically significant deficits on these scales?

Page 93

1 A I didn't work Gaddis, because this, in my
2 opinion, would not be that unusual for somebody
3 with his functioning level.
4 Q How about atypicality? What does that mean?
5 A Just unusual thought patterns, unusual behaviors
6 that are kind of outside of the norm.
7 Q What was the purpose of administering this
8 instrument if it didn't matter?
9 A Well, for instance, if he scored low in depression
10 areas, then he might see the school counselor and
11 receive some services in that area.
12 Q Okay. Just to move on beyond the assessments to
13 his actual IEPs --
14 MS. DePAOLA: Wes, could we take a quick
15 break?
16 THE HEARING OFFICER: All right. Take a
17 five-minute break.
18 (Brief recess.)
19 THE HEARING OFFICER: Back on the Record
20 here, and we'll continue with
21 examination.
22 BY MS. DePAOLA
23 Q Mr. Mayer, do you ever do any work in the area of

Page 94

1 functional behavioral assessments in the
2 behavioral intervention plan?
3 A Yes, ma'am.
4 Q I notice on page 58 here of my exhibits that
5 Gaddis' behavior is marked as something that
6 impedes his learning; is that correct?
7 A Yes.
8 Q So, a behavioral intervention plan is something
9 that would be appropriate?
10 A Yes.
11 Q I don't know a lot about this area, but as I
12 understand it, the thinking currently is that the
13 functional behavioral assessment is the best
14 approach to take in developing a behavior
15 intervention plan; is that accurate?
16 A I don't know that it's necessarily the best. It's
17 one tool.
18 Q Do you use it?
19 A Not all the time, no.
20 Q Do you use it?
21 A Yes.
22 Q What do you use instead?
23 A For creating a behavioral management plan?

Page 95

1 Q Uh-huh.
2 A I have a information sheet the teachers fill out
3 on problem behaviors, antecedents, and that kind
4 of stuff.
5 Q I thought the antecedent behavior consequence
6 paradigm was the functional behavioral assessment
7 paradigm?
8 A It is to a certain extent. Not totally.
9 Q How's it different?
10 A The emphasis is on immediate antecedents. The
11 sheet that I have the teachers fill out, what
12 happens right before this behavior, it's not quite
13 as detailed as the functional analysis. It's a
14 little bit in a different direction.
15 Q Tell us in what respect.
16 A I focus more on specific behaviors that are a
17 problem, what they have done about it, what
18 happens right before them. Where the functional
19 analysis tend to focus on one or two behaviors,
20 rather than list a bunch of behaviors. So, it's a
21 different emphasis on what you're looking for.
22 Q Let me get right down to what I am thinking. One
23 of the things that strikes me as different from

Page 96

1 just straight Pavlovian reinforcement and
2 punishment about an FBA is that you want to know
3 why he's doing something. Is that an element in
4 your plan?
5 A Yes.
6 Q So, you want to know why, for what reason?
7 A So, you could do something about the triggers to
8 the antecedents.
9 Q You can change the antecedents. Can you also
10 teach replacement behaviors?
11 A Yes.
12 Q So, the why is an important element to you, too,
13 why someone is doing something?
14 A So you can change the antecedent.
15 Q You didn't get the important. So, you agree with
16 me that the why is an important component of the
17 plan?
18 A Yes.
19 Q Now, in response to this behavior problem that
20 they identified, did they develop a plan, and do
21 you know whether they developed a plan or not?
22 A No, I don't.
23 Q Let's look at page 68. Is that your form?

Page 97

```
1   A   Yes.
2   Q   Okay.  So, let's just walk through this.  Can you
3       tell me what the antecedent is that they have
4       identified?  What's the problem behavior?  We'll
5       start with that.
6   A   It looks like basically noncompliance, not staying
7       on task.
8   Q   Well, it says, becomes upset -- under identify
9       antecedents, it says, becomes upset?
10  A   The behaviors are up there under target behaviors,
11      behaviors of concern.
12  Q   I see.  He ignores adults when upset.  That's the
13      behavior of concern.  The antecedent is he becomes
14      upset.  When he's upset, he ignores adults.  Tell
15      me where on this form it identifies why he's doing
16      that.
17  A   Well, it doesn't on this form.
18  Q   Okay.  So, nothing in this analysis in your form
19      here addresses that, the why question?
20  A   Well, the why question is addressed with the
21      transition is what they are saying is there are
22      times between activities, he tends to get upset.
23  Q   Well, no, I don't think that's what this said.
```

Page 98

```
1       They've got target behavior one, target behavior
2       two?
3   A   Right.
4   Q   They seem to be separate things here, like, during
5       transitions he does not stay on task.  And down at
6       the bottom, Gaddes will stay on task.  Am I
7       misinterpreting this form?
8   A   Well, I was taking it that he ignores adults, does
9       not respond to adults' commands during transition
10      to get back on another task to change the
11      direction of the activity.
12  Q   So, you think this is all one behavior?
13  A   No, I mean, it looks like two behaviors.
14      Transitions is an antecedent, according to this,
15      it's listed as part of the behavior
16  Q   The question is:  Why is he doing those things?
17      You can't tell from this, can you?
18  A   That's correct.
19  Q   How do you design a change or an outcome when you
20      don't know why he's doing it?
21  A   You don't have to know why to change behavior.
22      You just have to know the antecedents.  We know
23      transition periods are tough for him, so we do
```

Page 99

```
1       something about the transition.
2   Q   Isn't it true that changing antecedents is one
3       means of changing behavior, but another means is
4       teaching a replacement behavior as part of the
5   A   Yes.
6   Q   That will substitute for and address the why
7       issue?
8   A   Yes.
9   Q   So, instead of teaching a substitute behavior,
10      what you're saying is you just change the
11      antecedent?  There is no transition?
12  A   No, you do something about the transition, make
13      them shorter or somehow less stressful for him.
14  Q   Do you call this a functional behavioral
15      assessment?
16  A   No, this is not designed to be.
17  Q   So, you have no Functional Behavioral Assessment
18      or behavioral intervention plan relating to a
19      Functional Behavioral Assessment as a result of
20      that?
21  A   I'm not aware of this.
22  Q   What this is is a reward and punishment if the
23      disobeys the rules or doesn't stay on task; is
```

Page 100

```
1       that right?
2   A   Well, when you say what this is, I'm not sure.
3   Q   This plan.
4   A   No, it identifies antecedents as part of the
5       behavior.  Transition --
6   Q   Where does it say what they are going to do with
7       the transitions?  I just don't see anything in
8       here --
9   A   It doesn't say.  It just says that is a problem
10      area that they will deal with.
11  Q   Now, was there any measure of frequency of the
12      behavior in this document?
13  A   No.
14  Q   Okay.  I'll look at another one.
15      Anything in here about teaching replacement
16      behaviors?
17  A   Not -- not that I see.
18  Q   Okay.  I mean, did you participate in this thing?
19  A   I did not.
20  Q   Never seen it before this hearing came up?
21  A   No.  I did not.
22  Q   You just provided a form?
23  A   The IEP team does the behavior management plan.
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 101

```
 1   Q   This is your form, and the whole system is using
 2       it?
 3   A   Our county uses this form.
 4   Q   And you wrote it?
 5   A   Pardon me?
 6   Q   You wrote it?
 7   A   Yes.
 8   Q   Are they still using this form?
 9   A   Yes.
10   Q   What training has any member of the IEP team had
11       in doing a Functional Behavioral Assessment,
12       behavioral intervention plan?
13   A   I've done some workshops on both of those issues.
14   Q   And these specific teachers that are on this IEP
15       team have been to these?
16   A   I can't say that they were present. I don't know.
17   Q   Did this plan change his behavior?
18   A   I don't know how to answer that. I mean --
19   Q   Did it remedy these deficits?
20   A   They said his behavior is a lot better than it was
21       last year to the extent that he can change
22       classes, now, which he couldn't last year.
23   Q   Well, he has somebody walking with him, doesn't
```

Page 102

```
 1       he?
 2   A   Yes.
 3   Q   Okay. Let's look at the behavior intervention
 4       plan for this year, which I believe is attached to
 5       this next IEP. This is document number 83. What
 6       are the behaviors of concern in here?
 7   A   Attend toileting needs, independent toileting
 8       needs, and complying with teacher commands in a --
 9       it looks like a classroom, large group setting.
10   Q   Okay, the alternate behavior there is, close the
11       bathroom door. Is that what you understand this
12       to say?
13   A   No. He had a -- there was more to it than that.
14   Q   Okay. What does it say?
15   A   Well, by public display, he was -- occasionally
16       was exposing himself and doing some inappropriate
17       things.
18   Q   Did you write this plan?
19   A   No.
20   Q   Is it sufficient to address all of this behavioral
21       issues?
22   A   I think -- when I was talking to the teachers, the
23       big concern was the compliance issue, and that is
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 103

```
 1       being addressed here as a target behavior. So, in
 2       that sense, yes.
 3   Q   Is it your testimony that if you were teaching a
 4       course in FBA's and behavioral intervention plans,
 5       that this plan would comply with what you taught
 6       these teachers to do?
 7   A   This plan would be probably different than what I
 8       would do myself.
 9   Q   In what way?
10   A   Be a little bit more comprehensive, maybe. Maybe
11       show a few more strategies.
12   Q   Did you review this plan prior to this
13       hearing?
14   A   Yes, I had seen it.
15   Q   No, I mean, prior to us getting involved in this
16       litigation.
17   A   No, I don't think so.
18   Q   Can you tell from this plan the frequency of the
19       target behavior?
20   A   No.
21   Q   Can you tell what teaching strategies they are
22       going to use to change the behavior?
23   A   Well, under substitute behaviors, they are going
```

Page 104

```
 1       to drill him to close the bathroom door.
 2   Q   I'm sorry. Under substitute behaviors?
 3   A   That's his substitute behavior as opposed to
 4       leaving it open and doing inappropriate things
 5       that you could see --
 6   Q   No, I was asking, where is the teaching? Who is
 7       responsible? How they are going to do this?
 8   A   No.
 9   Q   It's not on here, is that right?
10   A   That's correct.
11           MS DePAOLA  That's all the questions
12       that I have, Your Honor.
13           THE HEARING OFFICER  Houston, do you
14       want to examine him now or wait --
15       by that, I mean, on your case in
16       chief? I want to keep going for
17       right now as far as the hearing.
18           MR. HOWARD  Let me examine him on some
19       issues now.
20                   CROSS-EXAMINATION
21   BY MR. HOWARD
22   Q   Jack, I want to talk with you a little bit about
23       the testing or intellectual assessments that were
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 105

```
 1   done on this child. Ms. DePaola mentioned those
 2   to you. First of all, there was a record of an
 3   intellectual assessment that came from Tallassee
 4   with him; is that correct?
 5   A   Yes.
 6   Q   And I think page 123 would be the intellectual
 7       assessment that came with him from Tallassee?
 8   A   Yes.
 9   Q   Now, the instrument that's referenced there is the
10       TONI, T-O-N-I; correct?
11   A   Right.
12   Q   Did the Elmore County Board of Education use that
13       instrument at that time?
14   A   No.
15   Q   Were you personally familiar with that instrument
16       at that time?
17   A   No, I wasn't.
18   Q   Now, then, in making -- well, look over to
19       page 115. That would be the eligibility
20       determination from Tallassee that makes reference
21       to that test and other tests; correct?
22   A   Yes.
23   Q   It says in the body on page 115, intelligence TONI
```

Page 106

```
 1   score, 62, raw score, one. What is the raw score,
 2   and what does that mean?
 3   A   That means basically he answered one question
 4       correctly, or performed one question correctly
 5       It's a nonverbal test
 6   Q   Where would a person get the IQ score of 62 based
 7       on that one correct answer?
 8   A   Well, they would do a statistical analysis, and
 9       that just turned out to be 62 based on that
10   Q   But, I mean, that would come with the test, with
11       the test manual?
12   A   Yes. Right.
13   Q   So, that if you got one question correct on the
14       whole test, then 62 would be the lowest you could
15       score?
16   A   Right.
17   Q   So, the difference between a raw score and a full
18       scale score is what?
19   A   Raw score is simply how many questions you
20       answered correctly. A standard score like a 62 is
21       based on what the average person scored
22   Q   Now, you administered a C-TONI in October of 2002,
23       is that correct?
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 107

```
 1   A   Yes.
 2   Q   And why did you use that instrument?
 3   A   Well, the C-TONI I was aware of is a very
 4       comprehensive instrument for measuring nonverbal
 5       intelligence. I was aware of the TONI-3, which is
 6       a revision of this TONI. The one I used was very
 7       comprehensive and had very good statistical
 8       qualities to it.
 9   Q   Why did you use a C-TONI instead of some other
10       type of intelligence test?
11   A   Because the original test is given on the TONI.
12       Typically, it's good practice to follow up with a
13       similar instrument.
14   Q   Now, first of all, in your opinion, does the
15       original TONI represent an accurate evaluation of
16       this child's intelligence?
17   A   No, it does not.
18   Q   I have a book here, Examiner's Manual, TONI-3.
19       What is that?
20   A   That's the third revision -- or really the second
21       revision of the original TONI.
22   Q   What is the book?
23   A   It's an examiner's manual with construction --
```

Page 108

```
 1   characteristics of the test
 2   Q   Okay. Does it contain a summary of the
 3       development of the TONI?
 4   A   Yes, it does.
 5   Q   And then, I have an excerpt from it, I've marked
 6       as Exhibit 8
 7           (Whereupon, Board's Exhibit 8 was marked
 8       for identification and is attached
 9       hereto.)
10   Q   Is Exhibit 8 an excerpt from the Examiner's
11       Manual, Jack?
12   A   Yes, it is.
13   Q   Now, when was the original TONI, the one that
14       Tallassee administered, put into use?
15           MS. DePAOLA:  Could I ask a question?
16       Is the TONI-3 and C-TONI the same
17       thing?
18           MR. HOWARD:  No, they are different.
19           THE HEARING OFFICER:  Ask that question,
20       again. I wasn't following.
21   Q   Are the TONI-3 and C-TONI the same?
22   A   No, they are different.
23   Q   What is the difference in the tests in a general
```

Page 109

1  sort of way?
2  A  The C-TONI is a much more comprehensive test using
3  some of the same constructs as the TONI, much more
4  comprehensive.
5  THE HEARING OFFICER: When it says,
6  nonverbal intelligence, what does
7  that mean, the manner in which you
8  test or what you test for?
9  THE WITNESS: It's the manner of
10  responding, really. They don't
11  have to make a verbal response.
12  They can make a pointing response.
13  They can take the test without you
14  actually giving them any sort of
15  verbal instructions or asking any
16  questions to them.
17  BY MR. HOWARD:
18  Q  Look on page 7, Jack, of Plaintiff's Exhibit 8.
19  Do you find the page?
20  A  Okay.
21  Q  Roman Numeral VII in the preface of Plaintiff's
22  Exhibit 8, did they explain in that first
23  paragraph what a Test of Nonverbal Intelligence is

Page 110

1  and why you would use that?
2  A  Yes, it does.
3  Q  Okay. If you would read that first sentence,
4  please, into the Record.
5  A  Problem solving was selected as the primary
6  cognitive ability --
7  Q  No, sir, on page 7 at the bottom under preface.
8  First paragraph that begins, test of --
9  A  Okay. Sorry. Test of Nonverbal Intelligence,
10  TONI, was developed in 1982 to assess the attitude
11  of children and adults whose cognitive,
12  linguistics, or motor skills might adversely
13  affect their performance on a traditional test of
14  intelligence or might prevent them from even
15  understanding or responding to material contained
16  on such test.
17  Q  Now, did that give us or describe for us why the
18  examiner would give the Test of Nonverbal
19  Intelligence?
20  A  Okay. Recent data has suggested that a lot of the
21  retarded students that happen to be minorities
22  possibly were at a disadvantage, because it was a
23  test using verbal stimuli, because of their home

Page 111

1  background and socioeconomic standards. So, the
2  nonverbal eliminates a lot of bias in minorities.
3  Q  That shows up in language usage?
4  A  Yes.
5  Q  If a child is just talkative, just talks a lot,
6  does that mean that a Test of Nonverbal
7  Intelligence is inappropriate for that child?
8  A  No.
9  Q  Why not?
10  A  Because talking a lot doesn't necessarily show any
11  verbal comprehension skills. That's what verbal
12  intelligence tests measure.
13  Q  Let's talk a little about the evolutions of the
14  TONI, or the generations of the TONI. The first
15  TONI, the first edition, the one that Tallassee
16  administered, was developed in 1982?
17  A  Right.
18  Q  And then was there a TONI-2 test?
19  A  Yes.
20  Q  When did it become available?
21  A  I believe it was 1990.
22  Q  And then the TONI-3, the manual we have, became
23  available when?

Page 112

1  A  1997.
2  Q  So, as of 2000 when Tallassee administered their
3  test, what is your understanding of the most
4  recent version of the TONI that was available
5  then?
6  A  The TONI-3.
7  Q  Now, from the point of view of a psychometrist or
8  a person administering tests, do you know of any
9  reasons for administering a test that was three
10  generations old?
11  A  Not unless that was the only test that happened to
12  have on hand. Just using supplies up, sort of
13  thing.
14  Q  All right. Were there any problems that were
15  identified in the validity or the accuracy of the
16  original TONI test?
17  A  Yes.
18  Q  And look on page 9 of the manual with TONI-3. It
19  begins at the bottom of page 8, actually. Does
20  the manual there identify problems with the test,
21  the original TONI?
22  Q  What page is that on?
23  Q  If you're looking at Plaintiff's Exhibit 8 in the

Page 113

```
 1   preface, Roman Numeral VIII and VIV.  It talks
 2   about Consumer Guide ratings.
 3   A   Okay.
 4   Q   If you would read the sentence beginning on page
 5   9, the Consumer's Guide ratings --
 6   A   The Consumer's Guide ratings for the TONI were
 7   generally acceptable, and overall ratings
 8   recommended based on component ratings were highly
 9   recommended for validity, recommended for both
10   normative characteristics in terms of consistency
11   reliability, and not recommended for stability
12   reliability.
13   Q   Now, what does the term, stability reliability,
14   mean?
15   A   That means if you take a test several weeks later
16   or several months later, the scores should be very
17   similar for it to be a reliable test.
18   Q   And if a test has a not recommended rating for
19   that characteristic, what does that tell us?
20   A   It would mean it wasn't a reliable measure of
21   intelligence, because it varies every time you
22   take it.
23        MR. HOWARD:  We offer Exhibit 8 into
```

Page 114

```
 1   evidence.
 2        THE HEARING OFFICER:  All right.
 3   Board's Exhibit 8 is admitted.
 4   BY MR. HOWARD
 5   Q   Going to show you what we have marked as Board's
 6   Exhibit 6.
 7        (Whereupon, Board's Exhibit 6 was marked
 8        for identification and is attached
 9        hereto.)
10   Q   What is this document, Jack?
11   A   This is a critique from a manual or a book that
12   critiques intelligence tests -- well, all kind of
13   tests, really.
14        MS. DePAOLA:  Your Honor, I don't know
15        if this is an objection, or how to
16        put this, but there has been no
17        evidence that this was the TONI-1,
18        TONI-2, or TONI-3.  We're going
19        through a whole lot of discussion
20        of the TONI-1, 2, or 3.  I'm not
21        sure where we got the impression
22        that this was a TONI-1.
23        THE HEARING OFFICER:  Well, I think it
```

Page 115

```
 1   appears on page 115 that it is the
 2   TONI-1, simply because it doesn't
 3   have another number.  Now, it may
 4   be that it was a different one.
 5        MS. DePAOLA:  You don't think that's
 6        just I for Intelligence, Test of
 7        Nonverbal Intelligence, T-O-N-I?
 8        MR. HOWARD:  I think the assumption we
 9        have to make is that the model or
10        the version of the test would be
11        significant, and they would have
12        identified it to be something other
13        than what they stated.
14        MS. DePAOLA:  They haven't stated
15        TONI-1.
16        MR. HOWARD:  There was not a TONI-1 at
17        that time.  It was just TONI when
18        it came out.
19        Do you see what I'm saying?
20        MS. DePAOLA:  In 2000 when this was
21        done, there was a TONI-3 was
22        already published, so, there was
23        all three of them.  So, I'm having
```

Page 116

```
 1   trouble -- the relevance of this in
 2   light of the fact that we don't
 3   know if it's the TONI-1, 2, or 3 is
 4   hard for me to understand.  That's
 5   what my objection is.
 6        THE HEARING OFFICER:  All right.
 7        Overruled.  Go ahead.
 8   BY MR. HOWARD
 9   Q   Jack, Plaintiff's (sic) Exhibit 6, what is the
10   name of the book or manual that this comes from?
11   A   I believe this was the Buros Mental Measurement
12   Yearbook.
13   Q   And is that a generally accepted authority in the
14   field?
15   A   Yes.
16   Q   Relied on by professionals?
17   A   Yes.
18   Q   And it contains critiques of tests?
19   A   Yes.
20   Q   And the document that you have before you, Exhibit
21   6, does it have a critique of the TONI?
22   A   Yes, it does.
23   Q   On page --
```

1    THE HEARING OFFICER: And are you saying
2    B-U-R-E-S-S?
3    THE WITNESS: B-U-R-O-S
4    THE HEARING OFFICER: Mental Measure --
5    THE WITNESS: -- Measurement Yearbook.
6    THE HEARING OFFICER: All right.
7 Q  Now, on the second page of Exhibit 6, page 1581,
8    the left column, the last paragraph, this sentence
9    appears, quote. It is disappointing, however,
10   that no validity data are provided for samples
11   drawn from explicitly culturally different
12   populations, end quote. What does that mean?
13 A There is no data that shows the relationship
14   between the test scores and culturally different
15   populations. That was not included in the norms.
16 Q And you mean by culturally different populations,
17   rather than --
18 A Mentally retarded, learning disabled, that sort of
19   thing.
20 Q On the next column, at the end of the paragraph,
21   before the next review, quote, the absence of
22   explicit reliability and validity data from
23   culturally different samples suggests that this

1    test be used with the greatest caution, if at all,
2    when making judgements about individuals from
3    members of such populations, end quote. What does
4    that mean?
5 A It simply means because the minorities were not
6    included in the sample, it's hard to tell exactly
7    what the results would mean for certain different
8    populations, culturally different populations.
9 Q And then on page 1583, the last page of this
10   document, the last paragraph on the upper
11   left-hand side of the reviewers' references,
12   quote, construction and standardization have not
13   supported well any claims for the adequacy of this
14   test, end quote. What is construction?
15 A The actual data presented in the test to show that
16   it's a reliable, valid test.
17 Q And standardization, what is that?
18 A It's the normal population that you would base
19   your norms on, the population that took the test,
20   so you could tell what the scores meant for the
21   individual.
22   MR. HOWARD: We offer Exhibit 6 into
23   evidence.

1    THE HEARING OFFICER: All right. It's
2    admitted.
3    (Whereupon, Board's Exhibit 7 was marked
4    for identification and is attached
5    hereto.)
6 Q Now, Exhibit 7, is that a similar document from
7    the C-TONI that you administered?
8 A Yes, it is.
9    THE HEARING OFFICER: This is from
10   Buros, too, or another critique?
11   MS. DePAOLA: Yes, it is.
12   THE WITNESS: I don't think it's from
13   Buros. It's a continuation from
14   the Buros series. But the authors
15   have changed. I can't tell you the
16   names of them. I've got it written
17   down --
18   THE HEARING OFFICER: But it is the same
19   critique?
20   THE WITNESS: Yes, same series of
21   critiques, just with different
22   authors.
23 Q Is Exhibit 7 a generally accepted authority in the

1    field?
2 A Yes.
3 Q Relied upon by professionals?
4 A Yes.
5 Q And at the bottom of the second page, page 313,
6    the paragraph that begins, the evidence for
7    construct validity is based on the finding that
8    the performance of C-TONI is highly correlated to
9    chronological age, prohibited by the developmental
10   age or intelligence, and it continues. What does
11   all of that mean to you?
12 A It just means, in fact, as you got older,
13   you're -- the number of items that you actually
14   got correct would increase.
15 Q Okay. Is that a good finding or a bad finding?
16 A Well, that's good. You would expect as you got
17   older you would answer more questions than when
18   you were much younger. It shows good test
19   construction.
20 Q And then it goes on, additional evidence is based
21   on the dramatically lower C-TONI performance of
22   the mentally retarded sub-group compared to other
23   sub-groups?

Page 121

1   A   Right.
2   Q   What's the significance of that?
3   A   Well, the test should be able to separate the
4       retarded population from your average population
5       with fairly significant scores.
6   Q   Now, the Hearing Officer was asking you a little
7       bit earlier about the difference between the TONI
8       and C-TONI. And you referred to the C-TONI as a
9       comprehensive test. What does that mean exactly?
10  A   The C-TONI measures really three mental
11      constructs. The ability to sequence items, the
12      ability to form analogies among items, the ability
13      to classify items, using two methods, and that is
14      concrete stimuli and pictorial stimuli. And the
15      previous TONIs don't do all that. They are not
16      that complex.
17          MR. HOWARD: We offer Exhibit 7 into
18      evidence.
19          THE HEARING OFFICER: All right. It's
20      admitted.
21  Q   Now, based upon your testing and your knowledge
22      and experience, where do you think this child's
23      intelligence level lies?

Page 122

1   A   Well, I think the 39 would be a more valid
2       estimate.
3   Q   Now, do you believe that this intelligence has
4       declined since the test was administered in
5       Tallassee?
6   A   No.
7   Q   Why not?
8   A   Well, you're comparing two different instruments,
9       one of which did not have good technical
10      properties. It's sort of like comparing apples
11      and oranges.
12  Q   Now, you were asked some questions about the DSM,
13      is that correct?
14  A   Yes.
15  Q   What is the DSM?
16  A   It's the Diagnostic and Statistical Manual for
17      mental disorders. It's used by professionals that
18      make diagnoses.
19          THE HEARING OFFICER: And that's the
20      fourth edition?
21          THE WITNESS: Yes.
22  Q   And that is the document that -- I don't remember
23      the exhibit number. It's already in evidence.

Page 123

1           THE HEARING OFFICER: Number three,
2       Petitioner's Exhibit 3.
3   Q   I want to ask you a little bit more about that.
4       Let me see if I can get before you a copy of some
5       pages.
6           MS. DePAOLA: My page went into
7       evidence. Can I have a copy of
8       yours?
9   Q   Now, Jack, I want to figure out the exhibit
10      numbers.
11          THE HEARING OFFICER: It's numbered
12      Petitioner's Exhibit 3, but also on
13      the bottom of mine, there is a
14      Exhibit 10.
15          MR. HOWARD: That was my number, but I'm
16      just going to go by Exhibit 3 to
17      keep from cluttering up the Record.
18  Q   Looking at Petitioner's Exhibit 10 (sic), second
19      page in the little block, Jack, does that show
20      where we looked to see where a particular child
21      fails?
22  A   Yes.
23  Q   And under the category of 318.0, moderate mental

Page 124

1       retardation, that is a range; correct?
2   A   That's right.
3   Q   And then even the lower end of that range is a
4       range; correct?
5   A   Right.
6   Q   And that lower end of the moderate mental
7       retardation range is what?
8   A   Thirty-five.
9   Q   Thirty-five to 40?
10  A   Right.
11  Q   And then severe mental retardation, 318.1, the
12      upper end of that range is what?
13  A   Thirty-five to 40.
14  Q   The same as the lower end of the other?
15  A   That's correct.
16  Q   So, that's how we have Gaddies perched on this
17      dividing line; correct?
18  A   Yes.
19  Q   Now, even in the severe category, in your
20      judgment, can Gaddies benefit from instruction?
21  A   Yes.
22  Q   And based on your experience and your testing, I
23      want to ask you about Gaddies' probable outcome in

1  life, even with an appropriately designed special
2  education program. I want to ask you, what you
3  would view as a good outcome, a probable outcome,
4  and then a just sort of an average outcome for a
5  child like this with an appropriately designed
6  program. Do you understand my question?
7  A  (Witness indicating.)
8  Q  Yes?
9  A  Yes.
10 Q  Okay. What would be, in your view, a good
11    outcome? And what I mean, what he would be doing
12    after he leaves the school system.
13 A  I think, again, probably some sort of a
14    community-based workshop activity, very structured
15    with a lot of supervision, I think would probably
16    be the predicted outcome, or it would be a decent
17    outcome.
18 Q  Do you understand my question? What I call an
19    average outcome, which would be just if you
20    considered a large group of people in this
21    circumstance what an average outcome would be.
22    And it may be the same as the most likely outcome.
23    Do you understand my question?

1  A  Yes.
2     MS. DePAOLA: I object to him leading
3     the witness.
4     THE HEARING OFFICER: Well, I think he's
5     just leading in a manner so that he
6     can understand the question.
7  Q  I'm trying to distinguish that type of an outcome,
8     which would be better than average, but possible.
9     I'm calling that a good outcome. Do you
10    understand my question?
11 A  Can you rephrase your question to me? I'm --
12 Q  What do you think is the most likely outcome from
13    Gaddies?
14 A  I would say the most likely would be some sort of
15    sheltered workshop activity with a group of people
16    under fairly strict supervision, doing some sort
17    of relatively meaningful task.
18 Q  What is a relatively meaningful task?
19 A  Well, hopefully, whether it be stapling papers
20    together, something of a benefit, but certainly
21    would be very nonprofessional sorts of activities,
22    very low-level activities.
23 Q  With his intellectual ability, is he capable of

1  independent living?
2  A  No, I would not think he would be.
3  Q  Even with a good outcome, something that's better
4     than the most likely outcome, would he be capable
5     of independent living?
6  A  That would not be my prediction.
7  Q  Now, in your judgment, does he have the capacity
8     to learn sight words like, stop, exit, danger?
9  A  I think he can learn some, yes, I do.
10 Q  Does he have the capacity to learn things like his
11    telephone number, his street address, his mother's
12    name?
13 A  Yes.
14 Q  In your judgment, is it appropriate for an
15    educational program to attempt to help him learn
16    those things?
17 A  Yes.
18 Q  Now, looking through the items you have reviewed
19    in his file, even the things that came from
20    Tallassee, are they more consistent with a person
21    of an IQ of 39 or consistent with a person with an
22    IQ of 62?
23 A  Thirty-nine.

1  Q  How so?
2  A  Because they are all preschool activities,
3     pre-academic sorts of activities.
4  Q  Do you think those preschool activities that he's
5     been doing are appropriate?
6  A  Yes, I do.
7  Q  Why?
8  A  Because, again, I would like to feel like at some
9     point they could lead into the meaningful
10    activities of some basic reading, some basic math
11    skills, that would have some functional value for
12    him.
13 Q  In your judgment, is his IEP adequate to allow him
14    to make educational progress?
15 A  Yes.
16 Q  How so?
17 A  Well, it identifies some academic skills, some
18    self-help skills, some behavioral skills, and
19    skills that the IEP team thought were important
20    for Gaddies at that time.
21 Q  Is that consistent with your observations?
22 A  Yes.
23 Q  Now, in regard to a person of his cognitive

## Page 129

1  ability, what effect does that have on things like
2  motor skills, or his ability to perform fine motor
3  activities?
4  A  I think your cognitive ability and how low
5  functioning you are certainly would affect all
6  aspects of communication, including physical
7  dexterity, fine motor skills, behavioral, social
8  skills, everything.
9  Q  You have a person of his cognitive ability that
10  has problems with fine motor skills, how do you
11  determine whether the problem with fine motor
12  skills is a physical problem with that motor
13  function, or whether it's with the cognitive, like
14  a cognitive --
15  A  Well, I think it's hard to separate the two. I
16  think the cognitive task would definitely
17  influence his physical skills. Just in my
18  opinion, if he can trace some numbers, which I
19  have seen him do on work samples, which I
20  has some potential for some fine motor skills.
21  Now, whether he consistently does it, I think
22  depends on the cognitive element in that
23  motivation, attention, and that sort of thing may

## Page 130

1  play in it.
2  Q  Well, for instance, if a child can trace one or
3  two letters, or write out one or two letters, but
4  can't write their entire name, what is that
5  indicating to you?
6  A  Well, I think writing his entire name is a little
7  higher cognitive task. That would require more
8  drilling and more time.
9  Q  How does that relate to whether the problem is a
10  cognitive problem or a problem with fine motor
11  skills?
12  A  Can you rephrase that?
13  Q  If you see a child that is not able to write his
14  entire name, but he can write some letters in his
15  name, does that give you an indication that the
16  problem is a cognitive problem or a problem with
17  fine motor skill?
18  A  Cognitive in that it is a higher level activity
19  that requires more skills, more cognitive skills.
20  Q  Okay. You mean, like remembering it all?
21  A  Yes.
22  Q  Now, is hyperactivity a normal symptom of mental
23  retardation of this degree?

## Page 131

1  A  Is it a symptom of it?
2  Q  Does it come with it, so to speak?
3  A  Yes, because you've got to keep in mind that he's
4  functioning at a lower mental age than his actual
5  chronological age.
6  Q  Do you think, in your clinical judgment, that this
7  child has Attention Deficit Hyperactivity
8  Disorder?
9  A  In my judgment, he does not, because, again, I
10  think that his level of functioning influences his
11  attention span, his ability to sit still and
12  complete a task more so than ADHD.
13  Q  In your judgment, would any additional benefit be
14  conferred on this child by identifying him as with
15  Attention Deficit Hyperactivity Disorder and
16  devising something for that?
17  A  No.
18  Q  The behavior management plan for the current IEP
19  that Ms. DePaola went over with you earlier, in
20  your judgment, is that adequate --
21  A  Yes.
22  Q  -- to deal with the behavior problems?
23  A  Right.

## Page 132

1  Q  Now, the assessments that were made back in the
2  fall of 2002, did you review all of those
3  assessments --
4  A  Yes.
5  Q  -- from all of the fields? I mean, vision,
6  language --
7  A  Oh, yes.
8  Q  -- were all of the required assessments performed?
9  A  Yes, they were.
10  Q  Let's see if I can find them in the book.
11    MS. DePAOLA: Page 119. Are you talking
12  about the 2000 assessments?
13    MR. HOWARD: No, I'm talking about the
14  2002 assessments.
15  Q  Page 165 in Petitioner's Exhibit 1. That would be
16  the Notice of Eligibility Decision. Is that
17  correct?
18  A  Yes.
19  Q  And the assessments that were done are listed
20  there?
21  A  Yes.
22  Q  And did you know, in your judgment, were any
23  additional assessments required to properly

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

Page 133

```
1    evaluate this child?
2  A No.
3  Q Were those, in your judgment, adequate?
4  A Yes.
5  Q And then this committee met on November 8th, 2002?
6  A Yes.
7  Q One of the evaluations done was the adaptive
8    behavior evaluation?
9  A Yes.
10 Q And he scored a 55 on that, is that correct?
11 A Right.
12 Q And then there had been an adaptive behavior
13   evaluation done in Tallassee, also?
14 A Yes.
15 Q Look on page 115, adaptive behavior, ADES-2.
16 A Okay.
17 Q The score that he came with from Tallassee on the
18   adaptive behavior was 55, also?
19 A Yes.
20 Q The same that showed up on your test?
21 A That's right.
22 Q What is the significance of that?
23 A Well, basically, first of all, 55 was the lowest
```

Page 134

```
1    score he can have on that particular instrument,
2    and also it suggests he hasn't changed any.
3  Q Okay.
4
5        MR. HOWARD: I think that's all at this
6    time.
7        THE HEARING OFFICER: All right. Any
8    follow-up questions?
9        MS. DePAOLA: Yes, sir.
10         FURTHER DIRECT EXAMINATION
11 BY MS. DePAOLA
12 Q Would you please look, Mr. Mayer, at page 123 in
13   the exhibit book? Could you tell me anything on
14   there that indicates that this is the Test of
15   Nonverbal Intelligence, 1, 2, or 3, or that you
16   can define which one it is?
17 A If you're asking me does it say TONI-1, it
18   certainly does not. On the other hand, the first
19   test that comes out typically doesn't have a one
20   after it.
21 Q Sure. Isn't it also true that the TONI-1 came out
22   in 1982?
23 A Yes.
```
Q And the TONI-2 came out in 1990?

Page 135

```
1  A Yes.
2  Q And the TONI-3 came out in about 1997?
3  A Right.
4  Q Okay. So, from this, we can't tell -- you're
5    asking this Court to assume that he had leftover
6    tests from 1982 and gave him a TONI-1, is that
7    what you're assuming?
8  A No, ma'am, I didn't say that.
9  Q So, you don't know whether it was the TONI-1, 2,
10   or 3, do you?
11 A All I can say is T-O-N-I, to me, would mean
12   TONI-1, because it shouldn't have a one after it.
13 Q You can't even order the TONI-1 now? It's out of
14   print?
15 A I don't know that for a fact.
16 Q So, you're saying when they issue the TONI-2, and
17   the TONI-3, they just keep on --
18 A Sometimes, yes, ma'am.
19 Q I'm not familiar with that.
20   Now, when did the C-TONI come out?
21 A 1997.
22 Q So, all of these criticisms that you have about
23   this TONI are issues that could have been
```

Page 136

```
1    addressed in the year 2000; is that right?
2  A Yes.
3  Q And, in fact, you would be the person in charge of
4    making that determination?
5  A Yes.
6  Q So, you made a determination in 2000 that no other
7    testing was required?
8  A Right.
9  Q And now you're saying it really was?
10 A Well, when I found out the data about the old TONI
11   and realized that a more appropriate test could
12   have been given --
13 Q But all that data was available in 2000,
14   Mr. Mayer, wasn't it?
15 A Yes.
16 Q And you responded in response to Mr. Howard's
17   question that this child could learn his telephone
18   number, his street address, and his mother's name,
19   but you weren't very specific. Are you saying he
20   could learn to write them? Are you saying he can
21   learn to read them, or are you saying he can learn
22   to say them? Let's be real specific.
23 A I think all of those options are conceivable.
```

Mary Moore-Wynn                     Court Reporting Services                     (334) 244-0203

Page 137

```
 1  Q  I want what's probable.
 2  A  I would say probable.
 3  Q  It's probable that he's going to be able to read,
 4     write, and say his telephone number, street,
 5     address, and mother's name at the end of his
 6     career in Wetumpka?
 7  A  Yes.
 8  Q  And how far has he progressed on any of these
 9     three items to date?
10  A  I think that would have to be a question you would
11     have to ask the teachers.
12  Q  You don't know?
13  A  Yes, he has made progress, to my understanding.
14     He can say his telephone number?
15  A  I don't know whether he can consistently say it,
16     but I think he has said it at times.
17  Q  Now, is there anything that indicates that you
18     have to identify a child as ADD before you can
19     address hyperactivity?
20  A  No.
21  Q  So, we're not here about whether he should have
22     been identified as ADD. My question is: Should
23     they address hyperactivity?
```

Page 138

```
 1  A  The -- I don't know that the main complaint has
 2     been hyperactivity.
 3  Q  If there is an issue of hyperactivity, should they
 4     address it in his behavior plan or the IEP?
 5  A  If it's a significant issue that it was impeding
 6     his learning, yes.
 7  Q  Isn't that what it said in the behavior evaluation
 8     scales, that it was a significant issue?
 9  A  No.
10  Q  It didn't say that?
11  A  Not in that instrument. It was the BASC
12     instrument that said that.
13  Q  So, it does say it in the assessments that he has
14     hyperactivity problems?
15  A  In one of the assessment, yes.
16  Q  By Ms. King, his teacher?
17  A  Yes.
18  Q  And I guess you've testified, and I think I heard
19     you say that his adaptive behavior scale when he
20     left Tallassee, and as it stands now in November
21     of 2002, is the lowest possible score; is that
22     right?
23  A  Yes.
```

Mary Moore-Wynn                     Court Reporting Services                     (334) 244-0203

Page 139

```
 1  Q  Has not changed any?
 2  A  That's correct.
 3  Q  Has not improved at all?
 4  A  That's correct.
 5         MS. DePAOLA: That's all.  Thank you.
 6         THE HEARING OFFICER: All right.
 7     Mr. Mayer, you may come back at
 8     another time, but that's all for
 9     right now. So, go about your
10     business.
11         Do you all want to take a lunch
12     break now, or take another witness?
13         MR. HOWARD: I like to do lunch.
14         MS. DePAOLA: I have to eat.
15         THE HEARING OFFICER: I've got 12:15, so
16     will an hour and ten minutes be
17     enough?
18         MS. DePAOLA: More than adequate for me.
19         THE HEARING OFFICER: Let's say 25 after
20     1:00, we'll resume.
21         (Lunch recess.)
22
23
```

Page 140

```
 1                      MELBA KING
 2        (Whereupon, the witness, after having first
 3     been duly sworn to speak the truth, the whole truth,
 4     and nothing but the truth, took the stand and
 5     testified as follows:)
 6                 DIRECT EXAMINATION
 7     BY MS. DePAOLA:
 8  Q  Would you state your name, please, for the Record?
 9  A  My whole name?
10  Q  Yes.
11  A  Melba Sue King.
12  Q  And where are you employed?
13  A  I'm employed here at Elmore County school
14     district.
15  Q  How long have you been employed here?
16  A  This is -- will be my ninth year.
17  Q  All right. And what is your position?
18  A  I'm a special ed instructor.
19  Q  Okay. Do you have any case manager
20     responsibilities for any of the special ed cases?
21  A  Yes, I do.
22  Q  All right. And are you the special ed case
23     manager for Gaddies Hill?
```

Page 141

1 A Yes, I am.
2 Q And how long have you been the case manager?
3 A This past year -- no, two years. Two years.
4 Q So, since he's been here, you've been the case
5 manager?
6 A No, I have not.
7 Q Last year and this year you've been the case
8 manager?
9 A Yes.
10 Q And tell us what case manager duties are.
11 A It means that you hold the file, and you make sure
12 that if that student is having any problems --
13 because you have to put out monitoring forms to
14 all the teachers. And you more or less look over
15 all of the monitoring forms that we pass out to
16 the teachers. And if they are having problems,
17 then we telephone the parents.
18 Q Are there some monitoring forms relating to
19 Gaddies?
20 A No, there is not.
21 Q Okay. Why not?
22 A Within the resource classes, when he goes from one
23 class to another class, in the resource class, we

Page 142

1 do not pass monitoring forms back and forth.
2 Q I thought they were a way to communicate with the
3 parents.
4 A It is.
5 Q So, how does that relate to Gaddies, I mean, the
6 monitoring forms?
7 A The students that are going from one resource
8 class to another for resource class, we do not
9 have monitoring forms on.
10 Q Well, then what are your responsibilities with
11 respect to Gaddies?
12 A In respect to Gaddies?
13 Q Uh-hum.
14 A As a case manager?
15 Q Yes.
16 A That is to look over the IEP making sure that I
17 and Mrs. Selmar is following the IEP, and making
18 sure that when it's time for him to have tests
19 done, that he has tests done.
20 Q Look at this notebook that's in front of you on
21 page 58 in the lower right-hand corner of that
22 document. When it refers there to -- let me let
23 you find that page, page 58. And it's the stamped

Page 143

1 number. It's not the handwritten number. Do you
2 see in the lower right-hand corner it says,
3 Gaddies is supposed to have monitoring forms? Are
4 you saying that's not true?
5 A When Gaddies was on this program, yes, he did have
6 monitoring forms. I'm sorry.
7 Q Where are those monitoring forms? They haven't
8 been produced.
9 THE HEARING OFFICER: Where are you
10 seeing that?
11 MS. DePAOLA: Page 58 at the very
12 bottom.
13 THE HEARING OFFICER: These forms are
14 for the parents or other teachers?
15 THE WITNESS: No, these are for the
16 other teachers to communicate to
17 me.
18 Q Where are those?
19 A They are probably in the folder in my file
20 cabinet.
21 MS. DePAOLA: Don't they need to be
22 produced? I mean, they are part of
23 the school --

Page 144

1 THE HEARING OFFICER: Yeah, let them see
2 the monitoring forms.
3 Q What is the purpose of the monitoring forms, to
4 tell how he's doing with particular goals and
5 objectives?
6 A This is just to let us know, case managers, how he
7 is doing in his classes.
8 Q So, your responsibility with respect to Gaddies
9 last year was to make sure there were monitoring
10 forms done. What else are your responsibilities,
11 to review the IEP?
12 A Yes, to review the IEP
13 Q And make sure that he's making adequate progress,
14 is that what you said?
15 A Yes.
16 Q Is it your responsibility to draft IEP's?
17 A Yes, I can also draft IEP's
18 Q Now, in conjunction with your responsibilities --
19 which I understand began in the fall of 2001, is
20 that right?
21 A Yes, ma'am.
22 Q -- did you review any of this prior IEP's?
23 A Yes, ma'am, I did.

Page 145

1 Q Which ones did you review?
2 A The ones that he had from Tallassee.
3 Q Let me just show you two that we have, beginning
4 on page 18 is an IEP from Tallassee. It was
5 produced by your attorney. Is that one that was
6 in your records?
7 A Yes.
8 Q Okay. So, you do recognize, then -- that was part
9 of your records in the school system?
10 A Yes.
11 Q Okay. How about the document on page 39, which
12 was the IEP when Gaddies was in grade seven in
13 Tallassee. Did you have that?
14 I'm sorry.
15 A Thirty-nine?
16 Q Yeah, on page 39.
17 A Yes, I did view this.
18 Q I'm sorry. I misspoke. This was the IEP that was
19 written in Tallassee, wasn't it, and came with him
20 when he came here?
21 A I believe so. And a new IEP was written after he
22 was -- had an MEDC. I did not see this when he
23 came here, because, at that point in time, I was

Page 146

1 not his case manager.
2 Q Okay. I'm sorry. I don't understand. You do
3 understand the 2000-2001 document, which is
4 labeled document number 39, was the IEP that came
5 from Tallassee; is that right?
6 A That's from what I understand.
7 Q And are you saying it was not the IEP that was
8 implemented for 2000-2001?
9 A I believe it was rewritten.
10 Q There is nothing in there that will remotely say
11 that it was.
12 MS. DePAOLA: Is there some other
13 document, Houston?
14 MR. HOWARD: No, I've given you
15 everything that was given to me,
16 Susan.
17 I'm really looking for the page that was signed by
18 Ann Steadman.
19 THE HEARING OFFICER: Look at page 57.
20 THE WITNESS: Okay. Yes.
21 Q Now, are any of those people --
22 A Any of our people?
23 Q Yeah.

Page 147

1 A The only one that I see here that could be one of
2 ours is Ron McDaniel, but I'm not sure Ron is his
3 first name. I just recognize the McDaniel.
4 MR. ANDERSON: He's not.
5 THE WITNESS: He's not the same
6 McDaniel? Okay.
7 Q I mean, he wasn't even in your system in March of
8 2000, was he?
9 A No.
10 Q So, this is the Tallassee IEP that was written in
11 March of 2000 came with him in September of 2000;
12 is that right?
13 A I am assuming so.
14 Q Well, you're the case manager; you would know?
15 A Yes, I am assuming that, since I did not receive
16 it. And at that point in time, I was not his case
17 manager.
18 THE HEARING OFFICER: Let me ask you
19 this, Ms. King. When was the first
20 IEP meeting that Elmore County
21 officials had for Gaddies? I see
22 one here April 27, 2001, on page --
23 it's signed on page 69. But that's

Page 148

1 later in the school year. So, I'm
2 wondering -- I think what she is
3 wondering is, what was the IEP that
4 they were using before the April
5 27, 2001.
6 THE WITNESS: They probably were working
7 off of the Tallassee's -- that's
8 the only thing I can assume, based
9 on that information.
10 BY MS. DePAOLA:
11 Q All right. Since you're not real familiar with
12 the Tallassee IEP, we'll move on to one that you
13 should be. Look on page 58. Are you familiar
14 with this document?
15 A Yes, I am.
16 Q Did you participate in this IEP?
17 A Yes, I did.
18 Q First of all, did you all decide to keep Gaddies
19 back a year? Because the prior IEP from Tallassee
20 says grade seven for 2000-2001; this IEP says
21 grade seven for 2001-2002?
22 A Yes, I guess that was made by Ms. Singleton or
23 Ms. Long. I don't know who made this one, but

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 149

```
 1   they thought that he needed to have another year
 2   as a seventh grader.
 3   Q   Did you attend an IEP meeting?
 4   A   Yes, ma'am.
 5   Q   And did you all discuss, we need to keep Gaddies
 6   back in seventh grade?
 7   A   I don't remember that exactly.
 8   Q   So, somebody -- I mean, unilaterally made that
 9   decision?
10   A   Evidently, we did as a team after all the
11   information was presented.
12   Q   But you don't have any recollection of that?
13   A   No, ma'am, I do not. I'm sorry. That's --
14   Q   Now, this handwriting in here is not your
15   handwriting, is it?
16   A   No, ma'am.
17   Q   That's --
18   A   Mrs. Long's.
19   Q   -- Ms. Long's handwriting, and she is no longer
20   with the system, is she?
21   A   No, she isn't.
22   Q   As his case manager, did you review his student
23   profile?
```

Page 150

```
 1   A   Yes, I did.
 2   Q   Had you ever met Gaddies when you went to this
 3   meeting?
 4   A   Yes.
 5   Q   How did that come about?
 6   A   The meeting come about?
 7   Q   Uh-huh.
 8   A   Mrs. Gill, Katrina Gill, had Gaddies in a room,
 9   which is now occupied by our speech therapist.
10   She had a room over there for students that
11   Gaddies was in a class with.
12   Q   So, his class adjoined whatever class you were
13   teaching in?
14   A   Yes.
15   Q   And so you went in and observed him, or just
16   talked to him, or just saw him in the halls, or
17   what?
18   A   Yes, all of the above.
19   Q   All of the above?
20   A   Now, I really didn't observe. But whenever
21   Mrs. Gill had a question, I would go in and try to
22   help her out the best I could.
23   Q   Now, on the bottom of the front page, it says that
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 151

```
 1   Ms. Corbett is going to get progress reports?
 2   A   Uh-huh.
 3   Q   I guess that's what -- progress something. What
 4   is that?
 5   A   It looks like reports.
 6   Q   And where are those?
 7   A   She has received progress reports.
 8   Q   Okay. For 2001-2002, tell me what progress
 9   reports there were.
10   A   Mainly the ones that I sent home whenever I was
11   working with Gaddies at that time.
12   Q   Did you keep a copy of those?
13   A   No, ma'am, I did not.
14   Q   What did they look like? Some form or what?
15   A   Yes, it is. It's a computer-generated form that
16   we have in our computer.
17   But I do know that Gaddies, sometimes, he's
18   got -- he has some smarts, okay? He's smarter
19   sometimes than what we think he is. And if he
20   thinks this is a bad note, he will tear it up, or
21   his mama doesn't receive it.
22   Q   You've seen him tear up his notes?
23   A   No, but I have heard this from the bus driver of
```

Page 152

```
 1   the trash that he leaves behind.
 2   Q   Can you generate those progress reports out of
 3   your computer today so that we can see them?
 4   A   I would have to -- no, I don't think I can. I don't
 5   know whether -- no, I don't think I can, because,
 6   I don't keep copies of the progress reports.
 7   Q   Okay. Now, I want to look at some of the specific
 8   goals in here for Gaddies from this IEP. Let's
 9   look, for instance, on page 63. How did you
10   measure the present level of performance in his
11   math skills?
12   A   Okay. If Gaddies could count at least four out of
13   five times, that would be like a 90 percent, or --
14   Q   No, I'm asking about the present level of
15   performance.
16   A   Ah, present level --
17   Q   Where did you get the present level of
18   performance?
19   A   On page 63?
20   Q   Yes.
21   A   Well, Ms. Long said that he could count beyond
22   ten. So, she is the one who wrote this on
23   page 63.
```

Page 153

```
 1    THE HEARING OFFICER: Now, who is
 2    Ms. Long?
 3    THE WITNESS: She is a teacher that was
 4    hired in the middle of the year,
 5    school year, during the 2001-2002
 6    school year.
 7  Q Now, I'd like you to look back on page 44. Keep
 8    your finger on page 63, but look back on page 44,
 9    which is the IEP for the prior year that you all
10    used. First of all, can you tell me whether he
11    accomplished any of his goals? It's on page 44.
12  A I'm getting there. Some of these numbers are not
13    too good. All right.
14    Here we go. On the present level of
15    performance, yes, he can count out loud to ten.
16  Q And they are going to now have him count objects
17    and state the number up to ten, right? That's
18    what that annual goal says, right?
19  A Yes, you're right. They do.
20  Q That's what the annual goal says. Will count
21    number and state correct numbers up to ten. When
22    I received him, he was doing that.
23  Q Let's look at the assessments that were given. As
      I understand it -- if you will look at page 87 --
```

Page 154

```
 1    an Alabama Alternate Assessment done in the spring
 2    of 2001, which would have gone with his 2000-2001
 3    IEP; is that right?
 4  A Yes.
 5  Q Page 87.
 6    Are you familiar with the Alabama Alternate
 7    Assessment?
 8  A Yes, I am. Well, I gave it for the first time
 9    last year.
10  Q Do you see on page 87, it says, Spring 2001. Is
11    this the assessment that would go with the
12    2001-2002 IEP?
13  A Yes, it would.
14  Q Where is his math in this?
15  A Pre-academics and academics and vocational skills.
16  Q Well, those both have zero?
17  A For the number of goals written.
18  Q Those both say zero?
19  A Yes, you're right. They do.
20  Q I'm trying to determine how this assessment
21    process relates in any way to this IEP. He's
22    supposed to be counting one to ten. And this is
23    to tell the parents whether they did it or not.
```

Page 155

```
 1    Where is it on here?
 2  A It isn't.
 3  Q So, we do not know --
 4  A The only thing --
 5  Q -- whether he made it or not from this assessment?
 6  A From that assessment, no. These were the things
 7    that I had to choose from.
 8  Q Well, where did you put the math?
 9  A It had to have been under the pre-academics --
10    academic -- pre-academics and academics is where I
11    had to have put it. And at that point in time, he
12    had not --
13  Q So --
14  A -- done his prevocational skills. The only thing
15    he could do was to count to ten.
16  Q Well, you can't tell that from this report, can
17    you?
18  A No, you really can't.
19  Q So, 2000-2001, you're going to count about to ten.
20    You can't tell from the assessment whether he
21    could do it or not. Now, you go 2001-2002, and
22    you say he can count aloud. It doesn't say
23    anything about objects. And now you're going to
```

Page 156

```
 1    have him count objects to 20. What did you base
 2    this present level of performance on in this IEP?
 3  A And you're on what page?
 4  Q I'm on page 63.
 5  A I went with what Mrs. Long said.
 6  Q So, just word of mouth?
 7  A If she thought that he could do this, then I went
 8    along with her, because at that point in time, I
 9    had not dealt with Gaddies.
10  Q Would she not have been the person who filled out
11    this Alabama Alternative Assessment for Spring of
12    2001?
13  A You -- no, she wouldn't have.
14  Q Why not?
15  A Because at that time, she didn't have him.
16  Q Who had him?
17  A I did.
18  Q In the spring of 2001?
19  A Yes.
20  Q That's the first year he was here.
21  A You're getting all those numbers -- I'm sorry.
22    2001.
23  Q 2000-2001, this is three years ago?
```

**Page 157**

1   A   Oh, three years ago? Well, I can't speak for that
2       one.
3   Q   Well, what I am getting at is you said that you
4       based his IEP on what happened in the prior year
5       And in looking at the Alabama Alternative
6       Assessment, I can't see that there is anything on
7       here related to math.
8   A   It would be under his academics. It would be
9       underneath the academics.
10   Q   Which says zero?
11   A   Which says zero. You're right. And that could
12       have been a mistake on my part.
13   Q   Well, I'm not sure that you did that document.
14       And I'm not accusing you of anything. I'm trying
15       to understand what it means. I don't even
16       understand that you did that document, because i
17       would have been --
18   A   I didn't do the document. I was just there
19       listening (sic) to the document, because I knew I
20       was going to have him in my class the following
21       year.
22   Q   Okay. What do you do with these assessment
23       documents? Do you mail them to the parents?

**Page 158**

1   A   No, I did not. If it was mailed to the parents,
2       it probably would have been done by Mrs. Freeman,
3       who was the counselor.
4   Q   Well, what is the routine? How do you communicate
5       this Alabama Alternate Assessment data to the
6       parents?
7   A   I did not communicate this to her
8   Q   Was it your responsibility to do that in 2001?
9   A   It probably -- yes, it was.
10   Q   I'm trying to understand what you normally do,
11       Ms. King. Do you normally send these to parents
12       so they will know something?
13   A   This was the first year I had done this. After I
14       had given the test, okay, I sent all the paperwork
15       and everything to Mrs. Freeman, who is our
16       counselor. As far as I knew, she was supposed to
17       take care of everything, like sending it off,
18       getting it back, and putting it in his cum
19       folder.
20   Q   Is the normal course of events for somebody to
21       send this to the parent?
22   A   If they had been back by the time he had gotten
23       his last report card for that year, yes. She

**Page 159**

1       would have had a copy of it.
2   Q   And if it's not back at that time, they just don't
3       get the information about whether their child is
4       progressing or not?
5   A   Not on this. I don't think I sent this out,
6       ma'am. I really don't.
7   Q   Well, in any event, the first year that you were
8       responsible for him, someone has written a present
9       level of performance, can count along beyond ten?
10   A   Yes.
11   Q   Going to count objects and state the correct
12       number?
13   A   Yes.
14   Q   Now, this is all oral, isn't it?
15   A   Yes, it is.
16   Q   There is no writing involved?
17   A   No, no writing involved.
18   Q   No tracing numbers?
19   A   Tracing numbers, there is writing involved. Now,
20       which one are you on, ma'am?
21   Q   I'm on page 63, math. I don't see anything about
22       writing.
23   A   Okay. There isn't anything there about writing.

**Page 160**

1   Q   Now --
2   A   But I tried to write with him, even though it
3       wouldn't be on here.
4   Q   I'm just concerned with what's in this document.
5   A   Okay.
6   Q   All right. Nothing in here about writing the
7       numbers, is there?
8   A   No, there isn't.
9   Q   Okay. Now --
10   A   Even though it says on here -- on number three, it
11       says, utilize various tapes and worksheets.
12       Worksheets, that is utilizing writing.
13   Q   Sure. But, I mean, the goal doesn't say anything
14       about he's going to write any numbers, does it?
15   A   No, it does not.
16   Q   And then I notice on the right, somebody has gone
17       through and changed all the benchmarks to the end
18       of the year. Who did that? Or at least the first
19       two.
20   A   I have no idea, unless it was Ms. Long herself at
21       the time of the IEP.
22   Q   So --
23   A   That is not my writing.

Mary Moore-Wynn        Court Reporting Services        (334) 244-0203

**Page 161**

1  Q   Is it Wetumpka's practice to write IEP benchmarks
2      that end at the end of the year?
3  A   Yes, it is.
4  Q   You understand that to be an appropriate
5      benchmark; everything is at the end of the year?
6  A   Some things he will be able to master, maybe by
7      December. And some things he will not be able to
8      master until the end of the year.
9  Q   Well, I mean --
10 A   And if he doesn't master them at the end of the
11     year, then, we're going to try to work on them the
12     next year.
13 Q   When this IEP was signed and handed over to the
14     mother, did it say by the end of the first grading
15     period, Gaddies will count to 20, or did it say by
16     the end of the year?
17 A   I think it said the exact same thing as what
18     you're seeing here before us today where it was
19     marked out at the end of the school year, and then
20     A.C. or A.L. is the person who initiated it.
21 Q   And that was done at the IEP meeting?
22 A   I do not remember.
23 Q   Well, you can't tell from here whether he

**Page 162**

1      accomplished that goal, can we?
2  A   No. He did, by looking at this, which is the
3      truth, he did not -- he has not accomplished that
4      goal, since he has not mastered it, nothing would
5      be put here.
6  Q   I'd like you to take a look at the Alabama
7      Alternate Assessment on page 88 for the 2001-2002
8      school year, which I understand relates to this
9      IEP. Is that accurate?
10 A   Yes, the best that it can relate to the IEP,
11     according to the choices that they have to choose
12     from.
13 Q   Well, for instance, math, it says one goal. Is
14     that right? I'm on page 88.
15 A   Oh, yes.
16 Q   It says four benchmarks?
17 A   Yes.
18 Q   And then zero progress?
19 A   Yes. That is correct.
20 Q   Now, you primarily teach the reading or language
21     arts or math or what?
22 A   I primarily teach the math.
23 Q   Okay. Let's go on to look at the language arts

Mary Moore-Wynn        Court Reporting Services        (334) 244-0203

**Page 163**

1      score on page 64.
2          MR. HOWARD: Susan, I think she taught
3      different things different years.
4          I don't mean to interrupt you.
5          THE WITNESS: I did.
6  Q   What did you teach last year?
7  A   I taught mainly math and science. Then when it
8      looked like we were having an overload of language
9      students, then I picked up language students about
10     the second month into school.
11 Q   Now, am I correct that you would have reviewed the
12     Tallassee IEP before the language arts score was
13     written before the next year; is that what your
14     testimony was?
15 A   Before which year.
16 Q   You said in preparation for the 2001-2002 school
17     year, you reviewed the prior years' IEP from
18     Tallassee?
19 A   No, I did not.
20 Q   You didn't?
21 A   Not for 01-02, no, ma'am, I did not, because I was
22     not the case holder that year.
23 Q   So, is this year your first year to be the case

**Page 164**

1      holder?
2  A   Yes, I guess it is.
3  Q   This is the first year you're in charge of --
4  A   All right. This is 2000 -- as far as the school
5      year goes, this is 2002-2003. No, I was the
6      holder of this (indicating).
7  Q   Okay.
8  A   But, no, when it was being made up -- at the time
9      it was written, no, ma'am, I had not viewed the
10     Tallassee until I got the folder, and then that's
11     when I went back and looked at everything.
12 Q   Which would have been when?
13 A   It would have been in September -- no, August of
14     2001.
15 Q   So, when this IEP was implemented, 2001-2002, you
16     were the case holder, and you would have reviewed
17     the prior Tallassee IEP?
18 A   Yes.
19 Q   Okay.
20 A   Yes, I would. But not until then. Not at the
21     time it was written, let me put it that way.
22 Q   But at the time it was implemented?
23 A   Yes.

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 165

1  Q  Okay. Now, let's go back to the Tallassee IEP on
2  page 45, his reading skills, present level of
3  performance. Have you found that page, 45?
4  A  Yes, ma'am.
5  Q  His present level of performance says he does not
6  recognize ABC's?
7  A  Correct.
8  Q  He's not following along in book. Poor visual
9  discrimination. What is his annual goal with
10  respect to language arts?
11  A  Well, you can see it says, Gaddies will work on a
12  given task for five minutes without stopping for
13  more than a 10-second pause.
14  Q  Does that tell you anything about where they are
15  going to try and get him in this ABC's?
16  A  All they are trying to do is keep him on task for
17  five minutes without stopping.
18  Q  So, at the end of this, you don't know whether
19  he's supposed to know all of his ABC's or write
20  them or say them or what; is that accurate?
21  A  If you want to take only the annual goal, yes,
22  ma'am. But whenever you go up here on this one up
23  here, it says, by the end of the first nine weeks,

Page 166

1  Gaddies will work on a given task without stopping
2  for one minute.
3  Q  What does that tell you --
4  A  All right. That one task is going to be trying to
5  learn his ABC's, because that's what it says to do
6  up here.
7  Q  How many of them will he have learned? You can't
8  tell? It has nothing to do with any realistic
9  reading goals, does it?
10  A  Well, in order to get him to learn his ABC's, he's
11  going to have to be on task. He's going to have
12  to be focusing on what you're doing.
13  Q  How many ABC's was he supposed to know after the
14  first nine weeks?
15  A  That, it doesn't say.
16  Q  And this is the IEP that Elmore County was
17  implementing for 2000-2001, right?
18  A  Correct.
19  Q  Now, moving back to the year you took over. I'm
20  reading page 64, it says, Gaddies does not
21  recognize his ABC's. That's pretty much the same,
22  right?
23  A  Right. Because I did not have any success with

Mary Moore-Wynn    Court Reporting Services

Page 167

1  him that year that I was working with him.
2  Q  Has extremely poor visual discrimination. That's
3  exactly the same as last year, is that right?
4  A  What page are you reading from?
5  Q  I'm on page 64. Present levels of performance,
6  they look identical to what they were last year?
7  A  This is 01-02 --
8  Q  THE HEARING OFFICER: Now, what page?
9  A  -- if you're looking at the language
10  Q  Okay. You need to compare 45 and 64. Forty-five
11  is what Elmore County did in 2000-2001.
12  Sixty-four is what Elmore County did in 2001-2002.
13  Am I not correct that essentially the present
14  levels of performance are identical?
15  A  I guess I'm not really where you are, because I do
16  not -- all right. I'm on page 64
17  THE HEARING OFFICER: Now, go back and
18  look at page 45. She wants you to
19  compare those two --
20  THE WITNESS: Oh, 45?
21  THE HEARING OFFICER: -- to see if they
22  look similar, identical, or
23  different.

(334) 244-0203

Page 168

1  A  Yes, they do.
2  Q  So, essentially present level of performance
3  appears to be identical; he didn't learn anything
4  as far as this score; is that right?
5  A  That is correct, according to this one in
6  Tallassee.
7  Q  Now, this is the one that was implemented here
8  in --
9  A  2000-2001.
10  Q  Was implemented here in Elmore County, right?
11  A  2000-2001 --
12  A  It was implemented here.
13  Q  So, in 2001-2002, when you started out, you're
14  showing basically no progress on that language
15  arts; is that right?
16  A  Right. And generally, what you do is you try to
17  pick it up, and you continue carrying it over.
18  Q  Now, in this case, what was his annual goal?
19  A  The one on --
20  Q  Page 64.
21  A  -- page 64. It looks like (inaudible).
22  Q  I'm just on page 64 here. What is his annual
23  goal?

Page 169

```
 1   A   Gaddies will improve in recognizing his ABC's,
 2       visual discrimination skills, and attending skills
 3       to improve his reading.
 4   Q   The statute requires measurable annual goals.
 5       What does improve mean? Does that mean he learns
 6       all 26, or he learns A? I mean, what does that
 7       mean from a measurable standpoint?
 8   A   From a measurable standpoint, that means that he's
 9       going to be learning his ABC's. Not the whole
10       ABC's, because Gaddies can't do that.
11   Q   He can't learn all of his ABC's?
12   A   No, he can't. Now, he might be able to say all of
13       them. But -- you know, orally. But he cannot
14       learn the whole thing as far as identify them.
15   Q   How do I know whether he reached this? Improved,
16       does that mean he learns one or he learns 26?
17   A   No, they go to say here in the benchmark that he
18       recognizes his first five letters of the alphabet
19       nine out of ten times.
20   Q   So, that's it? He's met his goal if he gets the
21       first five letters?
22   A   Yes, ma'am.
23   Q   That's a whole year, right?
```

Page 170

```
 1   A   Yes, ma'am.
 2   Q   Okay. End of the school year. Gaddies is -- at
 3       this time, you all put him up -- no, you kept him
 4       in seventh grade. He's 14 years old. And how
 5       many years would it take him to learn the entire
 6       alphabet if we were to consider this to be an
 7       appropriate annual goal?
 8   A   That, I don't know.
 9   Q   Well, five years. You're teaching him five
10       letters a year?
11   A   If we taught him five letters a year, and he had
12       constant repetition, assistance from home in order
13       for him to learn those letters, I really believe
14       Gaddies could do that.
15   Q   At this rate, it would take five years to learn
16       the names of the letters of the alphabet; is that
17       right?
18   A   Yes, ma'am.
19   Q   Okay. And this is just the names of the letters
20       of the alphabet, is that right?
21   A   No. To recognize the letters of the alphabet.
22       But it's only the first five letters of the
23       alphabet.
```

Page 171

```
 1   Q   Okay. What I am saying is, it's not the sounds of
 2       the letters, you're not teaching him phonics?
 3   A   No.
 4   Q   All you're teaching him is, this is an A; this is
 5       a B; this is C?
 6   A   Right.
 7   Q   A-B-C-D-E, the entire year, right?
 8   A   Right. And everything that goes along with it.
 9   Q   Not writing them, not the sounds?
10   A   Yes.
11   Q   So, after you have taught him the alphabet,
12       you still have to teach him phonics before he can
         read, right?
13   A   He is getting the names. And he is getting the
14       letters, but he is also getting the phonics in
15       there.
16   Q   It doesn't say anything about phonics?
17   A   I realize it doesn't, ma'am.
18   Q   Okay. At the bottom there, they have got, by the
19       end of the school year, Gaddies will learn the
20       first words on the Dolch, D-O-T-C-H, reading list?
21   A   Correct.
22   Q   Are you familiar with that list?
23   A   Yes, ma'am, I am.
```

Page 172

```
 1   Q   What's the name of that list?
 2   A   The Dolch Reading Vocabulary Reading List.
 3   Q   How do you spell it?
 4   A   D-O-L-C-H
 5   Q   So, it's not Dotch? If I've got the Dolch Basic
 6       Word List, that's the same list we're talking
 7       about, right?
 8   A   (Witness indicating.)
 9   Q   You need to say yes or no for the --
10   A   Yes.
11   Q   So, I just pulled this off the Internet
12       yesterday --
13   A   And I worked with him with that
14           THE HEARING OFFICER: You actually took
15       the list and showed it to him? How
16       did he work with it?
17           THE WITNESS: I only took a few of them
18       at a time. And we probably only
19       worked with two of them at a time.
20   Q   I'm talking about this IEP here.
21   A   I'm talking about the Dolch List.
22   Q   That's what's on the IEP, the Dolch List. How
23       many did he know at the time this was written?
```

Mary Moore-Wynn

Court Reporting Services                                    (334) 244-0203

Page 173

```
1    A    None.
2    Q    And these are words like, a, am?
3    A    Uh-hum.
4    Q    I mean, these are the basic, basic words
5    A    Uh-huh.
6    Q    He knew none?
7    A    Uh-huh.
8    Q    How many are they going to teach him by the end of
9         the year?
10   A    Will learn the first words on the Dolch reading
11        list.
12   Q    What does that mean? There is 220 words on this
13        list
14   A    Probably at least the first five or ten.
15   Q    The first five or ten, but you can't tell that
16        from this IEP, can you?
17   A    No, you can't.
18   Q    And we don't know whether he mastered those at the
19        end of this year?
20   A    He has not.
21   Q    So, even basic five or ten basic sight words he
22        had not mastered at the end of last year?
23   A    Correct.
```

Page 174

```
1    Q    Let's stay with language arts. Go to page 75.
2         Who wrote this goal?
3    A    I did. Well, I did not write the actual goals.
4         Ms. Selmar did. She is the language arts teacher
5         for him this year.
6    Q    What happened to the ABC's? They are not in here
7         at all now.
8    A    No, they are not, because after I, you know,
9         worked constantly with him on singing alphabet
10        songs, coloring the alphabet, trying to pronounce
11        the alphabet, and everything that I could do with
12        that alphabet, I thought about we need to put
13        something that he could actually -- you know, mean
14        something to him, like his name.
15             THE HEARING OFFICER: So, did you just
16             stop that and move to something
17             else?
18             THE WITNESS: Yes, we did. We went to
19             something that was more functional
20             for Gaddies, because we saw that
21             the year before it didn't work with
22             Mrs. Long. It didn't work with me.
23             And so -- and I looked back, and
```

Mary Moore-Wynn

Court Reporting Services                                    (334) 244-0203

Page 175

```
1         saw that, you know, he was doing
2         the alphabet ever since he's been
3         in Tallassee. So, since none of
4         that had been working, we needed to
5         get something that was actually
6         more geared to Gaddies, which was
7         learning his name, which means
8         something to him. We thought if it
9         meant something to Gaddies, then he
10        would be more apt to learn.
11   BY MS. DePAOLA
12   Q    So, it wouldn't be appropriate to continue this
13        ABC thing this year?
14   A    No, ma'am.
15   Q    Let me ask you to look at what we have marked as
16        Petitioner's Exhibit 2 and ask you if that's
17        exactly what these sheets are.
18   A    Yes, it is.
19   Q    ABC's?
20        And that's this year's work?
21   A    I guess it is. Yes, I recognize Ms. Selmar's
22        writing.
23   Q    So, even though you have just testified it's
```

Page 176

```
1         inappropriate, that's what they are working on?
2    A    She doesn't do that all the time. But she is
3         still trying to get that from him, yes, ma'am.
4    Q    Now --
5    A    Even if he went over to the high school, he
6         probably would even get the same thing, because
7         sometimes, at some point in time, some of this is
8         going to sink in after enough repetition.
9    Q    So, for language arts, you all wrote the goal,
10        he's going to pronounce his first and last name?
11             THE HEARING OFFICER: Are you on this
12             year?
13             MS. DePAOLA: I'm on this year, page 75.
14   BY MS. DePAOLA
15   Q    Gaddies will be able to write his name and address
16        by the end of the school year; is that right?
17   A    That is correct.
18   Q    Okay. Now, what was his present level of
19        performance with respect to his name, writing his
20        name? I mean, in this document, in this document
21        right here --
22   A    It says that his writing skills is extremely
23        limited. Gaddies can't say his name, address, or
```

Page 177

1  phone number.
2  Q  You've only got one thing? You're going to teach
3  him to write his name?
4  A  Yes, we were going to try to do that. That's all
5  we can do is try, ma'am.
6  Q  Does it say in present level of performance
7  whether he can write his name currently?
8  A  It says his present level of writing is extremely
9  limited.
10  Q  Does that mean he can write half of it? What does
11  that mean?
12  A  It means that he can write a G at that point in
13  time. At the time this was being written, he
14  could make a G.
15  Q  It doesn't say that in there? That's just your
16  recollection of what the present level was?
17  A  Yes, because by the time he left me, he was making
18  a G.
19  Q  What is the purpose of teaching him to write his
20  name, address, and telephone number?
21  A  If he is to go into a sheltered workshop, then
22  he's going to have to sign his name. He's going
23  to have to write his name in on the day that he

Page 178

1  gets there and the time.
2  He will also -- if, hopefully, if they know
3  that he can't read, maybe he will be able to
4  recognize his own name if they put, you know, a
5  paper up there to call him in to see someone.
6  Q  I guess they could just put up a picture of
7  Gaddies?
8  A  They could do that. They may be able to do that.
9  I don't know if they could do that or not, but
10  they could do that.
11  Q  Aren't you aware there are a lot of people who
12  sign with an "X?"
13  A  Yes, ma'am.
14  Q  Where did you pick this skill from? I mean, it
15  seems to me it was just an inspiration? I don't
16  see it from any scope and sequence of skills that
17  you're working on.
18  A  All right. We're trying to get Gaddies to be more
19  independent. We talked about this. We talked
20  about this at the IEP meeting about him being, you
21  know, more functional as an individual.
22  Q  Where are you drawing your scope and sequence of
23  skills from?

Page 179

1  A  His scope and sequence is from the -- I don't
2  know.
3  Q  I'm --
4  A  I don't know. At this point in time, I'm just
5  drawing a blank. I can't think of where we got it
6  from. But we did get it from somewhere. Right
7  now, I can't think of where. I'm sorry.
8  Q  Okay. You were concerned about Gaddies'
9  functional skills?
10  A  Yes.
11  Q  Let me ask you if the can do some of these things.
12  Can he open a lock to get in his house with a key?
13  A  I don't know.
14  Q  Do you think that's an important living skill?
15  A  Yes, I do.
16  Q  Are you teaching it to him?
17  A  No, I am not.
18  Q  Does Gaddies know how to prepare a sandwich?
19  A  If it's peanut butter and bread, yes, he can.
20  Q  He does that in school?
21  A  Yes, he does.
22  Q  Any other kind of sandwich he can prepare?
23  A  That's the only thing I've taught him, because I

Page 180

1  A  have been afraid to get him close to the stove.
2  Q  Does Gaddies know the name of all of his body
3  parts?
4  A  I do not believe so.
5  Q  Would that be an important thing for him to know?
6  Gaddies, does your throat hurt?
7  A  He knows his throat. He knows his nose. He knows
8  his head for a headache, yes.
9  Q  Why haven't you looked at those skills and made
10  the decision what is really critical?
11  A  A very good point.
12  Q  Okay. Now, does Gaddies know how to pour a glass
13  of milk without, whoosh, all over?
14  A  Yes, he can do that out of a carton, which is what
15  we have at school.
16  Q  The small carton?
17  A  The small carton, yes.
18  Q  Can he get a carton the milk out of refrigerator,
19  the normal size, and pour it without spilling it?
20  A  That, I don't know. I haven't gone and bought
21  that carton of milk or gallon.
22  Q  Now, does Gaddies know the front and back of his
23  clothes?

## Page 181

1 A  Yes, he does.
2 Q  You're sure about that? You've tested him on it?
3 A  Well, we have had him put on his clothes, yes,
4 ma'am.
5 Q  Does Gaddies know how to tie his shoes?
6 A  No, he does not. I have worked with him on a
7 little mockup of a shoe for shoe strings.
8 Q  You know, Gaddies has language arts -- I'll put
9 that in quotes -- from 9:30 to 11:15; is that
10 right, or 7:30 to 9:30, one or the two?
11 A  No, 7:30 to 9:30 is my hour for math. And 9:30 to
12 11:15 he has language arts with Ms. Selmar.
13 A  And the only goal in this IEP for language arts is
14 for him to pronounce his first and last name and
15 write his first and last name; is that right?
16 A  That's true.
17 Q  Two hours a day, five days a week for an --
18 A  She does more than that.
19 Q  But it's not in here?
20 A  No, it's not, because these were the attainable
21 goals that we thought Gaddies could do. We put
22 attainable goals that we thought Gaddies could
23 actually do. We wanted him to be successful.

## Page 182

1 Q  Then you had some other goals that he couldn't do?
2 That doesn't make sense.
3 A  We have other things that we bring in, yes, ma'am.
4 We try to stick as close as we can to the general
5 education classes. Only it is brought down to
6 Gaddies' level.
7 If we think -- and I realize that's very
8 subjective.
9 Q  Well, I mean, I have pulled out the kindergarten
10 curriculum from the Alabama course of study. And
11 you're going to have to -- I can't see from
12 looking at this -- which is the first thing on it,
13 the very first content standard under the Alabama
14 course of study for kindergarten is, demonstrate
15 one-to-one correspondence using a variety of
16 objects in real-life situations. I take it he
17 can't do that now?
18 A  No.
19 Q  So, I mean, accessing the general curriculum does
20 not appear to be a realistic option; is that
21 correct?
22 A  But, we have to follow some type of curriculum.
23 Q  And you don't have one, do you?

## Page 183

1 A  Yes, we do.
2 Q  Okay, well, I'm back to that question.
3 A  General ed curriculum for the junior high school.
4 Q  You're trying to put Gaddies through the general
5 ed curriculum for the junior high school?
6 A  It is adapted to Gaddies, the best that we can
7 adapt.
8 Q  You mean, if I go and get the seventh grade curriculum
9 off the web site from the State Department of
10 Education, that's what you're working on with
11 Gaddies?
12 A  We have adapted it, ma'am. If you would pull out
13 some math, for example --
14 Q  Yes.
15 A  -- for the seventh grade, or even for an
16 eighth grade -- because that's where he is right
17 now; he is in the eighth grade -- you will see
18 that there are numbers and problems on there that
19 Gaddies can't do. So, we try to incorporate in
20 there some type of program in which Gaddies can
21 function. Like the Touch Math, Gaddies can do the
22 Touch Math.
23 Q  Gaddies -- counting is not part of the

## Page 184

1 eighth grade curriculum, is it?
2 A  No, it isn't. But you know what, that is brought
3 down to Gaddies' level. That's all we're trying
4 to do here is bring it down to Gaddies' level.
5 Q  Let me show you one of the pages on Petitioner's
6 Exhibit 4. Is that part of the Touch Math?
7 A  Yes, it is.
8 Q  And as I understand it, what Gaddies is doing
9 here --
10 A  Counting backwards.
11 Q  -- is he just tracing the answers?
12 A  After we do Touch Math with him, then I have him
13 count backwards in order to do the subtraction,
14 yes, ma'am.
15 THE HEARING OFFICER: Now, give an
16 example of what you would do.
17 THE WITNESS: All right. We would take
18 the top number, say its name, then,
19 we count backwards on the number
20 below.
21 MR. HOWARD: Show him.
22 THE WITNESS: All right. There is an
23 eight and a six here. All right,

1  the eight is at the top. The six
2  is at the bottom. He would say the
3  number eight, and if he didn't say
4  the number eight, we would prompt
5  him. And then he would count
6  backwards. For example, if we were
7  taking six away from eight, which
8  is what this says; six away from
9  eight; what is this number? The
10  largest number is eight. Eight,
11  seven, six, five, four, three, two,
12  would be the answer, and that's
13  what he had.
14  BY MS. DePAOLA
15  Q  Gaddies just traced these answers, didn't he?
16  A  Yes, he did.
17  Q  Now --
18  A  But we go over this with Gaddies in order for him
19     to get the answers.
20  Q  Now, earlier I understood Gaddies couldn't count
21     beyond three?
22  A  No, he can orally count. Just to say his numbers,
23     he can count up to ten. If he uses those Touch

1  Points, he can go all the way up to six.
2  Q  Didn't you tell Mr. Mayer in October or November
3     of this year that he has no number or letter
4     recognition?
5  A  (Witness indicating.)
6  Q  Cannot recognize any numbers or letters and can
7     only count to three?
8  A  I said that he can count -- he did the assessment
9     back here of the WRAT. He counted those
10     correctly, yes, ma'am.
11  Q  He counted three?
12  A  He counted three.
13  Q  Okay.
14  A  When he started to count the boxes that were on
15     the assessment, which was at the top, he got mixed
16     up.
17     But those boxes and these numbers, I realize,
18     there is no -- he has -- you know, he can't tell
19     or distinguish them. But if he sees those dots,
20     he knows how to count them.
21  Q  I'm sorry. He doesn't know any of this. He can't
22     tell you that's a five?
23  A  No.

1  Q  He starts at eight, and you say, take away two,
2     Gaddies, and he says seven, six, he can't do that?
3  A  No, not without prompting. And that's what I
4     said, we have to prompt.
5     But he is learning. He knows how to count
6     backwards. He knows how to count forward on these
7     numbers. And one of these days, that child will
8     add. In my heart, I feel that.
9  Q  You show him the nine, and you say, eight, he says
10     eight. You say seven, he says seven. You say,
11     six, he says six. Then you write six on the
12     paper, and he traces it?
13  A  Uh-huh.
14     THE HEARING OFFICER: You need to say
15     yes.
16     THE WITNESS: I'm sorry. Yes, ma'am,
17     correct.
18  Q  Okay. Now, I forgot what I was doing. Did we
19     already do the language arts?
20     THE HEARING OFFICER: You were looking
21     at language arts, then we got back
22     on math.
23  Q  Let's take a look at 74. If I've already said

1  this, we'll just --
2  THE HEARING OFFICER: Okay.
3  Seventy-four, this year's IEP?
4  MS. DePAOLA: Seventy-four, this year's
5  IEP.
6  Q  Nothing on here about adding and subtracting?
7  A  No.
8  Q  Nothing about a present level of performance. The
9     only present level of performance I've seen is
10     what you reported to Mr. Mayer on page 163 where
11     it was said that he couldn't count, and he didn't
12     know his numbers?
13  A  As far as looking at numbers, no, he does not.
14     Now, he can count if he sees these dots; yes,
15     ma'am, he can do that. He cannot count hash
16     marks, no, ma'am. He gets mixed up.
17  Q  Do you agree that you should consider Gaddies'
18     progress in the last nine years in school when you
19     decide how you're going to spend the next five
20     years?
21  Q  How he's going to spend the next five years?
22  Q  How Wetumpka is going to spend the next five years
23     educating him? Do you think it's important to

Page 189

```
 1   look at the big picture of how much time you've
 2   got left?
 3   A   Well, you have to look at the big picture, yes,
 4       ma'am. Then, we're going to have to take little
 5       steps in order to get there.
 6   Q   We need to consider how much time we have left to
 7       work with?
 8   A   That is true.
 9   Q   So, as I understand your testimony, through
10       October of 2002, essentially, he had made no
11       progress in learning his letters or counting
12       objects beyond three?
13   A   No, he could count objects beyond three.
14   Q   Let me just --
15   A   He can count them up to five or six. Some days,
16       if it's a good day, he can count them up to six.
17       If it's a really good day, he can count all the
18       way up to ten.
19   Q   I would like you to look at page 163 at
20       Dr. Mayer's report.
21           In the fourth full paragraph it says,
22       classroom teachers state that Gaddis can't
23       consistently write his name and has essentially no
```

Page 190

```
 1   number or letter recognition. Did he report
 2   something inaccurate there? Page 163.
 3   A   Well, I have a 163, but it isn't that. It is his
 4       individual -- is that underneath miscellaneous?
 5       What section are you in?
 6   Q   It's right in front of miscellaneous. It says,
 7       test findings and analysis at the top. Student's
 8       name, Gaddis Hill, page 2.
 9   A   All right. I guess I've got it. 163.
10           MS. DePAOLA: I thought maybe she had a
11       different book or something.
12           THE HEARING OFFICER: Go down to the
13       fourth paragraph.
14   Q   In the fourth paragraph it says, classroom
15       teachers state that Gaddis cannot consistently
16       write his name, and has essentially no number or
17       letter recognition. Is that inaccurate?
18   A   At the time that he took the test, yes, ma'am,
19       that was accurate.
20   Q   Well, this is just October, isn't that right,
21       right before this request for a hearing was filed;
22       isn't that right?
23   A   Correct.
```

Page 191

```
 1   Q   Suddenly, has there been some major change; is
 2       that what your testimony is?
 3   A   I'm just saying there has been some major growth
 4       since then. I didn't say how major, but there has
 5       been growth since then.
 6   Q   When you wrote the 2002-2003 IEP, let's go back to
 7       the front of that. And I've got my pages sort of
 8       mixed up, so you're going to have to confirm
 9       whether my suspicion is correct or not. Page 70
10       is the front page, which includes the student
11       profile. And then if you look at my page 85, I
12       think it's the back of the student profile that
13       was just copied separately. I don't have the
14       original. So, I want you to confirm that one way
15       or the other.
16   A   Yes. Those were notes that I made.
17   Q   And these were on the back of -- these really
18       should be the back of page 70, right?
19   A   Yes, ma'am. As were there in the meeting,
20       those were notes that he was making at the time.
21   Q   Now, the mother, according to your notes here, is
22       concerned, because he can't read or write; is that
23       right?
```

Page 192

```
 1   A   Yes, ma'am.
 2   Q   And she wanted extended school year services; is
 3       that right?
 4   A   Yes.
 5   Q   And you agreed to provide him with extended
 6       services of 30 minutes per day during summer
 7       school, is that right?
 8   A   That is right.
 9   Q   How long does summer school last?
10   A   I believe it was six weeks.
11   Q   And when did it start?
12   A   I'm not really positive on that.
13           MR. ANDERSON: Eight?
14   A   Eight.
15           MS. DePAOLA: 8th of what?
16           MR. ANDERSON: Eight weeks.
17           MS. DePAOLA: Do you know when it
18       starts, Mr. Anderson?
19           MR. ANDERSON: Normally, about a week or
20       two after school gets out. And
21       then lasts until about a couple of
22       weeks before school starts.
23
```

Mary Moore-Wynn
Court Reporting Services
(334) 244-0203
Page 193

```
1   BY MS. DePAOLA:
2   Q   When did you get out of school in 2002?
3   A   It was right before school started, two weeks
4       prior to school. School started, I believe the
5       7th of August of this year.
6   Q   No, I'm saying when did you get out of school in
7       2002?
8   A   May -- I believe it was May 27th.
9   Q   And you know, and you are aware, that services
10      were not provided to Gaddies for eight weeks; are
11      you not?
12  A   No.
13  Q   You are not aware of that?
14  A   The only thing I was told was that they were
15      having a hard time getting ahold of his mother.
16      At that point in time, I was not here, because
17      my mother was ill, and I was back in Missouri. In
18      fact, I had to leave before school was out.
19  Q   Are you aware that he did not get eight weeks
20      worth of service?
21  A   No, ma'am.
22  Q   You are not aware of that?
23  A   No, I am not.
```

Gaddies Hill
March 12, 2003
Elmore County Board of Education
97 (Pages 193 to 194)

Page 194

```
1   Q   Do you know how much he got?
2   A   No, ma'am.
3   Q   Does Gaddies ride --
4   A   Because, I had it set up, you know, to get what I
5       had in here. And I turned it in, like I was
6       supposed to. And I had to leave to go see after
7       my mother.
8   Q   You don't know what --
9   A   So, no, ma'am, I do not.
10  Q   Now, you had decided in the spring of '02 to write
11      an IEP that didn't have anything about ABC's in
12      it; is that right?
13  A   That's true.
14  Q   So, you had abandoned that goal in the upcoming
15      IEP; is that right?
16  A   Yes, ma'am.
17  Q   Wasting his time?
18  A   Well, that's what we all thought, because he had
19      not been making any progress up to that time.
20  Q   Did you write any kind of IEP for this summer
21      program that said, don't do ABC's, it's a waste of
22      time?
23  A   No, ma'am. Except for I was hoping maybe she
```

Mary Moore-Wynn
Court Reporting Services
(334) 244-0203
Page 195

```
1       might be able to -- a different teacher, different
2       ways of doing things, might be able to get him to
3       recognize his ABC's or sounds, which I had not
4       been able to get him to do.
5   Q   So, you had abandoned it for the upcoming year,
6       but here it is again for the summer, all they are
7       going to do is ABC's and --
8   A   Sounds.
9   Q   -- sounds of the first five letters?
10  A   Yes.
11  Q   And you thought that was appropriate?
12  A   Yes, because it would be a different teacher who
13      had a different method.
14      I was going to give her a chance to see what
15      he could do.
16  Q   Well, what did he do? Did he get any kind of
17      report? Did he make any kind of progress?
18  A   No, ma'am.
19  Q   Who was it?
20  A   I believe it was Sheila Dean.
21  Q   Don't know?
22  A   I think she is the one that has the summer
23      program.
```

Page 196

```
1   Q   Okay. Now, also in this little addendum on
2       page 85 it says, Gaddies still needs safety
3       instruction from the counselor.
4   A   Uh-huh.
5   Q   What safety instructions were they supposed to be
6       working on?
7   A   Safety instructions meant going from one place to
8       another, getting to the classroom from one place
9       to another.
10  Q   Do you have any goals in this IEP about that?
11  A   No, ma'am. I do not.
12  Q   Okay.
13  A   I had to get with the counselor later on, because
14      the beginning of the year, she was not here at
15      that point in time. She was out due to illness.
16      So, that was the best I could do at the time when
17      I wrote this.
18  Q   Okay. Help with his personal hygiene?
19      MR. HOWARD: What page are you on?
20      MS. DePAOLA: I'm on page 85, which is
21      really the back of page 70. But
22      it's the way it copied.
23      MR. HOWARD: Okay. Okay. I see.
```

Gaddies Hill
March 12, 2003
Elmore County Board of Education
98 (Pages 195 to 196)

1  Q  What personal hygiene were you all trying to teach
2  him?
3  A  To go into the bathroom, to close the door, not to
4  show himself, and to wash his hands when he is
5  through. Taking care of his self, his toileting
6  skills.
7  And I do have -- and -- behavioral goals for
8  that.
9  Q  Okay.
10  A  And he has mastered some of those goals already.
11  Q  The goals that were written on page 73; is that
12  right?
13  A  Yes, ma'am.
14  He has met the first goal.
15  Q  I'm a little unclear on what the annual issue is.
16  Gaddies needs to be able to go to any restroom by
17  himself without hurting others and to perform his
18  toileting needs.
19  Q  Are you saying he needs to go without
20  supervision, or to go where nobody else is
21  there, or what does that by himself mean?
22  A  He needs to go to the restroom by himself without
23  supervision, and without causing a fight when he

1  goes there.
2  Q  And you have taught him to do that?
3  A  Right now, that is where he is. We have looked
4  at -- the first benchmark he has met that, by
5  himself with supervision. That's the way we
6  started him out. That's the way the counselor has
7  been working with him. Then he has graduated down
8  to the second benchmark, Gaddies will, by the end
9  of the semester, go into the bathroom for
10  his toileting needs by himself without
11  supervision. That means someone being inside
12  there making sure that he is doing what he's
13  supposed to.
14  Yes, ma'am, he can do that now.
15  Q  Can he wash his hands?
16  A  Upon prompting
17  Q  Can he wash his face?
18  A  Upon prompting
19  Q  You're working on that, too?
20  A  Yes, we are.
21  Q  Is it in there anywhere?
22  A  No, ma'am.
23  Q  Can he scrub his feet?

1  A  That, I have no idea.
2  Q  Comb his hair?
3  A  No. He does not -- his hair is -- he generally
4  has a buzz cut.
5  Q  Now, would you agree with me that Gaddies can't,
6  as we sit here today, write his name?
7  A  He can write part of his name.
8  Q  How much?
9  A  The first three letters.
10  Q  Okay. Well, let me ask you to look -- first of
11  all, let's look at Petitioner's Exhibit 6. Isn't
12  that basically just a bunch of tracing of his
13  name?
14  A  Yes, that's the way we have to start out with him,
15  is to trace first, before he can, you know,
16  graduate to writing it by himself
17  Q  And I'd like you to look in that notebook on page
18  172 and tell me if that's the work of his that you
19  recognize.
20  Q  Is that going to be found where?
21  A  It's under miscellaneous. 172.
22  A  Okay.
23  Q  Is that Gaddies wrote his name there?

1  A  Yes, ma'am.
2  Q  Is that legible to you?
3  A  I can see that it's a G-A. And it looks like he
4  tried to make two, three G's.
5  Q  So, you think if he went somewhere, and he needed
6  to sign his name, that somebody he has never seen
7  before is going to know what that is?
8  A  They probably would not, unless they were told
9  what his name is.
10  Q  Sure.
11  A  But I don't know at what point in time this was
12  done. And he can do better than this now.
13  Q  Do you have a sample that you have produced to
14  your attorney that shows anything better than
15  that?
16  THE HEARING OFFICER: What page?
17  Q  Mrs. Selmar might be able to do that.
18  MS. DePAOLA: 173 is the one I'm showing
19  her. Well, 172. Same thing.
20  Q  Is that in any way legible as Gaddies Hill?
21  A  No. But this is some of his first work. And
22  that's what he liked to do was put a lot of G's on
23  things.

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

**Page 201**

1  Q  How do you know that's his first work?
2  A  Because I know what he's doing now.
3  Q  You don't know what date those were done?
4  A  Pardon?
5  Q  You don't know what date those those sheets were done?
6  A  No, I do not. These are papers that Ms. Selmar
7  has supplied him with. These are not my work
8  papers.
9  Q  I mean, you did review this Exhibit 6, did you
10  not? Essentially, this is all tracing, right?
11  A  That's correct. It's all tracing.
12  You have to start at the very beginning and
13  work up. And it takes small steps.
14  Q  And you have to decide what you're going to work
15  on, too, don't you?
16  A  Yes, you do. And we're still working on him to
17  get his name. You have to put his name on just
18  about everything. Even in the high school, they
19  are going to be working with him putting his name
20  on things.
21  Q  I hate to skip backwards, but I do need to skip
22  back to the Alabama Alternate Assessment for the
23  spring of 2002. I don't think I went over this,

**Page 202**

1  but I just want to make sure. This was done last
2  year, this document 88, is that right?
3  A  Yes, it was.
4  Q  And as far as language arts and math, he made zero
5  progress, is that right?
6  A  That is true.
7  Q  With what was written on the IEP, yes, ma'am.
8  Q  Okay.
9  A  This year, when he takes the Alabama Alternate
10  Assessment, it will be over what I have written on
11  his IEP this year.
12  Q  Let me ask you a couple of others questions. So,
13  he didn't get -- you don't know if he got the
14  summer eight weeks? Well, you know he didn't,
15  don't you?
16  A  I have -- yes, I think so, because they were
17  having a hard time getting ahold of Mrs. Corbett.
18  But whenever I did finally return from my
19  mother's, I was told that they wanted to know
20  whether -- you know, my phone number was the same
21  as what they were calling. And it was.
22  Q  Let me ask you this: Does Gaddies require special
23  ed transportation?

Mary Moore-Wynn          Court Reporting Services          (334) 244-0203

**Page 203**

1  A  Yes.
2  Q  Was transportation provided for these services in
3  the summer?
4  A  I don't know.
5  Q  Normally, the parents bring them during the
6  summer, if I remember correctly.
7  Q  Ms. King, what kind of work do they do in a
8  sheltered workshop?
9  A  They do a lot of unscrewing bulbs, a lot of
10  sorting activities, putting things like beads onto
11  string or onto -- not string, but it will be a
12  piece of wire.
13  Q  For what?
14  A  They get orders.
15  Q  Making what?
16  A  I have no idea. I'm not in a workshop.
17  Q  When you wrote in this IEP on page 71 that he
18  could go to a sheltered workshop --
19  A  Yes, ma'am.
20  Q  -- what did you envision his employment would be?
21  A  I don't know. I don't know what they have there.
22  As I told his mother, this can be changed at
23  any point in time, and it will be changed

**Page 204**

1  especially during high school when he goes over
2  there, which will be next year.
3  Q  Now, do you understand that you have no obligation
4  to consider his transition goals at this time? Is
5  that your understanding?
6  A  That I have what?
7  Q  No obligation to consider transition goals?
8  A  But I have.
9  Q  You said you don't know what they do.
10  A  No, I said I don't know what the sheltered
11  workshops do. I don't know where they get their
12  jobs from. But I do know it does consist of
13  sorting.
14  Q  Sorting?
15  A  Screwing on things. Putting beads and bolts and
16  things onto wire. Now, different jobs will be for
17  different things. I do know they stuff envelopes.
18  What it will be for whoever he gets there, no,
19  ma'am, I do not. There is a lot of years in
20  between that
21  Q  Do you know it's important to know where you're
22  going with a student, what outcome or goal you
23  want with him so you can plan his program?

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 205

```
 1   A   Yes.  We do have a goal for Gaddies.
 2   Q   And I take it it's something about a sheltered
 3       workshop and beads, and that's it?
 4   A   It's about working at a sheltered workshop and
 5       complying with instructors, because sometimes he
 6       has -- at the point that we wrote this, he was
 7       having a lot of trouble complying with teachers'
 8       requests inside the classroom, and outside the
 9       classroom.
10   Q   Do you think that the employment goal is going to
11       give you some guidance on what you need to be
12       teaching him?
13   A   To a certain extent.
14   Q   For example, if I'm going to be a doctor, I
15       probably need to take advanced math --
16   A   Uh-huh.
17   Q   -- physics?  But it affects the curriculum, right?
18   A   When you get to the high school, yes, ma'am.  It
19       also affects the eighth grade.  If he's going to
20       be a doctor, he needs to be taking Algebra, I.
21   Q   And it's just as important for a severely retarded
22       kid?
23   A   Yes, it is.  That's why I have him stringing
```

Page 206

```
 1       beads.  I have him sorting.  I have him doing
 2       things towards colors.  I have him doing things.
 3   Q   The only identified occupation you have come up
 4       with is sorting beads and stringing them.  I mean,
 5       I thought there was some hope he could clean
 6       houses?
 7   A   That's what his mother wanted him to do.  That's
 8       what she said whenever I asked him what his career
 9       interest was.
10   Q   Is there anything wrong with that?
11   A   No, ma'am, there is not.
12   Q   What kind of skill do you need to clean houses?
13   A   You need to be able to have customer service-type
14       needs as far as being able to get along with your
15       boss.  You have to be able to clean the house,
16       which is like sweeping floors and dusting and
17       washing dishes.
18   Q   Are those skills that you are able to teach?
19   A   Yes, ma'am, they are.  And I am doing this.
20   Q   I didn't see it in the IEP.
21   A   No, ma'am, it is not in the IEP.  It is part of
22       his math.
23   Q   Okay.  I'm just focusing on what's in this IEP.
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 207

```
 1   Q   That's your commitment?
 2   A   Yes, ma'am.  But I am giving him more than that.
 3   Q   Okay.  Now --
 4   A   When this IEP was written back in May, things have
 5       changed from May until September when we had --
 6       actually, we revealed Gaddies after we got the
 7       results back.  I have not had a chance to redo
 8       this IEP
 9   Q   So, you agree this IEP should have been redone?
10   A   Yes, ma'am.
11   Q   Okay.  Because, suddenly you believe -- I mean,
12       his IQ has dropped -- I doubt that it's dropped --
13       but the measurement has changed from 62 to 30
14       something?
15   A   Yes.
16   Q   So, the program had to change?
17   A   Well, I could put in there what I am actually
18       offering him.  But I could not put that in there
19       at the time that I wrote this IEP, because I
20       didn't know --
21   Q   You can revise the IEP at any time, right?
22   A   Pardon?
23   Q   You can revise the IEP at any time?
```

Page 208

```
 1   A   Yes, I can.
 2   Q   As a matter of fact, at the meeting where the
 3       evaluations were gone over, Ms. Corbett asked that
 4       you redo the IEP, didn't she?
 5   A   Yes, ma'am.  She wanted to know if we were going
 6       to redo the IEP, yes, ma'am.
 7   Q   And you said, no, we'll do it at the end of the
 8       year?
 9   A   At the end of the year.
10   Q   So, essentially, Gaddies is functioning under an
11       IEP that you believe was not comprehensive enough
12       or appropriate or what?
13   A   No, the IEP is appropriate for what I am teaching.
14       Except it doesn't include everything that I am
15       teaching.
16   Q   Okay.  Now, another thing that is in here that's
17       of interest to me is on page 77.  Adapting
18       curriculum and instruction in inclusive classes.
19       Explain to the Hearing Officer what inclusive
20       classes Gaddies is in.
21   A   He is in PE, and he is in a cafeteria.  He goes to
22       a cafeteria with regular children.
23   Q   So, what you're going to have them do is in PE and
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 209

```
1   cafeteria, for instance, reduce the length and/or
2   complexity of written assignments?  Is that in any
3   way applicable?
4   A  Not to -- yes, to PE, it is, because they do do
5      tests in there.
6   Q  Gaddies gets written tests in PE?
7   A  No, he doesn't; he only gets oral.
8   Q  Does Gaddies get simplified written directions in
9      PE?
10  A  Yes, he does.
11  A  He can't read --
12  A  He does not get written.  He gets oral.
13  A  Well, it says here, simplified written directions.
14  A  If there is directions, it would have to be
15     definitely simplified, yes, ma'am.
16  Q  Extra practice with reading assignments at home;
17     is that something to do with PE or lunchroom?
18  A  Nope.  That says home, so that's at home.
19  Q  Well, does he have any reading assignments,
20     Ms. King?
21  A  No, ma'am.
22  Q  So, I mean, this sheet looks meaningless to me.  I
23     don't know why these things are checked.
```

Page 210

```
1   A  They are checked because -- I am not the only
2      person involved here.  Mrs. Selmar is involved.
3      Mrs. Ross is involved.  PE is involved.  We have
4      to make a checklist like this to give to them.
5      They have a copy of this.
6   Q  He's not in any inclusive classrooms like for
7      social studies, science, any real curriculum
8      areas, is he?
9   A  No.  He's in resource classes.  And those resource
10     classes are not self-contained, because children
11     come, and they go.  He's only in there for 90
12     minutes.
13  Q  Now, all the kids that are in the resource room
14     with him, aren't they all retarded?
15  A  No, ma'am.  They are handicapped.  I don't like
16     that word retarded.
17  Q  Well, are they all mentally disabled?
18  A  Mentally disabled?  Yes, ma'am.
19  Q  Is this child mentally retarded?
20  A  He is mentally disabled.
21  Q  Okay.  According to State guidelines, he's
22     mentally retarded, is that correct?
23  A  That's correct.
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 211

```
1   Q  Are the other children in the classroom mentally
2      retarded under State guidelines?
3   A  Yes, ma'am.
4   Q  So, when you say he's in a resource room, really
5      he's in a class with all different --
6   A  All levels children.
7   Q  -- all disabled peers?
8   A  Whether they are learning disability or whether
9      they are EMR, yes, ma'am.
10  Q  Okay.  You changed --
11  A  And he does have, also, in some of the classes,
12     there are helpers that come in that are regular
13     students.
14  Q  I think you either misunderstood, or you changed
15     your testimony.
16  A  I'm sorry.
17  Q  I thought all the kids in his class were mentally
18     retarded.
19  A  Yes.
20  Q  Now, you just said learning disabled?
21  A  But there are different -- there are both in the
22     classroom.
23         THE HEARING OFFICER:  Some mentally
```

Page 212

```
1      retarded with learning
2      disabilities?
3         THE WITNESS:  Yes.  There are different
4      levels.  There are both learning
5      disabled children in there; there
6      are also mentally retarded -- I
7      don't care for that word.  I
8      generally say handicapped -- in
9      there.  They are in there.  There
10     is a mix.
11  Q  Now, he is, however, receiving all of this services
12     with disabled kids, isn't he?
13  A  I don't like the word, disabled, because disabled,
14     to me, means crippled.  As far as disabled means
15     physically disabled.
16         THE HEARING OFFICER:  But they are all
17     special ed kids?
18         THE WITNESS:  All special ed kids, yes,
19     sir.
20  Q  So, here on his IEP where it says -- on page 84 --
21     does this student receive all special education
22     services with nondisabled peers, and it says, yes;
23     that's not true, is it?
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 213

```
1   A   When I read this, and I still put that on there.
2       Maybe I am wrong. But I put everybody's yes.
3       because nonsdisabled (sic) means people who are
4       crippled and in wheelchairs. If you was to look
5       up that word disabled, it would say physically
6       disabled.
7   Q   So, you just have a personal interpretation, you
8       don't follow what IDEA says about disability?
9   A   Well, I guess that is my interpretation of what
10      IDEA says.
11  Q   And the truth of the matter is --
12  A   It said, disability -- then, I would have checked.
13      no. But since it said disabled --
14  Q   Let's --
15  A   -- I checked, yes.
16  Q   You have been in this special ed for how long?
17  A   Twenty-four years.
18  Q   You know exactly what IDEA says a disabled child
19      is, don't you?
20  A   Yes, ma'am.
21  Q   Okay. So, this is just some kind of deliberate
22      statement on your part that you're going to defy
23      what the definition is and use your own
```

Page 214

```
1       definition?
2   A   Well, I looked it up in the dictionary. Disabled
3       is a person who is physically handicapped.
4   Q   Okay. My question is: You know what the
5       definition is under IDEA, don't you?
6   A   Would you like to inform me?
7       Yes, ma'am, I do.
8   Q   You do. And you know that this doesn't conform
9       with that definition, don't you?
10  A   For that definition, you're right.
11      I have looked this up several times, and --
12      trying to decide whether I should be putting yes
13      or no on all of the IEP's.
14      When I looked it up in the dictionary -- I am
15      afraid all my IEP's are written with a yes there.
16  Q   Did you ever review the Brigance that was sent
17      from Tallassee?
18  A   Yes, I have.
19  Q   Did you ever consider following up on all these
20      skills that are identified here as still needed,
21      as far as personal hygiene, grooming, dressing,
22      eating?
23  A   As far as in eating goes, he has made progress
```

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 215

```
1       with his eating. As far as his grooming goes, we
2       did work on some grooming skills last year, not
3       very many.
4   Q   My question is whether you ever considered using
5       the Brigance skills as a curriculum framework as a
6       manner of establishing present levels of
7       performance, et cetera?
8   A   No, ma'am.
9   Q   Okay.
10  A   And the reason for that is because it says birth
11      to seven years. He's 15 years old.
12  Q   Did you ever think what the name of the curriculum
13      is that you're using?
14  A   I'm using the -- as far as math, I'm using the
15      Touch Math, ma'am, in math.
16  Q   So, you understand this Brigance to only be
17      appropriate to use with a child from birth to age
18      seven?
19  A   Yes, ma'am.
20  Q   On grading --
21  A   Although, you notice in here things I am picking
22      up, which is personal data response. And it does
23      have phone numbers, parent's name, and complete
```

Page 216

```
1       address.
2       But I have picked this up
3       THE HEARING OFFICER: What page is that?
4       THE WITNESS: That's 106 underneath
5       assessments.
6   Q   I don't want to be argumentative. Isn't the
7       Brigance the skills that someone would develop
8       from birth to seven years as opposed to only
9       appropriate for children aged birth to seven
10      years?
11  A   Say that again.
12  Q   It was my understanding of the Brigance that it
13      outlines skills that one would expect to normally
14      develop birth to seven?
15  A   Yes.
16  Q   That does not mean that cannot be a yardstick for
17      an older child who had not developed those skills?
18  A   That is true.
19  Q   Now, when Dr. Gargiulo came to look at your class,
20      were the activities that you were doing fairly
21      typical?
22  A   Yes, ma'am, for the ten minutes that he was in my
23      class.
```

Page 217

1  Q   Did you throw him out?  Was he forced to leave?
2  A   No, ma'am.  I did not throw him out.  My class was
3      over that had Gaddies in there.
4  Q   Look at page 174.  Grades, a grade sheet goes home
5      to Ms. Corbett?
6  A   Yes, this is a progress report.
7  Q   Now, as I understand this progress report, this is
8      based solely and exclusively on his degree of
9      compliance and whether he completes his work, is
10     that right?
11 A   And everything else that we do with him, yes,
12     ma'am.
13 Q   And that --
14 A   I mean, it doesn't tell her whether he knows any
15     letters or numbers or --
16 Q   No, this is a normal progress report like any
17     other child.  Just like he has a schedule like any
18     other child.
19 Q   And grades are based on compliance and completing
20     his work?
21 A   Yes, ma'am.
22 Q   And so in order for her to know how he's doing on
23     his skills, I guess she has to rely on the daily
        progress reports that are identified on page 70 of

Page 218

1      the IEP?
2  A   Yes.  He was signing those.  I was signing a --
3      and his daily progress, we have like a -- this
4      year, the school -- Mr. Teal, our principal, has
5      said that we are to be writing on his planner, as
6      the progress and any notes that we want to talk to
7      the mother.
8  Q   So, you have been sending daily progress reports
9      to Ms. Corbett on his skills?
10 A   I was sending to her how he has been doing, yes,
11     ma'am.
12 Q   And that --
13 A   And then it was stopped, because I didn't know
14     whether she was getting them or not.  She wasn't
15     signing, you know, down at the end of each day
16     that she even saw them.  She is supposed to
17     acknowledge that she sees them.
18 Q   I see.  So, it's because of something she did, is
19     that correct?
20 A   Uh-huh.
21     MS. DePAOLA:  Your Honor, Mr. Howard has
22     produced some pages from the daily
23     progress report.  I have the entire

Page 219

1      book.  I would like to use that in
2      lieu of these.
3      Would you like to look at this?
4      MR. HOWARD:  I would like to get a copy
5      of the whole thing.
6      THE WITNESS:  Well, that is a progress
7      report that is the second
8      one --
9      MR. HOWARD:  Ma'am, ma'am, ma'am.
10     Please, ma'am.  We are just trying
11     to figure out what to do with it.
12     She's going to ask you some
13     questions.
14     THE WITNESS:  Oh, all right.
15     THE HEARING OFFICER:  While they are
16     looking through that, this is a
17     book that you fill out and then
18     send it home with Gaddies?
19     THE WITNESS:  Yes, it is.  If he does
20     okay every day.
21     THE HEARING OFFICER:  But each day the
22     notebook -- he takes the whole
23     notebook with him with that page?

Page 220

1      THE WITNESS:  To each teacher yes.
2      THE HEARING OFFICER:  But then what does
3      he take to the mother?
4      THE WITNESS:  To the mother?  That same
5      book.
6      BY MS. DePAOLA:
7  Q   So, this is the progress report?
8  A   That is like a progress report
9      THE HEARING OFFICER:  And you said it
10     was the second one?
11     THE WITNESS:  Second one.  There was
12     another one prior to that.
13 Q   For last year?
14 A   Yes, from the time school started until about
15     December, because we couldn't find the old one
16     THE HEARING OFFICER:  So, this is for
17     this year, 2002-2003?
18     THE WITNESS:  Not the whole one.  Yes, I
19     believe -- I think it's around
20     December.
21     MR. HOWARD:  What she says the first
22     part is missing or lost.
23     THE HEARING OFFICER:  First part of 2002

Mary Moore-Wynn   Court Reporting Services   (334) 244-0203

**Page 221**

```
 1   went missing during the holidays?
 2        THE WITNESS:  I think it was right
 3   before the holidays.
 4        THE HEARING OFFICER:  And so then you
 5   all started a new notebook?
 6        THE WITNESS:  Right.  There should be
 7   something in December, somewhere
 8   around in there.
 9        THE HEARING OFFICER:  Okay.  Go ahead.
10   But do make a copy for Houston.
11        MS. DePAOLA:  Well, if there is another
12   one, I'd love to see it.
13        THE HEARING OFFICER:  What she is
14   saying, someone lost the other one;
15   correct?
16        THE WITNESS:  Yes, where we were
17   actually documenting a lot of
18   things in there.
19        THE HEARING OFFICER:  Are you going to
20   mark this?
21        MS. DePAOLA:  Yeah, what's my next one,
22   7?
23        MR. HOWARD:  Is this 7?
```

**Page 222**

```
 1        (Whereupon, Petitioner's Exhibit 7 was
 2   marked for identification and is
 3   attached hereto.)
 4        THE HEARING OFFICER:  And this is --
 5   what should we call this -- 2003 --
 6        MS. DePAOLA:  2002-2003.
 7        THE WITNESS:  Somewhere in there.  I
 8   think it was December.
 9        THE HEARING OFFICER:  So, I'm going to
10   put 2002 -- does it go up to the
11   present?
12        MS. DePAOLA:  Yes.
13   BY MS. DePAOLA
14   Q    Is this the progress report that you are talking
15   about?
16   A    Yes, this is where we annotate --
17   Q    I did not know and Ms. Corbett didn't know there
18   was another notebook.
19        So, all this September, October that's blank,
20   we're not to interpret anything from that?
21   A    Right, because we had a little smaller one, and
22   this is the --
23   Q    Okay.  But I guess beginning on --
```

Mary Moore-Wynn   Court Reporting Services   (334) 244-0203

**Page 223**

```
 1   A    November 12.
 2   Q    -- November 12th, this is the daily progress
 3   report, right?
 4   A    Uh-huh.
 5   Q    So, on that week, there was one report, is that
 6   right?
 7   A    Uh-huh.
 8        THE HEARING OFFICER:  You need to say
 9   yes or no.
10        THE WITNESS:  Yes, ma'am.  I'm sorry.
11   Q    And the next week, there are no reports
12   whatsoever; is that right?
13   A    That's right.
14   Q    And the next report, there is one -- really, not a
15   report.  It's a homework assignment.  Please have
16   Gaddies trace his name and go from dot to dot?
17   A    This is our communication and everything that we
18   put in here for her.
19   Q    Is there any progress in here?
20   A    No, ma'am.
21   Q    Next week, this is all blank, too?
22   A    Yes.
23   Q    The next week is blank.  The next week we have two
```

**Page 224**

```
 1   notes out of five days; is that right?
 2   A    Uh-huh.
 3        THE HEARING OFFICER:  You need to say --
 4        MR. HOWARD:  Yes or no.
 5   A    Yes.
 6   Q    And one is about his snack?
 7   A    Yes.
 8   Q    And one is that he feels okay.  Is there anything
 9   in here about his ABC's, name, anything in this
10   week?
11   A    No.
12        I do send home progress reports.  Whether they
13   get there or not, I don't know, but they are
14   generated from the computer.
15        THE HEARING OFFICER:  Just so the Record
16   is clear, you're talking about two
17   separate things, this notebook is
18   one thing --
19        THE WITNESS:  Well, that is one way we
20   can report how Gaddies is going to
21   the mother.  Another way is
22   mathematically -- is the other
23   computer-generated progress report
```

Page 225

```
 1        that has to go out, yes, also.
 2   BY MS. DePAOLA
 3   Q    Is this the document that is referred to in the
 4        IEP?
 5   A    That's what we have been doing, yes, ma'am.
 6   Q    Daily progress reports is that exhibit right
 7        there?
 8   A    Yes, that's where it's supposed to go.
 9   Q    Who wrote the behavioral intervention plan for
10        Gaddies?
11   A    I did, and so did the whole team. Everyone was in
12        agreement with it.
13   Q    Now, the first thing is, attending toilet needs by
14        himself without public display and playing?
15   A    That is true.
16   Q    And what were you going to do to teach him that?
17   A    Well, first he was going to have to be supervised.
18        And then we hoped that -- you know, he would be
19        unsupervised. And he would be able to do that
20        without fighting.
21   Q    Did you ever consider why he was doing this?
22   A    Yes, ma'am.
23   Q    And why? What did you conclude?
```

Page 226

```
 1   A    As far as fighting?
 2   Q    No, as far as going to the toilet with the door
 3        open.
 4   A    Probably from what he had learned at home.
 5   Q    That was your conclusion?
 6   A    Yes, ma'am.
 7   Q    And has this plan been implemented?
 8   A    Yes, ma'am.
 9   Q    And all of his behaviors, are they cleared up now?
10   A    He is doing much better, yes, ma'am. They are not
11        completely cleared up. But he's working on them,
12        and he's doing a good job. In fact, I have made a
13        list of a lot of things that he's doing a good job
14        on.
15   Q    The materials that are actually being used for
16        Gaddies are really what I would call readiness
17        materials, aren't they?
18   A    Yes, ma'am.
19   Q    Isn't this what you do with kindergarten kids?
20   A    Yes, ma'am. You've got to go from where he is and
21        work him up, yes, ma'am.
22   Q    Do you consider those materials to be age
23        appropriate for Gaddies?
```

Page 227

```
 1   A    Age appropriate?
 2   Q    Yeah, I mean, they have got little kittens and
 3        that kind of stuff?
 4   A    Mentally, yes.
 5   Q    Any other way? Socially?
 6   A    Socially? No.
 7   Q    I mean, these are just all you've got, isn't it?
 8   A    They are just the kind of workbooks that are
 9        produced?
10   A    Yes, among other things. I do have other papers
11        that I have reproduced, and I believe they are
12        there. I think.
13   Q    His IEP doesn't include anything on the use of
14        money, does it?
15   A    No.
16   Q    Anything on the calendar, days of the week, months
17        of the year, none of that's in there, is it?
18   A    No, it is not.
19   Q    Now, let me ask you what counseling has been done
20        with this parent about the impact of a 39 IQ?
21   A    What counseling has been done?
22   Q    Yes.
23   A    I have no idea.
```

Page 228

```
 1   Q    So, when you had that meeting in November, and
 2        Mr. Mayer says, and your child has a 39 IQ --
 3   A    Uh-huh.
 4   Q    -- she is left to her own devices to figure out,
 5        you know, what that means?
 6   A    Well, we thought that she would know what that
 7        meant.
 8   Q    Based on what?
 9   A    On the findings of what Jack said.
10   Q    Does she have any background in education, do you
11        know?
12   A    You mean --
13   Q    Has she even graduated from high school?
14   A    I don't know.
15   Q    Is Gaddies seeing a counselor or psychologist at
16        school?
17   A    He is seeing a counselor, yes, ma'am.
18   Q    Starting when?
19   A    I could not tell you the exact date.
20   Q    I mean, it was promised in the spring of 2002?
21   A    Yes. And in August, I talked with the counselor
22        when she came back. And she told me that she
23        would see him.
```

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

**Page 229**

1  Q  And when is she seeing him?
2  A  I don't know. She has those records.
3  Q  Well, I mean, does he leave your -- you're the
4     case manager; you don't know?
5  A  Yes, I do. I talk with her to make sure she's
6     seeing him. And she tells me she is.
7  Q  How often --
8  A  She has -- her files which she is going to be
9     turning in to me, so I will have them to go with
10    this IEP for next year, or the new IEP for next
11    year.
12 Q  Is there anything in this IEP about counseling,
13    how often he's supposed to get it, what she is
14    supposed to be doing with him?
15 A  The only thing that's in this IEP about what the
16    counselor is supposed to be doing is what we wrote
17    on 9/11, I believe. We reconvened at that point
18    in time.
19 Q  Gaddies still needs safety instruction from the
20    counselor, on page 85, are you talking about?
21 A  85. How to get to and from his class is what we
22    consider safety, not fighting is considered
23    safety. One of the things --

**Page 230**

1  Q  Where are the things that he's supposed to work on
2     identified and outlined for her?
3  A  Those were things discussed at the meeting. And,
4     no, ma'am, I did not, at the time, discuss this --
5  Q  How often is she supposed to see him?
6  A  I believe we talked about two to three times, but
7     I more or less left that up to her.
8  Q  Two to three times a year, a week, a month, or
9     what?
10 A  No, ma'am, it was supposed to be biweekly or once
11    a week -- I mean, not once a week, once a month.
12    I don't know. She was going to have to work that
13    out.
14 Q  And this never was incorporated into an IEP?
15 A  No, it was not.
16 Q  Let me ask you to look on page 171 in the
17    notebook. This is another work sample that was
18    sent to me. Ask you if that's --
19 A  Is that --
20 Q  Page 171. It's under miscellaneous. Do you see
21    that document? Is that from this year?
22 A  171?
23    MR. HOWARD: It's not under

Mary Moore-Wynn                    Court Reporting Services                    (334) 244-0203

**Page 231**

1     miscellaneous.
2  Q  Is it talking about my house?
3  A  Uh-huh. Is that from this year?
4  Q  Yes, ma'am.
5  A  Which of this IEP goals and objectives does that
6     relate to?
7  A  Social studies and -- social studies.
8  Q  Show me the social studies goals in his IEP.
9  A  There are none, because we never write any social
10    studies or science goals.
11 Q  Why is that?
12 A  Because mainly it is taken from his reading, what
13    we have down for reading.
14 Q  Well, he's just reading the ABC's and his name?
15 A  Well, it's his name mainly they are practicing on.
16    The more he can do repetition --
17 Q  What does that have to do with my house?
18 A  I have no idea. I am not the social studies
19    teacher. You'll have to ask Ms. Ross.
20 Q  You're in charge of this file, right?
21 A  Yes, ma'am, but I'm not in charge of Ms. Ross nor
22    her classroom.
23 Q  Well, I guess it's your job to oversee that

**Page 232**

1  Q  Gaddies is getting an appropriate curriculum,
2     isn't it?
3  A  Yes, ma'am
4  Q  Do you think Gaddies might be able to stock
5     shelves in a grocery store?
6  A  Yes, ma'am.
7  Q  Do you think the might be able to roll up
8     silverware in the cafeteria, so people could have
9     their silverware in a little thing?
10 A  Yes, ma'am. I think he can be taught to do that.
11 Q  You don't think he's going to be working in an
12    office in any kind of literary position?
13 A  No, ma'am. No.
14 Q  And let's talk about shelf stocking. I guess it
15    would be very important for him to know some words
16    like, the top, the bottom?
17 A  Yes, ma'am.
18 Q  And it would be very important for him to know,
19    you know, biggest, smallest, first, and last,
20    those kind of words?
21 A  Uh-huh. It would.
22 Q  I just don't see anything in this IEP that relates
23    to any of that, is that a fair summary?

---

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203

Page 235

1  part of the day, what?
2  A  He was in there, I would say, probably out of a
3  whole day, we can say it was 100 percent, then he
4  was with me for 85 percent of the time.
5  Q  Where was he the rest of the day?
6  A  He was in PE.
7  Q  When he was in PE, was he with regular kids?
8  A  Yes, he was.
9  Q  It wasn't a special PE?
10 A  No.
11 Q  How many kids did you have in your class last
12 year?
13 A  At the very beginning for the first month, I only
14 had eight.
15 Q  Okay. Did that change?
16 A  Yes, it did.
17 Q  And what was the most that was in there at any one
18 point?
19 A  Twelve.
20 Q  And did you have any assistants?
21 A  Yes, I did.
22 Q  Who --
23 A  I had an aide.

---

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203

Page 236

1  Q  And one aide and you in that entire class?
2  A  Yes.
3  Q  And what was the level of the other kids that were
4  in the class with you? How many of them were
5  roughly equivalent to Gaddies in functioning
6  level?
7  A  Four.
8  Q  And the other kids in the classroom, what level
9  were they?
10 A  They were higher than Gaddies, much higher.
11 Q  And what sort of skills did you work with Gaddies
12 on last year?
13 A  I worked with him on -- after working with him and
14 seeing what level that he was actually on, I tried
15 to do the best I could to work on what was in the
16 IEP. And even watering down -- not watering
17 down -- adapting, modifying even the IEP on a
18 level.
19 Q  Tell me what activities you did. You were trying
20 to tell Ms. DePaola some of the things you worked
21 on.
22 A  Right.
23 Q  I want to give the Hearing Officer examples of

---

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203

Page 233

1  A  Yes, ma'am.
2  Q  But you also need to understand we cannot put
3  in every worksheet that we do with this child. We
4  cannot put in everything in this IEP. If we do,
5  it would be this thick (indicating).
6  Q  Well, you've only got one thing in there, this
7  name and address?
8  A  Yes, ma'am.
9  MS. DePAOLA: If we could take a break.
10 (Brief recess.)
11 THE HEARING OFFICER: Okay. Do you have
12 further questions of her?
13 MS. DePAOLA: No, sir.
14 CROSS-EXAMINATION
15 BY MR. HOWARD
16 Q  Ms. King, what education do you have?
17 A  I have a Master's degree in special education.
18 Q  All right. And how --
19 A  In the MR program.
20 Q  And your certification is what?
21 A  Class A. From the State, you mean?
22 Q  Yes, ma'am. Isn't it special ed?
23 A  Yes, ma'am (sic), and also I have a Bachelor's in

---

Mary Moore-Wynn                Court Reporting Services                (334) 244-0203

Page 234

1  elementary education.
2  Q  All right. And how many years have you been
3  teaching education?
4  A  A total of 24 years.
5  Q  And how many of those have been in this system?
6  A  Nine.
7  Q  And you first had Gaddies in your class in what
8  school year?
9  A  Uhm, this is the '02 to '03, so it would have to
10 be '01 to '02.
11 Q  That would have been last year?
12 A  That would have been last year.
13 Q  How long did you have him in your class last year?
14 In other words, all day, part of the day, what?
15 A  I had him mainly for most of the day. The only
16 time that he was -- went out was during cafeteria
17 time. And that's after we worked on his manners
18 and after we worked on the choking part, we took
19 him to the cafeteria. And then we worked with him
20 there --
21 Q  Ma'am, help me out, now --
22 A  Oh, I'm sorry. I'm going off.
23 Q  How long was he in your class last year, all day,

Mary Moore-Wynn                                    Court Reporting Services                                    (334) 244-0203

Page 237

1   some of the things you did in class on a daily
2   basis.
3   A   Okay.  We went over -- language arts was the first
4   period.  We went over ABC's by singing the song,
5   by singing the alphabet song, by him tracing his
6   letters.  And the reason why we did trace the
7   letters was because that was what the OT,
8   occupational therapist, told us that we should be
9   doing with Gaddies.  And also, lines, different
10  directional-type lines with Gaddies, which would
11  be helping him out.
12      Working with putty, therapeutic putty.  At the
13  very beginning, it worked out real well.  But I
14  ended up not working with the therapeutic putty,
15  because he figured out how to more or less cheat
16  and the things that I put in there.  So, I
17  just every once in awhile give that to him now.
18  Q   Stick with last year.
19  A   Okay.  Last year.  I'm sorry.  He did have blocks
20  that he used as building blocks.  He had counters.
21  He had bears that he used as counters.  We worked
22  on different colors, going from dot-to-dot, trying
23  to get him to trace something by having the number

Page 238

1   on there.  When I say dot-to-dot, the numbers were
2   from one to ten.  And then we would go up to one
3   to 15.  We did mazes, trying to explain that I
4   wanted him to stay on the sidewalk for the mazes.
5   Some of the mazes had numbers in there, so that
6   when he went from one turn to another, he could
7   identify that number.  Of course, it was through
8   prompting.
9       We worked on Touch Points.
10  Q   Okay.  Now, the Touch Point is the --
11  A   Is this Touch Point Math right here.
12  Q   And each number has a group of points on it?
13  A   Yes, it does.
14  Q   That correspond with that number?
15  A   With that number, yes, sir.
16  Q   Okay.
17  A   We worked on those, and I also have some flash
18  cards that I sent home with him so that his mother
19  could reinforce this.  Although, I don't know, she
20  said some of the flash cards, she didn't get.  So,
21  I would send more home.
22      And -- let's see.  We did do tracing of the
23  numbers.  We did putting numbers and puzzles and

Mary Moore-Wynn                                    Court Reporting Services                                    (334) 244-0203

Page 239

1   counting the animals that was on the puzzles and
2   the numbers together.
3   Q   And what would be the educational purpose of that?
4   A   Getting him to count and associate the number of
5   animals or balls or whatever it was or bats that
6   he had to count, coordinate with the actual
7   number.
8   Q   Okay.  And --
9   A   Hoping that he would be able to recognize that if
10  this had a set of three that he would have to, you
11  know, see the number three.  And then we would go
12  over that set of three with the Touch Points to
13  coordinate all of that together.
14  Q   Now, did you get good cooperation from his mother
15  A   Up to a point, yes, sir, I did.
16  Q   What do you --
17  A   Then it seemed like the cooperation kept dwindling
18  down.
19  Q   How was that?
20  A   She really wanted me to teach him, from what I
21  gathered whenever we were doing some talking --
22  later on in the year, she said something about
23  using hash marks, because that's what she was

Page 240

1   doing with him.
2   Q   Well, would you send home work and ask for her to
3   assist?
4   A   Yes, I did.
5   Q   And one of the types of work you sent home was the
6   Touch Point?
7   A   Yes, I did.  I sent home the flash cards that go
8   with that set.
9   Q   When the work came back, would it have been done
10  according to the instructions you sent home, the
11  Touch Point work?
12  A   The Touch Point work?  It looked like someone else
13  had held his hand or did it for him.  It didn't
14  look like his numbers, because his numbers
15  generally are skewed from the number lines.
16  Q   Well, would you send home Touch Point to get slash
17  marks back?
18  A   I did one day, yes, sir
19  Q   All right.  Now, the tracing that you sent home,
20  did you send home work -- tracing work?
21  A   Yes, I did.
22  Q   When the materials came back, did you recognize
23  whether it was Gaddies' work?

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 243

1 A After all the testing was done?
2 Q Yes, ma'am.
3 A Is it in here?
4 Q Look on page 165.
5 A Under what section?
6 Q Just bear with me.
7   Look on page 168 under assessments
8 A Okay.
9 Q Were you at that meeting?
10 A No, ma'am -- no, sir, I was not.
11 Q But you remember her seeing that first progress
12   book at that day
13 A I don't remember. I can't say. I'm sorry.
14 Q Now, Ms. DePaola asked you something earlier about
15   this meeting, as I understood it, and if my memory
16   is clear, was whether Ms. Corbett asked that a new
17   IEP be prepared. And it's my memory you said she
18   did?
19 A I think she may have. I don't know. I was not at
20   the meeting. At this point in time, I was back at
21   my mother's, again, because my mother was very
22   ill. And Ms. Ross stood in for me.
23 Q Well, do you remember, or do you have a memory of,

Page 244

1   Ms. Corbett asking that a new IEP be prepared at
2   some point after the testing was done this year
3   and before November the 8th?
4 A No, I don't.
5 Q What behavior problems was Gaddies having the last
6   school year, what types of problems?
7 A Okay. He did not want to comply with the teacher
8   whenever she would ask him to sit down. If he
9   wanted to sit down, he would. If he didn't, he
10   would not. He would get up out of his chair every
11   chance he could. At one point, I just sat right
12   close to him so that he wouldn't get up out of his
13   chair. I sat actually right in front of him.
14 Q And did you have problems with his toileting last
15   year, his behavior in the bathroom?
16 A Yes, I did. I had to be in there or Ms. Tate had
17   to be in there at the time he was going to the
18   bathroom, because he was afraid to go into a
19   closed door, is what I assumed.
20 Q Now, work on his toileting is listed on this IEP
21   for this year, isn't it?
22 A Yes, it is.
23 Q And have you done work in that area with Gaddies?

Mary Moore-Wynn    Court Reporting Services    (334) 244-0203

Page 241

1 A No -- in the very beginning, I was, I actually was
2   thinking it was Gaddies' work. But it got to the
3   point where it was improving to the point where it
4   didn't look like Gaddies' writing.
5 Q Did you ever have any discussions with his mother
6   about that?
7 A No, I did not.
8 Q Now, there were some discussions earlier about a
9   book. And there is one book on the table. What
10   do you call this book?
11 A It's a planner.
12 Q Does every student get one at the beginning of
13   this year?
14 A Yes.
15 Q Where is that book supposed to go: from where to
16   where?
17 A To each class in his book bag from one class to
18   the other.
19 Q And then where at the end of the day?
20 A It is supposed to be in his book bag and goes
21   home.
22 Q And then where the next morning?
23 A Back in the book bag to us.

Page 242

1 Q And was there such a book before the one that has
2   been marked as Exhibit 7 for this school year?
3 A For this school year, yes, sir.
4 Q Do you know where it is?
5 A No, I don't.
6 Q Where is it the last time you saw it?
7 A In Gaddies' book bag.
8 Q And do you remember when it went missing?
9 A It was right before -- right around the holidays,
10   and I believe in that book right there it said
11   something about -- around Thanksgiving.
12 Q So, the new book picks up with what date?
13 A Yes. It picks up. From the time of November
14   something -- November 12th, I think.
15 Q So, it was sometime before that one went missing?
16 A Yes.
17 Q Did you see that old progress book anytime after
18   the meeting of the committee on November 8th of
19   2002?
20 A No, not to my recollection.
21 Q There was a meeting on November 8th, 2002 that
22   Ms. DePaola was asking you about, correct? I
23   mean, after all the testing was done.

Mary Moore-Wynn
Court Reporting Services
(334) 244-0203

Page 245

1  A  I have not.
2  Q  None at all?
3  A  I have got -- I have tried to get him to go into
4  the bathroom, yes, once, because he said he had to
5  go. But other than that, Ms. Selmar --
6  Q  Not interested in what Ms. Selmar has done.
7  Interested in what you have done
8  A  No.
9  Q  All right. Okay. At one point earlier today, you
10  mentioned you had him for your hour between 7:30
11  and 9:30.
12  A  Yes.
13  Q  That's two hours. When is Gaddies in your class
14  this year?
15  A  From 7:30 to 9:30 or as soon as he gets off the
16  bus.
17  Q  Okay. Now, what have you worked with Gaddies on
18  this year, what types of activities?
19  A  All right. Mainly what's in the IEP, which is
20  learning his phone number, which he has done,
21  saying his mother's correct name instead of
22  Cookie, and his father's name, saying his whole
23  name, Gaddies Hill, instead of saying just

Page 246

1  Gaddies. We have -- since he's getting a little
2  bit more mature, we have also worked on sorting by
3  color, counting by color. We have also done
4  prevocational skills, which is going into the
5  kitchen and washing some dishes and him drying, or
6  he washes dishes, and another person dries.
7  Sweeping floors. He works at the cafeteria when
8  Mrs. Tate and Ms. Ross takes him to wash the
9  tables and Ms. Ross takes him to pick up the trays in there and take
10  them where they are supposed to be.
11  Q  Now, in regard to the sorting-type activities that
12  he's worked on, did you ever receive a list of
13  recommendations from a Tammy Hawkins, an
14  occupational therapist?
15  A  Yes, I did.
16  Q  Okay.
17  MR. HOWARD: This is page T39, Susan.
18  I'm going to mark it as Exhibit 11,
19  I guess it would be, the next Board
20  exhibit.
21  MS. DePAOLA: What is the date on it?
22  (Whereupon, Board's Exhibit 11 was
23  marked for identification and is

Mary Moore-Wynn
Court Reporting Services
(334) 244-0203

Page 247

1  attached hereto.)
2  Q  Is that a document you got from Ms. Hawkins last
3  year?
4  A  Yes.
5  Q  And those are activities you worked on with him
6  this year?
7  A  Yes, and last year as soon as I got them.
8  Q  Now, the area where your room is, is there a small
9  kitchen area adjacent to it in some ways similar
10  to what is in the hearing room today?
11  A  Yes.
12  Q  What is in that room adjacent to your teaching
13  room?
14  A  There is a stove, and there is a refrigerator.
15  There is a sink. There is cabinets on two sides
16  of the wall. There are tables in there, because
17  sometimes we do eat on there. There are a washer
18  and a dryer.
19  Q  Now, you mentioned earlier that you had worked
20  with Gaddies on what you characterized as
21  pre-vocational skills, such as washing, drying,
22  sweeping. When did you start doing that?
23  A  I didn't start doing that until second semester,

Page 248

1  because at that point in time is when he showed
2  the maturity that he could do those things.
3  Q  So, all of that was done after Christmas of this
4  year?
5  A  Yes.
6  Q  Now, during the course of the first semester, did
7  you notice improvement in Gaddies' work or
8  performance in class?
9  A  Yes.
10  Q  In what areas?
11  A  Well, his manners improved.
12  Q  Explain what you mean.
13  A  Well, manners like with teachers and others, he
14  would hold up his hand when he needed help. He
15  would stay in his desk instead of getting out of
16  it like he did last year. He would stay in his
17  desk. He would -- let's see. He would tell us
18  whenever he wasn't feeling well.
19  Q  And that was different from last year?
20  A  Yes. Last year, he didn't. We only had to -- he
21  would say he hurt. And he would point to the
22  area.
23  Q  Okay. Continue, please, ma'am.

Mary Moore-Wynn

Page 249

```
 1  A   Do you want -- well, his behavior, you know, has
 2      greatly improved --
 3  Q   Yes, ma'am.
 4  A   -- because now, he doesn't hit people in the
 5      classroom.  He has had less hitting and feeling of
 6      girls in the PE.  He has -- of course, his eating
 7      habits, too, have improved.
 8  Q   How so?
 9  A   Well, he used to eat so fast that he would get
10      choked on his food.  But that has slowed down, or
11      it is whenever I'm present, anyway.
12  Q   Is that something you have worked with him on?
13  A   Yes, it is.
14  Q   How so?
15  A   How so?  Well, we brought him from the cafeteria
16      and into the eating area of the kitchen there in
17      the room where I'm adjacent to last year.  And we
18      worked on that with him by just taking one step --
19      I mean, one bite, putting it down and waiting a
20      few seconds and then taking another bite.
21      His mother also wanted us to work on that.
22  Q   And you mentioned his behavior had improved.  Is
23      that something you had worked on Gaddis with?
```

Page 250

```
 1  A   Yes, I worked on Gaddis with behavior last year
 2      and this year.
 3  Q   How so?
 4  A   Well, trying to get him to know that he cannot hit
 5      people when he's just passing by them.  I think it
 6      was to get attention.  But we finally did get
 7      that --
 8  Q   How did you work with him on that behavior?  What
 9      did you do?
10  A   There were several things I did.  I would put him
11      into another room.  Tell him what he has done
12      wrong.  Put him into another room for about five
13      minutes.  Bring him back and let him
14      apologize to the person.
15      I put him also in a study carrel, so that he
16      wouldn't be bothering anybody when he would get
17      agitated.
18  Q   What other areas have you noticed improvement in?
19  A   Well, he will blow his nose now if we prompt him,
20      or tell him to.  Where before, he would just let
21      it drool down.
22  Q   On his face?
23  A   On his face.
```

Mary Moore-Wynn

Page 251

```
 1  Q   And when did you begin to --
 2  A   We have been working on that last year and this
 3      year.
 4  Q   Okay.  What other areas did you notice improvement
 5      in?
 6  A   He will also wipe his drool now.  If he does
 7      drool, all we have to do is go like this
 8      (indicating), and he will take his handkerchief
 9      out, and he will wipe that.
10      And when he comes into the classroom now, he
11      will shake your hand, or he will give you the high
12      five instead of coming over and hugging you.  We
13      have told him that that was inappropriate.  It
14      took us a while to get that down.
15  Q   Over what period of time did you work with him on
16      that?
17  A   That took a whole year.
18  Q   You mean last year?
19  A   Last year.
20  Q   Go ahead.
21  A   When he came in this year at the very beginning,
22      he came over, and he gave me a high five.  So, I
23      knew I had succeeded.
```

Page 252

```
 1      He can now button or zip his coat or jacket.
 2      He knows now, also, that he cannot wear his hat
 3      inside.  He has to put it inside his book bag.
 4  Q   Is that something you worked with him about?
 5  A   Yes, because he wanted to wear it during class,
 6      because it was his daddy's hat.
 7  Q   During what period of time did you work with him
 8      on that?
 9  A   I would say it probably took us a good six months
10      last year.
11  Q   What other areas has he shown improvement in?
12  A   Okay.  Well, it has been mentioned about his
13      toileting needs.  Well, he can go to the bathroom
14      now without supervision.  Ms. Selmar just stands
15      at the door and watches him go down to the
16      bathroom.
17  Q   Does he go to the bathroom while he's in your
18      class ever?
19  A   No, maybe if there is an accident, but no.
20  Q   Okay.  Go ahead.
21  A   He will wash his hands if prompted.  Sometimes by
22      the time he gets to Ms. Selmar, she will say, did
23      you wash your hands, and he'll say, oops.  He will
```